```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                        Docket 16-cv-07123
 CENGAGE LEARNING,INC., et al.,     :

                  Plaintiffs,       :

   - against -                      :

 BOOK DOG BOOKS, LLC, et al.,       : New York, New York
                                      August 3, 2017
                  Defendants.        :

---------------------------------- :


                    PROCEEDINGS BEFORE
           THE HONORABLE GABRIEL W. GORENSTEIN,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          OPPENHEIM ZEBRAK, LLP
                         BY:  MATTHEW J. OPPENHEIM, ESQ.
                         5225 Wisconsin Ave., NW, Suite 503
                         Washington, D.C.  20015
                         202-480-2999

For the Defendants:      MANDEL BHANDARI, LLP
                         BY:  EVAN MANDEL, ESQ.
                         11 Broadway, Suite 615
                         New York, NY  10013
                         212-269-5600




Transcription Service: Carole Ludwig, Transcription Services
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

                                                                3

        THE CLERK:   The case of Cengage Learning v. Book

Dog Books, docket 16cv7123.  Counsels, please state your

name for the record.

        MR. MATTHEW J. OPPENHEIM:  Good afternoon, Your

Honor, Matt Oppenheim, on behalf of the publisher-

plaintiffs.

        MR. EVAN MANDEL:  Evan Mandel on behalf of the

defendants, Your Honor.

        THE COURT:   Okay, you can be seated if you're

not speaking.  We were originally here on docket 76, to

which there was a response 81.  Was it everyone's view we

should do the other ones too?

        MR. OPPENHEIM:   I believe there are four issues

that are ripe for the court's consideration today.  One is

I believe the one you referred to which is the defendant's

letter motion on search terms.

        THE COURT:   Right.

        MR. OPPENHEIM:   Then I also believe that is ripe

the plaintiff's request for, second request really on the

financial documents and source information.

        THE COURT:   That's docket 80.

        MR. OPPENHEIM:   And the third issue is the

protective order issue with respect to Mr. Dimm --

        THE COURT:   That's 79.  So the answer is yes,

```
                                                       4
```

you want to do them all today.

          MR. OPPENHEIM:   Yes, Your Honor, and also I
think the fourth issue is the scheduling issue that you
sent us out to work on last week.

          THE COURT:   Okay.  Well, remind me if I miss
anything.  Okay, well, you know, it's just mindboggling
we're in discovery this late in the case.  But some things
happened last time, Mr. Mandel, that I would think may have
affected your request, so I hope as we go through them
you'll remind me.  If not, I'm sure Mr. Oppenheim will.

          MR. MANDEL:   Of course, Your Honor.

          THE COURT:   Okay.  Search related to defendants.
What's more to be done?

          MR. MANDEL:   There's two issues here, Your
Honor.  Really, both issues relate to which individuals are
going to be searched.  There's no dispute whatsoever
concerning key terms.  We would like all of plaintiffs'
anti-counterfeiting personnel's files to be searched, and
we'd also like sales personnel's files to be searched.

          With respect to anti-counterfeiting personnel,
where we stand in the case is they have not told us who all
their anti-counterfeiting personnel are.  In light of that,
there can be no meaningful discussion, there's been no
meaningful discussion about who should be searched.  But I

5

don't think that discussion would actually be productive because the reality is if their anti-counterfeiting personnel are emailing about the defendants, that's relevant to this case one way or the other.  Those emails either say the defendants are the problem with respect to counterfeiting, the books are coming from them, they're not checking the books, they're not doing a good job, or they're saying that the defendants are the solution. They're saying actually look at this, we just found a trove of counterfeit books because the defendants specifically identified them.  So with respect to all of plaintiffs' anti-counterfeiting personnel, we would like their records searched.

With respect to sales personnel, I understand they've got a lot of sales personnel.  You know, they haven't told us who they are, they haven't given us any organizational charts.  But for purposes of this request, we can agree to limit it to the personnel who are in the groups that deal with the defendants.  And we have no idea how the sales personnel are divided up.  If they're divided up by region, then the region in which the defendants fall would be appropriate.  If there's a group of sales personnel that deal with major distributors in the United States and we would fall under that category, then we'd

1                                                                 6

2  want that group's email searched.

3          But we're willing to live without every single

4  salesperson being searched, just the group or groups that

5  handle the buckets in which the defendants fit.

6          MR. OPPENHEIM:   The arguments change as we get

7  to court, but in any event, as we've informed Mr. Mandel

8  repeatedly, none of the three plaintiff publishers have

9  anti-piracy departments or groups.  They have individuals

10 from different departments who work on anti-piracy matters.

11 All of their files have been searched with the exception of

12 clerk-type personnel that report to the anti-piracy

13 personnel.

14         So all of those searches have been done, and the

15 issue here is he keeps asking, well, who's the anti-piracy

16 group and who's the anti-piracy department, and there is no

17 such thing.  But we have identified them for him and he

18 knows who they are.  That's number one.

19         With respect to the sales groups, as the Court is

20 probably likely aware, there are hundreds, if not

21 thousands, of salespeople at each of these companies, and

22 the idea that Mr. Mandel has put forward repeatedly to us

23 has been that we should search all of them.  Today, he

24 proffers for the first time, well, maybe we'll limit it to

25 those who are involved with the defendant.  This is not

7

1

2   what his request was.  This is the first time this comes

3   up.  And I'm not sure how you would do that.

4        All of this is because he has some theory that

5   maybe a salesperson within the companies has a different

6   view of the defendants on the counterfeiting issues than

7   the anti-counterfeiting people.  But he has no basis to

8   believe that such a thing exists, and, in fact, I highly

9   doubt it does because the sales personnel don't have any

10  involvement in anti-counterfeiting issues.  It would be –

11  it is not relevant, it is burdensome, and it is

12  disproportionate, Your Honor.

13        THE COURT:  Anything else, Mr. Mandel?

14        MR. MANDEL:  We would just ask that the clerks

15  be searched.  A lot of the work is done by clerks.  This is

16  relatively low-level work.  It's tracking down books one at

17  a time figuring out if they're counterfeit and then going

18  to figure out what the source is, and that is not something

19  the higher level people do.  So I have no idea what the

20  plaintiffs mean when they say clerks, but it sounds like

21  paralegals and a lot of the – we've received less than 50

22  emails in the case, and a lot of those are from paralegals.

23  So we would ask that the clerks be searched.

24        And the second point with respect to sales

25  personnel, the defendants and their affiliates sell two

1                                                                    8

2  million books a year in the United States.  There's

3  certainly a group at the plaintiffs that cover either the

4  defendants or companies like the defendants, and I think

5  we're entitled to know what those people are saying about

6  the defendants.

7          THE COURT:   All right, I find the search is

8  adequate based on the representations made by defendants.

9  What's next?

10          MR. OPPENHEIM:   Your Honor, are you ruling that

11  we should be searching --

12          THE COURT:   I'm sorry, by plaintiffs.  I

13  apologize.

14          MR. MANDEL:   Okay, so the second issue is the

15  source and the legitimacy of the titles at issue in this

16  case.  It's search B.  Here, plaintiffs seek emails about

17  how difficult or easy it is to discern authentic copies

18  from counterfeit copies of the titles at issue in this

19  case.  It obviously goes directly to willfulness.  It also

20  goes directly to the issue of whether the books at issue in

21  this case are counterfeit.  Plaintiffs have proffered their

22  own in-house employees are experts on the issue of whether

23  the books are counterfeit or not --

24          THE COURT:   Well, stop, stop, stop.  When you

25  say they've proffered them as experts, what do you mean by

                                                              9

1

2  that?

3         MR. MANDEL:   They've given us expert reports.

4  The only expert reports they've given us --

5         THE COURT:   Okay, so they have expert reports,

6  and you're going to have an opportunity to depose those

7  experts --

8         MR. MANDEL:   Sure.

9         THE COURT:   -- as to what they think are

10  appropriate – they're experts on what specific topic?

11  Whether the books at issue are counterfeit or not?

12         MR. MANDEL:   Exactly.

13         THE COURT:   Okay.  So there's a very clear

14  method in the rules by which one probes experts.  You find

15  out what they relied on, you depose them, and so forth.

16  What are we adding to this?

17         MR. MANDEL:   Sure.  If these experts are sending

18  emails, let's say they have no idea whether a copy --

19         THE COURT:   You're looking for impeachment of

20  the experts.

21         MR. MANDEL:   Well, yes, we're looking –

22  absolutely, we're looking for impeachment of the experts.

23  We're also looking for emails from other – this group is

24  anti-counterfeiting personnel.  It's not just the experts

25  in the case.  So if the expert is saying – just sort of

moving along.  I think the only dispute here, there's no
relevance dispute; I think the issue is privilege.  They're
saying documents concerning whether a book is or is not
counterfeit is privileged, and just to be clear, we're only
seeking correspondence about the titles at issue in this
case.  We're not seeking correspondence about other titles.
So if there are emails about the titles at issue in this
case that say we have no idea whether this book is or is
not counterfeit, I think that's very probative to this
case.

            But in any event, their argument is privilege --

            THE COURT:  Okay, well, that I understand.
That's not a matter of expertise, but go ahead.  There are
emails saying that the books are or are not counterfeit.
Go ahead.

            MR. MANDEL:  Sure.  So the reality is the
plaintiffs spend a lot of time inspecting books to see if
they're counterfeit.  That's completely separate and apart
from litigation.  For a lot of distributors plaintiffs are
willing to have the distribute send them a book, the
plaintiffs will inspect it, and the plaintiffs will let
that distributor know whether the book is or is not
counterfeit.

            Similarly, plaintiffs conduct a lot of friendly

1  inspections that have nothing to do with the litigation

2  whatsoever.  Often they're at the distributors' facilities,

3  and at those inspections those --

4  

5         THE COURT:  So you want to find out if they

6  found other exemplars of the books at issue in this case in

7  the hands of other people that were counterfeit, is that --

8         MR. MANDEL:  No, Your Honor – well, that's not

9  really the focus here.  That was the focus of a separate

10  request that the Court has addressed.  The point here is

11  they've come in with their side of the story which is we

12  can always tell when a book is or is not counterfeit.  And

13  we know, we're absolutely certain that the exemplars we've

14  got in this case are counterfeit.  If they're sending

15  emails just about the titles in this case that say we have

16  no idea whether other copies of the titles are issue in

17  this case are counterfeit --

18         THE COURT:   Other copies.

19         MR. MANDEL:  Other copies of the titles at issue

20  in this case.  Just the titles at issue in this case.

21         THE COURT:   Okay.

22         MR. MANDEL:  So their objection is a privilege

23  objection, and I don't think the overwhelming majority of

24  these emails are going to fit within any privilege.  When

25  they're just agreeing to perform a service for

```
 1                                                    12
 2    distributors, you send us a book, we'll inspect the book,
 3    determine if it's counterfeit or not, that is not – there's
 4    nothing privileged about that determination.  And if
 5    there's communications about that determination, that's
 6    directly relevant to the case.
 7              THE COURT:   Is this a privilege issue for you?
 8              MR. OPPENHEIM:   No, Mr. Mandel could not have
 9    misstated our position any more.
10              THE COURT:   Well, feel free to state your own
11    positions.
12              MR. OPPENHEIM:   Thank you, Your Honor.  And I
13    also, his factual recitation of what the plaintiffs do is
14    also inaccurate again.
15              These search requests have to be tied to a
16    request for a production, and this Court has already ruled
17    on the two issues related to this search request.  This
18    Court was previously asked whether or not the defendants
19    could get discovery into the plaintiffs' other anti-
20    counterfeiting investigations and other audits.  And this
21    Court ruled no in the first instance, and on the second
22    one, if we had a completed audit, we would produce the
23    results of the completed audit.  But that was the extent of
24    it, and Your Honor specifically indicated that -
25              THE COURT:   This was in May, right?
```

1

2          MR. OPPENHEIM:   I believe part of it was in

3   February and part was in May, Your Honor, yes.  If you –

4   and I hate to do this, but if you turn to the actual search

5   request that Mr. Mandel is seeking here which is on exhibit

6   B of his file, which is document 76 I believe.

7          (pause in proceeding)

8          MR. OPPENHEIM:   And if you look at – I'm sorry.

9          THE COURT:   You have to hold – for whatever

10  reason I don't seem to get courtesy copies from some people

11  sometimes.

12         MR. OPPENHEIM:   My apologies, Your Honor, I

13  didn't bring an extra copy of this.

14         THE COURT:   That's all right.  Oh, exhibit D is

15  the search terms.

16         MR. OPPENHEIM:   Yes, Your Honor.

17         THE COURT:   Yeah, I printed that out, hold on.

18         MR. OPPENHEIM:   I can hand you my copy just to

19  reference it if that's helpful.

20         THE COURT:   No, no, I have it.  Hold on a

21  second.  I thought you were going to point me to a document

22  request.

23         MR. OPPENHEIM:   No, Your Honor.

24         THE COURT:   Okay, go ahead.

25         MR. OPPENHEIM:   So if you look at what the

14

defendants are seeking out of search here, in the search

terms, they are, they've essentially captured for each of

the titles in the case a key word for the title, the ISBN

which is the SKU for the book, and the author.  And they

want the plaintiffs to search every piracy person's files

for any document related to any of these books.

Well, as we've discussed at prior hearings, there

are other counterfeits of these books involved in other

cases.  In fact, some of them are cases before Judge Pauley

potentially, or other judges in this court.  And this

Court's already ruled that all of those investigations are

not part of this case.  They're not relevant.  It's

disproportionate.  And Mr. Mandel's seeking to obtain what

this Court has already excluded from the discovery process.

He hasn't connected it to a different document request.

We've asked him repeatedly what request for production is

this associated with, and he will not answer us.

THE COURT:  Did I not rule on this?

MR. MANDEL:  Your Honor, no, you ruled on a

totally different request.  I believe it's page - I have to

double-check my notes.  But the request that Your Honor

ruled on was for inspection results of the plaintiffs, you

know, we were looking at - there's a long discussion about

CHEGG and we gave up a spreadsheet --

1

2          THE COURT:   Long discussion of?

3          MR. MANDEL:   Plaintiffs' results of large

4    inspections.  So when they inspect large numbers of

5    inspections, that was something we considered.  Your Honor

6    said have them produce some subset of them, and then you

7    can come back to me if you want more.  The parties are

8    still discussing whether they produced the inspection

9    results.  This is a totally different – we're seeking

10   emails for a totally different purpose.

11          The purpose we're seeking emails here are to see

12   if the plaintiffs, like they claim, really can tell the

13   difference between a counterfeit book and authentic book.

14   It is fine for their experts to walk into court and say

15   that I am certain that the copies at issues in this case

16   are counterfeit, but if they're sending emails about other

17   copies of that same title that say I have no idea whether

18   this is counterfeit or not, we're entitled to that document

19   and there is no other way that we can --

20          THE COURT:   But why since we don't – it's not

21   the – the assumption seems to be there's one counterfeiter

22   out there.  If it's not the counterfeit in this case, I

23   mean who knows if it's of the slightest relevance at all.

24          MR. MANDEL:   Well, I think that is a trial

25   question.  I don't think that's a relevancy question.

1

2  They're saying they can tell the difference between --

3         THE COURT:  Well, it's a proportionality and

4  burden question.  So if there was only one counterfeiter in

5  the universe, I might understand this, but there's not.  So

6  if they find a counterfeit copy of this book in some other

7  country with some other distributor, what's that got to do

8  with anything?  And let's say they say, oh, you know, boy,

9  this one was hard to tell, I mean you're not going to get

10 the book; you're going to have some emails.  It's not going

11 to do you any good.

12        MR. MANDEL:  Well, we might be able to get the

13 book because they've assured, you know, their position is

14 that all this kind of information needs to be preserved.

15        Look, I agree, if there were a way to limit this

16 request to just those books that look like the books at

17 issue in our case, we'd be happy to have that limitation on

18 it.  But the reality is --

19        THE COURT:  Well, the thing to do is to limit it

20 to the books in your case which would be to have this in

21 combination with your name, but I think we're probably

22 getting that through some other search.

23        MR. MANDEL:  Well, they would say all of those

24 are privileged, Your Honor, I think.  What we're really

25 looking for --

17

THE COURT:   I'm not dealing with any privilege issues.  As documents turn up that are responsive to your request that I said they have to produce and it's privileged, they've got to do a log.

MR. MANDEL:   I appreciate that, Your Honor.  So we don't think this is overboard.  We don't think there's going to be a million emails that discuss whether books, you know, the 25 or so titles at issue in this case are or are not counterfeit.  They've just told us that they only have a handful of anti-counterfeiting personnel, so we're not asking for a large number of emails to be searched.  We're not asking for a large number of titles to be searched.  And we really have no other way of impeaching their experts other than saying, you know, actually it's not the case that you can always tell the difference between what is and is not counterfeit.

THE COURT:   All right, putting aside the issue of the stronger showing in my view that must be made for a generic search for impeachment evidence, this is not of sufficient relevance that it justifies any effort on the defendant's part, and the request is denied.  What's next?

MR. MANDEL:   Understood.  C, I think the parties have reached an --

MR. OPPENHEIM:   I'm sorry, you meant on the

18

