1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    ---------------------------------X
                                      :
4    CENGAGE LEARNING, INC.,          :
     et al.,                          :
5                                     : 16-CV-07123 (WHP)(GSG)
                         Plaintiffs,  :
6                                     : October 13, 2017
                    v.                :
7                                     : 500 Pearl Street
     BOOK DOG BOOKS, LLC, et al.,     : New York, New York
8                                     :
                    Defendants.       :
9    ---------------------------------X

10

11        TRANSCRIPT OF CIVIL CAUSE HEARING FOR DISCOVERY ISSUES
            BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
                  UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For Plaintiffs:          MATTHEW JAN OPPENHEIM, ESQ.
                              JEFFREY GOULD, ESQ.
15                            Oppenheim Zebrak, LLP
                              5225 Wisconsin Ave. NW
16                            Suite 503
                              Washington, D.C. 20015
17

18   For Defendants:          RISHI BHANDARI, ESQ.
                              A. LEAH VICKERS, ESQ.
19                            Mandel Bhandari, L.L.P.
                              11 Broadway
20                            Suite 615
                              New York, New York 10013
21

22

23   Court Transcriber:       SHARI RIEMER, CET-805
                              TypeWrite Word Processing Service
                              211 N. Milton Road
24                            Saratoga Springs, New York 12866

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

1          THE CLERK:  This is conference in the matter of

2    Cengage Learning, Inc. v. Book Dog Books, Docket 16-CV-7123.

3          Counsels, state your name for the record.  First in

4    the courtroom and then on the phone, please.

5          MR. BHANDARI:  Good morning.  My name is Rishi

6    Bhandari from the law firm of Mandel Bhandari LLP, and I

7    represent the defendants in this case.

8          MS. VICKERS:  A. Leah Vickers also from the law firm

9    of Mandel Bhandari also representing the defendants in this

10   case.

11         THE CLERK:  Counsel on the phone.

12         MR. OPPENHEIM:  Yes, this is Matt Oppenheim and Jeff

13   Gould on behalf of the plaintiffs on the telephone.

14         THE COURT:  Mr. Oppenheim, can you just give your

15   appearance again?  I want to see if the volume button worked

16   here.

17         MR. OPPENHEIM:  Okay.  It's Matt Oppenheim and Jeff

18   Gould on behalf of the plaintiff publishers.

19         THE COURT:  If you could just be as close to the

20   microphone as possible because you're not that strong.

21         MR. OPPENHEIM:  Yes, sir.

22         THE COURT:  Why don't you folks in the courtroom

23   have a seat so that they can be as close to the mic.  Whoever

24   is speaking should -- by the base, not the neck.  Bring the

25   mic as close as possible.

1          So we're here -- the letters that I have in front of

2     me are Dockets 125, 128, 131, 132, 133 and 135.  So why don't

3     we start with the issues raised by defendants in 125.

4          MR. BHANDARI:  Thank you, Your Honor.  Would you

5     like me to give an overview of --

6          THE COURT:  Well, just give -- I mean maybe I should

7     take us through issue by issue.  Here's the thing.  I've read

8     the letters.  So here's the thing on the third party

9     depositions.  If we didn't have a trial scheduled and if we

10    didn't have witness lists that were due, already due, and

11    exhibits already -- due today, deposition designations and a

12    pretrial order due October 25th followed by motions in limine

13    there -- I would be a little more open to this.  My problem

14    with this is that you knew about these individuals -- these

15    companies I think it was March and you didn't seek to depose

16    them until just a couple of weeks before the deadline.  It's

17    to be assumed that a third party is not going to drop

18    everything in order to meet a discovery deadline.

19         MR. BHANDARI:  Your Honor --

20         THE COURT:  Go ahead.

21         MR. BHANDARI:  So that's not exactly factually

22    correct.  We originally subpoenaed MBS, Follett and Chegg in

23    August, I think towards the end of August.  So it might be

24    August 29th was when we subpoenaed them.  MBS and Follett

25    accepted -- said that they would accept service through

4

1   counsel.  Originally Chegg actually said that they would

2   accept service through counsel as well but all of them

3   basically took the position that the location of where the

4   deposition was taking place was not something they would

5   consent to.

6          While we thought we had the ability to depose them

7   here in New York because they regularly do business -- those

8   companies all regularly do business in New York and Rule 45

9   says that you can be deposed anywhere within 100 miles of

10  where you reside or where you regularly do business.  We felt

11  that we could have stood on the subpoena but we didn't want to

12  fight over a silly issue like that.  So we then at their

13  behest simply issued new subpoenas on September 20th for time

14  periods within the discovery period.

15         The back and forth between us and the third parties

16  started in August and I think for whatever reason they have

17  chosen to try and go slowly as possible.

18         THE COURT:  When was the discovery deadline in

19  August?  Because actually I moved it since then.

20         MR. BHANDARI:  What's that?

21         THE COURT:  When was the discovery deadline at the

22  time you started this, do you know?

23         MR. BHANDARI:  Yes.  The discovery deadline was

24  October.

25         THE COURT:  It was October.

5

1          MR. BHANDARI:   Yes, it was October 4th.

2          THE COURT:   Okay.  It was October as of August 14th.

3    So you did this --

4          MR. BHANDARI:  Yes.

5          THE COURT:  -- after that.

6          MR. BHANDARI:  Right.  Like I said, I think it was

7    August 29th is my recollection of when we served these

8    subpoenas.  It might have been -- it was sometime during the

9    week of August 20th shortly after the discovery deadline was

10   moved to October 4th.  So it's not that we sat back.  It's not

11   that we didn't want to give ourselves time to negotiate time

12   and a place with opposing counsel.  Their position was such

13   that they refused to talk about the scope of the depositions

14   unless we agreed to change the location.  We agreed to change

15   the location and then in the Follett's situation we have

16   narrowed the scope.  That deposition is going to take place on

17   October 24th and the other side, even plaintiffs don't --

18         THE COURT:  I'm not worried about that one.  That's

19   fine.

20         MR. BHANDARI:  So it's the November 10th date that

21   is the earliest possible date that MBS says that they're

22   available.  We started trying to negotiate with them in August

23   and that's just the earliest date that they could give to us.

24   Because there were third parties we didn't think that it made

25   sense to compel the deposition to happen in New York when that

6

1  was one thing we thought could be easily dealt with.

2          So while we'd be happy to take this deposition

3  earlier if the court were to order MBS to have to be deposed

4  earlier I suppose they would comply with whatever the court

5  orders there were whether or not causes them more expense as

6  they said that's the primary reason why they didn't want to go

7  during the weeks leading up to October 16th but we -- while we

8  prefer to have this done earlier it will not affect the

9  witness list.  We already provided the witness list.  We know

10 that there's either going to be follow up live witnesses or

11 follow up deposition witnesses that might be necessary.  It

12 will not affect the exhibits.  The exhibits are all things --

13          THE COURT:  Well, that's good to hear.  It won't

14 affect any exhibits.

15          MR. BHANDARI:  It won't affect any exhibits.

16          THE COURT:  Okay.

17          MR. BHANDARI:  I suppose there is a document

18 subpoena that's returnable earlier.

19          THE COURT:  Well, that's -- exactly.

20          MR. BHANDARI:  The document subpoena is returnable

21 earlier.  So I should -- the deposition will not affect any

22 exhibits.  There will not be any --

23          THE COURT:  Well, the exhibit list is due today;

24 right?

25          MR. BHANDARI:  The exhibit list is due today, yes.

7

1              THE COURT:  So it's not going to affect -- nothing I

2   do today is going to affect any exhibit list.

3              MR. BHANDARI:  Only to the extent that there's some

4   additional documents that you ordered to be produced from

5   today's meet and confer or from today's hearing.

6              THE COURT:  No, no, I meant on the basis of your

7   subpoenas to these third parties.

8              MR. BHANDARI:  Again, we would simply make a request

9   to supplement the exhibit list if something was to be produced

10  after the exhibit lists are exchanged.

11             THE COURT:  Okay.  So obviously so it is an issue.

12             MR. BHANDARI:  I suppose -- for Amazon it's not an

13  issue.  We're not requesting any documents from Amazon.

14             MR. OPPENHEIM:  Your Honor --

15             THE COURT:  Hold on.  So you proposed the date --

16  the earliest date for who was it?

17             MR. BHANDARI:  For MBS is November 10th.

18             THE COURT:  November 10th.  So you're asking for a

19  deposition from MBS on November 10 and from Amazon on an

20  unknown date.

21             MR. BHANDARI:  Yes.  We would ask for the court to

22  set a deadline for that.  We'll notice the deposition on

23  November 2nd but meet and confer with them and try and find a

24  mutually agreeable date before whatever deadline the court

25  imposes.

8

1          THE COURT:  Mr. Oppenheim.

2          MR. OPPENHEIM:  So the facts as they've been set out

3   not quite accurate, Your Honor.  So there were initial

4   subpoenas for which notice was sent to us in August.  I don't

5   believe the subpoenas were actually served on the third

6   parties in August.  We had a hearing on September 7th, Your

7   Honor.  All of the third parties indicated to the defendants

8   that they had substantial objections to the scope and the

9   locations of the subpoenas.

10          Defendants didn't do anything for several weeks and

11   sat on it for several weeks and then unilaterally noticed

12   without coordinating dates with anybody for the last couple of

13   days of discovery, October 2nd, 3rd and 4th, even though we

14   were already double tracked on other depositions.  So they

15   knew there was no chance that the depositions were going to go

16   forward during the discovery period.

17          They also included a long list of topics that all of

18   the third parties had already indicated to the defendants were

19   objectionable and we had already told the defendants exceeded

20   the scope, Your Honor, of what -- of many of the rulings that

21   you've issued in this case.

22          So with respect to follow -- I won't go through the

23   details.  I don't believe -- we'll go forward with the

24   deposition on the 24th because we agreed not to object on

25   timeliness basis but frankly we did that because defendants

1  told us that they were going to negotiate a stipulation that

2  would hopefully obviate the need for the deposition.  They

3  then told us they had no objection to the stipulation we gave

4  them but won't agree to it.  So not quite good faith but fine,

5  we agreed.  We'll go forward with it.

6         The other two -- excuse me, not the other two.  With

7  respect to MBS, their substantial disputes with MBS on the

8  scope of that deposition.  They've not even had a discussion

9  about it yet.  And we will -- depending on what happens in

10 that discussion we may have objections.  So they have not

11 pursued this timely, Your Honor.  They've waited to the last

12 minute.  They knew about it in March and they -- both with the

13 MBS deposition and the Amazon deposition which has other facts

14 associated with it because there's been no contact with

15 Amazon.

16        They want to use these depositions to introduce new

17 issues into the case.  New issues after discovery is closed.

18 So, for example, with respect to Amazon, they've noticed up a

19 topic about Amazon commingling inventory.  This is the very

20 first instance where that issue has come up with respect to

21 Amazon shipping seller's inventory.  So they're going to

22 introduce a brand new factual issue and presumably use it as a

23 defense after discovery is closed and after we've taken the

24 depositions of all their witnesses?  I don't think that's

25 proper.  We'll go forward with Follett.  MBS and Amazon should

10

1   not happen.

2        THE COURT:  Why did you wait until August when you

3   knew about all this in March?

4        MR. BHANDARI:  Your Honor, I think that there have

5   been many, many aspects of this case that have been dealt with

6   at various different times.  I think after looking at

7   documents and starting to get an idea of exactly what the

8   factual background is for what these allegations are it became

9   clear to us that there are some other issues here.  Let me

10  give you some examples.

11       For example, it became very clear after taking the

12  deposition of Jessica Stitt which just happened in -- a couple

13  of weeks ago that MBS supposedly has provided source

14  information to the plaintiffs claiming that the plaintiffs are

15  the source of various books.  Now, the plaintiffs don't have

16  any firsthand knowledge indicating they -- defendants are the

17  source of these books.  The defendants don't believe that

18  there's a source of counterfeit books, of all the counterfeit

19  books that the plaintiffs are claiming that we are.  MBS

20  clearly has information that's relevant to this.

21       The Amazon issue became something that became clear

22  after the first -- the depositions started taking place in

23  early September.  It became clear that Amazon was actually

24  shipping counterfeit books to the plaintiffs.  They were in

25  return.  So Amazon supposedly bought new books from the

1    plaintiffs.  When Amazon bought new books from the plaintiffs

2    they would not sell all of them.  So they're able to return

3    them to the plaintiffs.  But when they were returning books to

4    the plaintiffs what were supposed to be the original copies of

5    the new books that they received they would actually send in

6    the last -- during the course of the summer they said the

7    testimony came out in early September saying that sometime in

8    July or August of this summer Amazon was sending counterfeit

9    books back to the publishers under the auspices of potentially

10   -- of claiming that these were the new books that they had

11   purchased.

12           So that's what gave rise to our concern that Amazon

13   is commingling books where a lot of the books at issue in this

14   case that have supposedly been sold by the defendants have

15   never been touched by the defendants.  What happens is Amazon

16   has a program where books get shipped directly to Amazon.

17   They're stored in the Amazon warehouse and then when someone

18   like the plaintiffs conducts a test purchase Amazon will send

19   those books directly to the plaintiffs.

20           Now, if Amazon is commingling books as it seems like

21   they must be based on the testimony we learned about in early

22   September from the defendants, if Amazon is commingling books

23   then one, there's a novel question on whether or not we could

24   be considered the distributor of those books when we had no

25   knowledge whatsoever that they were counterfeit and two,

12

1   certainly that goes very strongly to whether or not there's an

2   innocent infringement defense.  So we learned about these

3   things.