```
 1   plaintiff's part.
 2          THE COURT:  I keep doing - you know what,
 3   because you guys are reverse from the way everyone else
 4   sits.  I usually have plaintiffs on this side and
 5   defendants on this side.  So I apologize.  If I do that
 6   again, tell me.
 7          MR. MANDEL:  Would you like us to sit in a
 8   different way?
 9          THE COURT:  No, no, it's my job to try to learn.
10          MR. MANDEL:  I always thought the plaintiff was
11   supposed to sit closest to the jury, so perhaps that's my
12   fault, Your Honor.
13          MR. OPPENHEIM:  I apologize, I did too.
14          THE COURT:  Well, no, I --
15          MR. OPPENHEIM:  Mr. Mandel and I agree on
16   something.
17          THE COURT:  I don't know what it is, maybe other
18   people are doing things differently.
19          MR. OPPENHEIM:  And Judge Pauley always makes me
20   sit on the left as the plaintiff.
21          THE COURT:  Where you are now.
22          MR. OPPENHEIM:  Where I am now.
23          THE COURT:  I think it depends on where the
24   clerk puts you.
```

1

2          MR. OPPENHEIM:   That may be.

3          MR. MANDEL:   There's no dispute at this time

4   with respect to search C which is searches related to

5   printing defects.  The Court addressed that in part at last

6   week's session, and I think we've been able to resolve

7   that.  If not, we will come back to the Court.

8          That brings us to search D, searches related to

9   plaintiffs' receipt and processing of suspect copies of the

10   titles at issue in this case.  There's no dispute with

11   respect to search terms, and the custodians are limited to

12   those groups involved in receiving books.

13          There's two instances of relevance here.  The

14   first is the sale doctrine --

15          THE COURT:   Hold on, hold on.  What's in

16   dispute?  I'm sorry.  You told me what wasn't in dispute.

17   You said there was a dispute as to custodians?  What're you

18   telling about this?

19          MR. MANDEL:   Sure.  Well, let me rephrase that.

20   They have not proposed alternative search terms.  They

21   don't want to run the search at all.  But there's no

22   specific dispute as to whether these terms are appropriate

23   or inappropriate.  And similarly with respect to the

24   custodians, they don't want to run the search at all, but

25   there's no - it's not like they've counter-proposed a

20

1

2  separate set of custodians.  I think it's pretty binary.

3          THE COURT:   I felt they were objecting to the

4  relevance of this.  Should we talk about this relevance

5  first?

6          MR. MANDEL:   Sure.  I think there's two issues

7  with respect to relevance.  The first is the first sale

8  doctrine defense.  As the Court is aware, plaintiffs

9  receive a massive number of books that they sell back in

10  return.  It could be something like, we don't know, it's

11  proprietary, but it could easily be something like 20

12  percent of the books they sell they get back, those copies

13  that they sell.  They inspect them or they don't inspect

14  them.  And then they sell them a second time.

15          Now, because in the industry in the United States

16  books are commingled, when the plaintiffs sell their, say

17  they sell 100,000 books to Acme, Acme puts those 100,000

18  books on a shelf.  Some of the books came from plaintiffs,

19  some of the books came from other sources.  At the end of

20  the semester or after the beginning of the semester,

21  whenever returns happen, Acme returns 20,000 books to the

22  plaintiffs, the books that Acme is returning are not

23  necessarily the books, the same books that plaintiffs sold

24  to them.

25          We covered this issue earlier in the case.  They

```
 1                                                    21
 2  were required to produce inspection procedures.
 3          THE COURT:    Right, right, I remember this, okay.
 4          MR. MANDEL:    Yes, it goes to two issues.  The
 5  first is the --
 6          THE COURT:    No, what is it that - I assume
 7  they're agreeing to produce the procedure.  So what is it
 8  they haven't produced?  What's the issue?
 9          MR. MANDEL:    Well, they produced virtually
10  nothing.  They produced maybe one --
11          THE COURT:    Maybe they don't have any written
12  procedures.
13          MR. MANDEL:    Well, and if that's their story in
14  depositions, that's fine, of course.  But we're entitled to
15  see, if there's no procedures, that they're all going to
16  testify we followed these procedures, we're entitled to see
17  what their actual inspection practices are.  And the
18  relevance is twofold.  First, it goes to the first sale
19  document defense.  It very well may be the counterfeit
20  books they're claiming we sold, that we actually directly
21  or indirectly, more likely indirectly, received from them.
22  So, in other words, plaintiff Cengage sells 100,000 books
23  of Campbell on Biology to Acme.  It receives 20,000 of
24  those books back.  Two thousand of those 20,000 books it
25  received are counterfeit.  Cengage then resells those 2,000
```

1

2  copies to, say, the Apple Company, Apple Book Distribution,

3  and the defendants in turn purchase them from Apple Book

4  Distribution.

5        If the books that are at issue in this case were

6  actually sold by plaintiffs, there's the first sale

7  doctrine defense.  And they have admitted in this case that

8  they have received counterfeit books back from returns.

9  They --

10        THE COURT:  So the theory – I'm just trying to

11  understand what – the theory is not related to this

12  particular book but some generic concept that they don't,

13  they're not perfect in their inspection of the books.  They

14  resell a set of books they weren't perfect about.

15  Therefore, there could be counterfeits; therefore, it

16  could've gone to us.

17        MR. MANDEL:   More or less.

18        THE COURT:   That's the theory, right.  Okay.

19        MR. MANDEL:   That's the first sale doctrine

20  defense.  That's the first instance of relevance.

21        The second instance of relevance is simply it

22  goes to willfulness.  If our inspection procedures are far

23  better than the plaintiffs' inspection procedures and

24  practices, we should be entitled to argue to the jury, you

25  know what, we know we do a good job and we know they think

23

we do a good job because we actually do a much better job
than they do.

THE COURT:   But I think I already said that they
need to tell you what their practice are about inspections.
So that's not in dispute I assume.

MR. MANDEL:   Your Honor is exactly right.   The
problem is they produced virtually no documents.

THE COURT:   Well, so maybe they don't – they
have nothing written down, and you can make all the hay out
of that you want.   Maybe you can make a lot.

MR. MANDEL:   Well, I think we will be able to
make a lot of hay out of that, but I think we're entitled
to their emails.   I don't think we should be forced to take
their word for it.   They're going to come into depositions
and they're going to say we do A and B and C when we
inspect, and if their emails show, no, they don't do A and
B and C, we're entitled to those emails.   In other words,
if their inspection practice is irrelevant, then we're
entitled to an email search to see what their inspection
practices are, particularly when they produce virtually no
inspection procedures.   So that's why we think we're
entitled to these documents.

THE COURT:   Okay, and this is now tied to a
particular search of particular custodians and particular

24

1   terms?

2         MR. MANDEL:   Yes, it's search D in the exhibit

3   to our – and as I point out, they haven't made any specific

4   – they haven't said we want to do a different search.

5   Their point is we don't want to do any search at all under

6   any circumstances.

7         MR. OPPENHEIM:   May I, Your Honor?

8         THE COURT:   Yeah.

9         MR. OPPENHEIM:   Factually, there's so much Mr.

10  Mandel put out there that's incorrect it's hard to even

11  begin.  I'll just – for the benefit of the Court, I hope

12  the Court won't necessarily assume it's all true since of

13  it's been put forward in any kind of declaration or

14  affidavit.  And to the extent that he has some confidential

15  source, as he indicates in his papers that he does, that

16  gives some baseline for what he's saying, I sure hope that

17  he would disclose his Rule 26 disclosures to us and tell us

18  what that is.

19        Now, having said that, if you feel like this is

20  déjà vu all over again, Your Honor, you're right, because

21  we had this exact same discussion, and on May 11, Your

22  Honor, you specifically had a back and forth with Mr.

23  Mandel where he agreed to limit his request to the policies

24  and procedures and forwent email searches.  So we've had

this discussion, it's been litigated before you, you came

to a conclusion, we agreed to produce the documents.  We've

searched for them.  We are continuing to look for them.  I

actually was just informed that one was recently created

that will be produced.

But, Your Honor, if he wants to relitigate the

issue, he should not do it in this manner.  He should come

forward with the request for production that he asked and

Your Honor's ruling on it and say a motion for

reconsideration and do it that way, not – this is a wolf in

sheep's clothing, Your Honor.

THE COURT:   So is this number 12?  Is this the

email search for purposes of document request number 12

which is the number that's referred to in the transcript

from May?

MR. MANDEL:   Just looking, Your Honor.

(pause in proceeding)

MR. MANDEL:   It's certainly within 12.  I don't

know whether it's also within others.

THE COURT:   So why are we doing this again?

MR. MANDEL:   Well, what happened before was we

thought they would have comprehensive procedures, and we

would see the comprehensive procedures, and we would be

able to examine them on those procedures.

1

2          THE COURT:   This is better than that.   They have

3    no comprehensive procedures.

4          MR. MANDEL:   I agree, although it now sounds

5    like they creating one for purposes of this case.

6          THE COURT:   Well, then I'm sure you can make hay

7    out of that too.

8          MR. MANDEL:   Yeah, I think that's right.   But,

9    Judge, they have produced less than 50 emails in this case.

10   They have claimed that they're going to receive tens of

11   millions of dollars in damages at trial.   And I've never

12   heard of a case in which you can claim you're going to

13   recover tens of millions of dollars and produce less than

14   50 emails.   There's no dispute whatsoever that these

15   documents are relevant.   They're just saying they don't

16   want to perform the search because of either

17   proportionality or burdensomeness, and respectfully, it

18   cannot be the case that the defendants are forced to go to

19   trial with less than 50 of plaintiffs' emails.

20         MR. OPPENHEIM:   Your Honor, may I on three

21   points?

22         THE COURT:   Go ahead.

23         MR. OPPENHEIM:   One, he keeps referring to what

24   we've, our settlement discussions.   Let's leave that out of

25   the discovery proceedings.   Those are settlement

27

discussions.  Two, the 50 emails that we've produced, he makes no mention of the many, many other documents that we've produced outside of emails.

Three, there's a huge relevance issue here.  This notion of a first sale doctrine on these books just doesn't connect.  Let's think about it, Your Honor.  Let's say that a customer returns books and fraudulently includes counterfeit books that they send back to the publisher.  And let's say the publisher doesn't catch those books and they get reshelved.  And let's --

THE COURT:  I'm sorry, why are we talking first sale?

MR. OPPENHEIM:  Well, that's what he was referring to.  That was the entire basis --

THE COURT:  All right, okay.

MR. OPPENHEIM:  -- for his argument.  So he --

THE COURT:  Listen, let's don't worry about this.

MR. OPPENHEIM:  Sorry.

THE COURT:  I can't do these things twice.  I limited this to the policies and procedures.  To me there couldn't be anything better from plaintiff than if there aren't such policies and procedures, and he can make tons of - I don't know why we're revisiting this just because

28

the production didn't turn out the way it was expected.

MR. MANDEL:  To be clear, Your Honor, Your Honor did not in any way rule that this was limited to policies and procedures.  At that time, we were only seeking policies and procedures.  When we didn't receive any or we received virtually none, we decided we need to do an email search.

THE COURT:  You said you'd be happy – I was in the middle of another marathon multi-hour session with you folks.  We go through each of the requests.  You start off by saying I'm going to limit number 12 to the following, and then that's it.  Okay?  We can't keep doing this twice. Next issue.

MR. MANDEL:  Okay, that brings us to search E which is the standards for discerning counterfeit books. You know, their in-house experts, as we were talking about a little earlier, have testified that they can discern the difference between a counterfeit and authentic book by doing X and Y and Z --

THE COURT:  Hold on a second.

(pause in proceeding)

THE COURT:  Go ahead.

MR. MANDEL:  They've produced, the plaintiffs have produced virtually no documents on that subject.  As a

29

result, we want to look at their emails to see whether

their anti-counterfeiting personnel are saying that they

used this method that they testified that they used or they

use a completely different method for determining whether

the books are counterfeit.  Similarly --

THE COURT:  Isn't this the same thing what we

just did?

MR. MANDEL:  No, this is much more narrow

search.  The search before that we were discussing was

looking at the titles at issue in this case.  The search

here is looking at the methods and practices that the anti-

counterfeiting personnel used to discern the difference --

THE COURT:  Isn't this the same answer as

before?  This is number 12 again, isn't it?

MR. MANDEL:  No, number 12 is people who inspect

incoming books.  In other words, the returns issue.  This

is the anti-counterfeiting personnel.  They're similar –

it's a similar issue, and I understand where the Court is

coming from, but this is a totally different search, and

this search is limited to anti-counterfeiting personnel to

determine what their methods and practices are for

examining whether a book is or is not counterfeit.

THE COURT:  Which I assume I've required them to

produce, if there were procedures and standards and so

forth.  And they produced nothing, and you want to see if

there's emails that talk about it.

      MR. MANDEL:  Yeah, we want to see if there's

emails that say here's how you tell the difference between

a counterfeit and an authentic book.  Because if those

emails are, you know, we're entitled to those emails.

      MR. OPPENHEIM:  Your Honor --

      THE COURT:  Hold on.

      MR. OPPENHEIM:  I'm sorry.

      (pause in proceeding)

      THE COURT:  All right, go ahead.

      MR. OPPENHEIM:  You asked the question isn't

this related to document request 12, and the answer is yes.

If you look at defendants' own submission to you, document

number 76, they quote from the transcript, yes, number 12

seeks their documents.  Now, we've asked them is there

another basis for this request that the Court, right, we've

had this back and forth with them.  We, by the way, Your

Honor, prior to this letter being filed, agreed to search

many terms and many custodians.  What you're getting now

are the things that we said this is out of bounds.  We

asked that it's connected to search requests, or to

requests for production that the Court hadn't ruled on or

hadn't ruled against.  They didn't do it.  You've ruled on

1
2  this, Your Honor.

3          And this search, by the way, if you look at the

4  terms included, is so incredibly broad and burdensome --

5          THE COURT:  Did you say he did the search

6  already for some people?

7          MR. MANDEL:  No, Your Honor, they've not done

8  any searches at all --

9          THE COURT:  I'm sorry, I misunderstood.  I just

10  --

11          MR. MANDEL:  -- except for a search of the

12  defendants' names.  That is the only search they have run,

13  and they produced less than 50 emails.

14          THE COURT:  Okay.

15          MR. OPPENHEIM:  Your Honor, so the search terms

16  that they've requested would pull up a mass of documents

17  having absolutely to do with what Mr. Mandel is looking

18  for.  Just look, they want us to search the term test.

19  Pierson is the largest testing company in the world --

20          THE COURT:  Let's - talking about a search term

21  whether we haven't done the big picture yet.

22          MR. OPPENHEIM:  I'm sorry.

23          THE COURT:  So let's not worry about search

24  terms yet.  Let's talk about - I don't know why I'm unable

25  to distinguish it, but it seems to me that, and you quote

32

the very thing, Mr. Mandel, from the May transcript, it

seems to me that this is exactly what I was speaking about

earlier.  You asked for procedures.  They produced some

very limited thing.  And now you want emails on it.  I

think the fact that it's very limited is only helpful to

you, and that was how the ruling was in May.  Why do we

redo this?

            MR. MANDEL:  We're not redoing this, Your Honor.

Your Honor ordered them to produce these documents, and

then they ran zero searches to find the documents.

            THE COURT:  You think there are policies,

procedures manual, standard operating procedures that exist

that they weren't able to find.

            MR. MANDEL:  I think there are emails that talk

about their practices and methods and procedures for

discerning a counterfeit book from an authentic book, and

they've not made any effort --

            THE COURT:  Well, you haven't deposed any of

these people yet.

            MR. MANDEL:  Correct.

            THE COURT:  Are you going to?

            MR. MANDEL:  Yes.

            THE COURT:  When they are asked, if you know,

Mr. Oppenheim, do you have any standards, procedures,

33

processes in writing for doing this, what're they going to say?

MR. OPPENHEIM:   Your Honor, we've produced the policies, procedures, the manuals that he's asked for. We've gone about trying to identify --

THE COURT:   They're not going to point to anything other than those things?

MR. OPPENHEIM:   No, Your Honor, they're not --

THE COURT:   I mean that's - yeah, go ahead.

MR. OPPENHEIM:   But, Your Honor, of course there are internal experts at the companies who have processes they go through from 30 years of experience in looking at a book, and they'll testify what they do based on 30 years of experience, I'm sure.  So do they have a process that they go through because they've got 30 years?  Yes, the same way Your Honor takes the bench and deals with a court hearing like this based on many years of experience.

THE COURT:   I mean maybe it's a proportionality thing, but I guess, Mr. Oppenheim, I mean if there's some email, if there's some - I mean we're down to the same thing, if there's something that's been sort of set into a form that's meant for repeated use, I mean that's the whole point.  You know, if someone has some one-off system they never disclosed to anyone or mentioned in some email, it

34

doesn't seem to be terribly relevant here.  I think what's

relevant is what can be formulated, and one needs to do a

reasonable search for where those things have been

formulated.  And it's your contention that you can conduct

a reasonable search by saying where those formulations are

kept, is that the idea?

MR. OPPENHEIM:  Yes, Your Honor.

THE COURT:  And where are they, give me a copy.

MR. OPPENHEIM:  In a very old-fashioned way, you

interview your witnesses, you talk to people within your

clients, you find out what they use, what they rely on, you

obtain the documents, and you produce them.  We've done

that, and we're doing that.

THE COURT:  And there are actually documents?

MR. OPPENHEIM:  Yes.

THE COURT:  And so your theory on the emails is

there must be some other things that are going on other

than what they gave you?

MR. MANDEL:  My point, Your Honor, is that

they're communicating with each other about counterfeits,

and we're entitled to know what those emails say about how

you distinguish an authentic book from a counterfeit book.

I really – stepping back to the sort of what I believe is a

very serious injustice here, the idea that we would be

1

2  forced to go to trial on this case, which they say is very,

3  very serious allegations where it's potentially $150,000

4  they're arguing – we don't believe that that's possible –

5  but they're saying it's $150,000 per work, and there's over

6  20 works at issue in this case.  There's 140 works at issue

7  in the other case.  That we've literally received less than

8  50 emails.  And with respect to each of these issues, what

9  the Court is saying is we have to accept their party line,

10  and they do it, they --

11         THE COURT:   You're confusing things.  Let's do

12  them one at a time.  I mean when someone is being accused

13  of a tort, it's actually quite common that the plaintiff

14  doesn't really have evidence of what's going on.  That's

15  actually not that strange.  I don't think we can just say,

16  oh, there's millions at stake in this case; therefore, they

17  must have emails that are relevant to explaining why I

18  committed no tort.  So I know you said it a few times, and

19  I don't want it to be left hanging out in the record.   I

20  completely reject the notion that there's some assumption

21  that because a large amount of money is at stake, that a

22  plaintiff alleging a tort necessarily has documents that

23  are relevant to that.  So let me put that to bed.

24         You were starting to go onto another larger

25  point, but go ahead.

 1

 2          MR. MANDEL:   May I just address that point, Your

 3  Honor, for a moment?

 4          THE COURT:   Go ahead.

 5          MR. MANDEL:   I agree that this is – that if

 6  there were a slip and fall case or a civil rights case,

 7  that very well may be the case.  There's lots of tort cases

 8  where the plaintiff wouldn't be expected to have documents.

 9  However, here, the plaintiffs are proffering that they're

10  the ones who can tell the difference between the

11  counterfeit and an authentic book; yet they're not willing

12  to tell us anything about how --

13          THE COURT:   That's not the theory of the case.

14  The theory of the case is that only the plaintiffs could do

15  it; the theory of the case is that anybody should be able

16  to do it and that you're going to have to prove why anybody

17  should've been able to do it.  Now, you want to use them as

18  an example, and I understand why you want to do that, but,

19  in fact, this is an objective test, and whether it's

20  possible to do that certainly could be looked at by whether

21  these plaintiffs did it or, frankly, any publisher did it.

22  You could be subpoenaing other publishers to find out their

23  counterfeiting methods.  Now, I might not be a –

24  counterfeit detection methods.

25          I might not be that happy to burden another

1

2  person in the way I would the plaintiffs, but it's not a

3  necessary element of their case or your defense to show

4  what it is they did.  If they were not in the business of

5  buying books at all, you would have zero.  You buying back

6  or taking back books at all, there would be zero evidence

7  on their part.  They would just be putting it in the

8  marketplace and that would be that.

9          MR. MANDEL:   Sure, I think we're – I understand

10  where the Court is coming from, and I think the Court's

11  point there addresses some of the prior requests.  But this

12  request is geared specifically towards the anti-

13  counterfeiting group, and the question is when the anti-

14  counterfeiting group is thinking about how to tell the

15  difference between a counterfeit and an authentic book, and

16  I think they're doing it in a way that's totally different

17  than the receiving group.

18          So just setting the receiving group aside, these

19  people --

20          THE COURT:   Who are these people?

21          MR. MANDEL:   They're --

22          THE COURT:   What're their jobs?

23          MR. MANDEL:   They are, some of them will make

24  test orders from distributors to see if the book that they

25  get when they place the test order is or is not

1   counterfeit.  Some of them, their job is to serve as an

2   expert witness in cases like this.  Others play other

3   roles, they attend these inspections that they do at the

4   distributors.  They will be the ones who, when a

5   distributor sends them a book and says, hey, we don't know

6   whether this is counterfeit or not, is it, they will be the

7   ones who inspect that book.  Those are the people's emails

8   we want to see, not with respect to what their general

9   procedure is for checking books, but with respect to

10  specifically what methods do they use for distinguishing a

11  counterfeit from an authentic book.

12          And I think that goes to the absolute heart of

13  this case.  One of the elements of the case is are the

14  books counterfeit, and they've decided that they're going

15  to use their own in-house testimony to say whether the

16  books are or are not counterfeit.  And if those people and

17  the people who work in the office next to them are emailing

18  each other saying I know we testi – I'm sorry, Your Honor.

19          THE COURT:  Go ahead.  No, keep going.

20          MR. MANDEL:   I know we testified that we used,

21  that X, Y, and Z means that it's counterfeit, but the day

22  before I sent another email that said X, Y, and Z doesn't

23  tell you whether or not --

24          THE COURT:   We're kind of back to searching for

1

2 impeachment.  I'm trying to think what you could get out of

3 – it seems to me if I want to know what these people say

4 I'm supposed to have done and what makes it so obvious a

5 book is counterfeit, I would have a 30(b)(6) or ask for

6 what are your formulated policies and procedures, and then

7 I'd look at them and say, you know what, now I know what it

8 is they think.

9           So what you're telling me is, okay, that's not

10 enough, it's not enough for me to ask that question.  I

11 want to see, I just want to do discovery to see if they're

12 lying.  I don't know that you get that.

13           MR. OPPENHEIM:   May I, Your Honor?

14           MR. MANDEL:   I think we do get that, Your Honor.

15           THE COURT:   You think you do get – you get –

16 this is discovery just to see if what they're going to say

17 in the deposition about these general policies for telling

18 when books are counterfeit or not, whether, in fact,

19 they're lying about it.

20           MR. MANDEL:   I think with any discovery request

21 you could characterize it is one party lying or telling the

22 truth.  I think the way, respectfully, the fair way to

23 categorize this request is what is the appropriate method

24 for determining whether a book is or is not counterfeit.

25 And if they're emailing each other saying ABC is the

40

method, we're entitled to that whether it's consistent or
inconsistent with their testimony.

MR. OPPENHEIM:   May I, Your Honor.

THE COURT:   And remind me, again, why that
colloquy where I say you get policies, you agreed to go to
policies and procedures, why that's not the end of it.  The
very colloquy you quote.

MR. MANDEL:   That was – that I believe that
colloquy related to inspection procedures for receiving
groups.  That didn't relate to the --

THE COURT:   The people who are sort of the
investigator-prosecutor types, is that what you mean?

MR. MANDEL:   No, when I say the receiving
groups, I mean --

THE COURT:   No, no, it related to those, it
doesn't relate to this group which you view as more like
prosecutor-investigator types, is that it?

MR. MANDEL:   Correct.

THE COURT:   All right, well, you can respond.

MR. OPPENHEIM:   Your Honor --

THE COURT:   So, wait, and so we look through
their emails for search terms that talk about
counterfeiting?  I'm just trying to think how you find the
emails that talk about kind of the generic processes they

1

2    use.  That's, you know, that's the part I'm having a hard

3    time.  Let's say you were suing a bank for not checking the

4    signature on the check, which they're supposed to do, I

5    mean an argument about whether it was their job to see if

6    there was a forgery on the endorsement or your job to find

7    it yourself.  And they have a policy about what you do, and

8    you check for white-outs and this, that, and the other

9    thing for what makes for a bad check.  And banks,

10   apparently unlike these folks, have it really laid out in a

11   written policy.

12          So then someone's going to come to me and say,

13   you know what, I now want emails of all the check people to

14   start finding out ones where they're actually doing some of

15   this.  That's what you're asking me for.  Just to see if

16   there's something other than the policy out there.

17          MR. MANDEL:   I mean I think in that situation

18   the relevant question would perhaps be are the personnel

19   involved checking that specific check complying with the

20   policy, and how far down Your Honor's hypothetical you want

21   me to go, but in that case I think the question would be,

22   you know, is the person who actually checked that check and

23   is that person's manager, are they following the policy or

24   are there a bunch of emails --

25          THE COURT:   But you do that – you want to do

42

 1

 2  that by looking at – I'm just trying to figure out what –

 3  I'm just trying to figure out what hope there is of having

 4  an email search that obtains this kind of information in

 5  some targeted way.

 6          MR. MANDEL:   Sure.  I think search E I think

 7  accomplishes it.  I think now that Your Honor has excluded

 8  some of the other searches, we could add the parties have a

 9  list of words that they've been using for counterfeit, they

10  could add, they could take the search that's here and they

11  could say those words within some number of words of

12  counterfeit, fake, infringing, whatever the words are that

13  the parties have been using, and we could – that would be

14  an extremely targeted search.  So unless the, you know, the

15  words method or policy or process or checklist were right

16  near counterfeit or a similar word, the document would not

17  pop up.  And they've already told us that there's a very

18  tiny number of people at these companies that do anti-

19  counterfeiting work, so it sounds like we're talking about

20  --

21          THE COURT:   But if that's all they do, you're

22  going to get every email they have.

23          MR. OPPENHEIM:   May I, Your Honor.

24          THE COURT:   Go ahead, and then I'll hear from

25  Mr. Mandel again.

43

1

2          MR. OPPENHEIM:   If I may make two points.  The

3   first is Mr. Mandel doesn't get to come in here and make it

4   up as he goes.  He issued search requests.  We've litigated

5   many of those search requests.  We asked him repeatedly in

6   the back and forth prior to his sending this letter to tell

7   us what document request was associated with this search

8   request.  The only reference he makes is in the letter

9   because he didn't tell us in the meet and confer, and that

10  reference is to a document request that Your Honor ruled

11  on, and specifically --

12          THE COURT:   12.

13          MR. OPPENHEIM:   12, and limited to exclude what

14  Mr. Mandel is now seeking.  So this issue has been

15  litigated and resolved and should not be reopened, that's

16  number reopened.  That's number one.

17          Two, this is not novel territory.  There have

18  been tens of thousands of infringement cases over the last

19  decade I am sure, and there is a way you deal with the

20  question of is that work infringing.  We put forward an

21  expert.  They get to examine that expert.  They then get to

22  put forward their own expert --

23          THE COURT:   Right, well, he wants to impeach

24  your expert by saying notwithstanding his statement that

25  here's the policies we follow, in fact, in practice they do