4           So Amazon we did not notice on August 29th.  We did

5   notice them for the first time on September 20th and we only

6   have three depositions topics with them.  We're not seeking

7   documents from them and it's because of the testimony that

8   came tonight in this case in early September from the

9   defendants -- from the plaintiffs, excuse me.  So that's the

10  reason for the Amazon subpoena being issued on September 20th.

11          MR. OPPENHEIM:  Your Honor, can I --

12          THE COURT:  What was the MBS reason again?

13          MR. OPPENHEIM:  I'm sorry.

14          MR. BHANDARI:  The MBS reason was it became clear as

15  we were studying this case and going through documents and

16  seeing what we had and what we didn't have that there's no

17  clear chain of custody indicating why the plaintiffs are

18  claiming that books that they got from MBS's warehouses during

19  audits of MBS they're claiming that the defendants sold those

20  books.  We couldn't find anything.  We thought that that would

21  be -- in order to bring a good faith claim against us we

22  figured that they would have to have clear documentation of

23  that.

24          When we started to take a very close look at all the

25  documents they produced it's evident that there's nothing

1  indicating that MBS actually has proof that the books in their

2  inventory were books that came from the defendants in this

3  case.  So once that became clear we were like we have to

4  actually depose MBS.  We have to depose Follett.  We have to

5  depose Chegg to see how their inventories are stored.

6          For example, with Chegg, we just found out at the

7  deposition on October 4th that for certain books, rental books

8  our client will send a book directly to a Chegg customer.  The

9  Chegg customer will use the book for an entire semester if

10  they want but that when they send the book back to Chegg,

11  Chegg then puts a sticker on it claiming that it was something

12  that was provided by our client.

13          Now, it's very possible as the Chegg witness

14  testified that the book that the student sends back -- let's

15  say that they lost a book.

16          THE COURT:  Sorry.  Why are we talking about Chegg?

17          MR. BHANDARI:  Oh, to give you an example of how

18  we're finding out that the custody issues are not what the

19  plaintiffs have represented them to be in this case.  MBS and

20  Follett -- the plaintiffs are claiming that MBS and Follett

21  have also identified books that were sourced by the

22  defendants.  That's the heart of their claim.

23          There's almost no books that the defendant -- that

24  the plaintiffs have received directly from the defendants.

25  Every book that they claim in this case that is counterfeit

14

1  and that was distributed by the defendants --

2          THE COURT:  So they said long ago that MBS has

3  counterfeit books that allegedly came from you; right?

4          MR. BHANDARI:  Right.  So we went through the

5  documents.

6          THE COURT:  So why wouldn't you have at that time

7  subpoenaed MBS to figure out how it is that they have books

8  that came from you and what the process was?

9          MR. BHANDARI:  We did in late August and that seemed

10 to be sufficient time.

11         THE COURT:  No, no, not in August.  Off the bat

12 here.

13         MR. BHANDARI:  Your Honor, there was a -- there's

14 been a lot of discovery in the past two months.  We've done

15 over 20 depositions all around the country.  There were a lot

16 of things that had to be done and in August that's when we

17 realized that there should be depositions of MBS as well

18 because the documentary evidence was not -- did not clearly

19 tie any books from the defendants to sales or distributions

20 that were identified by the plaintiffs.

21         So we came to that conclusion.  I can't tell you why

22 we didn't do it faster but we came to that conclusion in

23 August.  We should subpoena shortly thereafter and they're

24 important pieces of information.  I think that there's no real

25 reason why MBS shouldn't be deposed in this case.  It's highly

1  relevant.

2      THE COURT:  It's not that the issue.  The issue is

3  this all happens weeks before the discovery deadline and that

4  -- I don't know if you -- I don't think you responded.  Mr.

5  Oppenheim said there was a period in September where you did

6  nothing on all this.

7      MR. BHANDARI:  That's not true.  I was meeting and

8  conferring with opposing counsel during that period as well.

9  I mean it's just not true.  I mean I don't know how Mr.

10  Oppenheim would even know that.  Of course he wasn't on the

11  line for phone calls that I had with the opposing counsel but

12  that's how we got the Chegg deposition nailed down on October

13  4th even though it was issued on September 20th, the revised

14  subpoena because for several weeks I had in fact been

15  negotiating with opposing counsel.  That's why the Follett

16  deposition is more or less lined up on October 24th.

17      MBS was far less -- I had less interaction because

18  their counsel took the position that they wouldn't give us any

19  dates, they didn't want to talk about the scope until there

20  was a date but I tried and so then we ultimately just issued

21  the subpoena and said now you can move for a protective order

22  and then instead of having to move for a protective order --

23      THE COURT:  But there are other values at stake here

24  which is there is built into the schedule -- the problem is

25  there's the trial date.  We have built into the schedule

16

1  motion in limine for example which are due in two weeks and I

2  can't imagine that Mr. Oppenheim will give up his right to

3  file a motion in limine as to any of the issues or testimony

4  or documents that might come up here and there's also the

5  disruption by the fact that the plan was to actually be

6  preparing these motions, preparing for trial on a fairly

7  expedited basis.

8          So that's the other value here and the problem is

9  that sometimes to achieve a value like that you are going to

10 have to forego the ability to get certain testimony especially

11 third party testimony when we don't have the same kind of

12 control over them and we have to be more solicitous and you

13 can't necessarily expect that they will be available within

14 the discovery deadline.  That's the problem here.

15         So arguing relevance is not the point.  That's the

16 problem.

17         MR. BHANDARI:  Right.  I mean, Your Honor, I would

18 say that it affects us just as strongly as it affects the

19 plaintiffs in this case.  We would far prefer to get this done

20 at the time that we originally noticed the depositions because

21 there were third parties and because we tried to work with

22 them to find mutually agreeable dates.

23         THE COURT:  Who do you care more about, MBS or

24 Amazon?

25         MR. BHANDARI:  We care about them both a great deal.

1  If you're asking us to select then I would need a few minutes

2  to confer with my client if you said that we can only have one

3  but we care about them both a great deal.

4        I'll say one thing, Your Honor, which I think has

5  not been stated.  MBS has entered into a settlement agreement

6  with the plaintiffs in this case.  We believe that MBS is

7  having -- is cooperating with the plaintiffs and to the extent

8  that MBS was told not to go forward with depositions on

9  certain dates by the plaintiffs we don't know that that

10  happened but there's certainly cooperation between the two.

11  There's a settlement agreement between the two.

12        So, again, you can ask Mr. Oppenheim whether or not

13  he's had communications with MBS and told them that he didn't

14  want them to go forward with the scope of a deposition but we

15  think that there's reasons, tactical reasons.

16        THE COURT:  This is speculation.  The problem is you

17  bring this dispute to me on the last day of discovery and that

18  now creates this situation whereas if you had come in mid

19  September and said you know what, we're in big trouble here,

20  we're not getting assurances -- early September more likely.

21  We're not getting assurances this will happen by October 4th

22  there might have been things I could have done back then.

23  That's the problem here.

24        MR. OPPENHEIM:  Your Honor, may I speak to some of

25  the factual misrepresentations that have been made that I

18

1   really think will help?

2          THE COURT:  All right.  Go ahead.

3          MR. OPPENHEIM:  So the notion that the defendants

4   were not aware of these -- of the issues with MBS is just not

5   true.  So when we served our Rule 26 disclosures we provided

6   images of the books at issue.  For the MBS books, three out of

7   the four books have Textbooksrus stickers on them. Big round

8   promotional stickers that say Textbooksrus.  The notion that

9   there's some question as to whether or not Textbooksrus

10  distributed these is belied by that which they received in

11  March.

12         But more importantly, these books were -- we told

13  the defendants in our very first discovery responses back in

14  March -- I believe March.  Maybe it was April.  That all of

15  the counterfeit books were available for their inspection and

16  within three out of the four MBS books -- there are only four

17  MBS books.  Three out of the four MBS books there is a sheet

18  that MBS put within each of the books that indicates that the

19  books came from the defendants.  Those sheets were

20  independently produced very early in discovery to the

21  defendants.  So they had those sheets but had they chosen to

22  inspect the books, which they never did, they would have seen

23  those sheets and would have understood.

24         There's no question these four books came from MDS.

25  There's no testimony that's going to undermine it and so

1   everything that Mr. Bhandari said about questions on -- about

2   the -- where -- that the MBS books came from the defendants is

3   just simply not true.

4           Now, the suggestion that we told MBS not to go

5   forward with the deposition is -- that should not --

6   statements like that should not be made in open court because

7   there's no basis for them.  We would not have done that and we

8   didn't do that.  The notion that we would is -- well, it just

9   shouldn't be said in open court.  It shouldn't be said anyway.

10  So MBS -- there's no basis for this.

11          Amazon, let me turn to Amazon.  Mr. Bhandari's

12  description of Amazon -- first of all, he revealed something

13  that was highly confidential from the deposition and I'm not

14  troubled that it's been spoken in open court but now that it's

15  out there I'm going to speak to it because I have to respond.

16          The questions he asked about Amazon's return of

17  counterfeit books has nothing to do with the books at issue in

18  this case.  When Amazon shipped to the plaintiffs books from

19  the defendants they have stickers on the back of them that

20  refer to Apex Media, which is one of the defendant's

21  storefronts, or Textbookrush, one of the other storefronts

22  that the defendants operate.  There's no question that when

23  Amazon shipped boxed counterfeit books on behalf of the

24  defendants they were on behalf of the defendants because they

25  got those stickers on them.  What Mr. Bhandari is referring to

1  has nothing to do with defendant's books.  It is a separate

2  dispute that the plaintiffs have with Amazon over Amazon

3  buying books from the plaintiffs and then returning some books

4  that happened to have some counterfeits in them because Amazon

5  is apparently, we assume, sourcing some of their inventory

6  that they sell on their own behalf, not on behalf of others,

7  on their own behalf from some third parties who may have

8  counterfeit books.

9         That is an independent dispute that is frankly was

10  highly confidential and is certainly not a part of this case

11  and frankly should not be explored by the defendants while the

12  plaintiffs are still dealing with that issue with Amazon.  So

13  both of these are beyond Follett and Ditor [Ph.].  They're not

14  timely.  The defendants didn't pursue them.  They should not

15  go forward.

16         THE COURT:  Are you calling MBS or Amazon as

17  witnesses, are they on the witness list?

18         MR. OPPENHEIM:  Yes, I do want to speak to the

19  witness list issue.

20         THE COURT:  Can you answer my question first?

21         MR. OPPENHEIM:  Amazon is not our witness list.  MBS

22  is.  We may call them.  But remember, Your Honor, the

23  defendants already deposed MBS and BDB-1.  So it's not as

24  though they haven't gotten testimony in BDB-1, general

25  testimony from them in BDB-1.

1          With respect to the four books at issue in this

2    case, they sat on their rights and if you look at the stickers

3    on the books and you look at the documents that were provided,

4    there's no question that these came from the defendants.  So

5    we will be -- the court wants us to try to prepare thoughtful

6    motions in limine to narrow the scope of the case.  The court

7    wants us to prepare a trial that is directed and well

8    organized.  Having us run around like crazy at the last minute

9    undermines all of that and the defendants have created this

10   mayhem both with this discovery request, what they've done on

11   financial and we really need to try to put a stop to it.

12          On the issue of what Mr. Bhandari said on the

13   witness list where he said this is not going to affect their

14   witness list at all, that's because, Your Honor, their witness

15   list included every possible person involved in the case

16   including witnesses who had to do with the claims that --

17   fraud claims in the first case that have been dismissed,

18   right, and they've even included witnesses that Your Honor

19   precluded such as Mr. Mooney where you ordered -- they said

20   they would never going to call him and Your Honor in his order

21   said they're not allowed to call them based on what they

22   represented and they even included him.

23          So their witness list is -- they didn't do anything

24   other than just say here are the thousand people we could

25   possibly -- and thousands is an exaggeration, Your Honor, but

22

1  every possible person we could potentially call.  So their

2  provision of a witness list was not at all useful.  So that's

3  why they're saying it's not going to affect their witness

4  list.

5          MR. BHANDARI:  Your Honor, may I respond to a bunch

6  of things?

7          THE COURT:  Go ahead.

8          MR. BHANDARI:  First of all, we did inspect the

9  books during the expert depositions.  We looked at the

10 physical copies of the books and those slips as the testimony

11 indicated from their expert witnesses, nobody has any idea who

12 put those slips in there.  They could have been done by

13 anybody.

14         Also, on September 26th Jessica Stitt testified --

15 from Cengage.  She was a Cengage witness who testified --

16         THE COURT:  And you say inspected it during the

17 expert depositions?  Is that what you said?

18         MR. BHANDARI:  Yes.  In September.  We --

19         THE COURT:  But that's not the issue.  The point is

20 if you cared about pursuing what MBS knew about the four books

21 at issue here you knew in March that MBS was the source.  Not

22 the source.  Was one of the I guess purchasers from you of the

23 books.

24         MR. BHANDARI:  Your Honor, I will also say that on

25 September 26th we heard for the very first time from Jessica

1 Stitt at Cengage that there was a spreadsheet provided by MBS

2 that provides document source information.  Her testimony was

3 -- I said -- the question was do you know whether or not any

4 of the books that you reviewed were allegedly obtained by MBS

5 from the defendants in this case.

6 "A   I would need to see the document that supplied the source

7 information.  So once the samples are sent to me and I

8 determine that they are in fact counterfeit then I receive

9 source information."

10          We have not received that source information even to

11 this point.  It's one of the requests we have in our letter

12 that we wrote to you on October 4th.  We heard about this on

13 September 26th.  It amplifies the importance of this

14 particular deposition of MBS to figure out what source

15 information are they providing.  Where is this information

16 coming from.  How are they compiling it.  When did they decide

17 to put slips into books.  Who's keeping control of the books

18 if they get a shipment that has nine copies of the same title,

19 how do they decide which slip goes into which box or which

20 book.