```
 1                                                44
 2   something else.  They don't do it I guess.
 3              MR. OPPENHEIM:   The document request he
 4   references does not go to that, and he doesn't get to make
 5   it up on the fly here, Your Honor.  If he has a new
 6   document request that he wants to posit --
 7              THE COURT:   Well, frankly, I don't even have the
 8   document request in front of me.  So which document request
 9   is this trying to get to?
10              MR. OPPENHEIM:   Well, presumably --
11              THE COURT:   No, it's a question for Mr. Mandel.
12              MR. OPPENHEIM:   Oh, I'm sorry, Your Honor.
13              MR. MANDEL:   16.
14              MR. OPPENHEIM:   Your Honor, I don't have --
15              (interposing)
16              THE COURT:   Would you read it out loud to us.
17              MR. MANDEL:   And we asked him this repeatedly in
18   the meet --
19              THE COURT:   I'm sorry you're blindsided, and if
20   you want to table it, come back, we can do that, but maybe
21   we should try hearing what he says.
22              MR. MANDEL:   16 is "all quality control
23   policies, procedures, or checklists used by plaintiffs,
24   their agents in inspecting textbooks for printing errors."
25   I'm sure there's other requests that go to this, Your
```

45

1   Honor.

2           MR. OPPENHEIM:   Your Honor, I think this issue,

3   he's raised it, he referenced a document request that Your

4   Honor's ruled on.  He's had his bite --

5           THE COURT:   I don't know, did I rule on 16?

6           MR. OPPENHEIM:   No, you ruled on 12, and that's

7   what he references in his letter.  I don't think he gets to

8   change his argument on the fly because --

9           THE COURT:   Well, if you want, I can let him

10  make a new application if he wants.  I don't have deadlines

11  for raising discovery disputes.  Maybe I should.

12          MR. MANDEL:   I think we're putting kind of form

13  over substance here, Your Honor.  We have sent them search

14  requests – when we learned that they only ran a search

15  request for defendants, we sent them multiple sets of

16  search requests.  They refused to run --

17          THE COURT:   No, but I'll tell you something, I'm

18  totally behind Mr. Oppenheim in one point, which is search

19  requests are solely have the purpose of having the

20  searching party conduct a reasonable search for specific

21  document requests.  That's the only purpose of doing an

22  electronic search of a database or of email or anything

23  else.  So it absolutely has to be tied.

24          MR. MANDEL:   I guess I would respectfully

46

 1    disagree with that.  I think a party is permitted to serve

 2    a document request that just contains a search list, and

 3    either the search list is supposed to kick up relevant

 4    documents or it's not.  But I understand --

 5             THE COURT:  I couldn't disagree with you more,

 6    so maybe that's what our disconnect here is.

 7             MR. MANDEL:  Okay, well, look, this issue has

 8    been briefed.  The Court has heard a lot of argument on it.

 9    We could, I could go back to my office today and serve

10    another request, and we could come back here and, you know

11    --

12             THE COURT:  Well, let's talk about it.  What

13    would the request be specifically?

14             MR. MANDEL:  The request would be for

15    communications concerning how to discern a counterfeit book

16    from an authentic book.

17             THE COURT:  Okay, do you want to deal with it

18    now, Mr. Oppenheim, or you want to wait till it's in

19    writing?

20             MR. OPPENHEIM:  Your Honor, I want to see it in

21    writing, I want to look at what you've ruled on before, and

22    have an opportunity to talk to my clients about it and now

23    deal with it on the fly.

24             THE COURT:  All right, I'm going to speed up the

46

 1

 2    disagree with that.  I think a party is permitted to serve

 3    a document request that just contains a search list, and

 4    either the search list is supposed to kick up relevant

 5    documents or it's not.  But I understand --

 6             THE COURT:  I couldn't disagree with you more,

 7    so maybe that's what our disconnect here is.

 8             MR. MANDEL:  Okay, well, look, this issue has

 9    been briefed.  The Court has heard a lot of argument on it.

10    We could, I could go back to my office today and serve

11    another request, and we could come back here and, you know

12    --

13             THE COURT:  Well, let's talk about it.  What

14    would the request be specifically?

15             MR. MANDEL:  The request would be for

16    communications concerning how to discern a counterfeit book

17    from an authentic book.

18             THE COURT:  Okay, do you want to deal with it

19    now, Mr. Oppenheim, or you want to wait till it's in

20    writing?

21             MR. OPPENHEIM:  Your Honor, I want to see it in

22    writing, I want to look at what you've ruled on before, and

23    have an opportunity to talk to my clients about it and now

24    deal with it on the fly.

25             THE COURT:  All right, I'm going to speed up the

47

1

2  process for you to respond to it from 30 days to a week.

3  So as soon as you serve it, he'll respond, and then tee it

4  up again if you have to.

5          MR. MANDEL:   Okay, do you a meet and confer --

6          MR. OPPENHEIM:   Your Honor --

7          THE COURT:   I'm not saying you have to produce

8  the documents in a week.   I just say you have to respond.

9          MR. OPPENHEIM:   Could we make that ten days?   I

10  am trying to take some part of next week off if possible.

11          THE COURT:   No problem, ten days.

12          MR. MANDEL:   And do we need to meet and confer

13  again or have the parties exhausted the issue?

14          THE COURT:   No, you should talk again.

15          MR. MANDEL:   Okay, understood.   All right, that

16  brings us to organizational charts.

17          THE COURT:   Hold on.

18          MR. MANDEL:   Here --

19          THE COURT:   Hold on, hold on.

20          (pause in proceeding)

21          THE COURT:   Go ahead.

22          MR. MANDEL:   I think the issue has been

23  significantly narrowed, you know, during the meet and

24  confers they refused to produce any organizational charts

25  other than the ones they've already produced, which is I

1

2  believe three or four-page pieces of paper.  From what I

3  understand from their response, I think that they're

4  agreeing to produce documents sufficient to show all

5  individuals who performed the following functions.  I know

6  there's some debate about what a group is or is not a

7  group, but who performed the following functions:  anti-

8  counterfeiting, anti-piracy, printing, and receiving

9  incoming books from January 1, 2013 to the present.  Can we

10  first clarify whether I'm correct in understanding that?

11          THE COURT:   Mr. Oppenheim.

12          MR. OPPENHEIM:   I didn't know I was going to be

13  put on the spot to deal with it --

14          THE COURT:   If you aren't able to answer it,

15  tell me.

16          MR. OPPENHEIM:   I know we've agreed, Your Honor,

17  to produce – we have produced some organizational charts.

18  The major hiccup here has been their insistence on an

19  organizational chart for an anti-piracy department which

20  doesn't exist.  We've agreed to provide information, some

21  additional organizational information on the receiving

22  issue --

23          THE COURT:   Is there a way to answer how much --

24          MR. OPPENHEIM:   I can't give a comprehensive

25  answer because I'd have to, on the printing side.  On the

```
 1                                                    49
 2  receiving yes, and on the anti-piracy side yes.  On the
 3  printing, I think everybody who's involved in the printing,
 4  as he articulated it, sounds very broad to me, but I'd have
 5  to check with my colleagues on what we've actually pulled,
 6  because these are publishers, and everybody involved in the
 7  printing process could be a very large endeavor.  I do know
 8  that on the receiving of the printed books we've definitely
 9  done that.
10          THE COURT:   Where does that leave us, Mr.
11  Mandel?
12          MR. MANDEL:   It sounds like there's a dispute
13  with respect to printing.  I'm wracking my brain for some
14  way to try and resolve it, but nothing comes to mind.
15          THE COURT:   I mean are you objecting to
16  producing an organizational chart for printing?  I think
17  that's the question.
18          MR. OPPENHEIM:   Your Honor, I thought this issue
19  had been resolved, and if he's asking for an organizational
20  chart that includes everybody who's involved in printing at
21  the companies, yes, I think we would object --
22          THE COURT:   Organizational charts don't usually
23  include everybody.  They include sort of management and
24  groups and so forth, right?
25          MR. MANDEL:   Well, to be clear, they claim they
```

50

1
2    don't have organizational charts.  So the way I phrased,

3    what I understood they were agreeing in their letter to

4    produce was documents sufficient to show the personnel

5    between January 1, 2013 --

6          THE COURT:   All the personnel?  I mean down to

7    the printer?

8          MR. MANDEL:   Well, they don't do the printing

9    themselves, Your Honor, but yeah, I mean I guess in the

10   printing departments - I mean in the printing departments I

11   guess, in the first instance, we could limit it to

12   managers, documents sufficient to show the managers in all

13   the printing groups.  I would assume our list of deponents

14   will be drawn from managers, but we would, you know, I

15   don't want this to be taken as an agreement by me that for

16   the rest of this case we're never going to insist upon

17   anyone, identifying anyone else in the printing department.

18   This is just at this stage this would be a preliminary

19   production in the hopes of us not having to resolve this

20   issue again.

21         MR. OPPENHEIM:   Your Honor, as I understand it,

22   and I don't have the documents in front of me on this right

23   now, but the printing specifications that were produced

24   very early in this case include on them the individual

25   within the company responsible for the printing of that

```
 1                                                    51
 2  book.  So we've identified that person to them for each of
 3  the --
 4          THE COURT:   There's zero burden here.  Just give
 5  them an organizational chart for these people that'll help
 6  them understand who in the company has what role.
 7          MR. OPPENHEIM:   To the extent we have them, Your
 8  Honor --
 9          THE COURT:   If you have them, yeah.
10          MR. OPPENHEIM:   Yes.
11          MR. MANDEL:   And then the main dispute here is
12  with respect to sales personnel.  I would offer the same
13  limitation I offered earlier, it can be whichever sales
14  groups the defendants fit into.
15          MR. OPPENHEIM:   There's absolutely no relevance
16  to this case, and the sales personnel --
17          THE COURT:   You want to know - just so I
18  understand - the sales, these are people who sell books out
19  in the world?  That's these people's main business I
20  suppose.
21          MR. MANDEL:   Yeah, I mean it would be the people
22  - I assume, and I don't know this, but I assume there are
23  like relationship people in other corporations.  They're
24  the ones responsible for talking with --
25          THE COURT:   Why do you need them?
```

```
 1                                                      52

 2              MR. MANDEL:   And we need them because we believe

 3     that those people are going to say that we are very good at

 4     doing anti-counterfeiting work.

 5              THE COURT:   Based on reputation?  What?

 6              MR. MANDEL:   Based on their experience with us

 7     in the marketplace.

 8              THE COURT:   But you, I mean --

 9              MR. MANDEL:   I should say they have requested

10     from us all of our communications with the sales personnel.

11     They have already raised the issue of whether these --

12              THE COURT:   With their sales – well, don't you

13     know who their sales personnel are?  I mean you deal with

14     them, right?

15              MR. MANDEL:   No, two of the three plaintiffs

16     will not sell us any books.  So with respect to --

17              THE COURT:   Well, then why do you need their

18     sales personnel?

19              MR. MANDEL:   Because they may very well have

20     been saying internally we should be selling books to these

21     people, this is crazy.

22              THE COURT:   This sounds like very hearsay-like

23     and nothing you could ever use as evidence.  How does it

24     get to Rule 26 relevance?