21          THE COURT:  Was this a subject of your deposition of

22 MBS in Book Dog Book 1?

23          MR. BHANDARI:  I do not believe that it was the

24 subject of our deposition --

25          THE COURT:  But surely you asked them how they knew

24

1  things; right?

2          MR. BHANDARI:  I was not the counsel -- we were not

3  the counsel on the case so I don't know the answer off the top

4  of my head.  But these books in particular is the four titles

5  at issue.  Figuring out the source information for these is

6  important and it's something that -- if they will agree not to

7  call MBS as a witness then I suppose we can agree that we

8  don't have to take that deposition but if they're planning to

9  call MBS as a witness we noticed the deposition in August.  We

10 tried to meet and confer.  MBS says they're available on

11 November 10th.

12         It's disruptive to both sides but unfortunately in

13 trial situations I've had situations where even the weekend

14 before the trial the court has ordered depositions to take

15 place for witnesses who became available who otherwise might

16 not have been on the witness list previously.  It's

17 unfortunate.  It's not what I want to happen by any stretch of

18 the imagination but in the course of trying to meet and

19 confer with third parties this was the only -- the only date

20 that the third party said that they were available and so

21 that's why we're asking the court for a special dispensation

22 to be able to take the MBS deposition on that date.

23         MR. OPPENHEIM:  One very quick note, Your Honor.

24         MR. BHANDARI:  Of course the plaintiffs can

25 participate by phone or by video if they don't want to deal

1  with the travel --

2          MR. OPPENHEIM:  All of the slip sheets that were put

3  within the books --

4          THE COURT:  Mr. Oppenheim, you can't be talking when

5  Mr. Bhandari is talking.

6          MR. OPPENHEIM:  I'm sorry.  I thought he had

7  finished.  I apologize.

8          THE COURT:  He has been talking for the last minute.

9  He was talking about disruption and talking about minimizing

10 the disruption through video or telephone.  Anyway, go ahead.

11         MR. BHANDARI:  I had one very last point.

12         THE COURT:  Hold on.  Don't go ahead.

13         MR. BHANDARI:  In terms of the timing just to be

14 very clear about the timing, the document production in this

15 case was ongoing through September to be perfectly honest.  We

16 were getting documents from the plaintiffs through September

17 but the substantial part of the document production was not

18 completed until August.  Party depositions, and there have

19 been over 20 of them, took place starting in late August.  I

20 think August 26th or 31st.  I can't remember was the first

21 deposition, party deposition that took place.  And it was

22 because both sides agreed that it didn't make sense to start

23 party depositions until after all documents had been fully

24 exchanged.  It was the same thing with MBS, Follett and Chegg.

25 We didn't think that it made sense to take their depositions

26

1    prior to the document production being substantially complete.

2           So the late August subpoena really was the earliest

3    that we could realistically serve a subpoena and know that we

4    could take the deposition on the date that we served the

5    subpoena for.  We could have been placeholder subpoenas and

6    then continually told the third party oh, we can't do it on

7    that date because we haven't received documents but that

8    wouldn't really have made any sense.

9           In this case the reason why there were over 20

10   depositions in September and October all around the country is

11   because document production from both sides really wasn't

12   complete until August, substantially complete until August and

13   still as far as we can tell isn't fully complete from the

14   plaintiffs.

15          THE COURT:  Go ahead, Mr. Oppenheim.

16          MR. OPPENHEIM:  So the spreadsheets which Ms. Stitt

17   was referring to was the plaintiffs aggregated all the

18   information in the slip sheets contained within the books and

19   put it into a spreadsheet.  That spreadsheet was produced to

20   the defendants.  They've had it.  Again, they chose not to

21   inspect these books.  We said to them in April or March or

22   April they're here, you're welcome to come see them.  We'll

23   make them available for inspection.

24          We said many times in the back and forth in this

25   case they're available for inspection.  They got very upset

27

1  that we weren't going to bring them to the expert depositions

2  even though the expert depositions were going to take place in

3  New York, the books were in Washington.  They got very upset

4  on a Friday.  I actually had one of my paralegals drive the

5  books up to the expert depositions so they'd be available for

6  the defendants to inspect during the expert deposition.

7  Several weeks ago they had the slip sheets.  They sat on their

8  rights here.  They had the ability to pursue this and all of

9  this is a problem of their own making.

10         MR. BHANDARI:  I disagree with that, Your Honor.

11         THE COURT:  I've had enough on this.  I'm going to

12  give you a ruling at the end.  I want to do the other issues.

13  Audits and reviews.  I got to refresh my recollection on this.

14         Okay.  So here's the problem here, Mr. Bhandari.  In

15  May for good or ill Mr. Mandel agreed to limit this in my view

16  to the titles at issue in this case.  In other words, to

17  documents involving inspections that related to the titles at

18  issue in this case.  So that's our first limitation.

19         Then we got into the issue of burden.  And I

20  accepted your arguments on relevance.  I accepted that this

21  material was relevant so we don't need to go over that again.

22  But there was a statement regarding burden and I said well,

23  I'm going to need more information on that.  Then the thought

24  was being put forward that there was going to be a way to

25  provide to you information that related to sort of large

28

1   inspections.

2          By the way, on burden, it wasn't just finding it.

3   It was also that it was going to interfere with negotiations

4   that were ongoing with other people.  So then I said we'll

5   leave it as it is now, they're going to make this effort that

6   I described and then if you had to you would come back to me.

7          Now, when I said in May that you could come back to

8   me I did not expect and certainly my orders -- most obviously

9   my order on February 25th where I said you have to tell me

10  about any disputes immediately and no later than the 30 days

11  prior to the end of discovery I think it was pretty clear that

12  I was not going to have you come back to me on the last day of

13  discovery on this.  So that's kind of the overarching problem.

14         So with that in mind, why don't you tell me what's

15  going on.

16         MR. BHANDARI:  Sure.  So, Your Honor, if you go to

17  Page 3 of our letter we have enumerated four bullet points of

18  documents that we think should have been produced earlier

19  through the course of reviewing their documents that were

20  being produced to us through the end of August and then doing

21  depositions we realized things that have not been produced to

22  us.  On September 13th I wrote a letter to opposing counsel --

23         THE COURT:  No.  But did you follow up from my

24  ruling in May to track this issue and say well, what are you

25  going to give us, why not, and do we have to go back to the

29

1   judge.  What --

2           MR. BHANDARI:  Your Honor --

3           THE COURT:  Don't interrupt me.  All right.  What

4   happened on that front specifically?  Go ahead.

5           MR. BHANDARI:  Your Honor, we were told all

6   responsive documents are going to be produced by the

7   plaintiffs and they made a rolling production with I think it

8   was 18 or 19 different productions through the middle of

9   August.  We believed we were going to get all responsive

10  documents that the court ordered should be produced through

11  the middle of August.  When we started taking -- when we

12  reviewed the documents they gave us and we started taking

13  depositions it became very evident they had not produced

14  documents that they said that they were going to produce that

15  the court ordered them to produce.

16          So on September 13th I wrote a letter to them saying

17  here are 20 categories or 24 categories of documents that you

18  guys should have produced to us that you haven't.  Please

19  produce these to us immediately.

20          On September 16th opposing counsel wrote a letter

21  back to us.  On September 18th I had a --

22          THE COURT:  Yes.  But you know I'm just talking

23  about the titles at issue in this case.

24          MR. BHANDARI:  Yes.  So the first -- there's two

25  requests that deal with only the titles at issue in this case

1  and then there's two requests that are slightly different than

2  that.  So let's start with the first one.

3          In terms of -- so I was addressing the timing.

4  So --

5          THE COURT:  I'm sorry.  You're right.  I just wanted

6  to make sure you knew that there's no way you're getting

7  anything beyond the titles at issue in this case because that

8  was a definitive ruling in May.

9          MR. BHANDARI:  Okay.  So the first bullet point is

10 related to the titles at issue in this case only and it

11 basically says please give us the results of all your audits

12 and inspections for any of the titles at issue in this case.

13 There's 24 titles at issue in this case.  Please tell us --

14 show us all of the results for any audits you conducted.  How

15 many books did you think were suspected of being counterfeit,

16 which ones were counterfeit, what were the sources of those

17 books, where did they come from.

18         So the first bullet point is squarely within what

19 the court ordered, what we expected to be produced and it has

20 not yet been produced.

21         THE COURT:  But again you're missing my point which

22 is they raised issues at the time regarding burden, both sort

23 of literal burden and finding it to the extent there was just

24 a random inspection of one seller or another.  But also this

25 burden regarding their ongoing negotiations [inaudible].

1       So what I said was I don't know the answer to this

2   question because I don't have enough information about this

3   burden.  You need to discuss it further and figure out what

4   the arguments are on that point and if you think you have a

5   basis for coming back to me.  So was there discussion -- at

6   that point I think it was obvious it wasn't enough to just say

7   okay, well they never gave it to us, so now it's the end of

8   discovery so now we want it.  There was an obligation on your

9   part to explore the burden issue and present it to me and not

10   on the last day of discovery.

11       MR. BHANDARI:  Your Honor, we did explore the burden

12   issue and that's why this request as you'll see says for any

13   person or business which plaintiffs have inspected, audited or

14   reviewed at least 500 books since January 1, 2013 to the

15   present.  Documents sufficient to show the results for each

16   copy of all the titles at issue in this case including but not

17   limited to the person or business's source of the books.

18       So, Your Honor, we did have negotiations with them.

19   We did try and limit the idea that if there's a single book

20   seller who does one surrender that they have to track down

21   every single one of those for the titles at issue, we

22   understood that and we said fine.  For people who you have

23   inspected 500 or more books since January 1, 2013 then please

24   give us the audit results or the inspection results.

25       They did not say that that was an impossible burden.

1   They -- I don't even know that they're going to say that

2   that's an impossible burden now but they didn't produce this

3   document and raised it with them at the -- when we first

4   realized that they didn't produce it and it became evident

5   after the depositions, the initial round of depositions we

6   took that --

7            THE COURT:  But it became first evident in May.

8   That's when it was first evident.  That's why you brought it

9   to my attention.

10           MR. BHANDARI:  Your Honor, they represented to us

11  that they produced all medium and large audits of our books.

12  That's what they represented.

13           THE COURT:  Maybe we're arguing over nothing.

14           MR. BHANDARI:  They told us that.

15           THE COURT:  Are we arguing over nothing, Mr.

16  Oppenheim?  Have you produced inspections of the titles at

17  issue for the larger 500 or more book inspections?

18           MR. OPPENHEIM:  Your Honor, there are -- we did

19  produce results for four different audits that were done.  Two

20  of them I would categorize as large.  Two of them I would

21  categorize actually as medium size.  We produced those.  The

22  defendants raised questions with us in August about it.  We

23  had an email exchange with opposing counsel on August 16th

24  where we told them exactly what we had done and what we were

25  producing and we never heard from them after that until we're

33

1   sitting in a deposition and Mr. Bhandari during a deposition

2   as is apparently his custom is he calls for the production of

3   documents during the deposition even though it's not a proper

4   way as far as we believe to request production.  He calls for

5   production of documents.

6           Then afterwards he sends us this letter on September

7   13th listing everything he asked for in the depositions but

8   doesn't as early -- and wants to have a meet and confer on it

9   but he doesn't relate it back to any request for production.

10          So we had a very lengthy meet and confer with Mr.

11  Bhandari over that trying to understand what is it that you're

12  asking for, how does it relate to the request for production

13  and tell him what we produced.  We went through all of that.

14  We dealt with all of those issues.  It took a very long time.

15          He then sends this letter to the court with these

16  four bullet points which by the way we had never seen before.

17  He never discussed with us.  Those four bullet points, Your

18  Honor, in his letter of those documents don't -- he doesn't

19  tell you which document request they come from and when we

20  tried to meet and confer with him yesterday he was

21  exacerbated, frustrated and didn't want to tell us where they

22  came from and in fact after three of them he refused to tell

23  me any more.

24          But so having said that, okay, a meet and confer has

25  to be -- and the letter has to be regarding a motion to compel

1  a specific request for production.  The request for production

2  at issue in the first three bullet points is apparently

3  request for production No. 8.  With respect to No. 8, we have

4  produced documents and we have produced responsive documents.

5  So I just don't know --

6          THE COURT:  I don't think you've answered my

7  questions --

8          MR. OPPENHEIM:  -- what it is we're arguing.

9          THE COURT:  Mr. Oppenheim, I don't think you've

10  answered my question --

11          MR. OPPENHEIM:  And --

12          THE COURT:  Mr. Oppenheim, can you hear me?

13          MR. OPPENHEIM:  And -- yes, sorry, Your Honor.  Go

14  ahead.

15          THE COURT:  I don't think you've answered my

16  question yet.  Should I try it again?

17          MR. OPPENHEIM:  Yes, please.  I apologize then.

18          THE COURT:  What I'm trying to understand is are

19  there documents relating to the titles at issue in this case

20  for inspections that we can categorize as large, say 500 or

21  more books, that have not been produced to the defendants.

22          MR. OPPENHEIM:  So, Your Honor, to the extent that

23  in the last month we've done an additional inspection which I

24  know we have large inspection, I don't know because those

25  results are just being compiled.  But as of the August date

1    when we had a meet and confer with Mr. Bhandari's counsel, A.

2    Leah Vickers, we had produced all of the medium and large ones

3    to date when we had that meet and confer.

4            THE COURT:  So it sounds like, Mr. Bhandari, we're

5    having an argument over nothing.  I mean now that I've limited

6    this to the titles in the case.