25              MR. MANDEL:   Well, anything they say that's
```

53

within the scope of their job is an admission, and they may

have made fact-specific arguments that are based on

personal knowledge that support the proposition that we're

very good at doing anti-counterfeiting work which we

believe we are.

THE COURT:  This is speculation, and in the

absence of some evidence that, you know, this has ever

happened and, therefore, if some salespeople are saying

that, I want to find out if other salespeople, I mean this

just seems extremely far afield, so I'm denying it.  What's

next?

MR. MANDEL:  That resolves the defendants' --

THE COURT:  Docket 76?

MR. MANDEL:  Yes, thank you, Your Honor.

THE COURT:  Okay.

MR. OPPENHEIM:  I believe we're moving to docket

number 80, Your Honor.

THE COURT:  Well, should we just do their stuff

first or you want to end up with --

MR. OPPENHEIM:  Whichever you prefer, Your

Honor, it makes no difference to me.

THE COURT:  Mr. Mandel, what do you want to do?

MR. MANDEL:  The David Dimm issue is very

important and depositions are upcoming.

```
 1                                                       54
 2          THE COURT:   Well, we're doing everything, so
 3  don't worry.
 4          MR. MANDEL:   Okay.
 5          THE COURT:   But since you're up, let's do it.
 6          MR. MANDEL:   Okay, the bottom line is we cannot
 7  prepare for trial in this case without Mr. Dimm.  Mr. Dimm
 8  has three decades of experience in the book business.  He
 9  started work for the defendants in 2012.  He had a very
10  long career obviously in the book business before he works
11  for defendants.  We fully expect him to have a long career
12  in the book business after he leaves the defendants.
13          They reached out to us and said will you agree to
14  extend the protective order in the Book Dog Book I to this
15  case.  We said if, and only if, Mr. Dimm and another person
16  can see highly confidential documents.  At that time --
17          THE COURT:   Okay, let's - I mean I remember this
18  issue.  Is it your contention that it would be
19  inappropriate to designate particular items as highly
20  confidential - let me phrase it another way.  The original
21  order said that certain material was not going to be
22  produced with people who had decision-making authority over
23  pricing, selection of customers, and selection of
24  distributors because they had some - I remember this - they
25  had some very sensitive sales type data.  Is it your
```

1

2  contention that, putting aside whatever agreements were

3  made or whatever protective order was in place, that this

4  is material that they should not be able to – strike that.

5  That they should not be able to say that a person who has

6  such responsibilities must not look at this very sensitive

7  data.  You're saying, tough, they've got to be able to look

8  at it even if they have those responsibilities?

9           MR. MANDEL:   Yes, Your Honor.

10          THE COURT:   That's the nub of it.  Now there are

11  some procedural things I guess, but that's the main

12  disagreement between the two of you.

13          MR. MANDEL:   Well, I think there's very

14  significant procedural arguments --

15          THE COURT:   Because --

16          MR. MANDEL:   -- but just to get to the merits,

17  which is what you're – I'm sorry, Your Honor.

18          THE COURT:   Because that's obviously a complete

19  turnaround I guess from what the position was in the last

20  case.

21          MR. MANDEL:   That's correct.  I don't know what

22  happened on this issue in the last case.  I can tell you,

23  when I started this case, one of the reasons I got involved

24  in this case was my clients were extremely dissatisfied

25  with the way the case was going, and they felt that because

56

they couldn't see certain documents, they could not mount a
defense. This information is highly technical. It is much
more complicated than you would think looking at it from
the outside. And without Mr. Dimm's participation, we're
not going to be able to prepare for trial.

The substantive limitation Your Honor mentioned
makes no sense for distributors. It might make sense for
publishers, but I doubt it even makes sense for publishers.
I think – I can talk about what I think is going on on
their side. They essentially have an outside law firm that
is so experienced in the area through many years of very
hard work, that they have a lot of the expertise that
someone like Mr. Dimm has. There's only one law firm in
the country that I'm aware of that can say that. So they
may not need anyone on the inside to see the documents to
be able to understand the case.

But from our perspective, what the order says is
anti-counterfeiting people can see everything provided they
don't have responsibility over those three areas. The
problem is your anti-counterfeiting people are necessarily
the ones who decide, hey, we're going to stop buying from
that supplier or we're going to stop selling to that
customer because they're the ones who are looking at the
books, are they authentic, are they counterfeit, we're

57

1  doing the best that we can.  This person has sold us a lot

2  of counterfeit books, suggests maybe they're doing this

3  intentionally.  We need to stop doing business with this

4  person.

5          So from our perspective, the substantive terms of

6  the order make no sense because the person who is chiefly

7  responsible for anti-counterfeiting work over most of this

8  relevant period had to have decision-making responsibility

9  over those areas.

10         THE COURT:   Hold on, I need more help.  I mean I

11 know Mr. Oppenheim is going to say it's too late, you

12 agreed to it, and we may get there.  I don't know yet.  I

13 just want to think about this as, on the merits as if we

14 were looking at it afresh to see what the answer would be.

15 So let's go through that exercise, and then we'll go

16 through the exercise of, you know, whether we're bound by

17 the prior order and so forth.

18         So I still don't understand what kind of data

19 we're talking about, what it's going to be used for, by

20 which party, and then why you need Dimm.  So can you do it

21 that way for me?

22         MR. MANDEL:   Sure.  Let me give Your Honor an

23 example.  In the fall there was a deposition of Chegg.

24 Chegg's a major U.S. distributor.  It's a public company.

1
2   The defendants have perhaps four or five different --

3           THE COURT:   This is a plaintiff?  I'm sorry.

4   Who is this person, Chegg?

5           MR. MANDEL:   Chegg is a third party --

6           THE COURT:   Third party.

7           MR. MANDEL:   They are a major book distributor

8   in the United States.  They're public.  They deal I believe

9   largely --

10          THE COURT:   Who deposed them, you?

11          MR. MANDEL:   We deposed them, yes.  The reason

12  they got involved in the case was the plaintiffs claimed –

13  this was a Book Dog Book I deposition – the plaintiffs

14  claimed that they had obtained books from Chegg that the

15  defendants had sold to Chegg and that those books were

16  counterfeit.  So we were deposing Chegg to see, among other

17  things, did you really get these books from Chegg.  Excuse

18  me, from the defendants.

19          So, again, there's four or five different types

20  of relationships, and the Chegg witness testified we are

21  definitely 100 percent certain that we received the books

22  at issue in this case from the defendants.  And through Mr.

23  Dimm's assistance, I was able to get the Chegg witness to

24  admit that --

25          MR. OPPENHEIM:   Whoa, whoa, are we going to say

                                                                59

1  something that's highly confidential on the record in

2  public?

3              THE COURT:   Well, actually --

4              MR. MANDEL:   No, not at all.  It's not going to

5  refer to any specific title.  It's just going to refer to a

6  channel of relationships between Chegg and Book Dog Books.

7  I cannot imagine --

8              THE COURT:   I'm willing to go off the record

9  just for a second.  Hold on.

10             (off the record)

11             (on the record)

12             THE COURT:   Okay, the transcripts are never

13 filed publicly.  There's always a period you can give me a

14 redacted version.  I just need to understand what's going

15 on, what this highly confidential material is and why it's

16 important for the case.  Go ahead.

17             MR. MANDEL:   Sure.  So Chegg, this witness

18 testified that these books definitely came directly from

19 defendants to Chegg.  With Mr. Dimm's assistance, we were

20 able to get the witness to admit that that was not the

21 case.  With respect to most of the books, they went through

22 a very separate, very unusual channel, one that I never

23 could've imagined, and I can briefly explain that channel -

24 -

1                                                              60

2              THE COURT:   Okay, I think we're doing this

3    backwards.   How Dimm is useful is the last thing I wanted

4    to hear.

5              MR. MANDEL:   Sure, let me start with the first

6    thing then.   I understand where Your Honor is going.   The

7    first thing is what is the document that was flagged --

8              THE COURT:   What's the kind of thing --

9              MR. MANDEL:   Yes.

10             THE COURT:   What is the - is this literally -

11   what is that they're designating generically - you don't

12   have to tell me the numbers or the names - what is it that

13   they're designating that is going to make your case here as

14   to why it's so important once we get to Dimm?   What kind of

15   material is this?

16             MR. MANDEL:   Sure, sure.   Chegg produced to us a

17   spreadsheet that --

18             THE COURT:   If you want to use Chegg as an

19   example, that's fine.   I thought you might do it more

20   generically.

21             MR. MANDEL:   Well --

22             THE COURT:   I'm happy to use an example.

23             MR. MANDEL:   I think this is just - maybe make

24   it a little more concrete for the court.

25             THE COURT:   No problem.

61

```
 1
 2          MR. MANDEL:   Chegg gave us a spreadsheet, and
 3    we've talked about this spreadsheet before.
 4          THE COURT:   This is not highly confidential?
 5          MR. MANDEL:   The exact substance of the
 6    spreadsheet is highly confidential.  I don't think the
 7    existence - I'm not going to mention a single line of data
 8    on the spreadsheet, so I can't imagine --
 9          THE COURT:   I said he could mention highly
10    confidential data.  It'll be someone's job to redact.
11          MR. OPPENHEIM:   That's fine.
12          THE COURT:   Okay.
13          MR. OPPENHEIM:   So long as we understand that.
14          MR. MANDEL:   I've already explained this in
15    previous transcripts, so I don't think there's anything
16    novel around here.
17          The transcript - the spreadsheet identified all
18    the books that plaintiffs inspected when it visited Chegg's
19    facility.  Each line on the spreadsheet was a different
20    book --
21          THE COURT:   You know, something just occurred to
22    me.  Hold all these thoughts.  But you're not talking about
23    a third-party's designation of material is highly
24    confidential, is that right?
25          MR. MANDEL:   Yes, but the plaintiffs are
```

62

1

2  producing the same material in this case, so it's just an

3  example --

4          THE COURT:   No, but I'm saying obviously I'm not

5  going to - there's no way if someone already produced

6  material under the old protective order that says it can't

7  be shared with anybody who's involved in sales and so

8  forth.  There's no way I am changing that.

9          MR. MANDEL:   I understand.  The plaintiffs have

10 the same documents, so we'll just ask them to reproduce to

11 us, and that will achieve the same outcome.

12         MR. OPPENHEIM:   Except that the plaintiffs have

13 that document --

14         THE COURT:   Because they got it --

15         MR. OPPENHEIM:   -- based on information from

16 Chegg and subject - and that's just one example.  There are

17 a lot of third-party documents that have been produced that

18 include sales information, customer information, pricing

19 information, not to mention that our own internal, the

20 plaintiffs' documents --

21         THE COURT:   Okay.

22         MR. OPPENHEIM:   -- sales, pricing --

23         THE COURT:   There's no way I'm doing anything to

24 change material that was produced under the old protective

25 order.  I assumed that you were looking for relief with

63

respect to new material.  Are you looking for it with

respect to old material?

        MR. MANDEL:   We're not – we're only looking for

it with respect to material produced in this case and --

        THE COURT:   In this case meaning Book Dog II?

        MR. MANDEL:   Correct.

        THE COURT:   Okay, that's fine.

        MR. OPPENHEIM:   I don't mean to interrupt.  He

just said that he took that deposition in BDB I which is --

        THE COURT:   Well, so now that' snot going to be

a great example, I agree.  I really was looking for a

generic example, so give me a generic example of material

that they have produced, plaintiffs, under the protective

order in Book Dog II that you are going to, that is, you

know, been designated as highly confidential and that you

are concerned you're not going to be able to use because I

need to understand what its importance is here because

that's the only way you'll convince me that we need a new

protective order applying to the new material, assuming I'm

even willing to do that, that allows people involved in

sales to look at their sales data.  Okay.

        MR. MANDEL:   Sure.

        THE COURT:   Can I just a question?  Is it as

simple as this – I'm just trying to think.  Is the stuff

64

1  you're trying to protect the prices you charge certain

2  people for certain books?  Is that the crown jewels here?

3          MR. OPPENHEIM:   No, there are a lot --

4          THE COURT:   A lot of other things too?

5          MR. OPPENHEIM:   Yeah, so it includes --

6          THE COURT:   I'm just trying to find out what it

7  is that you're concerned about from your end, maybe that's

8  a way to start, and then I'll hear why he needs this guy to

9  work with.

10          MR. OPPENHEIM:   So there's customer information

11  --

12          THE COURT:   Who your customers are.

13          MR. OPPENHEIM:   Who our customers are and third-

14  parties' customers like the distributors.  So Chegg, for

15  instance, we may have an information exchange with them

16  based on an NDA where they provide us information regarding

17  who they're selling certain books to and at what price, and

18  they provide that to us, and that becomes part of an

19  analysis we do on counterfeiting.  And so those documents

20  have been produced.  They're very confidential both to

21  Chegg and to us.

22          THE COURT:   Okay, and the price – why is the

23  price all part of this?  Is the price part of this because

24  price is an indicator of counterfeit if it's too low?  Is

1

2  that what this is about?

3          MR. OPPENHEIM:  Well, why they --

4          THE COURT:  Why are we talking about price?

5          MR. OPPENHEIM:  Well, that's just among the

6  information - so they include customer information, the

7  sale information including pricing, and titles and

8  quantities, all of which these companies maintain as

9  confidential.  Within our own documents, Your Honor, we

10 have highly confidential information about the details of

11 the counterfeits that we don't, they're our crown jewels

12 because if it gets out what it is --

13         THE COURT:  Well, hold on, hold on.  I thought

14 that what we were concerned here were people involved with

15 sales and those categories I listed, not counterfeiting,

16 sales, pricing, things like that.

17         MR. OPPENHEIM:  Well, those are certainly part

18 of it.  You asked the categories of highly confidential

19 information, so I was kind of going through it.

20         THE COURT:  Could you just hold on a second?

21         MR. OPPENHEIM:  Yes, Your Honor.

22         THE COURT:  What I thought I'd been presented

23 with, and actually came up because, you know, I think your

24 letter also threw in counterfeiting occasionally.  Hold on.

25         (pause in proceeding)

1

2          THE COURT:   Well, let's not worry about that.

3 Your anti-piracy efforts, you threw that in at one point.

4 To me this is about sale, pricing, selection of customers,

5 selection of distributors, you know, what I view as

6 classic, I'm not sure what to call it, sales, confidential

7 sales information.  Just the kind of things I assume

8 companies want to keep secret, which is who they're selling

9 to and for how much.  So if it's something beyond that sort

10 of thing, tell me what you think we're talking about.  What

11 is it you're trying to protect when you designate something

12 as highly confidential other than what I just said?

13          MR. OPPENHEIM:   I haven't done a complete review

14 of our production, Your Honor, but it's generally the

15 categories you described I would assume.  I'd have to look

16 at the entirety --

17          THE COURT:   There may be others, I understand.

18 I'm not holding you to it.  So now step two is what is the

19 relevance of the information about who are selling to and

20 at what price.  I assume the – frankly, I don't know for

21 sure, but all I've heard so far is maybe it's relevant to

22 figuring out whether a price they pay should've alerted

23 them that they had a counterfeit.  I'm trying to understand

24 what the relevance of this highly confidential information?

25          MR. MANDEL:   Your Honor, I mean in prior, in

1
2   many of these prior marathon sessions, Your Honor said we

3   couldn't get price information from the plaintiffs.  So I

4   think what we're talking about probably is third-party

5   pricing information.

6               THE COURT:   Third-party pricing information.

7               MR. MANDEL:   But I don't think third party –

8   well, I guess this is, so this would be the relevance, we

9   need to be able to ask the client were these so, you know,

10  they're saying that these counterfeit, you know, well – the

11  pricing information, it's hard to see – they're precluded

12  on arguing the prices are too good to be true in this case.

13  So I guess the only relevance of pricing information at

14  this stage is if we want to use the third-party documents

15  to show that the prices were not too good to be true.  And

16  --

17              THE COURT:   Okay, are you getting any of this in

18  Book Dog II?

19              MR. MANDEL:   We have yet to move into third-

20  party discovery.  So --

21              THE COURT:   So your fear is that one of those

22  third-party people will designate material as highly

23  confidential that you want to use to show that the prices

24  you paid were not too good to be true.

25              MR. MANDEL:   With respect to pricing, off the

68

 1   top of my head, that's the only issue I can think that

 2   would pop up.  But there are other sort of categories he

 3   mentioned that might make this easier to go through.

 4           THE COURT:   He's not doing this – I don't like

 5   deciding protective order issues in a vacuum.  You know,

 6   protective orders are very useful certainly as long as

 7   parties agree.  But when parties disagree, what I like to

 8   do is see, well, what is the information, should it be

 9   designated, and who needs to look at it, and it's just very

10   hard to do this in a vacuum.

11           MR. MANDEL:   Sure --

12           THE COURT:   I just don't know that I want to

13   say, and, again, I haven't yet gotten to the issue of

14   whether you should now be bound by this thing, you know, by

15   the old one.  But I would just try to do this without

16   actual concrete, you know, designation that's happened.  It

17   sounds like it hasn't even happened yet.

18           MR. MANDEL:   No, no, may I give Your Honor a

19   very concrete example?

20           THE COURT:   Go ahead.

21           MR. MANDEL:   So they mentioned the pricing,

22   excuse me, the printing specifications.  This is what they

23   call their secret recipe book for making the books at issue

24   in this case.  For each book at issue in this case, they

69

1

2   have or will shorty have produced, a short document, it's

3   probably typically two pages, and it says the book is made

4   with this kind of paper and with this kind of ink and with

5   this kind of binding, and there's very specific stuff.

6   There's obviously a dispute in this case as to whether the

7   books, exemplars at issue are or are not counterfeit.

8   Their experts say they rely upon the printing specification

9   in determining whether the books are or are not

10  counterfeit.  We want Mr. Dimm's opinion, are the books

11  counterfeit or are they not counterfeit.

12          THE COURT:   Stop.  So the printing specification

13  has been designated as highly confidential.

14          MR. MANDEL:   Yes.

15          THE COURT:   And it just seems that this –

16  there's a disconnect here because the order talks about

17  giving such material to people who don't have authority

18  over pricing, selection of customers, selection of

19  distributors, which has got nothing to do with why they're

20  designating the specifications as confidential.

21          MR. MANDEL:   I agree.

22          THE COURT:   So there's an illogic to it.  And I

23  think we should have a ruling, assuming, you know, we get

24  aside whether this is in effect or not – we should have a

25  ruling on about whether that is appropriately designated as

1                                                                          70

2   highly confidential, and they will be, and who you need to

3   show that to.  But I would like to do it in the context of

4   a specific thing that you need access to, assuming we don't

5   go down this other road.

6            MR. MANDEL:   Well, let's start with the printing

7   specification then.

8            THE COURT:   Okay.  Which has already been

9   designated.

10           MR. MANDEL:   Correct.

11           THE COURT:   I don't have the full protective

12  order.  So under the old protective order they could

13  designate that, and you would not be allowed to show that

14  to anyone who dealt with pricing.

15           MR. MANDEL:   Correct.

16           THE COURT:   Or selection of distributors.  Does

17  that make sense?

18           MR. OPPENHEIM:   Yes, it does, Your Honor.

19           THE COURT:   Tell me why.

20           MR. OPPENHEIM:   Because the idea – so it is a

21  super secret document.  The plaintiffs only agreed to this

22  protective order and this process and this production based

23  on all of this.  So I know you put --

24           THE COURT:   And I'm not making you – there's no

25  reliance issue.  Have you produced it already?