7            MR. BHANDARI:  It sounds like there's a supplemental

8    -- like under Rule 26 there's supplemental exposures.

9            THE COURT:  I agree he has an obligation to

10   seasonably amend as soon as it's in a format that it's

11   possible.  So if something happens since August that was a

12   large inspection and it involved the titles at issue in this

13   case I guess there might be an obligation although it's

14   certainly of less relevance since the sales happened a while

15   ago.  But I think this is an argument over nothing now.

16           MR. BHANDARI:  So if -- just so we've got a clear

17   record on this then, Your Honor, because I think that you may

18   be right.  Am I correct from what I understand that

19   plaintiff's counsel has represented that they have already

20   produced all the results for any audits or inspections from

21   businesses whom the plaintiffs reviewed at least 500 books

22   from January 1, 2013 to the present except for such results

23   that are currently being compiled in a format that will be

24   produced to us in accordance with Rule 26 as a supplemental

25   disclosure?

36

1           If that's what their testimony is then you're right,

2    we are done with that.  It's not what our understanding was

3    based on depositions.  When I was taking depositions --

4           THE COURT:  Stop, stop.  Let's just make -- let's

5    see if that is -- that certainly what I understood Mr.

6    Oppenheim to say just now.  Is that right, Mr. Oppenheim?

7           MR. OPPENHEIM:  First off, Your Honor, I am not

8    testifying.

9           THE COURT:  I agree.  It's not testimony.  It's a

10   statement.

11          MR. OPPENHEIM:  Okay.  Second of all, this 500

12   number, the first time I ever saw it was in the letter to Your

13   Honor.  I have never done --

14          THE COURT:  How do --

15          MR. OPPENHEIM:  -- nor do I have an obligation to do

16   calculus as to what we did.  Your Honor said large.  We did

17   large and medium.

18          THE COURT:  What does that mean?

19          MR. OPPENHEIM:  So that's what we did.

20          THE COURT:  What does large mean?

21          MR. OPPENHEIM:  We did not go back to -- sorry, Your

22   Honor.

23          THE COURT:  What does large and medium mean?

24          MR. OPPENHEIM:  I didn't hear you speaking.  I

25   apologize.

37

```
 1              THE COURT:  What does large and medium mean?

 2              MR. OPPENHEIM:  I haven't quantified them, Your

 3    Honor.  I know what the audits have been and based on just

 4    kind of knowing kind of the scale of them and I don't have

 5    them as I sit here, we did large and medium.

 6              THE COURT:  Are there inspections of 500 or more

 7    that are not included in large and medium, or you don't know?

 8              MR. OPPENHEIM:  I have no idea because I've never

 9    asked for numbers.  Is the 500 related to the titles at issue

10    or is the 500 related to total books reviewed, is it 500

11    titles?  I mean the 500 number I have no idea what it is and

12    it's not well defined nor did I ever do an analysis of it.

13              THE COURT:  Well, I --

14              MR. OPPENHEIM:  The court said large and medium.  We

15    gave them four of them.  They have four of them.

16              By the way, Your Honor, just also to be clear.  In

17    those bullet points they exceeded the scope by date of what

18    they actually had originally asked for.  They originally asked

19    for 2014 forward and then in their letter motion to compel

20    they want to 2013 to the present.  So this is all -- they're

21    asking for things they never asked for before and I haven't

22    investigated and I don't -- I'm not testifying as to it.  I'm

23    telling you what we did, Your Honor.  We complied with your

24    order.  We did produce.  I frankly still don't understand the

25    relevance of it and think it's totally irrelevant but we've
```

38

1  done it.

2      THE COURT:  Well, I overruled your relevance

3  objection.  So I don't know why you're raising that.

4      I think I need to -- I think you need to have some

5  basis for explaining to me what was a large and medium and

6  what's not included.  So if you can figure out a way to at

7  least describe that I think you should provide that to Mr.

8  Bhandari and if he wants to come back with a request on this I

9  may consider it but it's -- I really would not like to spin my

10 wheels if it's in fact the case that you have produced what I

11 said was relevant which was -- and not obviously burdensome

12 which was results of any "large, major" whatever inspections

13 that related to the titles at issue -- that included books at

14 -- that are at issue in this case.

15     So I think that information needs to be provided to

16 Mr. Bhandari.  If he wants to come back then he can come back.

17 I'm not saying I'm going to do anything at ths point but I

18 just don't want to waste my time if in fact you've done

19 everything that you could have done anyway.

20     MR. OPPENHEIM:  Your Honor, this is not an exercise

21 where I'm aware of a whole bunch of audits that were done that

22 we're classifying as small and so we're thus not producing it.

23 That's not the situation.  I cannot think of any -- any audit

24 of any kind of substantive nature that was done that we didn't

25 produce except for the one I just told you about very

1   recently.  So they really got it.

2          Frankly, Your Honor, in August we had a meet and

3   confer on this exact issue.  So the idea that on October 4th

4   they send their letter and I now have to go digging and find

5   out questions about numbers and five and scope it just seems

6   that this is not what I should be forced to do this late in

7   the game.  It's bad enough I got to deal with the financial

8   document issue they created for me.  I've got stuff to do to

9   prepare this case for trial.

10          If Your Honor orders us to do it we will absolutely

11  do whatever you order us to do, Your Honor, but we've complied

12  with your order.

13          THE COURT:  I just want some -- I just want some --

14          MR. OPPENHEIM:  They've got this information.  I

15  don't know how they're going to use it but they've got it.

16          THE COURT:  Mr. Oppenheim, if we ever do this on the

17  phone again can you just make sure you don't use a speaker

18  phone because it's impossible to talk to you when I want to

19  get your attention sometimes.

20          I didn't think what I was asking to do was highly

21  burdensome.  I think there has to be some way you can explain

22  other than your own gut why the -- what you have produced was

23  reasonable in terms of the burden and that any other

24  inspections were of such a minor nature or so small that they

25  weren't included in your production, that the ones that you

40

1  chose were appropriate.  So produce a letter of some kind the

2  best you can on that topic within the next week and then if

3  Mr. Bhandari thinks he has a basis to come back to me I will

4  think about it then but I just want something other than your

5  own gut to explain what was produced.  Next issue.

6          MR. BHANDARI:  So for bullet points 2 and 3 I

7  understand your ruling, Your Honor.  We do have questions

8  related to inspections of any books that were sourced from the

9  defendants.  It's not just the titles at issue in this case.

10          THE COURT:  No, no.  It's just the titles at issue

11  in this case.

12          MR. BHANDARI:  That's what I'm saying.  So for

13  bullet points 2 and 3 I understand you're saying we're not

14  getting them because they're too broad.  So we would limit it

15  just to the titles at issue in this case.

16          THE COURT:  Yes.

17          MR. BHANDARI:  The books that were sourced from the

18  defendants that are the titles at issue in this case for any

19  person or business from which plaintiffs have inspected.  So

20  for bullet points 2 and 3 we will limit them in exactly the

21  way that you've described which is for the titles at issue in

22  this case.

23          THE COURT:  Well, you're not limiting anything.  I

24  made a ruling in May.

25          MR. BHANDARI:  Right.

1          THE COURT:  And I'm not sure your bullet points add

2     anything to this.  I made a ruling in May about a request.  I

3     told them -- I overruled the relevance objection.  I accepted

4     the burdensomeness objection.  I understand there was

5     discussion about the issue and what was being produced in

6     August and I just want to follow through on that and made a

7     ruling.  That's all.  So I'm not -- your bullet points are not

8     the point for me.

9          MR. BHANDARI:  Okay.  For the fourth bullet point

10    that's related to a press release that we asked questions

11    about during the deposition where Exhibit E was a press

12    release issued by Cengage where they said in the second

13    paragraph of the press release in cooperation with EPEG [Ph.]

14    Cengage recently reviewed the inventory.

15         THE COURT:  I'm totally lost now because I had

16    viewed this whole request as following up on the May 11th

17    ruling in the pages that you -- or the excerpt you provided to

18    me.

19         MR. BHANDARI:  The first three bullet points.

20         THE COURT:  So can you just give me some -- can you

21    give me some explanation of where this fourth bullet point is

22    coming from and how it fits into the world?

23         MR. BHANDARI:  Yes.  The fourth bullet point is

24    based on a document that was provided in discovery.

25         THE COURT:  So is this the subject of a previous

42

1  document request or is it a new document request?

2       MR. BHANDARI:  This would -- the document request is

3  a general document request which we said documents related to

4  the distribution of counterfeit -- I can find you the specific

5  document request that it refers to in a moment if you'll just

6  give me a second.  Let me just tell you the background of this

7  request.

8       THE COURT:  This just sounds like the plaintiff's

9  audit inspection of books and you want documents about that

10  and I already limited it to the titles in this case and the

11  major inspections.  So what are we talking about now?

12       MR. BHANDARI:  This is a particular statement that

13  they made.  This statement in a press release they say that

14  there are certain online book sellers who have 75 percent to

15  100 percent of the titles in their inventory are counterfeit.

16  So all we have said to the other side is please just provide

17  is with whatever documentation you have supporting your public

18  statement that there are online book sellers who have 75

19  percent to 100 percent of the titles in their inventory as

20  being counterfeit.

21       THE COURT:  So this is a new document request,

22  right?

23       MR. BHANDARI:  It's not a new document request.

24  It's a -- it's a document request that would be related.  It

25  would be the sort of thing that we would get based on

43

1   documents sufficient to show the identities of entities with

2   whom you have decided not to conduct business due to concerns

3   regarding counterfeit books.  That would be our overarching

4   document request from March.

5          THE COURT:  Is this the -- was this raised with me

6   at the May 11th conference?

7          MR. BHANDARI:  No.  This was something that only

8   came up during the course of a deposition when I showed this

9   document to the 30(b)(6) witness for Cengage and I said to the

10  30(b)(6) witness can you please tell us who -- what is your

11  basis for saying that there's online sellers that have 75

12  percent to 100 percent of the titles in their inventory are

13  counterfeit.  The person says I don't know off the top of my

14  head, there's documents we have that obviously support this.

15  And I said okay, please provide us with these documents on

16  September --

17         THE COURT:  Didn't I already make a ruling that

18  you're going to get information about other sellers only with

19  respect to the titles in this case?  That's the ruling I made

20  in May.

21         MR. BHANDARI:  I think with regard to general audit

22  and inspections, yes.

23         THE COURT:  Okay --

24         MR. BHANDARI:  This is not necessarily a general

25  audit and inspection.  They might have gotten this from like a

44

1   third -- the police reports might have told them this.  They

2   might have gotten it from an FBI raid.  There might have been

3   customs officials who do this.  We have no idea what the basis

4   is.  If they oh, the basis is the audit --

5           THE COURT:  But this is the same -- this was my same

6   problem last time which is if there are sellers out there who

7   have counterfeit inventory that's not the inventory in this

8   case that is just balancing proportionality and all the other

9   factors.  That's not going to be part of the discovery in this

10  case.

11          MR. BHANDARI:  We don't know that it's not the

12  inventory in this case.  We don't know anything about who

13  these sellers are, what books they have, what books were in

14  their inventory.  It could be titles at issue in this case.

15          THE COURT:  But now we're back to where we were

16  which is if they actually examined it and something we can

17  call an auditor inspection and they found these titles and

18  it's major you're getting it.

19          MR. BHANDARI:  But it might not be from an auditor

20  inspection.  It could -- like I said, we just have no idea.

21  This is simple stuff.  We're not asking for the audit results

22  for everything.  We're not saying show us the backdrop of what

23  you did in order to gather the information but in the

24  deposition the 30(b)(6) witness for Cengage said there would

25  be documents that substantiate our position in the press

1  release that there are certain online book sellers that have

2  75 percent to 100 percent of the titles.

3          THE COURT:  When did you get this press release?

4          MR. BHANDARI:  Where or when?

5          THE COURT:  When.

6          MR. BHANDARI:  I don't know.

7          THE COURT:  Mr. Oppenheim.

8          MR. OPPENHEIM:  So this -- I presume this arises

9  because the defendants have sent a premotion letter to compel

10  production of a request for production that they believe we've

11  not produced documents on.  So they don't identify what the

12  request for production is in their letter.

13          In the meet and confer yesterday Mr. Bhandari

14  refused to tell me which request for production this relates

15  to.  Today for the first time I'm hearing that it relates to a

16  document request that has to do with entities that the

17  plaintiffs will not do business with.  How you can connect the

18  statement in the bullet point to that document request I don't

19  know but I do know, Your Honor, that we had a hearing and I

20  haven't had a chance to pull up the transcript to this -- this

21  is the first time I'm hearing this.  Where they moved to

22  compel this issue and Your Honor said no, it has nothing to do

23  with the defendants.  So you don't -- the defendants don't get

24  to take discovery into who the plaintiffs choose to do

25  business with or don't choose to do business with.

46

1          Now, I can't connect that discussion to this press

2     release but that is apparently what Mr. Bhandari is trying to

3     do.  So, anyway, again, we produced a press release because he

4     thought that the fact that it addressed counterfeits in some

5     ways we should produce it.

6          Now, at a deposition he calls for documents, again

7     not an appropriate way to request documents.  Then he just

8     keeps going at it.  There's no issue that's properly put

9     before the court at the moment I don't believe.

10         THE COURT:  What is your document request?

11         MR. BHANDARI:  So there's several document requests

12    that this would relate to but it is something that also did

13    come up in the course of a deposition.

14         THE COURT:  Wait, Mr. -- to get practical here. Do

15    you know, Mr. Oppenheim, by any chance what documents exist

16    that fit within -- understanding that fourth bullet point is

17    not a document request but just for the sake of simplicity and

18    perhaps cutting through this, do you know what documents exist

19    that correspond to what's being asked in the fourth bullet

20    point?