```
 1
 2          MR. OPPENHEIM:   Oh, it's been --
 3          THE COURT:   No, in this case.
 4          MR. OPPENHEIM:   Oh, yes, absolutely.
 5          THE COURT:   Under the old protective order.
 6          MR. OPPENHEIM:   Under --
 7          THE COURT:   Under the protective order that you
 8 thought --
 9          MR. OPPENHEIM:   Yeah, it was extended --
10          THE COURT:    -- was in effect, that you had been
11 led to believe was in effect.
12          MR. OPPENHEIM:   It is in effect.
13          THE COURT:   No, I understand.
14          MR. OPPENHEIM:   I don't think there's any
15 dispute that protective order is in effect, that we and
16 they have produced documents pursuant to that protective
17 order, that we've produced highly confidential information
18 pursuant to that protective order.  And the law from the
19 Second Circuit here is very clear, the presumption is that
20 that protective order remains in effect.  So he has a very
21 steep hill to climb --
22          THE COURT:   Okay, can I tell you something else,
23 because I've written on it and someone cited the case.  The
24 case law you're talking about that talks about reliance is
25 not addressing this situation.  It's talking about parties
```

72

1
2   that create material, specifically usually at a deposition,

3   in reliance on the existence of a protective order.  So

4   there would be zero reliance – there's no reliance interest

5   on you if we say, you know what, we're going to visit

6   afresh the issue, I'm not saying we're going to do it, but

7   it's annoying me that this is out here, and I just got to

8   bring it to your attention.

9          If we did go down this road and we said, you know

10  what, I'm prepared to modify the protective order and now

11  we're going to decide afresh whether you need to produce

12  those specifications under some different standard, there

13  is zero prejudice to you because either it should or it

14  shouldn't and those specifications would have been, had

15  been created independent of the protective order.  Do you

16  understand what I'm telling you?

17         MR. OPPENHEIM:  I do, Your Honor.  In this case,

18  this was a stipulated protective order.  The Court entered

19  this because the parties agreed to it, and --

20         THE COURT:  That's fine, and we can talk about

21  whether you should, that by itself has any value, but I

22  reject, and just don't bring it up again, the notion that

23  there's some Second Circuit case law saying that there's a

24  steep road to reconsidering that protective order.  Because

25  the case law you're talking about, and if I'm wrong, you'll

1
2  show me the cases, has to do with people who relied on a
3  protective order, and if you read the Allen case, you'll
4  understand why you did not rely on this protective order.
5          MR. OPPENHEIM:   I don't know about the Allen
6  case, Your Honor --
7          THE COURT:   Some cited it.  I assume they cited
8  it because they knew I wrote it.
9          MR. OPPENHEIM:   We cited the SEC v. The
10 Street.com case out of the Second Circuit --
11         THE COURT:   No, this is a district court case.
12         MR. OPPENHEIM:   So --
13         MR. MANDEL:   The procedural issue --
14         MR. OPPENHEIM:   The district court case that we
15 cited, Your Honor, was Kerrick, but in any event, Your
16 Honor, to the extent that, where Mr. Mandel is going is
17 simply soft, as it is in virtually all of these cases.  He
18 goes and he gets an expert, a true expert who can review
19 the books, they can have access to the same materials our
20 experts had access to subject to the protective order.
21 There's a process for this.  He's trying to find a way
22 around the process that he agreed to, that his clients
23 agreed to.
24         THE COURT:   Okay, so, again, we haven't yet,
25 haven't even gotten to that yet.  So your answer on the

1
2 merits is they don't need – it's highly confidential
3 because I assume you understand why.  I understand why it's
4 relevant to the case.  And now you're addressing the
5 question of why they don't need Dimms, and your answer is
6 one hires an expert for that purpose, one doesn't use the
7 president of the corporation.

8              MR. OPPENHEIM:   Correct, Your Honor.

9              THE COURT:   Got it.  Okay, you know, we picked
10 out this one thing because I needed something concrete, so
11 I guess we have to go down the road of this one thing.  Why
12 wouldn't that be the answer?

13              MR. MANDEL:   Sure.  I'm not aware, and we've
14 looked, for an expert on this issue, and I will note they
15 haven't sought an outside expert.  They're using their own
16 employee.  I am not sure I will be able – even if – and
17 I've --

18              THE COURT:   This guy's going to be qualified as
19 an expert under Rule 70 whatever, that's the plan?

20              MR. MANDEL:   Potentially.  I need to be able to
21 show him the document to see what his opinion is.  We may
22 not ultimately contest this issue as to whether a lot of
23 these books are or are not counterfeit, but we have to be
24 able to consult the only expert we've been able to identify
25 who happens to be an in-house expert.

1

2          THE COURT:   Okay.  You want to say something?

3          MR. OPPENHEIM:    There are thousands of printers

4   and production people in this country who have worked on

5   these types of issues.  The notion that the only person

6   that they could possibly get is the president of the

7   defendant, a defendant who has now been sued three times

8   for the distribution of counterfeit books and who the

9   plaintiffs inherently do not trust, seems far-fetched.

10         MR. MANDEL:  May I add that there's no

11  obligation to hire an expert.  I mean this is not --

12         THE COURT:  No, I'm not saying there's an

13  obligation, but if I agree that this is highly sensitive

14  information, which I probably do.  You know, it's like the

15  U.S. mint says here's how you put together a $50 bill.

16  Then I can see why one doesn't want to put this in the

17  hands of the tort feasor; one hires the expert.  Accused

18  tort feasor.

19         MR. MANDEL:  In a case where we were accused of

20  having manufactured counterfeits, I might have --

21         THE COURT:  Maybe that was the wrong --

22         MR. MANDEL:  But there's no allegation that we

23  manufacture any counterfeits.  There's an allegation that

24  we're not good enough or that we don't care to bother to

25  tell the difference between authentic books and counterfeit

1    books.

2          THE COURT:   We're now going down a road that no

3    one thought about beforehand, and I don't know what the

4    experts are.   This is all being spring on both of you.   And

5    it's because of my own insistence that I don't want to

6    decide the Dimms issue in a vacuum.   I want to decide it

7    based upon specific needs over specific types of data.   So

8    I hate to keep putting things off, but I think this is a

9    real problem.

10          Now, I could try going down the road we talked

11   about earlier which is whether you should or should not be

12   bound by the protective order, and I know Mr. Oppenheim

13   wants to go down that road, so I think we have to go down

14   that road.   So let's see if that answers the question, and

15   if it doesn't, we're going to have to come back to this and

16   figure out how you can do this on a category by category

17   basis, what kind of data you need and why, and how you can

18   make the case that Dimms is the only guy in the world who

19   can help you on this.

20          MR. MANDEL:   Sure, so let me begin there with

21   paragraph 4(b) of the protective order.   Paragraph 4(b) of

22   the protective order --

23          THE COURT:   Well, no, let's begin with his

24   argument.   Maybe I should hear from him.   Well, go ahead.