21         MR. OPPENHEIM:  I know what the press release

22    relates to.  I'm not sure what the documents are.  But it has

23    nothing -- the reference in the press release has to do with

24    online sellers selling counterfeits.  How that has anything to

25    do with this case I don't know and I'm not really at liberty

47

1  to go into that those online sellers because that's a

2  different litigation.

3           THE COURT:  We have to go back, Mr. Bhandari,

4  because you have to show me that there's a document request --

5           MR. BHANDARI:  Sure.

6           THE COURT:  Hold on.  Pre-existing the one in your

7  letter, a timely document request --

8           MR. BHANDARI:  Sure.

9           THE COURT:  Hold on.

10          MR. BHANDARI:  Okay.

11          THE COURT:  That calls for production of material

12  that you number one, have reason to believe was not produced

13  and two, was not previously addressed by me with respect to

14  the request in which the request was limited.

15          So this letter does not do it because all this

16  letter did was talk to me about the May 11th hearing and I'm

17  not even sure what document request at this point but I feel

18  that this issue is just not teed up.  I mean I don't know what

19  we can do it right now.  If you want to take one more crack at

20  it

21          MR. BHANDARI:  Sure.

22          THE COURT:  Go ahead.

23          MR. BHANDARI:  Okay.  So first, Your Honor, if you

24  look at Exhibit D there's a letter dated September 13, 2017.

25          THE COURT:  No.  Well, that's a document request.

48

1  Okay.

2          MR. BHANDARI:  Yes.

3          THE COURT:  So there's a document request here.

4          MR. BHANDARI:  Right.

5          THE COURT:  Which document request am I looking at?

6          MR. BHANDARI:  No. 17.

7          THE COURT:  Okay.  I'm not saying this is timely but

8  it's more than -- less than 30 days before the end of

9  discovery.

10          MR. BHANDARI:  Right.

11          MR. OPPENHEIM:  I'm sorry.  Which request for

12  production is that?

13          MR. BHANDARI:  I can tie it back to an earlier

14  document request that's more general but this is the specific

15  request that they have had since September 13th of 2017.

16          THE COURT:  Okay.  I think we need to go -- since

17  this is not a timely document request I think we should go

18  back to the original one.

19          MR. BHANDARI:  So the original one would be would

20  Request No. 12 in the first set of document requests that were

21  issued I guess in June -- not the first.  This is the second

22  set of document requests that were issued in June of 2017.

23          THE COURT:  What's No. 12?

24          MR. BHANDARI:  Request No. 12 says all documents

25  concerning the ability of one or more book distributors,

1  wholesalers and/or retainers to discern legitimate books from

2  counterfeit books.

3         THE COURT:  Concerning their ability.

4         MR. BHANDARI:  So here they have -- that's a general

5  request.  We understand that that's a general request.  It was

6  made more specific when we saw documents that specifically

7  raised a particular question.

8         I would also like to add that we have during the

9  meet and confer a statement from opposing counsel from

10  September 20th of 2017 in response to the Exhibit D letter

11  from September 13th saying we're looking into Item 17 and 18

12  of your letter and hope to have answers for you shortly.  They

13  accepted that they were -- these things were responsive to

14  previous requests.  I've gone through it.

15         THE COURT:  Please, please, don't set Mr. Oppenheim

16  off.  That doesn't tell me anything --

17         MR. BHANDARI:  I have the email here.

18         THE COURT:  -- about whether it's responsive.  So if

19  -- going back to my question.  What does -- Document Request

20  12, repeat it again for me.

21         MR. BHANDARI:  All documents concerning the ability

22  of one or more book distributors, wholesalers and/or retailers

23  to determine -- to discern legitimate books from counterfeit

24  books.  So they have a statement where they say 75 percent --

25         THE COURT:  Hold on, hold on, hold on.  Concerning

50

1  their ability.  What does this have to do with proportion of

2  counterfeits found by Cengage?  I'm totally lost.

3          MR. BHANDARI:  They say that they've identified 75

4  percent to 100 percent of the books in certain online book

5  seller's inventories as being counterfeit.

6          THE COURT:  So therefore that shows they have some

7  ability to identify it.  Is that what you're getting at?

8          MR. BHANDARI:  Yes.

9          THE COURT:  Well, I'm not so sure that's true.  It

10 shows that they claimed to have identified it.  Who knows how

11 they did it.

12         MR. BHANDARI:  Okay.  Then let me find another

13 document request from our original document request.

14         THE COURT:  Go ahead.

15                    [Pause in proceedings.]

16         MR. OPPENHEIM:  To the extent it helps, Your Honor,

17 we produced this press release on June 20th.  They took the

18 deposition and asked a witness about it on September 8th.

19 Let's be done with this.  There's no reason that this issue

20 should have been raised on October 4th.

21         MR. BHANDARI:  Request No. 8 in our original

22 document request says with respect to each book that

23 plaintiffs viewed for the purpose of determining whether it is

24 counterfeit from January 1, 2014 to the present documents

25 sufficient to show the title, edition, ISBN, author, all

51

1  sources of sellers, inspection, location, inspection date,

2  inspection results --

3          THE COURT:  The titles in this case.

4          MR. BHANDARI:  That was not for the titles at issue

5  in this case.  It's for titles that they determined were

6  counterfeit.  Now, we narrowed it again specifically over the

7  course of time to just the things that support their statement

8  in a press release.  We were told during a 30(b)(6) deposition

9  in early September that there's just -- documents that Cengage

10 has that lay out what evidence if any they have to support

11 public statements they're making about --

12         THE COURT:  So why did you wait until October 4th on

13 this?

14         MR. BHANDARI:  We -- we wrote our letter on

15 September 13th.  We met and conferred through September 20th.

16 On September 20th I got an email from Julie Chen in Mr.

17 Oppenheim's firm saying Rishi, per our meet and confer I'm

18 providing the Bates number of the following -- in response to

19 Items 1 and 20 of your letter.  We are -- and then skipping it

20 says we are still looking into Items 17 and 18 --

21         THE COURT:  I take it back on the timing because I

22 can't do two things at once.  It's my fault.  You were in the

23 middle of a document request which I didn't even understand.

24 What is the document -- I couldn't fit it into the first --

25 are we going to have any more document requests you're going

52

1   to claim this fits into?

2           MR. BHANDARI:  I think so.  I think there are many

3   document requests that this fits into, Your Honor, and that

4   was never something that was raised by opposing counsel.

5           THE COURT:  You know what, this is coming out of

6   nowhere.  Have another meet and confer and write another

7   letter if you want.  Right now I'm not ordering anything.

8           What's the next issue?

9           MR. BHANDARI:  The next are communications that are

10  supposedly not being produced to us because of the common

11  interest privilege.

12          THE COURT:  Hold on.  Hold on.

13                      [Pause in proceedings.]

14          THE COURT:  This is easy.  They say they don't have

15  any.

16          MR. BHANDARI:  That's their position that they don't

17  have any such documents?

18          THE COURT:  Yes.  Did you read their letter?

19          MR. BHANDARI:  Yes, but I then spoke to Mr.

20  Oppenheim yesterday and that's not my understanding that they

21  really don't have any and also based on the documents we

22  received -- a privilege log we received from Chegg it does not

23  appear that they don't have any.

24          THE COURT:  Well, Chegg I can't do anything about.

25          MR. BHANDARI:  No, no, but we received a privilege

53

1   log from Chegg that shows communications with the publishers.

2   So the publishers claiming that they don't have anything when

3   Chegg says that they have things from the publishers suggests

4   that that's not correct.

5          THE COURT:  The publisher may have its own views.  I

6   don't know.

7          So, Mr. Oppenheim, I skipped over this because I

8   read your letter that said you didn't have any such documents.

9   Is it correct or not?

10         MR. OPPENHEIM:  So we -- Your Honor, we need to

11  identify what we're talking about.  All kinds of issues are

12  running together and confusing the matter.  So what is raised

13  on Page 3 of the letter, No. 2, is documents concerning the

14  effectiveness of the best practices.  The court limited it to

15  effectiveness.  We did a thorough review and there are no

16  documents to produce.  We did provide a short log of a handful

17  of documents that we asserted common interest privilege on but

18  not with Chegg.  It was -- it was regular privilege, attorney-

19  client privilege.  So the Chegg issue is not part and parcel

20  of this.

21         With respect to effectiveness, there are no

22  documents.  We complied with Your Honor's order.

23         THE COURT:  Then -- all right.  So --

24         MR. BHANDARI:  Your Honor --

25         THE COURT:  What's going on?

54

1          MR. BHANDARI:  So if you read what Your Honor

2     ordered it was documents concerning a) the effectiveness of

3     the best practices identified on the website created by

4     plaintiffs, and b) whether others in the market are acting in

5     accordance with these best practices.  Mr. Oppenheim told me

6     yesterday that they have things for B.

7          THE COURT:  How about B, Mr. Oppenheim?

8          MR. OPPENHEIM:  It's inclusive, Your Honor.

9          THE COURT:  I don't know what to tell you, Mr.

10    Bhandari.  He's saying he doesn't have documents.  I can't

11    speak for what Chegg thinks is at issue.  That's their view.

12         MR. BHANDARI:  If you can look at the document that

13    we attached, Exhibit J, which is the privilege log produced by

14    Chegg on October 3rd --

15         THE COURT:  Okay.

16         MR. BHANDARI:  -- it has documents -- so there was a

17    settlement with Chegg about -- where Chegg was going to be

18    acting in accordance with the best practices.  If you look at

19    the Bates stamp -- excuse me, the Document No. 8 -- excuse me.

20    12.  If you look at Document No. 12 there is an email which is

21    dated September 27, 2016 from somebody named David Borders to

22    Dana Jewell and the description is email re: best practices

23    protocol and audits.

24         Now, our understanding from looking at this and from

25    talking to the Chegg lawyer is that there are in fact many

55

1  emails with the publisher related to Chegg's adoption of the

2  best practices, best practices protocols.  So the publisher's

3  statement that there's no communications between them and any

4  of the textbook distributors related to best practices is

5  undermine one, by this privilege logo; and two, by the fact

6  that Chegg's counsel has said that there are in fact

7  communications between the publishers and Chegg at least

8  related to best practice protocols but that they're not going

9  to produce it because the publishers and them supposedly have

10  a common interest privilege.

11          THE COURT:  They're not withholding anything on

12  common interest.

13          MR. BHANDARI:  Who's not?

14          THE COURT:  The plaintiffs.

15          MR. BHANDARI:  They shouldn't be --

16          THE COURT:  Right.

17          MR. BHANDARI:  -- but they are.

18          THE COURT:  No, they're not.  They would have a

19  privilege log.

20          MR. BHANDARI:  They served a privilege log last week

21  of ten items that they claim they're withholding on common

22  interest grounds and they also asserted the --

23          THE COURT:  But not within this category.  They say

24  they don't have any.

25          MR. BHANDARI:  Okay.

1          MR. OPPENHEIM:  But, Your Honor --

2          MR. BHANDARI:  Your Honor --

3          MR. OPPENHEIM:  -- just so you understand --

4          THE COURT:  Hold on.

5          MR. OPPENHEIM:  -- Item 12 on this spreadsheet on

6     this privilege log.  Dave Borders is the general counsel of

7     Chegg.  Dana Jewell is the deputy general counsel of Chegg.

8     So this is -- what Mr. Bhandari is referring to is an internal

9     Chegg document I suppose.  I have no idea what it is but it's

10    certainly not a publisher document.

11         THE COURT:  That's a good point.  I assumed you were

12    going to pick something out of the Chegg list that should be

13    in the possession of the plaintiffs.

14         MR. BHANDARI:  Like I said, the Chegg counsel told

15    me that there were many communications between Chegg and the

16    publishers related to best practices protocols that were not

17    being produced.

18         MR. OPPENHEIM:  I don't know from these

19    descriptions.

20         THE COURT:  Would it have been so hard to say could

21    you tell me which items in the log you're talking about or

22    communications with the plaintiffs?  Do you think it would

23    have been reflected in the author or recipient?

24         MR. BHANDARI:  So, for example, we know that there's

25    emails between Chegg and the publishers.  If you look at the

1   author on No. 6 it's Jessica Stitt who works for Cengage as

2   the author and the recipient are various people, one of whom

3   we've been told was -- that works at Chegg and its email re:

4   validation of publications.

5           THE COURT:  So we have one.  It's not 12 then.  Do

6   you want me to look -- you want them to look at 6?

7           MR. BHANDARI:  Six and then 7 is from Chegg to

8   Steven Rosenthal.

9           THE COURT:  So, Mr. Oppenheim, do you know anything

10  about 6 and 7?

11          MR. OPPENHEIM:  So, Your Honor, I don't know what

12  those documents are specifically but based on looking at this

13  I -- it seems pretty -- I'm guess and it's probably a pretty

14  good guess that this is an instance where Chegg sent a handful

15  of books to the publishers and said we're not sure if these

16  are counterfeit or not, could you take a look at them and let

17  us know.  And the publishers responded.  That has nothing to

18  do with the effectiveness or the best practices.

19          MR. BHANDARI:  There's an email No. 34 which is

20  Linda Dicker at Chegg to Matt Oppenheim and several other

21  people -- excuse me, Linda Dicker.  I don't know who -- where

22  she is but it's to Matt Oppenheim and several other people and

23  it says email re: training and audits.  The training is

24  certainly something --

25          THE COURT:  So we're skipping.  We're giving up on 6

1   and 7, Mr. Oppenheim.  Do you know anything about 34?