```
 1                                                        77
 2              MR. MANDEL:   I think this is going to cut to the
 3   chase, I really do, Your Honor.
 4              THE COURT:   Go ahead.
 5              MR. MANDEL:   Paragraph 4(b) says any party can
 6   consent to any other party seeing highly confidential
 7   information.  Before we agreed to this protective order,
 8   they consented in writing twice to Mr. Dimm seeing the
 9   highly confidential --
10              THE COURT:   I mean, see, that's cute, but it was
11   before he had these responsibilities.
12              MR. MANDEL:   No, Your Honor, there was no
13   material change in his responsibility – first of all, they
14   knew, they deposed him in Book Dog Book I, and in that case
15   he testified I have responsibility over pricing.  So at the
16   time they consented twice in writing to Mr. Dimm seeing
17   highly confidential information, they deposed him, and he
18   had said under oath, yes, I have control over pricing.  So
19   the idea that --
20              THE COURT:   Well, I don't --
21              MR. MANDEL:   -- they were bamboozled or the idea
22   that something changed --
23              THE COURT:   No, I'm not worried about them being
24   bamboozled, but I'm worried about why you would have
25   allowed him to see it if he had control over pricing.
```

78

1

2          MR. MANDEL:   We did not allow him to see

3  anything.   When it came time to negotiate the Book Dog Book

4  II protective order, we said, look, we're not agreeing --

5          THE COURT:   No no, no, no, hold on, but you now

6  acted as if they had sort of waived something in the prior

7  case, and I'm --

8          MR. MANDEL:   No, my only point --

9          THE COURT:   -- by knowing that this guy had

10  these roles and then agreeing to him be a person.

11          MR. MANDEL:   Yes, that I am arguing.   When they

12  knowingly --

13          THE COURT:   And I'm saying I'm not sure I buy

14  that.

15          MR. MANDEL:   Okay, I understand, but I think the

16  point here --

17          THE COURT:   Let's go to the next one.

18          MR. MANDEL:   Okay, but you --

19          THE COURT:   I can tell you why I don't buy it.

20          MR. MANDEL:   That would be helpful.

21          THE COURT:   No, because if you have something in

22  writing and says person who gets the confidential material

23  can't have jobs that do A, B, and C, and if you then say to

24  him is it okay if this guy does it without specifically

25  saying he does A, B, and C as opposed to making them

1
2   remember from the deposition, I don't think I would find a
3   waiver in that situation.
4        MR. MANDEL:   Okay, well, the other – all right.
5   So the second point is if you look at paragraph 4(g) of the
6   protective order, it says at any time --
7        THE COURT:   Do I have it quoted somewhere?   Is
8   it in your letter or --
9        MR. MANDEL:   It was attached.   I know we
10  provided a courtesy copy --
11       THE COURT:   Okay, it's attached to your letter,
12  hold on, I'm going to get it.
13       MR. OPPENHEIM:   Which attachment is that again?
14       MR. MANDEL:   It is --
15       THE COURT:   It's docket 79, exhibit A.
16       MR. MANDEL:   Yeah, it's --
17       THE COURT:   No, that's the extension, I'm sorry.
18       MR. MANDEL:   No, it's --
19       THE COURT:   It's attached to it, okay.
20       MR. MANDEL:   It's exhibit A.   Of course, I've
21  forgotten my copy, but it is exhibit A.   And 4(g) says --
22       THE COURT:   Let me look at 4(g).   Oh, it allows
23  you to come back to me and get permission for the guy.
24       MR. MANDEL:   Yes.
25       THE COURT:   Who's not authorized under (b) or

80

(c).  Okay, so you're saying this specifically allows you to obtain permission.  All right, so I'm not sure what standard I would apply to that, but the parties contemplated that possibility.

MR. MANDEL:  Yes, that's exactly right.  And the third point I would make is --

THE COURT:  Well, I'm not sure this was in your letter.  Was there sprung on you, Mr. Oppenheim?

MR. OPPENHEIM:  Yeah, this is the first time I've heard this.

THE COURT:  Well, if you look at it, it's not a bad argument, but I want to give you the chance to think about it.

MR. OPPENHEIM:  I just wish we could submit an argument, we get to respond, and we rule on that instead of this free-wheeling brainstorming session to help Mr. Mandel's case.

THE COURT:  Well, sometimes these things happen.  All right, go ahead.

MR. MANDEL:  And then the third point is, to be clear, we received their statement in writing that they consented to Mr. Dimm seeing highly confidential information before we agreed to the protective order in this case.  We absolutely, and if you look at exhibit C to

81

1

2  our letter, I think it's very clear that we would never

3  have agreed to this protective order if they hadn't told us

4  in advance, sure, we have no objection to Mr. Dimm seeing

5  the highly confidential information.  And their point is,

6  oh, but --

7           THE COURT:   Did he have the president job at

8  that time?

9           MR. MANDEL:   The short answer is I'm not sure.

10 When Mr. Dimm testifies, he's going to say there was an

11 exact day he became president.  There was a point at which

12 his responsibilities changed.  The reality is in most

13 respects, possibly in all respects, he has less day-to-day

14 control over pricing, customers, and distributors as

15 president than he did when he was head of inventory and he

16 was deposed in the last case.  The reality is there's now a

17 new person that has that inventory role, and his is a more

18 global management role.  He's not as involved in making

19 decisions about specific books or specific suppliers or

20 specific prices.

21           So the reality is if you wanted to cut to the

22 purpose of the protective order and look at how his change

23 in role affected that purpose, I think it is very clear

24 that he is more entitled to see the highly confidential

25 documents now than when they consented to it back at the

                                                               82

1   time the protective order was issued by this Court.

2            THE COURT:   Go ahead, Mr. Oppenheim.

3            MR. OPPENHEIM:   My mother would characterize

4   this as the ultimate chutzpah.  And here's why.  What

5   happened in this case is that the defendants violated the

6   protective order in --

7            THE COURT:   In Book Dog I?

8            MR. OPPENHEIM:   In Book Dog I they submitted the

9   undertaking in June of 2015, and they describe Mr. Dimm as

10  apparently the VP of inventory, which I guess now is not

11  accurate and was not accurate.  And at some point in time

12  his titles may have changed.  They never told us.  And they

13  want to claim that because we took his deposition a year

14  and a half later in a context where we're not thinking

15  about the protective order is, oh, woe is you, you

16  should've known and now you've waived your argument.  But

17  for the fact that Mr. Mandel's represented to us that Mr.

18  Dimm has never seen highly confidential information, we

19  would be here on a motion to enforce a violation of the

20  protective order of some sort.

21           THE COURT:   Okay, well, I agree with you on this

22  waiver thing, so don't worry about that any further.  I

23  think their main point, the best point right now is that –

24  hold on – that they would not have agreed to this

protective order if you hadn't said that Dimm was going to be part of it, and maybe you didn't have complete information.  Maybe that's the problem.

MR. OPPENHEIM:  Well, the consent that they're talking about is because they had told us in June of 2015 he was the VP of inventory and that he had already signed the undertaking as though he complied with the protective order.  So he says, well, you consented.  Now, you may have consented under false pretenses, but you're bound by that.  That's unbelievable, Your Honor, this notion --

THE COURT:  Well, no, but the point – I don't think – they're saying – it's one step removed from that because what they're saying is we wouldn't have signed the second protective order stipulation if you hadn't agreed to Dimms.  But your argument is, well, we only agreed to Dimms because of a misrepresentation.

MR. OPPENHEIM:  Of course, Your Honor.

THE COURT:  It's just one step removed from what you were saying.

MR. OPPENHEIM:  I don't --

THE COURT:  We went down a chain, and your point is it's their fault because they're at fault in this chain.

MR. OPPENHEIM:  They absolutely misrepresented what Mr. Dimm's responsibilities were when he signed the

84

1
2    undertaking, and then they said, well, you consent to Mr.
3    Dimm, and we're sitting here based on their having misled
4    us --
5            THE COURT:   I don't think they made any
6    representation at the time they asked you to include Dimms
7    the second time around.
8            MR. OPPENHEIM:   No, but I think it's fair for us
9    --
10           THE COURT:   There's no misrepresentation there.
11           MR. OPPENHEIM:   Except it's a misrepresentation
12   by omission, Your Honor, because they clearly knew that Mr.
13   Dimm had executed it in BDBI --
14           THE COURT:   Well, they also knew that he told
15   you what his job duties was in the deposition.   So, you
16   know, neither of those was referenced at the time they
17   asked to have Dimms included.
18           MR. OPPENHEIM:   The way you hand this, Your
19   Honor, is if Mr. Mandel wanted what he's now seeking, he
20   would've said, you know, Mr. Dimm's responsibilities have
21   changed.   We still want him to be able to see highly
22   confidential information.   He wouldn't be able to sign the
23   undertaking as the way it's currently drafted, but if
24   you'll consent to him seeing it, we'll stipulate.   Mr.
25   Mandel didn't say that to us.   That's how you handle it.

85

 1    That's how you would've handled it, that's how I would've

 2    handled it.

 3            To come now and suggest we've waived because they

 4    omitted a --

 5            THE COURT:   That's not the – I told you forget

 6    that argument.  You won the waiver argument.  What they're

 7    saying is to come – here's what they're saying.  They're

 8    saying is we signed the second thing assuming you were okay

 9    with Dimms, and your answer to that is, well, we're only

10    okay with Dimms because you misrepresented to us something.

11            MR. OPPENHEIM:   They don't get to roll that back

12    and say that now, Your Honor.

13            THE COURT:   Well, I think we do have a 4(g)

14    problem.  I know it was sprung on you, and maybe you don't

15    want to deal with it on the spot, but it's there.

16            MR. OPPENHEIM:   There's a specific federal rule

17    on this, and I'm sure – Rule 37 I believe addresses, and

18    I've not done the legal research on this to see what their

19    standard is to come and seek an exception under the

20    protective order.

21            THE COURT:   The order provides no – I don't

22    think Rule 37's going to help you.

23            MR. OPPENHEIM:   Your Honor, I believe – one

24    moment, let me just pull it out.  So under 4(g), if I'm

1
2   reading it correctly, it says, first, they're supposed to
3   come to us to try to negotiate a resolution --
4           THE COURT:   Oh, you mean you're talking about
5   the generic meet and confer stuff.
6           MR. OPPENHEIM:   And then it says, "If the
7   parties are unable to obtain permission, it may seek
8   intervention by the court pursuant to S.D.N.Y. Civil Rule
9   37.2" --
10          THE COURT:   Which just says meet and confer,
11  that's all.
12          MR. OPPENHEIM:   Well, oaky, and Rule 3(a)(4), I
13  just – Your Honor, I've not done the legal research --
14          THE COURT:   That's fine.
15          MR. OPPENHEIM:   -- this is the first argument.
16          THE COURT:   I would like to – I'm not, for what
17  it's worth, I'm not ready at this point to say, oh – I'd
18  rather not deal with the question of who's bound by Dimms
19  or the protective order, if, in fact, even under the
20  existing protective order they're free to come here and
21  make, I don't know if you call it equitable, whatever case
22  that they need to have Dimms here.  So I'd like just to
23  have the opportunity to look at that question.
24          MR. OPPENHEIM:   So, Your Honor, I believe, based
25  on their current request to the Court, you should deny it.

87

1  If they have another request under 4(g) and they want to

2  set forth the basis by which they should get an exception,

3  they should submit that to the Court.  We should see it,

4  and then we can respond.

5

6       THE COURT:   I agree.  Assuming 4(g) lets them

7  just say here's a just result, they're going to make that

8  case, and this is the very thing I was talking about which

9  is I want to know the specific data at issue, what it's

10  going to be used for, and why, you know, it has to be him

11  and not an expert or some other person in the company or a

12  lawyer, whatever it is.  I think that has to be laid out.

13  That's assuming 4(g) allows them to do that.

14       Right now looking at it, it does seem to allow

15  them to do that.  So I would rather instead of parsing out

16  this whole other issue, which won' help you, because your

17  best case scenario is the protective orders in effect.  And

18  this protective order gives them an out.  Your best case

19  scenario in all that is they're bound by the protective

20  order.

21       MR. OPPENHEIM:   I assume the protective order is

22  in effect and they would have to abide by it.

23       THE COURT:   Yeah, right, exactly.  And so I

24  think 4(g), I think we shouldn't waste our time on that, on

25  whether the protective order is in effect or not, because

1

2   4(g) is there anyway.

3        MR. OPPENHEIM:   If they want to submit a new

4   revised request under 4(g) to Your Honor, I guess I can't

5   preclude them.  I think as an equitable matter, given their

6   misconduct in the first instance, they shouldn't be allowed

7   to do it now, but if Your Honor wants to allow it, I think

8   that's up to Your Honor.

9        MR. MANDEL:   Your Honor, there was no

10  misconduct.  Whatever happened in the first case, the

11  protective order, in order for someone to see highly

12  confidential information requires two different things.

13  First, they have to sign the undertaking, and, second, they

14  have to represent that they meet the substantive standard

15  that's set forth in the protective order regarding not

16  having responsibility of a pricing distribution sourcing.

17  That representation was never ever made, ever.

18        So this idea that they were relying upon an

19  undertaking which was some sort of lie is crazy because the

20  reality is --

21        THE COURT:   No, the reliance part came when you

22  emailed them and said is it okay for Dimms to see this

23  stuff.  And then they said yes because they assumed he had

24  the whatever responsibility that had been represented, and

25  then you're using that to say, well, that's why I agreed to

89

the same thing.  It's like this chain which I don't want to

go down because even if the protective order's in effect,

it looks like 4(g) is just, you know, letting it wash out,

and we start over again.

MR. MANDEL:  Understood.  I felt I had to

respond to the misconduct allegation.

THE COURT:  All right, so I think it's now

understood, make your application under 4(g) any time, meet

and confer.  Mr. Oppenheim will have the opportunity to say

4(g) means something other than what we've said, but you

should certainly not assume that's the case and go down the

substantive road of saying I need Dimms to look at specific

things, not just be some generic person to look at all

highly confidential material.

MR. MANDEL:  Okay, we need Mr. Dimm, in our

opinion we need Mr. Dimm to attend the depositions which

are about to start shortly.  So can we just get a date on

the calendar by which this can be fully briefed and we can

come back and address this before the depositions begin?

THE COURT:  Yeah, I mean does he – does it have

– are these depositions necessarily including highly

confidential material?

MR. MANDEL:  I would expect they all will.  But

yeah, I mean and, frankly, yeah, I mean – yes, I think

90

1  certainly I'm trying to envision some person where they're

2  not going to ask – I mean if they want to consent for

3  certain people to not ask Mr. Dimm to leave the room during

4  the depositions, I don't think that conversation will be

5  productive.

6          THE COURT:   Okay.

7          MR. OPPENHEIM:   Your Honor.

8          THE COURT:   Yeah.

9          MR. OPPENHEIM:   Mr. Mandel raised --

10         (pause in proceeding)

11         THE COURT:   Go ahead.

12         MR. OPPENHEIM:   Mr. Mandel raised this issue

13  about Mr. Dimm months ago with us.   Months ago.

14         THE COURT:   Where are you going with this?

15         MR. OPPENHEIM:   The idea that we're going to now

16  going suddenly be crushed to respond to this request

17  quickly because of the onslaught of oncoming depositions

18  when he could've filed this motion four or six weeks ago to

19  me is --

20         THE COURT:   I'm not saying I'm rushing you.

21  When do you think you're going to figure this out?

22         MR. MANDEL:   I think we'll submit our letter

23  next week.  So I would think early the following week we

24  can --

91

THE COURT:   You're trying to have a vacation next week, right?

MR. OPPENHEIM:   I was trying.

THE COURT:   No, I'm not going to schedule anything during your vacation.  Just one week, right?

MR. OPPENHEIM:   Yes, Your Honor.

THE COURT:   All right.  So you'll do this while he's on vacation.

MR. MANDEL:   Yeah, I will actually be gone the following week, so one of my colleagues will have to handle it, but it's that important that I think it needs to be handled that week.

THE COURT:   Well, he's going to have to answer when he comes back, so we need to give him a few days.

MR. MANDEL:   Sure.

THE COURT:   Maybe the Friday of the following – can you pull up a calendar?  All right, so today's the 3rd. Your letter's coming in next week.  You're coming back from your vacation the 14th, right?

MR. OPPENHEIM:   The 13th, yes, Your Honor.

THE COURT:   So how about the 16th for any response?

MR. OPPENHEIM:   That's fine, Your Honor.  When is their motion due?  I'm sorry, I missed that date.

92

1

2          THE COURT:   Well, you know, of course, the

3    theory of this is you're conferring with him.

4          MR. MANDEL:   I think we've conferred

5    extensively, I mean --

6          THE COURT:   All right, fine, don't worry about

7    it.   Okay, what's on the 18th – what's the 18th look like?

8    (pause)  What's the case?  (pause)  All right, okay.

9    Anything else?  How about 10:30, Friday the 18th?  If you

10   prefer another day, just tell me.

11         MR. OPPENHEIM:   My only concern is, Your Honor,

12   that with all the depositions that we need to do, and we've

13   already proffered dates that I believe --

14         THE COURT:   I don't think we should be putting

15   off, I mean I think your guy's going to have to not go – we

16   can't put off depositions indefinitely.   Who's taking whose

17   depositions?

18         MR. OPPENHEIM:   I have no idea who they're

19   taking and --

20         THE COURT:   I'm going to call you back, all

21   right.

22         MR. OPPENHEIM:   I'm sorry, Your Honor.  I have

23   no idea who they're taking or when.  We've given them

24   notices, we've given them proposed schedules, but --

25         THE COURT:   Well, you don't need him for, they

93

don't need him to be at your depositions of their people.

MR. OPPENHEIM:   No, no, no, my concern is that I believe we've scheduled a deposition for the 18th.  So if we have to be here in court, we can't be in Ohio taking a deposition.

THE COURT:   Oh, I see.  All right, so the 21st, I don't know.

MR. OPPENHEIM:   I don't believe we have a deposition scheduled for the 21st at the moment, but I also haven't received any response --

THE COURT:   Do you guys want to figure it out tomorrow and send me a letter with a few dates?

MR. MANDEL:   I think the 21st is fine, Your Honor.

THE COURT:   Want to try the 21st?

MR. MANDEL:   Yes.

THE COURT:   Who knows if I'm free.  (pause)  Hi, how's the 21st look?  (pause)  How about the 22nd?  What's Cooper v. Fuller?

MR. OPPENHEIM:   We have depositions --

THE COURT:   You have depositions the 22nd?

MR. OPPENHEIM:   The rest of the week we have depositions.

MR. MANDEL:   Nothing has been scheduled.

94

2  They've been proposed — we will move — I don't think we can

3  let it go past the 22nd, so --

4         THE COURT:   Let me work on — I'm booked all the

5  day the 21st, but I see what the thing in the morning is.

6  (pause)  Oh, that's never going to happen.  They're putting

7  a new person on that case.  All right, we can do 11 a.m. on

8  the 21st.  (pause)  All right, thank you.  Thank you, bye.

9         So you're going to have to put specific types of

10  information you're talking about because I couldn't — no

11  one's even talked about sales information here.  Right now

12  all I heard about is printer specifications.

13         MR. MANDEL:   Sure.

14         THE COURT:   So you're going to have to figure

15  this out.

16         MR. MANDEL:   May we file our motion under seal?

17  I assume we're going to need to attach highly confidential

18  documents?

19         THE COURT:   Yeah.  You know, if you can redact,

20  just file a redacted version — don't file it under seal.

21  File a redacted version or leave out documents or whatever

22  on ECF and send me by overnight mail or delivery unredacted

23  courtesy copies.

24         MR. MANDEL:   Understood.

25         THE COURT:   Did we get to your issue?

1

2          MR. OPPENHEIM:   I think the only outstanding

3    issue on Dimm was you didn't set a date by which their

4    application is due.

5          THE COURT:   Oh.

6          MR. OPPENHEIM:   You said the response was due on

7    the 16th --

8          THE COURT:   They're going to do it while – it

9    has to be done while you're on vacation anyway, right?

10         MR. OPPENHEIM:   Well, that's fine --

11         THE COURT:   So a week from tomorrow, right?

12         MR. OPPENHEIM:   Yes.

13         THE COURT:   The 11th.

14         MR. OPPENHEIM:   The 11th.

15         THE COURT:   Right.

16         MR. OPPENHEIM:   So if we're done with the Dimm

17   issue, Your Honor --

18         THE COURT:   Now we have your issue, right?

19         MR. OPPENHEIM:   Yes, Your Honor.

20         THE COURT:   Okay, oh, financial data, all right.

21         MR. OPPENHEIM:   And sourcing data, Your Honor.

22         THE COURT:   Okay, hold on.  Andrew, just make a

23   note so we don't forget to calendar that, 11 a.m. on the

24   21st.

25              (pause in proceeding)

96

        THE COURT:  Hold on, hold on.

        MR. OPPENHEIM:  Is it possible to take a two-
minute break, Your Honor?

        THE COURT:  Go ahead.

        MR. OPPENHEIM:  Thank you.

        (off/on the record)

        THE COURT:  Okay, go ahead.

        MR. OPPENHEIM:  So, Your Honor, docket reference
80, number 80 is what we're on now.  There are two pieces
to it, one is financial information and the second is
source information.  Your Honor, both of these the Court
has already ruled on and ordered the defendants to produce
the information.  The defendants, unfortunately, have
provided documents and information by half measures here.
We have gone back and forth numerous times, and we still
can't seem to get what we've asked for and what the Court
has ordered.

        So the Court on the financial issues previously
ordered the defendants to produce what they produced in
BDBI, and what was produced in BDBI was ordered by Judge
Pauley, and that order included all documents relating to,
dot dot dot, and extended to entities beyond just the
specific defendants in the case but other entities that
were related to the defendants.  And if I may, Your Honor,

97

1

2   in order to aid the Court in its understanding of the

3   issues, just as a demonstrative hand-up, what was produced

4   in BDBI and then what has been produced in BDBII so you can

5   see the actual documents at issue.  Is that all right?

6            THE COURT:   Let's hope you have copies for Mr.

7   Mandel.

8            MR. OPPENHEIM:   Of course I do, Your Honor.

9   These are marked highly confidential, Your Honor, so I'm

10  not --

11           THE COURT:   Just remember to take them back from

12  me if you don't mind.

13           MR. OPPENHEIM:   Yes, Your Honor.  May I

14  approach?

15           THE COURT:   Yes.

16           (pause in proceeding)

17           MR. OPPENHEIM:   So, Your Honor, the first

18  document which is the one with the darker of the two covers

19  and says deposition exhibit 8 was what was produced in

20  BDBI.  Then you will see this is an example of the

21  consolidated financial statement that was produced in

22  response to Judge Pauley's order in BDB1, and you can see

23  that it provides information with respect to Robert William

24  Holdings LLC and its subsidiaries and all of the details in

25  there.  There was other financial information produced as

1

2    well, but this is an example of what was produced.  If you

3    look at the second document, Your Honor, which was produced

4    by the defendants in this case, you will see mostly black

5    because it's been redacted.

6           And so there are two points here, Your Honor.

7    First off, this is not, what the defendants produced here

8    is not consistent with what was produced and ordered in

9    BDBI which is what Your Honor ordered.  Secondly, it is not

10   possible to understand the finances of the defendants in

11   this case when we get a document 90 percent of which is

12   redacted.  And so we believe that the Court needs to

13   enforce its prior order and require the defendants to

14   produce unredacted versions of these documents.

15          In addition to that, we have been produced no

16   information on distributions, Your Honor.  While the

17   defendants --

18          THE COURT:   Distributions?

19          MR. OPPENHEIM:   Distributions, that is profits

20   spinning out of the companies.  The defendants suggest in

21   their letter, oh, we don't need to produce that

22   information.  You can calculate that on your own and here's

23   how you do it, here's what you look --

24          THE COURT:   Tell me what was required to be

25   produced before in distributions.

1

2           MR. OPPENHEIM:   Your Honor ordered that

3  distributions information be produced, and it's in the

4  transcript, Your Honor.

5           THE COURT:   Of BDBI?

6           MR. OPPENHEIM:   And BDBII.  So Your Honor

7  ordered on May 4 that they must produce whatever was

8  ordered last time unless we reach some other agreement.

9  And then you'll see in our letter, which is document 80, we

10  list what was ordered in BDBI.  And what the --

11           THE COURT:   Well, I'm just wondering were

12  distributions at issue in BDBI or ordered in BDBI.  That

13  was my question.

14           MR. OPPENHEIM:   Well, Judge Pauley is the third

15  bullet point, specifically identified distributions.

16           THE COURT:   Ah, distributions.  Distributions

17  transferred to Smeyers from these other people.  So it's a

18  little more specific than that.

19           MR. OPPENHEIM:   Well, that's because he was the

20  owner, Your Honor, so that's who the distributions would go

21  to.

22           THE COURT:   I see.  Okay, Mr. Mandel.

23           MR. MANDEL:   Mr. Oppenheim, with all due

24  respect, said something that was false and it absolutely

25  goes to the heart of the dispute.  He repeatedly said that

100

1   Your Honor ordered us to produce what we produced last

2   time.  That's not at all what happened, and if you just

3   look at page 1 of Mr. Oppenheim's own letter, you will see

4   he quotes Your Honor's order and Your Honor's order is

5   defendants, quote, "must produce whatever was ordered last

6   time unless you two reach some other agreement."  They have

7   produced no order whatsoever that requires any affiliate of

8   the defendants in the last case to produce financial

9   statements.  I'm not aware of any other order.  It was a

10  long case.

11          I assume what Your Honor I think said to them

12  during the last conference is if you've got some order that

13  says they have to produce something, show it to the

14  defendants and then they have to, you know, then they have

15  to produce it.  There is no order whatsoever that requires

16  us to produce financial information for affiliates.  The

17  defendants have produced all of the relevant financial

18  information.  So I think that puts that issue to bed.

19          With respect to the distributions --

20          THE COURT:  Well, no, he had another point,

21  which is he can't understand the statement without having

22  the material that's been redacted.

23          MR. MANDEL:  So – okay.  So what he produced

24  here are audited financial statements.  In BDBI audited

101

 1

 2  financial statements might have been relevant because Mr.

 3  Smeyers was a defendant, and he owned the whole

 4  consolidated company.

 5          THE COURT:  It's a slightly different point.

 6  He's saying you can't understand this document without

 7  having full context.

 8          MR. MANDEL:  Sure, I understand what he's

 9  saying.  Let me say this is not – we produced this as an

10  accommodation to them.  We're not required to produce this

11  document.  We produced, which explains everything he needs

12  to know about the defendants' financial statements, our

13  quarterly financial statements for every quarter during the

14  relevant period that has all of the defendants' financial

15  information on it.

16          So this was just produced because they said we

17  want audited, we want audited, we want audited.  They're

18  not audited.  The defendants have no audited financial

19  statements.  The only thing that remotely resembles --

20          THE COURT:  Why does it say independent

21  auditor's report?

22          MR. MANDEL:  That is an audit of the parent

23  company.  The material that's been redacted --

24          THE COURT:  A parent of what, your client?

25          MR. MANDEL:  Of the defendants, correct.  The

1

2  defendants, there's a supplement or an attachment that

3  describes the defendants at issue in this case.  We

4  produced that portion of the audited financial report.

5  There is - because they have our complete financial

6  statements, the only purpose of this audit report is they

7  can compare our monthly, or quarterly, excuse me, financial

8  statements to whatever's in the audited thing.  This is

9  just a check on the comprehensive statements that they

10  already have.

11          MR. OPPENHEIM:   Your Honor, so, again, this is

12  just a blatant misrepresentation.  So in Mr. Mandel's

13  letter, he acknowledges that the quarterly statements that

14  they produced were things they created just for this

15  litigation.

16          THE COURT:   Right.

17          MR. OPPENHEIM:   Summaries.  Judge Pauley

18  specifically told the defendants in 2013, "The mere

19  production of documents summarized in the request for

20  production of documents or information will not satisfy

21  this order and may result in sanctions."  Because we went

22  through this exact same exercise in BDBI.  That's why we

23  ended up with these audited financial statements.

24          So this is not complicated.  Audited financial

25  statements get produced in cases all the time.  They can

1

2  designate it as highly confidential, which they have, but

3  they need to be produced in a way that is understandable.

4  Moreover, we know, based on both entries that we've seen in

5  these documents that show intercompany transfers and from

6  the sales and sourcing data of books going back and forth

7  as between these entities, that there's no way we're going

8  to be able to understand the financial picture without

9  seeing the entirety of this.  And there's no reason not to

10  let us see it unless they're hiding something.

11          THE COURT:   Mr. Mandel.

12          MR. MANDEL:   The purpose of the Court's last

13  order was not to relitigate what should or should not be

14  discovered.  And they're now seeking information that was

15  not ordered to be produced in the last case.  They start

16  off by saying this was ordered to be produced in the last

17  case, and now they're backing away from that position.  Now

18  they're making a totally different argument --

19          THE COURT:   Hold on a second.  I don't think I

20  meant to say that – all right, well, I'll withdraw it.  So

21  your point is you voluntarily produced it in the last case,

22  and he's saying that's not correct, that you were required,

23  in fact – listen, I'm not going to spend more time on this.

24  This is highly confidential material.  It's been

25  designated, it's going to be treated that way by the

104

plaintiff.  There has been enough information in Book Dog I

regarding the confusion (indiscernible) the finances of

these defendants.  They need the full thing just to

understand it.  It'll be kept highly confidential.  So I'm

overruling your objection.  You should produce an

unredacted version.

MR. MANDEL:  The Court - I mean we haven't gone

to our second argument which is that Mr. Smeyers is not a

party in this case.  He was a party --

THE COURT:  Let me hear about that.

MR. MANDEL:  I mean if this was ever relevant,

and I don't think it was, and it -

THE COURT:  So you're saying this is not

relevant.

MR. MANDEL:  It has nothing to do --

THE COURT:  Why did you produce it if it's not

relevant?

MR. MANDEL:  We produced it as an accommodation

to them.  They said we are dying for an audited financial

statement.  Why won't you give us an audited financial

statement --

THE COURT:  It's of one of your defendants

though, right?

MR. MANDEL:  No, this is the - this company is

1   
2  not a defendant.

3           THE COURT:   It's a parent of the defendant.

4           MR. MANDEL:   Correct.  All of the information
5  about the defendants that is in the financial statement is
6  unredacted, and they have that.  And they can compare that
7  to the quarterly financial statements, which they have.
8  They have fully 100 percent comprehensive information about
9  the defendants in this case.  What they're hoping to do,
10 the only reason they're going down this path is because
11 they want to waive in front of a jury what some parent
12 company made, which has nothing to do with what the
13 defendants in this case made, and that is the only reason
14 we're here.

15          THE COURT:   Okay.

16          MR. MANDEL:   They have not come in with – they
17 have a ton of a documents that they've now coming in, they
18 have not articulated in any way how there's some fact that
19 they need to know that is not in those quarterly financial
20 statements.

21          THE COURT:   Well, he was articulating some facts
22 involving financial transfers between companies.

23          MR. MANDEL:   He said that vaguely but he hasn't
24 identified a single --

25          THE COURT:   We don't know.  I'm adhering to my

106

1
2   ruling.  It should be produced in unredacted form.

3            MR. OPPENHEIM:   Your Honor, turning to the sales

4   and sourcing information.

5            THE COURT:   Yes.

6            MR. OPPENHEIM:   Since day one of this case, Your

7   Honor, we've been trying to identify where did the

8   defendants obtain the 56 counterfeit books in BDBII.  We

9   don't know.  The defendants claim that they know where

10  three of them came from but they won't tell us.  They've

11  produced massive spreadsheets on three different instances.

12  Those massive spreadsheets are marked by their

13  inconsistency and lack of information.

14           THE COURT:   You know, we need to ground this,

15  unfortunately, in the Federal Rules of Civil Procedure.

16  What is this?  Is this an interrogatory answer?  Is this --

17           MR. OPPENHEIM:   Yes, Your Honor.

18           THE COURT:   -- a production of data in some new

19  form?  What is it and – I need to know what the rules are

20  on all this.

21           MR. OPPENHEIM:   So, Your Honor, so we served

22  interrogatories and requests for production in January or

23  February, Your Honor.  We had a – oh, excuse me, on March

24  3.  We had a hearing before Your Honor on their objections

25  to producing both sourcing information for the titles at

107

 1                                                   107

 2  issue and sales information on the titles at issue.  And we

 3  – the transcript is lengthy --

 4        THE COURT:   I don't think they're objecting,

 5  unless I misunderstood you, Mr. Mandel, you're not

 6  objecting to producing this information.  You've produced

 7  the information you have.  Am I correct?

 8        MR. MANDEL:   With two exceptions that we

 9  outlined, and if they want to talk about those exceptions,

10  otherwise, we've given them everything responsive that we

11  have.

12        THE COURT:   So now what do we do?

13        MR. OPPENHEIM:   So that's not – so let me – I'll

14  go through the specifics, Your Honor.

15        THE COURT:   Okay.

16        MR. OPPENHEIM:   I apologize for the level of

17  detail.  But --

18        THE COURT:   Should I look at this thing?  No

19  one's given it to me.

20        MR. OPPENHEIM:   I have it on my laptop which I

21  don't have with me at the moment, Your Honor.  I could go

22  down and get it with a court order.  So the spreadsheet has

23  many tabs.  Some of those tabs relate to purchasing by the

24  defendants and some relate to sales.  The purchasing tabs

25  show purchasing through different channel, let's say,

1

2  different needs.  So, for instance, buyback purchasing or

3  purchasing in bulk.

4        So with respect to - so with respect to the

5  buybacks, they've provided names and addresses of who they

6  bought the books back from.  That's fine.  And that applies

7  for 3,100 entries.  But with respect to bulk purchasing,

8  which includes almost 20,000 books --

9        THE COURT:  Oh, this is the Amazon thing, right?

10        MR. OPPENHEIM:  No, this isn't even Amazon.

11  From individuals.  They refuse to provide any addresses,

12  even though they did it through a PO system where they

13  absolutely must have the address, and what their response

14  to us on this is is, well, you said identify, we've

15  identified and we've given you the names.  Of course,

16  identify both in our definitions in our document request

17  says it includes address and the local rules in the

18  Southern District of New York require an address as part of

19  identifying.

20        THE COURT:  Okay, this is identification of who

21  exactly? Purchasers or sellers of these books?  I'm sorry.

22        MR. OPPENHEIM:  So there are bulk - they do

23  sales in a lot of different ways.  They call this PO

24  inbound, which is purchase order I assume, inbound

25  purchasing.  And they have a list of 20,000 names, but

1

2  those names have no addresses associated with them, so we

3  can't cross-reference them to anything.  And we have to --

4  　　　　THE COURT:  Again, I don't understand.  This is

5  for a particular title?

6  　　　　MR. OPPENHEIM:  Yes, so it identifies what books

7  - so, for example, we could sort it and say for this title,

8  here are the 4,000 purchase orders, purchases we did of

9  this title.

10  　　　　THE COURT:  Okay, so, in other words, this could

11  be a title for which there was one counterfeit book?

12  　　　　MR. OPPENHEIM:  That we're aware of?

13  　　　　THE COURT:  Yeah.

14  　　　　MR. OPPENHEIM:  But we can't - we just don't

15  have addresses.

16  　　　　THE COURT:  No, no, no, no, I'm just trying to

17  put this altogether.

18  　　　　MR. OPPENHEIM:  Yes.

19  　　　　THE COURT:  So there could be just one

20  counterfeit book, and they're giving the 4,000 people who

21  sold it to them.

22  　　　　MR. OPPENHEIM:  Yes, a great reference, of

23  course, would be --

24  　　　　(interposing)

25  　　　　THE COURT:  Hold - do you think you can really