2          MR. OPPENHEIM:  We sent people down to train folks

3   on how to identify counterfeits.  That doesn't -- again, what

4   are we doing here?  This doesn't have to do with

5   effectiveness.  This is not --

6          MR. BHANDARI:  Hold on a moment, please.  These are

7   related to --

8          MR. OPPENHEIM:  And based on the date of it, it's

9   probably before the best practices is my guess.  I don't know.

10  But this is -- again, these aren't our documents.  This is a

11  Chegg issue.  If they've got a dispute with Chegg they need to

12  deal with it with Chegg.

13         THE COURT:  No, no.  The question is whether you --

14  well, that's no answer.  In fact, that's a disturbing answer

15  because if this was a document in your possession that came

16  within A and B that I ruled on at the July 28th conference I

17  assume you're not denying it should have been produced.  I

18  think that's the only question.

19         MR. OPPENHEIM:  Well, assuming it's responsive, Your

20  Honor, right.

21         THE COURT:  That's my question.  I don't know if

22  it's responsive.

23         MR. OPPENHEIM:  I don't know, Your Honor.  We didn't

24  go through the Chegg log that we received and say did we

25  produce this or not produce this.  We didn't -- I mean we

59

1   produced what was responsive.  The defendants are now ignoring

2   the court's limitation that this request goes to the

3   effectiveness of the best practices.  Look, there are a lot of

4   entities --

5           THE COURT:  Hold on.  It's not just -- it's not just

6   a --

7           MR. OPPENHEIM:  -- that have now adopted the best

8   practices.  There are many entities that have reached out and

9   asked questions about the best practices.  Obviously the court

10  didn't order nor would it have been appropriate to order the

11  plaintiffs to open up and produce every email about every

12  discussion about other distributors deciding whether to adopt

13  best practices.

14          THE COURT:  I -- listen, you keep harping on A and

15  there's also a B.  I'm not saying it comes within B.  It's

16  just strange that you keep ignoring B or maybe you were saying

17  it while I was talking.  But I think it would be worth just

18  your looking at this email and seeing whether it was about

19  people -- whether they were acting in accordance with the best

20  practices.  I understand the limitation because this was not a

21  ruling that says you get to hear about anybody's discussions

22  about counterfeiting.  It was specifically about best

23  practices.

24          So I don't know if this email relates to best

25  practices or not.  Apparently Chegg thought it was responsive

60

1  to something you said to them but that doesn't necessarily

2  mean, Mr. Bhandari, that it comes within this ruling that I

3  made on July 28th.

4        MR. BHANDARI:  So I think there's a simple way to

5  maybe short circuit this, Your Honor.  We can ask again Mr.

6  Oppenheim whether or not there are any emails or documents

7  related to whether others may market or acting in accordance

8  with the best practices.  Our understanding is that there are.

9        THE COURT:  He said -- no.  That he was clear on.

10 He said -- Mr. Oppenheim, you think you produced what's in --

11 let me put it this way.  You think you've made a reasonable

12 effort to identify the documents in A and B and have produced

13 them.  Is that correct or not?

14       MR. OPPENHEIM:  Yes.  Yes, Your Honor, and in fact

15 the date of this entry that he's planning to predates Chegg

16 and Ingram's adoption of the best practices.  So I think by

17 definition they couldn't be responsive.

18       THE COURT:  Well, that's a good point.

19       MR. BHANDARI:  So my question is this.  Whether the

20 publishers have any documents with anybody at Chegg about

21 their adoption of the best practices after the best practices

22 were adopted.  Our understanding those documents do exist.  So

23 another simple question to ask is will the publishers agree

24 that they do not have a common interest agreement -- privilege

25 with any of the textbook distributors so that we can obtain

61

documents from those textbook distributors that are between
the publishers and the textbook distributors related to the
adoption of best practices.

THE COURT:  You just went on a totally different
topic here.  We asked Mr. Oppenheim this a thousand times.
He's already answered it.  I don't expect him to say that it's
impossible there's a document there.  I expect him to say that
he made the reasonable efforts to search for them.  That's
been said.  So your request to me on No. 2 which was that I
have to somehow order them to produce these documents to me is
moot and I don't have to reach the common interest doctrine.
I don't know what your last question was but it's not a
question to me.

So let's go to the next issue.

MR. BHANDARI:  Discovery concerning damages.

THE COURT:  Well, I've read everyone's letter on
this.  I'm not quite sure what you're getting at.  There's a
Rule 26 obligation to talk about computation of damages which
to me means actual damages and they're not -- they're not
relying on actual damages.  They're going to make arguments
about why statutory damages apply or don't apply and I don't
think that's a factual discovery issue.

MR. BHANDARI:  Your Honor, I think that it is in the
same way that a plaintiff in a case can say that they're going
to be making arguments about emotional distress that is a wide

62

1   range.  They can claim anything that they want but prior to

2   trial they have to say what the range of emotional distress

3   damages are that they're seeking and what the basis for it is.

4            THE COURT:  In terms of the number?

5            MR. BHANDARI:  What's that?

6            THE COURT:  In terms of a dollar number?

7            MR. BHANDARI:  In terms of a number, yes.  They have

8   to say --

9            THE COURT:  That's easy.  I assume they'll just give

10  you the statutory maximum.

11           MR. OPPENHEIM:  That's what they're seeking $150,000

12  and that's fine.  They can say that --

13           THE COURT:  That's all you want?

14           MR. BHANDARI:  -- if that's that's their position.

15  Yes, but I'm not taking any position on that.  If they're

16  going to tell a jury that the conduct that we've taken --

17           THE COURT:  Why do you need them to say that?  What

18  does it matter to you whether they choose 140 or 150?  I'm

19  totally lost.

20           MR. BHANDARI:  Because again the jury is going to

21  hear what it is that they are seeking.  We want to hear it in

22  advance of what they tell the jury.  If they're going to make

23  an argument as many plaintiffs do --

24           THE COURT:  Are you sure --

25           MR. BHANDARI:  Actually many plaintiffs do.

1          THE COURT:  Are you sure that they're going to be

2    seeking a specific number?  First of all, I thought it was a

3    judge decision.  It's a jury decision?

4          MR. BHANDARI:  It's a jury decision, Your Honor.

5          THE COURT:  Okay.  And the jury -- in tort cases we

6    don't allow them -- lawyers to say the number.  Do you think

7    that's different in this case?

8          MR. BHANDARI:  I think that it's a mixed question in

9    terms of -- in tort cases.  Sometimes juries do hear a number,

10   sometimes they don't.  But I -- if they're saying that they're

11   not going to say any number to a jury that's fine.  That's a

12   totally reasonable position to take.

13         THE COURT:  And you want to know whether they will

14   say the statutory maximum or some other number?

15         MR. BHANDARI:  Exactly.

16         THE COURT:  Mr. Oppenheim.

17         MR. OPPENHEIM:  I don't know what discussion we're

18   having now.  I do know that the issue raised in his letter is

19   a question of whether or not we've produced discovery

20   regarding damages and we elect -- we gave them our election

21   early.  We had a discussion with them in May and in July.

22   They on the last day of discovery had raised an issue.  The

23   one specific document that they asked for which they believe

24   is relevant has to do with the effect that counterfeits have

25   on the publishers.  We've produced those documents.  I

1  don't -- we don't have to tell them what we're going to argue

2  to the jury before we hear the case.  That's certainly not

3  what they raised in their letter.

4         THE COURT:  I don't see the basis either and it's

5  not in the letter.  The application is denied.

6         What's the next issue?

7         MR. BHANDARI:  Your Honor, one thing.  On actual

8  damages just so we're clear, they're not going to present any

9  evidence of actual damages; correct?

10        THE COURT:  Mr. Oppenheim, I thought that was in

11  your letter.  Am I wrong?

12        MR. OPPENHEIM:  I don't know what -- why I'm being

13  asked about what it is we're going to argue to the jury.

14  That's -- this is not a proper forum.

15        THE COURT:  No, no, no.  But here's the thing.  I

16  think there was a specific -- they've asked you about actual

17  damages and you've not produced any documents on it.  So are

18  there documents on actual damages or not that you're going to

19  offer?

20        MR. OPPENHEIM:  No, there are no documents.  We've

21  told them that other than the one set of documents that they

22  raised an issue with and we produced.

23        THE COURT:  I think that's a sufficient answer, Mr.

24  Bhandari.

25        MR. BHANDARI:  Your Honor, my question is a little

1  bit different.  Under Rule 26 they're supposed to do an actual

2  damages calculation.  Is the actual damages calculation zero

3  or is that some other number?  Our understanding is it's zero

4  and if we have that clearly stated on the record that would be

5  -- that would obviate the issue with regard to actual damages.

6         MR. OPPENHEIM:  Simply not true.

7         THE COURT:  I think it's there's a simple answer.

8  There's a simple answer to this.

9         MR. OPPENHEIM:  And we don't have to -- the whole

10 purpose and reason for having a statutory damage provision in

11 the law is because it's hard to calculate actual damages.  Mr.

12 Bhandari's effort to get us to say or the court to say that

13 there are no actual damages so he can represent that to the

14 jury is improper.  The fact that you can't necessarily

15 calculate them or can't calculate them easily doesn't mean

16 there are no actual damages.  This letter is about documents.

17 There are no documents.

18        THE COURT:  I agree, Mr. Bhandari.  You can --

19 you'll be free to say to the judge or to the jury that there

20 was a Rule 26(a) disclosure obligation and they didn't

21 identify any computational damages.  You can do whatever you

22 want with their absence of proof on this issue but I don't --

23 I don't think I can force them to say anything at this point.

24        Next issue.

25        MR. BHANDARI:  So the next issue is there were three

1    titles at issue that the plaintiffs sued the defendants over

2    in this case.   Then in their second amended complaint they

3    removed those three titles at issue.   So originally there was

4    24 titles at issue in this case and now there's 21 titles at

5    issue in this case.   That is testimony.   The only testimony

6    we've seen is from the defendants regarding this is that they

7    are confident the books reviewed were counterfeits and they

8    believe that the books were supplied by the defendants and yet

9    the books were removed from this case.

10             We're entitled to explore why books were improperly

11   -- why there were improper allegations of counterfeit books in

12   this case.   That's certainly something that goes to the

13   credibility of witnesses, goes to who their decision makers

14   are and what titles they're suing us over.

15             THE COURT:   Decision makers in this litigation you

16   mean.

17             MR. BHANDARI:   The decision makers -- the fact --

18   the people at the publishers made a decision to include

19   certain books and people at the publishers made a decision to

20   withdraw certain books.   Those are decisions that were made by

21   the plaintiff, plaintiffs in this litigation.   McGraw-Hill.

22             THE COURT:   Well, it could have been made by the

23   attorneys.   It could have been made by anyone.   An attorney

24   could say you know what, I can't prove this one by a

25   preponderance of the evidence, this one we can, this one we

1  can't.  I've now changed my mind.  It's very unusual you get

2  to explore those decisions but go ahead.

3          MR. BHANDARI:  Your Honor, we think that it is a

4  factual issue that does not implicate attorney-client

5  communications.  We want to know why the publishers thought

6  that particular books should be included in this lawsuit, why

7  they thought they were counterfeit.

8          THE COURT:  But you already had an opportunity to

9  depose them on the ones that they included or didn't -- I

10 assume didn't include.  I guess the --

11         MR. BHANDARI:  We asked questions why the decision

12 was made.

13         THE COURT:  But you could say what is it about this

14 book that makes it counterfeit.  When did you -- you took the

15 depositions before or after the withdrawal?  Not that it

16 matters.

17         MR. BHANDARI:  After the withdrawal.

18         THE COURT:  Did someone stop you from asking at the

19 time I'd like to talk about this book that was withdrawn, tell

20 me -- is this book what counterfeit.  Why do you think it's

21 counterfeit, why do you think it's not counterfeit?  I don't

22 think I would have stopped you from asking those questions.

23         MR. BHANDARI:  I did not -- I was not stopped from

24 asking those questions.  I was stopped from asking the

25 question why did you sue on this book originally and why --

68

1          THE COURT:  That's not relevant to a claim in this

2     case.  What's relevant is whether the books are counterfeit

3     and what indicia there are that they are or are not

4     counterfeit.

5          MR. BHANDARI:  So the statement by the witness, the

6     30(b)(6) witness was that the books were counterfeit.  She did

7     not change her opinion on whether or not those books were

8     counterfeit and that the books were in fact distributed by the

9     defendants.

10         THE COURT:  Right.

11         MR. BHANDARI:  She did not change her opinion on

12    whether or not the books were distributed by the defendants.

13         THE COURT:  So you're entitled to explore anything

14    related to that but not what goes on in her head as to why it

15    should be part of a lawsuit.  That's not related to a claim or

16    defense in this case.

17         MR. BHANDARI:  So why would the book be withdrawn if

18    you think a book is counterfeit and a source from the

19    defendants, what possible reason would you have for not suing

20    the defendants over those books in this litigation and

21    withdrawing the books.

22         THE COURT:  That's not the question.  The question

23    is what possible reason it's relevant to a claim or defense in

24    this case.

25         MR. BHANDARI:  The claim or defense is is there some

 1  other factor besides being certain that a book is counterfeit

 2  and supposedly certain that the book was provided by the

 3  defendants that causes the plaintiffs to sue in a situation

 4  like this.

 5          THE COURT:  Not relevant to a claim or defense in

 6  this case.  So that's my ruling on that.

 7          MR. BHANDARI:  And it goes to the cred --

 8          THE COURT:  No, we're done.  Next issue.

 9          MR. BHANDARI:  So the documents concerning printing

10  errors.  There was testimony saying that they consulted error

11  files and those error files have not been produced.