```
 1                                              110

 2  solve this?

 3          MR. MANDEL:   With a bulk tab.  I believe, it's

 4  not in front of me, but I believe the bulk tab has

 5  purchases from five major distributors.  They know the

 6  address of those five major distributors.

 7          THE COURT:   Well, he's talking about 4,000

 8  names.

 9          MR. OPPENHEIM:   Yeah.  No, no, that's – and with

10  respect to those, we do.  There's a bulk tab where there

11  are five, and we know who they are.  That's not an issue.

12          THE COURT:   All right.

13          MR. OPPENHEIM:   This is the nineteen thousand --

14          THE COURT:   This is the 4,000 individuals who

15  sold them books?

16          MR. OPPENHEIM:   Well, it's 19,748entries where

17  there are no addresses, but they bought through PO's.

18  Purchase orders.  So they must have addresses.  We need it

19  because --

20          THE COURT:   These are like individuals or who

21  knows?

22          MR. OPPENHEIM:   Yes, but we happen to know that

23  these individuals sell through false names using the same,

24  they use the same address over and over but false names, so

25  it's very important for us to see the address information,
```

1    Your Honor.

2          MR. MANDEL:   Here is what I believe the

3    confusion is.  I believe, I'm not sure because it's not in

4    front of me, and there's what I've learned this is more art

5    than science, because the defendants' systems don't

6    maintain this information in a way that it designed for

7    litigation.  They have it for purely business purposes.

8    There are a lot of things in the system that are referred

9    to PO's where there's no actual PO.  You're imagining like

10   a piece of paper that's a purchase order.  In fact, their

11   system doesn't allow you to enter a book into the system

12   unless you create a fictitious PO, so they create an

13   imaginary PO as purely an administrative thing, but there's

14   no actual document with any actual --

15         THE COURT:   So you don't think you have these

16   addresses?

17         MR. MANDEL:   I spent – correct.  I spent 90

18   minutes on the phone with my client after we received their

19   motion to compel, having previously spent at least three to

20   four hours trying to track down all this information.

21   After questioning about the whole – we went through the

22   whole spreadsheet, we went through all of their questions,

23   we went through the – we went through everything.  What we

24   concluded was there's only two things that are responsive

1

2 that we don't have in our possession --

3          THE COURT:   Just answer my question, you don't

4 have these addresses?

5          MR. MANDEL:   Correct.

6          THE COURT:   Okay.

7          MR. OPPENHEIM:   If they don't have it, Your

8 Honor, I can't force them to produce it.  I just want a

9 declaration that says that they --

10          THE COURT:   Well, no, you have a letter that

11 says they produced everything.  They only thing we haven't

12 produced are, and then they list the two things.  Why

13 aren't we just talking about those two things?

14          MR. OPPENHEIM:   That's the one letter I don't

15 have in front of me, Your Honor, but I believe --

16          THE COURT:   I hope you read it.

17          MR. OPPENHEIM:   I did, Your Honor.  It came in

18 late last night, and I was on a train early this morning,

19 so my apologies.

20          THE COURT:   So they have two paragraphs --

21          MR. OPPENHEIM:   But I did read it, and, Your

22 Honor, they have been objecting on the basis that the term

23 identify doesn't require them to give us addresses.

24          THE COURT:   Well, let's not worry about that

25 because they've now said that they don't have the

```
 1                                              113
 2  addresses.  Am I right?
 3           MR. MANDEL:  Yes, Your Honor.
 4           THE COURT:  Okay.
 5           MR. OPPENHEIM:  Well, if they don't have it, and
 6  that representation stands, that's fine.  We'll find out in
 7  depositions.
 8           Then with respect to, Your Honor, to the
 9  customers to whom they sold it, they've, for 24 1/2
10  thousand entries, they list a no.
11           THE COURT:  Hold on a second.
12           MR. MANDEL:  It's Amazon.
13           THE COURT:  Hold on a second.  No, this is not
14  the Amazon thing.  You say it's proprietary, completely
15  irrelevant --
16           MR. OPPENHEIM:  Oh, I'm sorry, I did skip an
17  issue, but go ahead, Your Honor.  I skipped --
18           THE COURT:  Which are we doing?  I thought you
19  were talking about - I started reading this while you were
20  talking.  Addresses of purchasers, they say they don't want
21  to give you the addresses of the purchasers.  And you never
22  asked for it.  And this is the thing where you said
23  identify, and you say identify includes addresses.
24           MR. MANDEL:  I think Your Honor and Mr.
25  Oppenheim are talking about two different things.
```

1

2          THE COURT:   The two of us are?

3          MR. MANDEL:   Yeah, I think Your Honor --

4          THE COURT:   I'm looking at your first paragraph.

5          MR. MANDEL:   I agree, he's not talking about

6    that.  He's talking about a totally different issue --

7          THE COURT:   You're talking about Amazon?

8          MR. OPPENHEIM:   Let's talk about what you're

9    talking about, Your Honor.

10          THE COURT:   Okay.

11          MR. OPPENHEIM:   So what you're talking about is

12   the issue we started with which is the lack of addresses,

13   and in their letter --

14          THE COURT:   Of purchasers.

15          MR. OPPENHEIM:   They call them purchasers, but I

16   believe that --

17          THE COURT:   Or renters, whatever.  That they're

18   not the ones who – we started out this thing ten minutes

19   ago talking about the people who sold to them.

20          MR. OPPENHEIM:   That's what I understand that

21   category is.  Mr. Mandel can clarify if --

22          THE COURT:   No, these are purchasers.

23          MR. MANDEL:   These are outgoing books, Your

24   Honor, so they're books that we either sold or rented to a

25   third party.

1

2          THE COURT:   Yeah, yeah, right.

3          MR. OPPENHEIM:   Okay, so --

4          THE COURT:   They say that's the one thing they

5    haven't give you because it's proprietary and irrelevant.

6    Do you want this letter?  I'm happy to share my copy.  Do

7    you have an extra copy right there?

8          MR. MANDEL:   Here, you can look at this.

9          THE COURT:   This is number 84, page 2, first and

10   second paragraphs beginning with those words.

11         MR. OPPENHEIM:   Well, Your Honor, so the

12   representation here in that second paragraph, that second

13   sentence --

14         THE COURT:   Hold on, can we skip number one

15   then?  We're done with number one?

16         MR. OPPENHEIM:   I'm sorry, I thought you had

17   pointed me to page 2.

18         THE COURT:   No, no, no, but there's two things

19   that he says he hasn't given you.  One begins with the

20   paragraph, word first; one begins with the word second.

21         MR. OPPENHEIM:   Yes, so I'm on first.  That's

22   where you want me to be?

23         THE COURT:   Oh, okay.  Yeah.

24         MR. OPPENHEIM:   Okay, the second sentence of

25   that paragraph --

116

THE COURT:  Okay.  No, forget that.  Even if you'd asked for it, he's not going to give it to you.  So let's pretend you asked for it.  Let's not worry about that piece.  He says it's proprietary and irrelevant.  So before we worry about whether you asked for it, could you just address that?

MR. OPPENHEIM:  Well --

THE COURT:  Take your time.

MR. OPPENHEIM:  So they sold the books, and we want to know where they sold the books to and to whom.  And his objection, I mean you're now saying, well, that objection doesn't matter; he's now saying that it's proprietary.  Well, the produce it subject to highly confidential.  I don't understand.

THE COURT:  Well, it says it's irrelevant.  Why do you need these addresses?  These are people to whom they sold books, not people who sold them books.

MR. OPPENHEIM:  But we want to correlate it to where we got the books from if we can.  It's more – I will grant you, Your Honor, it's more important on the sourcing side than on the sales side, but this is the first time I'm hearing this.  All along they've been standing on this absurd objection that identify doesn't include address when it's defined to include address.

THE COURT:   Tell me why you need it, you want to match up their buyers with other buyers?

MR. OPPENHEIM:   No, so we're trying to match where the books traveled to so we can show distribution. So that's what we're trying --

THE COURT:   But these are not the major distributors.  These are the individuals, right?

MR. OPPENHEIM:   Right, so, Your Honor, we have books that we know came from the defendants.  We're trying to figure out where they sourced them.  They know on three of them, they won't tell us.  We don't know on any of them. So we're trying any which way to puzzle backwards to figure out, well, which book is it that we have, and if we can figure out who they sold it to and then we got it from this distributor, we might be able to figure out which the book is, what the identifying number is, and go back to their sourcing information.

If they want to simply tell us for these three books, this is where we got them, for all the rest we have no idea where we got them, we didn't track it, and we can't tell, I guess we'll live with that and then turn to the sourcing information.

THE COURT:   I'm not sure I followed it, but does it solve the problem?

118

1

2          MR. MANDEL:   Nothing Mr. Oppenheim said

3    responded to Your Honor's question.  Your Honor's question,

4    and this is a very narrow issue --

5          THE COURT:   No, he did answer it because he said

6    I'm going to use the addresses of the people you sold these

7    books to to match up with like some sources of counterfeit

8    books that, I guess he has some other thing, and see if

9    it's the same person I guess.

10          MR. MANDEL:   Have the plaintiffs produced this

11    other list that they want to match it up with?

12          THE COURT:   It doesn't sound like it.

13          MR. MANDEL:   So let them produce that and we'll

14    take a look at it, and we'll see if this exercise is a

15    waste of time or not.  I mean he's saying he has some --

16          THE COURT:   Your concern is you don't want to

17    give up the names of these individuals you sold books to?

18          MR. MANDEL:   We don't want him – no, they

19    already have the names.  This is --

20          THE COURT:   I'm sorry, the addresses.

21          MR. MANDEL:   This is just – we just don't want

22    our customers to be harassed, an we haven't heard any

23    reason why he needs to contact the customers.  All he's

24    saying is he wants to match --

25          THE COURT:   No, he doesn't want to contact.  He

119

1  wants to match up things.  I mean I could make him

2  undertake not to contact anyone.

3       MR. MANDEL:  So he promises, the plaintiffs

4  promise for perpetuity to never contact any of the people

5  on this list, and we then give them the addresses.

6       THE COURT:  Yeah, you'd have to undertake that.

7  Are you ready to do that or not?

8       MR. OPPENHEIM:  I would articulate it this way,

9  Your Honor.  We won't use the list to contact somebody.  I

10 have no idea if at some point --

11      THE COURT:  Yeah, yeah, you won't use the list

12 to contact someone obviously.

13      MR. OPPENHEIM:  That's not our goal, Your Honor,

14 so yes, that's fine.

15      THE COURT:  Okay, so produce it with that

16 undertaking.  He's not to contact any of them using the

17 list.  Let's hear the second thing.  The only other thing

18 they did was the Amazon books.  They'd have to look each

19 book one at a time.

20      MR. OPPENHEIM:  But this is key, Your Honor.  We

21 need to know where they're source --

22      THE COURT:  But it's not their data.  Why should

23 they have to --

24      MR. OPPENHEIM:  We don't have access to it, Your

120

 1

 2   Honor, they do.  They have access to this Amazon – they

 3   have a portal entry into the Amazon system to see where

 4   they're getting the books, and they're not – we don't have

 5   access to that.

 6              THE COURT:  Well, it sounds like a very

 7   burdensome thing.  Do you want to pay for it?  If you want

 8   to pay for it, it's fine, but it sounds way too burdensome

 9   to look up these 10,000 books one at a time.

10              MR. OPPENHEIM:  So are the defendants

11   representing that they have no other – they don't access

12   and look at that information and they haven't done it

13   themselves?

14              THE COURT:  I assume so.

15              MR. OPPENHEIM:  Because they've said they know

16   where three of them came from, but they refused to tell us.

17              THE COURT:  Have you done this effort for the

18   10,000 books at issue?

19              MR. MANDEL:  No, we haven't attempted to do it

20   for one of them, as far as I'm aware.

21              THE COURT:  For not even one?

22              MR. MANDEL:  Not even one.

23              THE COURT:  Okay.

24              MR. OPPENHEIM:  Well, this is the definition of

25   hide the ball.  So they tell us they've got three, but they

121

won't tell us what they are.  We're supposed to go to trial

--

THE COURT:  Oh, I'm sorry, what's this three

thing?  I don't even know what you're talking about.

MR. OPPENHEIM:  Mr. Mandel said with respect to

three of the fifty-six counterfeit books in this case, the

defendants know where the sourced those counterfeits from.

Great, tell us.

THE COURT:  Well, why wouldn't they tell you?

MR. OPPENHEIM:  That's what I want to know.

THE COURT:  I'm totally confused.

MR. MANDEL:  I have no idea what he's talking

about with respect to the three.  Maybe that was some

discussion we had many months ago.  Let me tell you what I

can tell Your Honor.  We have produced a spreadsheet that

shows where we source every copy of every title in this

case.  The only exception is these books we get from Amazon

that are specifically described in our letter.  So the idea

that we're hiding the ball is preposterous.  We have

absolutely no information on sourcing that we have not

turned over to plaintiffs.

THE COURT:  Okay, that's pretty definitive, Mr.

Oppenheim.

MR. OPPENHEIM:  So long as the defendants are

1
2   not going to, at trial, put forward that they know where

3   any of these counterfeit books came from.  Because Mr.

4   Mandel, what he just said was really careful, we may have

5   discussed that a long time ago.  But he has this full

6   spreadsheet.  He didn't say they don't know.  Because he's

7   told us repeatedly they know.  So I don't want to go to

8   trial and have some witness --

9            THE COURT:   Do you know what he's talking about?

10           MR. OPPENHEIM:   -- take the stand and say we've

11   looked up and figured out three, and let me tell you what

12   we figured out.

13           MR. MANDEL:   We're not playing games.  I truly

14   have told you everything --

15           THE COURT:   I mean this could be solved with a

16   single request for admission or interrogatory or something

17   that just very specifically you would answer and say you

18   don't have the information.

19           MR. MANDEL:   Right now we're just talking about

20   this Amazon database we can access or not access.  Before

21   this conversation, it didn't even occur to me to try and

22   access the database to try and find anything.  It's

23   actually not a bad idea.  To the extent that's going to

24   happen in this case, of course, we have to provide the

25   information to Mr. Oppenheim well in advance of trial.  So

123

1

2  --

3         THE COURT:   I mean you're going to have to - it

4  would have to have been on this spreadsheet, right?

5         MR. MANDEL:   Correct.  I agree.

6         MR. OPPENHEIM:   Well, no --

7         THE COURT:   If you actually know it.

8         MR. MANDEL:   I a hundred percent agree.

9         THE COURT:   Okay, so you'd be under a duty to

10 supplement the spreadsheet with respect to that information

11 even for an Amazon book.

12        MR. MANDEL:   I a hundred percent agree.

13        THE COURT:   That solves your problem, right?

14        MR. OPPENHEIM:   But if there are 60,000 lines on

15 the spreadsheet and they've identified the three lines that

16 are relevant, they should articulate what those three lines

17 are.

18        THE COURT:   I don't know what you're talking

19 about.

20        MR. OPPENHEIM:   So, Your Honor, if we're allowed

21 to submit to them an interrogatory and a request for

22 admission and they can respond in ten days, maybe we can

23 clear this up.

24        THE COURT:   Okay, well, why don't we just do

25 that.  I mean if you don't think the spreadsheet's enough