12          THE COURT:  Another one they say they --

13          MR. OPPENHEIM:  Your Honor, can I --

14          THE COURT:  Go ahead.

15          MR. OPPENHEIM:  -- address this quickly?

16          THE COURT:  Yes.

17          MR. OPPENHEIM:  So we did an exhaustive search

18  because this issue has been re-raised repeatedly.  With

19  respect to the titles at issue there are no documents that are

20  responsive.  What Mr. Bhandari is seeking is for the

21  plaintiffs to produce every document about printing errors

22  having nothing to do with the titles at issue in this case and

23  the court has never ordered that and in fact the court has

24  limited it to the titles at issue in the case and the issue

25  has not been properly -- it's just -- this is not an issue.

70

1          THE COURT:  Well, I heard a couple of answers there.

2    I thought -- I mean is there -- are there documents regarding

3    printer errors for any of the titles and issues in this case

4    that you haven't produced, Mr. Oppenheim?

5          MR. OPPENHEIM:  The answer is no.  We've looked

6    thoroughly and there are no such documents.

7          THE COURT:  And the thing that Ms. Periano was

8    referring to is not such a document, or do you know what she

9    was referring to?

10          MR. OPPENHEIM:  Ms. Periano -- I'm sorry, Your

11    Honor.  I thought you were done.  I apologize.

12          THE COURT:  What was she referring -- do you know

13    what she was referring to and is it responsive to this

14    request?

15          MR. OPPENHEIM:  Sure.  She has a file.  I think -- I

16    don't know that it's she but the company has a file with

17    printing errors on a title by title basis.  They went and

18    searched with respect to the titles at issue in this case were

19    there any documents associated with -- indicating printing

20    errors for the titles at issue in this case and the answer was

21    no, there were none.

22          THE COURT:  It sounds like that's it, Mr. Bhandari.

23          MR. BHANDARI:  Ms. Periano testified differently.

24    She testified that she actually consulted the printing error's

25    document for certain books because she was reviewing different

1  editions of those books -- excuse me, different print runs of

2  those books so she was looking at the print error files when

3  she rendered her expert opinion.  She specifically mentioned

4  the document that she consulted.

5          THE COURT:  No, but the document may exist but he's

6  saying these titles aren't on it.

7          MR. BHANDARI:  She testified differently.

8          THE COURT:  She said the titles are on it?

9          MR. BHANDARI:  She said she consulted with something

10  about one of the titles at issue in this book to see the error

11  file and none of the -- there was no errors of the type that

12  would make her --

13          THE COURT:  But there were other errors?

14          MR. BHANDARI:  I don't remember whether --

15          THE COURT:  But it's not -- maybe she looked at the

16  list and those titles weren't on there.

17          MR. BHANDARI:  I understand mr. Oppenheim's

18  position.  It seems contradictory from what we heard from the

19  expert but to the extent that he's representing that that's

20  true if we find something indicating otherwise we'll call it

21  to the court's attention.

22          THE COURT:  Next issue.

23          MR. BHANDARI:  So this is the list of books that the

24  plaintiffs supposedly show their employees so that the

25  employees can determine whether or not a book is likely to be

72

1    counterfeited.  We got testimony that there was lists of books

2    that need to be flagged for secondary review and we asked for

3    such documents in our document requests that during

4    depositions of the 30(b)(6) witnesses we determined that in

5    fact there are such documents that exist that had not been

6    produced and that's what we're seeking here which is basically

7    the list of books --

8              THE COURT:  Again, let's talk about what document

9    request this means and whether I made a ruling at the May 4th

10   hearing limiting it because that's what the defendants'

11   argument is on this.

12             MR. BHANDARI:  Sure.  The document request is No. 12

13   which is Exhibit I.

14             THE COURT:  Right.  Did I not rule on this at the

15   May 4th hearing and limit it to the policies and procedures?

16             MR. BHANDARI:  Your Honor, yes.  Sorry.  These are

17   encompassed in policies and procedures.  The procedure is that

18   there's a list of books that are flagged for secondary review

19   that are shown to their employees and it's just simply a

20   document.  There's no real basis for them not producing it

21   other than they say it's highly confidential.  It's not

22   burdensome.  It's not difficult.  It's a list of books that

23   are provided to the personnel who inspect incoming inventory

24   that highlight for them books that are known to have been

25   counterfeited in the past.

1          So it is a policy and procedure.  It's a simple list
2    of secondary -- for secondary review.
3          THE COURT:  I mean it's not a policy and procedure.
4    What it is is a method of implementing a policy and procedure
5    which is -- you should check inventory or whatever against
6    this list.
7          MR. BHANDARI:  I suppose it's a semantic difference,
8    Your Honor.  I mean from us the policy would be you should
9    check incoming books against this list and you would say that
10   is an implementation directive.  I mean we would view it as a
11   policy.
12         THE COURT:  Why do you need the list though?
13         MR. BHANDARI:  To show that we have the exact same
14   policies or more expansive policies where we're flagging the
15   same books and more books in order to try and eliminate
16   counterfeits from ever getting into our inventory.  We need to
17   show a jury we're behaving like the best --
18         THE COURT:  Right.  But why can't you do it by
19   saying we also have a list?
20         MR. BHANDARI:  Because to compare the two lists and
21   say look at what they look at, look at what we look at, we're
22   not behaving willfully.
23         THE COURT:  Are you going to show the jury your
24   list?
25         MR. BHANDARI:  Yes.

74

1          THE COURT:  Well, they're going to be precluded from

2   showing the jury their list.  So it sounds like you're doing

3   much better than looking at their list.  Why do you need their

4   list?

5          MR. BHANDARI:  Your Honor, for the reasons --

6          THE COURT:  Isn't it better not to have it?  To

7   preclude them from showing it to anyone.  Let's say their list

8   is longer, that's going to be bad for you.

9          MR. BHANDARI:  Our understanding is that their list

10  is not longer.

11         THE COURT:  You'll be able to say you know what,

12  jury, we haven't even seen their list.  Look at our list.

13  Look how great it is.

14         MR. BHANDARI:  Your Honor, I suppose there are a lot

15  of different ways to present things to a jury.  We'd like to

16  have the document.

17         THE COURT:  I just don't know why you need it

18  because it obviously has some confidentiality to them.

19         Anyway, so, Mr. Oppenheim, what's your view on this?

20         MR. OPPENHEIM:  My view is that in May we had a

21  hearing on this.  Your Honor limited this to policies and

22  procedures.  This is a living breathing catalog that changes

23  what the plaintiffs are looking at.  It is among the most

24  highly secretive documents that we used for our piracy efforts

25  and it's not responsive to what Your Honor ordered and it

1  shouldn't be produced especially against a serial defendant in

2  counterfeiting cases.  Even subject to EO I would have great

3  concerns and worries about producing this.

4           THE COURT:  Mr. Bhandari --

5           MR. OPPENHEIM:  But most importantly it's just not

6  responsive.

7           THE COURT:  Mr. Bhandari, I think when I was talking

8  about policies and procedures I was talking about them from a

9  descriptive standpoint which is our policy is to do A, B and

10  C, our policy is to do D, E and F, and I don't see why you

11  need the actual list.  It's enough to know that there's a

12  policy to compare it against the list.  So I'm denying that

13  request.

14           Source spreadsheet.  I think the answer from the

15  defendants was that they don't have such a thing.

16           MR. BHANDARI:  No.  They said that they already

17  produced it.  So if they could provide us with a Bates stamp

18  number of what they supposedly already produced --

19           THE COURT:  Plaintiffs are unaware of the existence

20  of any MBS source spreadsheet.

21           MR. BHANDARI:  But at the beginning of our phone

22  call Mr. Oppenheim -- when we were talking about the MBS

23  deposition --

24           THE COURT:  Oh, I'm sorry.

25           MR. BHANDARI:  -- one of the things Mr. Oppenheim

1  said at the beginning of this phone call was there is some --

2  I've read you the excerpt from Jessica Stitts' deposition

3  transcript saying she consulted with the source spreadsheet.

4  Plaintiffs up until this point claimed they had no idea what

5  Jessica Stitt was talking about.

6         Then on this phone call Mr. Oppenheim said oh,

7  that's a source spreadsheet that compiled all of the slips in

8  -- there's a spreadsheet she looked at and it was produced to

9  the defendants in this case.  If that's the case I ask for Mr.

10  Oppenheim to simply provide the Bates stamp number of the

11  document that up until this morning they claimed they had no

12  idea whether or not such a thing existed.

13         THE COURT:  Mr. Oppenheim.

14         MR. OPPENHEIM:  The reason these discussions are

15  difficult is because within their letter they don't cite to or

16  excerpt the testimony that they are referring to and so we

17  we're sitting here trying to figure out what did the -- what

18  did the Cengage witness say.  It's not I think what Mr.

19  Bhandari just described.  I've described it, there were slip

20  sheets.  We've produced the relevant slip sheets.  The

21  aggregation of those slip sheets were put into a spreadsheet

22  of sorts.  It's not called -- I don't know what it's called

23  but I don't think it's called MBS source spreadsheet.  But

24  they have that.  It's been identified to them.  They've seen

25  it.  If they want us to identify it to them again I'm happy to

77

1   do that but there's no -- there's nothing here.

2          THE COURT:  Do you have Bates numbers you can give

3   them?  Not now but by Monday.

4          MR. OPPENHEIM:  Yes.

5          THE COURT:  Okay.  So do that by Monday.

6          MR. OPPENHEIM:  Yes, of course.  I can give it to

7   them later this afternoon, Your Honor.

8          THE COURT:  Good.  So I put off the issue -- I know

9   we have a little Chegg issue but I will now give you the

10  ruling on the deposition issue.

11         So I am reluctantly going to allow only a deposition

12  -- when I say reluctantly I don't know that I should be

13  allowing any depositions but I'm prepared to allow a

14  deposition of MBS on the date they chose on the understanding

15  that the issue will be limited in the extreme to the four --

16  their sources of their four textbooks at issue and their

17  knowledge of that.

18         In addition, there's going to have to be a videotape

19  set up so that not only does Mr. Oppenheim not have to travel

20  but Mr. Bhandari is no at greater advantage by being at the

21  location.  So the witness can either come to Washington or you

22  can set up a three-way video but this has to be very limited.

23         Now, if they want to start complaining about this on

24  some other cases, MBS, I'm not going to preclude them from

25  doing that since they're not here but since I have control

1   over deposition notices that get issued from this court I will

2   make those limitations as being sort of the maximum of what's

3   going to be permitted.

4           Any questions about the ruling, Mr. Bhandari?

5           MR. BHANDARI:  Your Honor, we would request that we

6   also be able to ask about MBS's policies and procedures for --

7   in keeping books in their inventory to see whether or not

8   there's commingling and other -- basically the chain of

9   custody so we can establish --

10          THE COURT:  If you can do a number that relates in

11  some way to figuring out how they know those textbooks came

12  from you that's reasonable but that has to be the central

13  focus.

14          MR. BHANDARI:  Okay.

15          THE COURT:  Any questions, Mr. Oppenheim?

16          MR. OPPENHEIM:  Your Honor, the scope that was

17  previously noticed is very, very broad.  Your articulation of

18  limiting it to the source of the four books works and concerns

19  that that under the guise of well, it's semantics will be

20  overblown and kind of knowing what happened in the Chegg

21  deposition that we went through there are going to be all

22  kinds of questions about well, how is it that you received

23  books and what do you do to inspect them and how many

24  counterfeits do you have and have you ever distributed a

25  counterfeited.  It becomes an inquisition of the third party

1   about their entire business, all of their interactions with

2   the publishers on every possible issue.  If it's really

3   limited to the four books fine but I'm concerned about how

4   we're going to enforce that limitation.

5          THE COURT:  I'm hopeful.  I mean some of the things

6   you said seem clearly outside like other instances -- I can't

7   remember what you just said but other instances of sales

8   unrelated to these four topics and other accusations of

9   counterfeit but questions about the chain of custody I would

10  call it about that -- that relate to these four books I think

11  are fair and shouldn't be burdensome to MBS.  So my hope is it

12  will work.

13         MR. OPPENHEIM:  Very well, Your Honor.

14         THE COURT:  Chegg.  We have a little problem which

15  is that I don't know that -- no one pointed out to me that --

16  I don't know if Chegg was even sent this letter of October 4th

17  but if they were no one pointed out to me that they haven't

18  responded and I noticed they're not here.  So I'm not quite

19  sure what we do about that.  Were they sent this letter?

20         MR. BHANDARI:  No, Your Honor, we did not send this

21  letter to them.

22         THE COURT:  Well, then I don't know how I can

23  possibly rule on something involving Chegg if they're not

24  present.

25         MR. BHANDARI:  I think there's a simple way to rule

80

1   on this issue which is a common interest privilege means that

2   there has to be two sides to the privilege.  If one side says

3   that there's no privilege then we can go back to Chegg and we

4   can say there is no common interest privilege because the

5   publishers say that there is no common interest privilege, so

6   please produce --

7            THE COURT:  Well, I don't know that they're saying

8   that.

9            MR. BHANDARI:  That's how we can resolve it here.

10  Just as you were able to make a ruling on the MBS --

11           THE COURT:  No, no, no, no, no.  I'm not going to --

12  no, that's ridiculous because Chegg has its own right to claim

13  a common interest privilege even if we could somehow force

14  Cengage to say otherwise or -- no.  This is a process issue.

15  Cengage is here.  That's fine.  They can speak to their

16  position on this but even -- I can't decide something for

17  Chegg if they're not present.  That's absurd.

18           So if you want to do a new letter that is sent to

19  Chegg and which I would require them -- you should explain my

20  individual practices and they need to respond that's fine but

21  I'm absolutely not going to rule on something that affects

22  Chegg without them being notified.

23           MR. BHANDARI:  Okay.  Fair enough.  We'll do that.

24           THE COURT:  All right.  There's more.  Hold on.

25                   [Pause in proceedings.]