```
 1                                                    124
 2  for you.  Then do an interrogatory.
 3            MR. OPPENHEIM:   And they'll respond on an
 4  expedited basis.
 5            THE COURT:   Yeah, if you can respond to this one
 6  within ten days, Mr. Mandel.  I mean if there's some
 7  problem, you'll let me know, but that's the presumption.
 8            MR. MANDEL:   Yes, that's fine.
 9            THE COURT:   It's a single interrogatory on the
10  sourcing point.
11            MR. MANDEL:   Yes, Your Honor.
12            THE COURT:   All right, good.  Anything else, Mr.
13  Oppenheim?
14            MR. OPPENHEIM:   Just the scheduling issue, Your
15  Honor.
16            THE COURT:   What do we do about that?
17            MR. OPPENHEIM:   So, Your Honor --
18            THE COURT:   Is there an agreement or not?
19            MR. OPPENHEIM:   No.
20            THE COURT:   Oh, great.
21            MR. OPPENHEIM:   No, there's not.  We agree with
22  Your Honor that there's a little bit of room in the
23  schedule to push the discovery deadline, but there's not a
24  lot.  And the defendants want to put forward a schedule
25  that we think is just, is destined for disaster and puts us
```

125

1  at a disadvantage going into trial.  And, Your Honor, it's

2  all being pushed because the defendants had told us that

3  they don't want to make their witnesses available for three

4  weeks in August for depositions.  And obviously we have a

5  ton of depositions to take.  We have noticed them up to all

6  be taken prior to August 18.  They never noticed a single

7  deposition.  We should not be jammed up at trial because

8  they're late --

9           THE COURT:  So you want to do depositions in

10  August --

11           MR. OPPENHEIM:  We've give them --

12           THE COURT:  -- and they don't want to do it.

13           MR. OPPENHEIM:  -- a comprehensive schedule of

14  the depositions that we want to take based on the documents

15  that we have now.  And we've provided them a proposed

16  schedule.  In our proposed schedule --

17           THE COURT:  Your depositions of their witnesses.

18  How many are there?

19           MR. OPPENHEIM:  Yes.  So, Your Honor, there are

20  - it's what we --

21           (interposing)

22           MR. MANDEL:  It's a ballpark of ten at this --

23           MR. OPPENHEIM:  -- 14.

24           MR. MANDEL:  Okay, 14.

                                                                126

1

2                MR. OPPENHEIM:   Including --

3                THE COURT:   Fourteen depositions.

4                MR. OPPENHEIM:   -- the 30(b)(6) depositions,

5    which may come off based on the way --

6                THE COURT:   And what's the problem doing it in

7    August?

8                MR. MANDEL:   So there's three weeks in August.

9    We sell college textbooks.  So there's three weeks in

10   August which is by far the busiest three weeks of the year.

11   They want to talk to the key key people who have been doing

12   all the anti-counterfeiting work.

13               THE COURT:   All 14?

14               MR. MANDEL:   No, there's --

15               THE COURT:   Can you give him a few in August?

16               MR. MANDEL:   -- two or three we can do - I think

17   we'll be able - two or three we can do in August.  We

18   offered three or four for next week.  They said they

19   weren't interested in them because they hadn't gotten the

20   documents yet, which is fine, totally fine.  But we've

21   tried to work with them on this issue.  I think there's two

22   or three that we can get done in August, and I don't think

23   the plaintiffs want the people who can tell the difference

24   between counterfeits and non-counterfeits sitting in a

25   deposition as opposed to actually checking the books each

127

1

2  day, which is what they're doing this time of year.

3        MR. OPPENHEIM:   Nobody does anti-piracy, anti-

4  counterfeiting work on the sales side.  It's all on the

5  buyback side, and that's not happening in August.

6        THE COURT:   Well, what's the big deal if he

7  gives you a couple in August and you do ten in September?

8        MR. OPPENHEIM:   Because, Your Honor, the way –

9  he also is going to want depositions, and it just simply

10  isn't, the schedule won't allow for it.  Can I tell you --

11        THE COURT:   What about October?

12        MR. OPPENHEIM:   Well, Your Honor, we're supposed

13  to have a November 6 trial date, and Judge Pauley, we had

14  signed off on the pretrial being due on September 15 and

15  the motions in limine being due on September 27.  Now, we

16  believe we can move that pretrial report by ten days, and

17  we believe --

18        THE COURT:   Do you want to move this trial or

19  not?

20        MR. OPPENHEIM:   What?

21        THE COURT:   Do you want to move this trial or

22  not?

23        MR. OPPENHEIM:   I would prefer not to, Your

24  Honor, but I do not want to have three days to prepare for

25  trial after the judge hears the in limine motions.

128

1

2          THE COURT:   Well, you know, I never understood

3   why we did this, but the desire was to hold off on the old

4   case to do this case, which I thought was crazy, but

5   apparently that wasn't the parties' desire.  You know, we

6   are where we are, and either I cut down the number - I'm

7   not going to make people show up in August if there's, you

8   know, I can't make those judgments.  My solution would be

9   to just take everything in September, and you have your

10  multiple lawyers do it and they'll have their multiple

11  lawyers do it, and if that's what you want me to do, you

12  know, I'll do it.  I'm not going to start ordering people

13  to appear in August if they don't want to appear in August.

14  I'm not going to do that.

15          MR. MANDEL:   We have a proposed revised schedule

16  for Your Honor.

17          THE COURT:   Okay.  Well, I mean is the schedule

18  - people expect me to order depositions on certain days or

19  certain people?  What're you asking me to do?

20          MR. MANDEL:   These are just end dates.  These

21  are not deposition dates.

22          THE COURT:   You need something from us?

23          MALE:   (inaudible)

24          THE COURT:   Sure, go ahead.  No problem.

25          MR. OPPENHEIM:   So, Your Honor, we sent them a

129

1   proposal before they sent --

2         THE COURT:   This allows you to do everything by

3   the end of September.

4         MR. MANDEL:   Exactly, Your Honor.

5         THE COURT:   Now, what's your proposal?

6         MR. OPPENHEIM:   So our proposal, which he didn't

7   include and we sent to him in advance, and the reason he

8   didn't include it is because he's done something that I

9   objected to last night, and he's overlooked it.  So first

10  is, Your Honor, the defendants should complete their

11  document production by no later than August 8.  They've had

12  – we finalized search terms with them on July 25.  So they

13  shouldn't get an extension to August 17 based on the fact

14  that they've just resolved issues with us on search terms.

15        THE COURT:   What's the problem with the 8th?

16        MR. MANDEL:   There's two issues.  First of all,

17  we didn't finalize search terms last week, that's just

18  false.  But setting that aside for a second, we've been

19  trying for about a week to collect the documents.  We have

20  now learned one person at our client that's capable of

21  pulling the documents.  Of course, that person was on

22  vacation.  So we haven't even gathered the documents.  They

23  will be uploaded into the system at the earliest tomorrow

24  or Monday.  That's at the earliest, that's assuming the

1  second most knowledgeable person learned this week how to

2  do it correctly, which I don't know whether that happened

3  or not.  So we're not going to be able to review the

4  documents in three days.

5

6          By the way, his point about asymmetry makes no

7  sense.  The Court ordered virtually no new documents to be

8  produced today.  Last week both parties discussed running

9  additional search terms.  So the idea that there's some

10  kind of asymmetry here is just false.  All the discussions

11  that are really material happened last week.

12          THE COURT:   Okay, 17th is fine.  What's next?

13  What's the next date now that I've done that?

14          MR. OPPENHEIM:   Is the close of discovery, what

15  is the final close of discovery.

16          THE COURT:   What do you want?

17          MR. OPPENHEIM:   We suggested moving it from

18  August 18, moving it roughly four weeks to September 13.

19  They want to move it all the way to September 29 which is

20  an additional 16 days.

21          THE COURT:   I think you're going to need it.

22          MR. OPPENHEIM:   Well, the problem with that,

23  Your Honor, and I don't disagree that if they're not

24  compelled to actually produce witnesses in August, I agree

25  with you we will need it.  But then the problem is all of

131

their subsequent dates, which are in their proposal here,

which I assume is the same as what they – no, they've

changed it from what they sent us last night.  No, it's the

same, okay.

So all of their proposed dates.  Here's the

problem with it --

MR. MANDEL:  Just so I'm not accused of having

made some misrepresentation, I honestly can't remember.  We

were looking at it – I may have – I think I looked at it

yesterday with my colleagues.  I might have tweaked it this

morning.  I cannot remember.

MR. OPPENHEIM:  So there are a couple of

problems with this proposed schedule.  First off, it backs

up the motions in limine so that Judge Pauley doesn't even

get them fully briefed until October 23.  If the idea of

motions in limine are to narrow the trial, as Judge Pauley

has ruled in other cases that I've been involved in in

front of him, there will be no chance to do that if they're

not fully briefed until the 23rd.

Apart from that, there isn't nearly enough time

in their schedule between the close of discovery and the

pretrial order --

THE COURT:  Let's take a break, everyone.

(off/on the record)

```
 1                                                    132

 2              THE COURT:   Okay, we're back on the record.  I'm

 3    going to hopefully issue a ruling on the schedule just in

 4    writing.  On the depositions, what is it you're prepared to

 5    offer, Mr. Mandel, timing-wise?

 6              MR. MANDEL:   We can offer three witnesses in

 7    August, and we will work with the plaintiffs to come up

 8    with a schedule for everyone else in September, provided

 9    there's no substantive objection.  In the next, I think in

10    the next week we'll be able to come up with a deposition

11    schedule.

12              THE COURT:   All right, let's do this.  Let's

13    just say - I'm going to move it up by a week.  You have to

14    produce the rest so that they're all deposed by September

15    22.  And I'll let you know about the remaining schedule.

16              MR. MANDEL:   Thank you, Your Honor.  There's

17    just one other scheduling issue.  Our expert report is due

18    tomorrow.  We'd ask for a three-week extension.  Twice the

19    plaintiffs asked us for extensions of their expert report

20    deadline.  We consented both times.  We asked them this

21    time; they asked me a bunch of questions about why we

22    needed an extension, and then they wouldn't - when I

23    answered them, they wouldn't tell me one way or the other

24    whether they consent or not.

25              THE COURT:   Three-week deadline?  Three weeks?
```

133

1

2          MR. MANDEL:   Yes, well, we're extending the

3     whole schedule by approximately six weeks.   So three weeks

4     would still take us well within August.   They would have -

5     if, I'm not even sure we're going to have an expert, but if

6     we have an expert, they would have --

7          THE COURT:   Why do you need three weeks?   I

8     don't understand.   And why you waited till the day before

9     to ask me for it?

10          MR. MANDEL:   Sure.   Well, I asked them for it

11     yesterday --

12          THE COURT:   No, but why did you wait till

13     yesterday --

14          MR. MANDEL:   Yeah, well --

15          MR. OPPENHEIM:   Last night.

16          MR. MANDEL:   -- first of all, we thought we were

17     going to be getting a lot of emails after today, and we

18     thought those emails would be very helpful in the expert

19     report.   Second, I've been dealing with summer vacations

20     which has greatly slowed down the process.   And, third, I

21     work for a small firm.   We have had I believe five

22     discovery motions in the last ten days, and I thought there

23     would've been a lot more time to invest in the expert

24     discovery issue, and there just hasn't been.

25          MR. OPPENHEIM:   Your Honor, we've been talking

1

2 about experts in this case.  If I go into the transcripts

3 and go back to March where there's been discussion of

4 experts, there's just no reason at this point, and my

5 concern is, Your Honor, that --

6          THE COURT:   The due date was tomorrow?

7          MR. MANDEL:   Yes, Your Honor.

8          MR. OPPENHEIM:   And here's my concern, Your

9 Honor, we already produced our expert reports because the

10 way Judge Pauley set this up was the plaintiffs produce

11 reports and then defendants report their reports afterwards

12 on the assumption that they're all rebuttal reports.  Now

13 that wasn't stated – it wasn't stated that way.  My concern

14 is he's going to come forward with some experts on non-

15 rebuttal issues, and we're going to be jammed up with

16 having to try to rebut them --

17          THE COURT:   Is there a date for you to rebut

18 them?

19          MR. OPPENHEIM:   There's no date for us to rebut

20 them.  So we – so if he's going to put forward anything

21 other than a rebuttal witness, I wanted it ages ago --

22          THE COURT:   Is this going to be rebuttal expert?

23          MR. MANDEL:   I just don't know yet, Your Honor.

24 We just haven't made – we have not had a chance --

25          THE COURT:   I'll extend it one week, that's it,

135

17th.

          MR. MANDEL:   Can we have two weeks, Your Honor?

          THE COURT:   You don't have much to do next week

because he's not around, right?

          MR. MANDEL:   I know, but --

          MR. OPPENHEIM:   The prejudice --

          MR. MANDEL:   -- literally everyone, including

half of my clients, are on vacation at the moment.  So two

weeks I think will allow us to get this done.

          MR. OPPENHEIM:   Your Honor, there's prejudice

here.  There's real prejudice.  If they're putting forward

affirmative experts on issues --

          THE COURT:   You should have some idea --

          MR. OPPENHEIM:   They're due tomorrow.

          THE COURT:   -- at least of whether it's, what

the topic area is.

          MR. OPPENHEIM:   We have asked repeatedly, and we

never get an answer.

          THE COURT:   You have no idea?

          MR. MANDEL:   The one potential topic that we've

identified thus far, and no final decisions have been made,

are industry practices concerning the inspection of books.

And --

          THE COURT:   Okay.

136

1

2          MR. MANDEL:   We agreed to – they asked for two

3    extensions --

4          THE COURT:   So that would be the only topic it

5    would be on?

6          MR. MANDEL:   Well, we might – you know, I have

7    not been able to show Mr. Dimm their printing

8    specifications, so it's very hard to know one way or the

9    other whether we want to serve a rebuttal report with

10   respect to whether the books are counterfeit or not.   That

11   was the next step in the process.   We gave them, without

12   any strings attached whatsoever, two extensions of their

13   deadline as a pure courtesy.   I'm shocked that they're

14   standing here not extending that same courtesy to us.

15         THE COURT:   Okay, okay.

16         MR. OPPENHEIM:   Your Honor, I have done nothing

17   but extend courtesies --

18         THE COURT:   Okay, everyone stop.   Two weeks, the

19   18th.   I'll make sure that you're not prejudiced, Mr.

20   Oppenheim.

21         MR. OPPENHEIM:   Your Honor, we object.

22         THE COURT:   Feel free to invoke Rule 72 and do

23   whatever you wish.   What else do we need to do today?

24         MR. MANDEL:   Nothing, Your Honor.

25         THE COURT:   Mr. Oppenheim?

137

 1

 2          MR. OPPENHEIM:   Your Honor, I just – on this

 3   issue of the experts, he sent me the request --

 4          THE COURT:   Are you rearguing my ruling?

 5          MR. OPPENHEIM:   I am arguing on your ruling,

 6   Your Honor.

 7          THE COURT:   Use Rule 72.

 8          MR. OPPENHEIM:   I don't believe --

 9          THE COURT:   Rule 72 is the way to reargue it.

10   Make an objection to Judge Pauley.

11          MR. OPPENHEIM:   Your Honor, you never even

12   allowed me to articulate a position on this issue.

13          THE COURT:   Go ahead.  You said – I thought you

14   finished.  If there's more, go ahead.

15          MR. OPPENHEIM:   So, Your Honor, they have had

16   more than ample opportunity to put forward who their

17   experts are.  We have told them since day one of this case

18   exactly what experts we were going to put forward and what

19   those experts would be providing expertise on.  We

20   immediately provided them with access to the books, with

21   information on what was counterfeit, on images of the

22   books, everything they needed to pursue this.  They have,

23   in response to our question time after time after time,

24   refused to give us any information.

25          And what's going to happen here is in two weeks

138

1     he's going to produce a report; we're going to have to go

2     find an expert to respond to that report, and we'll have to

3     do that while we're in the crush of depositions, and the

4     answer's going to be, well, do you want to move the trial

5     date, which we don't want to do.  So there is clear

6     prejudice to us.  There's no reason they didn't get it done

7     by now because the issue has been raised repeatedly.

8            THE COURT:   I adhere to my ruling.  Anything

9     else, Mr. Oppenheim?

10           MR. OPPENHEIM:   No, Your Honor.

11           THE COURT:   Mr. Mandel, anything?

12           MR. MANDEL:   No, thank you, Your Honor.

13           (Whereupon the matter is adjourned to August 21,

14    2017, at 11 a.m.

139

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Cengage Learning, Inc., et al v. Book Dog Books, LLC, et al Docket #1:16-cv-7123-WHP-GWG, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature_____

                    Carole Ludwig

Date:   August 5, 2017