1          MR. OPPENHEIM:  Your Honor, just one clarification

2    on the prior ruling on the depositions.

3          THE COURT:  Yup.

4          MR. OPPENHEIM:  I presume that by omission you're

5    deciding not to permit the deposition of Amazon to go forward.

6    Is that correct?

7          THE COURT:  That is absolutely correct.  No Amazon

8    deposition.

9          MR. OPPENHEIM:  Thank you, Your Honor.  I'm sorry.

10   I just wanted to clarify.  Thank you.

11         THE COURT:  The remaining issue is one I think that

12   was just raised and you haven't had a chance to respond yet on

13   which is the number of hours for the Cox deposition and the

14   due date of the letter on the proposed expert report.  So your

15   choice, Mr. Pandora.  Do you want to do this orally or do you

16   want a chance to respond in writing?  The response would be

17   due Monday.

18         MR. BHANDARI:  Sure.  Ms. Vickers I think is

19   prepared to respond orally just so we can expedite this and

20   get the court's ruling.

21         THE COURT:  All right.  Let's try that and if Mr.

22   Oppenheim has a problem with getting it orally without a

23   chance to digest it I'll hear from him.  Go ahead.

24         MS. VICKERS:  Okay.  So, Your Honor, there were two

25   issues that were raised.  One was with respect to the timing

82

1   of the report that the plaintiffs plan to submit and the other

2   was with respect to the length of Ms. Cox's continued

3   deposition.

4          With respect to the timing of the report, what

5   plaintiffs had proposed -- first of all, it's not necessary

6   and I can speak to that but it's also not workable given our

7   current schedule because as Your Honor noted previously you've

8   not yet ruled on whether this report would be permitted to

9   begin with.  So after the plaintiffs submit their proposed

10  report we would need an opportunity to respond to that to why

11  it's not appropriate.  Your Honor would need to rule on that.

12  Then to the extent that you did allow it we would need the

13  opportunity to identify a rebuttal witness and provide a

14  rebuttal report.

15         What we would propose as a more reasonable

16  resolution is to keep the dates that Your Honor had said --

17  you had actually extended the date after we offered to produce

18  additional information and to the extent that -- we don't

19  believe that the deposition of Ms. Cox is necessary for the

20  preparation of this report given the materials that were

21  produced, and I'll speak to that in a minute.  But to the

22  extent that the plaintiffs are able to make a showing that

23  they need to supplement in some way their report as a result

24  of Ms. Cox's deposition then they're entitled to try to make

25  that showing.  But we don't think the schedule really allows

1  for them to wait this long to prepare that report.

2          THE COURT:  What about the hours?

3          MS. VICKERS:  So with respect to the hours, so the

4  materials that were produced -- that were produced just

5  recently the plaintiffs have described them as being

6  voluminous and complex, documents that should have been

7  produced before and that's not -- that's not correct.  We

8  agreed to make the production of these materials essentially

9  for two reasons.

10          One was because they wouldn't agree to a stipulation

11 that the distribution information we already produced that all

12 the distributions went to Mr. Smyers.  So we said okay, fine,

13 we'll give you some additional information to document it.

14 The materials are -- and the second reason we produced these

15 materials quite frankly was to stop -- we've been going back

16 and forth on these financials.  It's taken up a lot of our

17 time.  It's taken up a lot of Your Honor's time.  We didn't

18 want to have this dispute any more about whether we were or

19 were not somehow hiding information but the information that

20 we produced is not complex.  It's things like the K-1s to Mr.

21 Smyers which have a box that says distribution.  It is largely

22 duplicative information about payments to Garrison.  Any

23 information we produce this time is the same information we

24 produced before because as we've indicated multiple times to

25 the plaintiffs the Garrison reports we produced before had

84

1   historical information.

2          To the extent it's about different entities like the

3   UK entity it's really not relevant to this case.  We just

4   wanted to stop having this fight but these materials are

5   tangential, duplicative and simple and I don't think that it

6   warrants additional time with Ms. Cox.

7          THE COURT:  Mr. Oppenheim.

8          MR. OPPENHEIM:  Your Honor, unlike the issues -- I'm

9   sorry.

10          THE COURT:  Go ahead.

11          MR. OPPENHEIM:  Unlike the issues that we've been

12   going through with respect to the defendants' production, the

13   plaintiffs moved on -- to compel the production of financial

14   documents on March 3rd -- excuse me, 30th of this year.  We

15   have been back to the court at least five times to get these

16   documents.  So the court -- when we became aware that -- well,

17   initially all we had were the annual financials highly

18   redacted.  We got the court to unredact those.

19          Then we looked at those.  We took a deposition of

20   Ms. Cox and learned that there were many things not included

21   and she had readily handled these monthly financial packages.

22   We came back to the court.  The court said yes, you should get

23   these monthly financial packages and you get two hours again

24   with Ms. Cox.

25          We take Mr. Smyers deposition and we learn contrary

85

1    to what the defendants had told us and just told the court

2    that all of the distributions went to Mr. Smyers that there

3    were distributions to others.  In fact, there were.

4         We come back to the court yet again.  We ask for

5    additional financial information.  What was produced on

6    Wednesday night, Your Honor, is 498 different financial

7    spreadsheets.  This is the information that should have been

8    produced in March and we have been ridiculously prejudiced by

9    this.  There are numerous questions about these documents as

10   we look at them.  First of all, they're entirely inconsistent

11   with the annual financial reports to the tune of tens of

12   millions of dollars to Mr. Smyers which are not in the

13   financial reports.

14        There are -- but looking at these documents some of

15   the information like the millions of dollars to Mr. Smyers is

16   evident but some of the information you can't understand

17   without asking a CFO question.  So, for instance, when there's

18   descriptions of phase one and phase two for certain financial

19   reporting you just can't know what that is until you ask the

20   CFO what is phase one, what is phase two.

21        So we absolutely need to ask Ms. Cox about all of

22   these documents.  And we will not be able to cover all the

23   monthly financial packages and these 498 spreadsheets within

24   the course of two hours.  It's just not possible.  So that's

25   number one.

1        Two, we -- our expert is going to need to rely on

2   this additional information in order to generate the proposed

3   report which is going to -- all the more necessary because now

4   we have such massive financial information which we didn't

5   have before.

6        The issue here is not whether the defendants will be

7   prejudiced.  The question is will the defendants be unfairly

8   prejudiced and on that the answer is clearly no.  This is an

9   issue of their making.  Had they produced the financial

10  documents when Your Honor first ordered them to produce them

11  after our March 30th letter they would not be in the position

12  they're in now in terms of trying to respond to our expert

13  report.

14        So the idea that we should get jammed up because

15  they didn't comply with the court's orders over and over and

16  over and over again doesn't make sense to me.  I frankly still

17  think that their conduct was sanctionable.  Your Honor chose

18  not to sanction them but clearly jamming us up in order to

19  make sure that their rights are protected on the back end

20  doesn't make sense to me.

21        MS. VICKERS:  May I respond?

22        THE COURT:  Yes.

23        MS. VICKERS:  So that's --

24        THE COURT:  By the way, when is the deposition

25  scheduled for?

1           MS. VICKERS:  We proposed -- we made Ms. Cox

2    available for the 19th and the plaintiff said they would not

3    agree to that unless we agreed to an extension of the report.

4           THE COURT:  When did they want to have it?

5           MS. VICKERS:  They --

6           MR. OPPENHEIM:  Your Honor, we --

7           THE COURT:  Go ahead.

8           MR. OPPENHEIM:  We can do the 19th, Your Honor, but

9    we need to have a week to digest that -- for our expert to

10   digest the answers and put together the report the 26th.  So

11   what I said to the defendants was we need to have a package of

12   dates here to propose -- to how to handle this.

13          THE COURT:  Okay.  But what if we got her earlier?

14          MR. OPPENHEIM:  Well, we have 498 spreadsheets to

15   get through before we even take her deposition.  So I don't

16   know how we could even do that, Your Honor.  As is the 19th is

17   going to be a challenge.  That's Thursday I believe.

18          THE COURT:  Well, let me ask you this.  Would you

19   rather have more time before her deposition or more time to

20   prepare the report after her deposition?  Which period is more

21   important?

22          MR. OPPENHEIM:  Your Honor, I'm asking -- Your

23   Honor, a week on either side is frankly less than we need but

24   we can manage it.  I don't think we should have to take less

25   than that.  498 spreadsheets produced Wednesday night.

1          MS. VICKERS:  May I respond to that because --

2          THE COURT:  Well, I know there's a factual dispute I

3    have no way of resolving between you and Mr. Oppenheim as to

4    the nature of these documents but go ahead and response.

5          MS. VICKERS:  I think I can actually clarify some of

6    that.  So the reports with the exception of maybe ten or 12

7    spreadsheets -- what Mr. Oppenheim is referring to are

8    actually just 12 -- around a dozen reports that have sub

9    spreadsheets.  I guess he's tallied them up and he's found

10   that there's are hundreds.  Those reports are the Garrison

11   reports.  As I indicated before, we previously produced the

12   information that the plaintiffs -- the reason that the

13   plaintiffs have said those -- they wanted the monthly Garrison

14   packages is they said we want to know how much money was being

15   paid to Garrison because you've characterized that not as a

16   distribution.  We think it's a distribution.  We think it's

17   profits.  We think it should be -- it should go in the profit

18   column.

19         We said okay.  So we produced those Garrison

20   reports.  We produced them.  They contained historical

21   information going back to the beginning of the relationship

22   with Garrison.  So they have now had for weeks the reports

23   that show all the information.  It's literally -- it's one

24   spreadsheet.  It's not 498.  It's one of these spreadsheets

25   that say -- has list of years and how much money has been paid

89

1    to Garrison.  That's why they said they needed this

2    information.  We produced it.  They've had it.

3            We produced in -- again, in the interest -- I

4    absolutely take -- I absolutely disagree with plaintiff's

5    characterization of our productions previously.  We produced

6    everything this court ordered.  This production was made just

7    to close out this issue.  In an effort to do that we said

8    look, are there any other reports that we have that relate to

9    this Garrison relationship so we can't be accused of not

10   having produced something.  We found a few other reports which

11   again have duplicative information about these monthly

12   payments to Garrison.  Absolutely duplicative information

13   about the historical payments.  So we produced those.

14           They may have many tabs, they may have discussion

15   about the phase one and two and how these payments were

16   calculated but that's not what the plaintiffs have ever raised

17   as the relevance of these documents.  All they've said is we

18   want to know how much you paid to Garrison and they've had

19   that information.

20           So Mr. Oppenheim can say 498, 498, but the truth is

21   it's one page of a spreadsheet which is duplicative of what

22   we've already produced.  So I do think that that is a

23   mischaracterization of our recent production.

24           MR. OPPENHEIM:  Your Honor, just to --

25           THE COURT:  Go ahead.

1          MR. OPPENHEIM:  For clarification sake.  Let me just

2     give you an example.  In none of the prior documents that were

3     produced either in the annual financial statements or the

4     monthlies as far as we can tell was there ever any financial

5     information provided about the affiliated entity Gekr, G-E-K-

6     R, providing distributions in the millions of dollars every

7     year to Mr. Smyers.

8          THE COURT:  Mr. Oppenheim, hold on.  Mr. Oppenheim.

9          MR. OPPENHEIM:  Yes.

10         THE COURT:  I'm going to make the ruling on this.

11    I'm going to allow the four hours and I'm going to allow the

12    additional time for the expert report.  I'll make every effort

13    to -- in other words, expert report on the 26th plus the

14    letter explaining why it should be permitted.

15         I'll make every effort to give the defendants a

16    chance to respond to it.  This is a very narrow issue in a

17    sense because it goes only to I guess the -- an argument about

18    statutory damages, punitive damages and so forth.  It doesn't

19    relate to liability anyway which is of course the heart of the

20    case.  So I think there's going to be very little problem with

21    just having a separate track on this and allowing expert

22    reports if I do allow it on a timetable that comes after the

23    timetable that's being contemplated right now for the trial.

24         So four hours plus October 26th for the letter and

25    expert report.

91

1          Anything else we need to do today, Mr. Oppenheim?

2          MR. OPPENHEIM:  I have a question for Your Honor in

3    terms of process if I may.  I don't think it's a disputed

4    issue.  In terms of a final pretrial conference with Judge

5    Pauley, is that something we should contact his chambers to

6    get on calendar?  Do you have a suggestion on how we should

7    set that up because I don't believe that's on calendar yet.

8          THE COURT:  I don't now about Judge Pauley.  I don't

9    have final pretrial conferences.  I just have -- I set a trial

10   date and let everyone show up and then do motion in limine

11   rulings in writing.  If he normally has a final pretrial

12   conference you should feel free to write him a letter and say

13   we're ready to have one scheduled or we don't know if you have

14   one and do you want one.  I don't think that's anything I can

15   be involved in to answer your question.

16         MR. OPPENHEIM:  That actually is very helpful.

17   Maybe he doesn't intend to have one.  Okay.  Thank you, Your

18   Honor.  I wasn't sure.

19         THE COURT:  Okay.

20         MR. BHANDARI:  Nothing else from plaintiffs, Your

21   Honor.

22         THE COURT:  Okay.  Thank you everyone.

23         MS. VICKERS:  Thank you, Your Honor.

24                      * * * * *

25

92

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                              Shari Riemer, CET-805

7  Dated:  October 16, 2017