HCEVCENC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CENGAGE LEARNING, INC., ET AL,

4                Plaintiffs,

5           v.                          16 CV 7123 (WHP)

6   BOOK DOG BOOKS, LLC, ET AL,

7                Defendants.            MOTIONS IN LIMINE

8   ------------------------------x
                                       New York, N.Y.
9                                      December 14, 2017
                                       9:36 a.m.
10
    Before:
11
                   HON. WILLIAM H. PAULEY III,
12
                                       District Judge
13
                            APPEARANCES
14
    OPPENHEIM & ZEBRAK
15       Attorneys for Plaintiffs
    BY:  MATTHEW OPPENHEIM
16       SCOTT ZEBRAK

17  MANDEL BHANDARI
         Attorneys for Defendants
18  BY:  EVAN MANDEL
         RISHI BHANDARI
19       ALYSSA L. VICKERS
         ROBERT A. GLUNT
20

21

22

23

24

25

1      (Case called)

2      THE COURT:  Good morning to all of you.

3      I have allotted roughly an hour and-a-half to deal

4  with the 12 motions *in limine* by my count that are outstanding.

5  I'd like to move through these; some obviously are more

6  complicated than others.

7      For purposes of this argument, you can remain seated.

8  Pull the microphone close to you so we will all be able to

9  hear.  Don't put those mikes too close because you know what

10  can happen.

11      I'm going to turn to the motions in the order in which

12  they were briefed, starting with the plaintiffs', all of the

13  plaintiffs' motions *in limine*, and then I'll proceed to the

14  defendants' motions *in limine*.

15      First up is the motion precluding testimony from

16  Professor Wu.

17      Mr. Oppenheim, Dr. Wu is obviously qualified and did a

18  standard statistical analysis.  Even if you point to errors in

19  his assumptions and methods, why doesn't that go to the weight

20  of his conclusions?

21      MR. OPPENHEIM:  Your Honor, with your permission --

22      THE COURT:  And you can remain seated so that we can

23  all hear.

24      MR. OPPENHEIM:  It's habit.  I apologize.

25      I'll let my colleague Mr. Zebrak address this motion.

1          THE COURT:  All right.

2          MR. ZEBRAK:  Thank you, your Honor.

3          So with Professor Wu -- and we certainly understand

4     the tension between admissibility versus just weight of

5     testimony.

6          But at some point the foundational defects of

7     testimony become so extensive that, as it is, we have a very

8     tight time frame, given the issues that we intend to cover.

9     And Professor Wu, we don't challenge his underlying

10    qualifications.  He has the pedigree to be an expert, we

11    acknowledge that; it's just really he, in a very short time

12    frame, went out and began his work with a data set that he had

13    no idea where it came from, what it meant, how it was compiled.

14    And upon that he based his whole analysis.

15         Our issue with how he acquired the data set is not the

16    mode of transmission, that it happened to come from an employee

17    of defendant, rather than the third party whose data it

18    purports to be.  It's the larger set of circumstances where

19    there's just no understanding as to the provenance of the data

20    or the integrity of the data.

21         Professor Wu acknowledges he has no understanding of

22    how the data was compiled or by whom; he has no idea how the

23    person that forwarded it to him obtained the data for if

24    additional data exists that would shine a light on these

25    issues.  He has no idea if the data is accurate, comprehensive,

1    or even altered.

2              The third party MBS, whose name will come up quite a

3    bit today, initially produced this data set as we understand it

4    in the form of two very large Excel spreadsheets purporting to

5    represent their sales data and acquisition data for 118

6    different titles.  What Professor Wu received from defendants'

7    former employee, John Glass, was a single large txt file.

8    That's it.  There's no testimony of record of how that relates

9    to the two documents produced by MBS and, by the way, that were

10   never the subject of any deposition testimony from MBS.

11             THE COURT:  Why can't he just be crossed on that?

12             MR. ZEBRAK:  He certainly could, your Honor.  In our

13   view, it's a waste of time and resources and confusion for the

14   jury, including -- there's a few other points I'd like to make,

15   but including because plaintiffs shouldn't have to suffer the

16   risk of unfair prejudice by Professor Wu walking in and

17   parading out statistics about why, with respect to 18 or 22

18   titles, the evidence that defendants distributed those titles

19   to MBS is nonexistent or statistically insignificant, when it's

20   a house of cards.

21             Juries put a lot of emphasis on expert testimony in

22   the form of someone with this pedigree.  If Professor Wu

23   testifies, then we are going to have to bring our rebuttal

24   expert, Professor McCabe, which will complicate the trial.

25   There are several other points about why his testimony is

1    unreliable for *Daubert*.

2              THE COURT:  They are in the briefing.

3              MR. ZEBRAK:  Yes, your Honor.

4              THE COURT:  If we spend a lot of time on this motion,

5    we are not going to get to others that, in my view, are more

6    complicated.

7              Mr. Mandel, tell me who compiled the data that Dr. Wu

8    relied on?

9              MR. MANDEL:  Mr. Glunt will handle this motion.

10             THE COURT:  All right.

11             MR. GLUNT:  Good morning, your Honor.

12             So what I think is important to know is that the

13   plaintiffs are not only not questioning Dr. Wu's

14   qualifications, they are also not actually challenging whether

15   he did the calculation properly.  While they have made some

16   comments about the provenance of the data -- so let me just put

17   it very simply.

18             This is a text file.  The text file was fed into a

19   MATLAB program that Dr. Wu describes having put together in his

20   report.  And the text file was prepared by John Glass, who was

21   an employee of the defendants.

22             The data obviously came --

23             THE COURT:  Is he going to testify?

24             The point is obviously that the plaintiffs are going

25   to attack the underlying database that Dr. Wu relied on.  So

1    what are you going to offer to the jury in terms of lending

2    legitimacy and credibility to that database?

3            MR. GLUNT:  Well, your Honor, the underlying Excel

4    spreadsheets from which the text file was compiled have been

5    identified and will be offered into evidence by way of a record

6    certification that we've obtained from MBS.

7            The other thing I wanted to note, your Honor, is they

8    have their own statistical expert who has also looked at this

9    data.  I think it's a little bit disingenuous to suggest that

10   there may be alterations or there may be problems or changes or

11   anything of that nature, when their expert, running the same

12   calculation, didn't discover any evidence of that.

13           This is a file that was reformatted so that it could

14   be fed into a computer program.  It was originally in Excel

15   format; it then was changed into a txt format.  While that

16   reformatting wasn't done by Dr. Wu himself, I don't think

17   there's anything to suggest that fundamentally alters whether

18   his analysis is credible and admissible or not, particularly

19   when, as I've noted, their own expert hasn't challenged whether

20   the analysis was done properly or whether, when you run that

21   analysis on the data, you actually get a different result.

22           MR. ZEBRAK:  Your Honor, very briefly.

23           Another issue with our preclusion motion here is that

24   MBS produced these two Excel spreadsheets back in BDB1, three,

25   four years ago, I don't remember the exact date.

1        Defendants' counsel did not depose MBS about these

2    Excel spreadsheets, authenticate the documents, or anything of

3    that sort.  The evidence certification that defendants' counsel

4    just mentioned is something that they just obtained after we

5    filed our motion *in limine.*

6        So the idea is MBS produced these two Excel

7    spreadsheets years ago; and then several years later they just

8    obtained this records documentation that, by the way, they only

9    obtained it long after discovery closed in both cases, and only

10   after they went to Magistrate Judge Gorenstein to obtain leave

11   to take MBS's deposition on four books in BDB2.  And in lieu of

12   that deposition, lo and behold, this record certification is

13   produced that goes well beyond merely even saying that it's

14   records; it goes to explaining what they are.

15       From opposing counsel they've refused to even let us

16   know whether drafts went back and forth with MBS.  The whole

17   context upon which Dr. Wu did this analysis was improper from

18   the start, it was an unreliable data set, and we just have

19   substantial concerns about the distraction and confusion this

20   will have on the jury not only for the 18 titles that they want

21   to cover with him, but more broadly in the case.

22       THE COURT:  All right.

23       Let's turn to the next motion.

24       Plaintiffs' motion *in limine*, seeking to preclude

25   testimony from Gerard Hiller.

1          Here, again, for plaintiffs' counsel, won't testimony

2     from Hiller provide necessary and appropriate background

3     information on counterfeit detection in the publishing

4     industry?

5          MR. ZEBRAK:  Well, your Honor, there's a few points in

6     response to that.

7          The first point is that only a small and largely

8     noncontroversial portion of his testimony actually concerns the

9     existence of counterfeits in the industry and how that's

10    evolved over time and generally how textbook distributors have

11    reacted to it.

12         Really, as identified in our papers, our core concerns

13    with his testimony is that whatever expertise he has by dint of

14    having worked in Nebraska Books for those years, he's far

15    beyond any expertise; and he's really into that area of *ipse*

16    *dixit* where he has little to no understanding of what other

17    publishers -- excuse me, other textbook distributors have done

18    to detect counterfeits, when, if at all, they stop buying from

19    suppliers of counterfeits, and what they do with respect to the

20    counterfeits they've obtained.

21         He, by his own very clear and uncontroverted

22    deposition testimony, said he has no firsthand knowledge or

23    personal experience of what other textbook distributors do.

24    He's never spoken with any of them either when he worked at

25    Nebraska Books or afterwards.  He made no effort to inform

1    himself during his expert retention here of what other textbook

2    distributors have done.  Rather, he was hired by defendants'

3    counsel in this case; he had a conversation; he sat down and

4    wrote a report, citing nothing, not even appending his supposed

5    statements about state of mind about other textbook

6    distributors and their policies and practices and what they do

7    with counterfeits to any personal experience, any research, any

8    conversations, nothing.

9           Fundamentally, even if his testimony were for some

10   proper purpose -- and I'd like to speak to that for a moment,

11   your Honor, but we'll put that aside for the moment, just

12   fundamentally, it's just unreliable.  He can't assist the jury

13   with speculation and conjecture and subjective beliefs about

14   what other textbook distributors do; yet defendants wish to put

15   in front of the jury this idea that textbook distributors, even

16   when they act in good faith and -- or excuse me.

17          What they intend to do is put before the jury an

18   argument that even when textbook distributors follow whatever

19   Mr. Hiller defines as all customary practices, they still can't

20   detect all counterfeits, and that their subsequent sales are

21   inadvertent or unknowing.  And inevitably that causes us

22   extreme prejudice because a jury is going to then think that

23   defendants, likewise, that their distribution is unintentional.

24   This is really the trial themes that defendants want to offer.

25   With all due respect to Mr. Hiller, because I met him, he's a

1   serious person, I have no issue with that, but he's really here

2   as a mouthpiece to advance the themes that they have touted

3   from day one in the case in which to offer.  He did no work,

4   spoke with no one, has no basis for these statements.

5          I could go on in more detail or address the improper

6   purpose, if that would be acceptable, your Honor.

7          THE COURT:  I think I've got it.

8          Let me ask defense counsel, what qualifies Hiller to

9   speak to industry practices in general, rather than only his

10  own experience at the Nebraska Book Company?

11         MR. MANDEL:  Sure.  Three points, your Honor.

12         First, he spent 30 years in Nebraska Book Company.

13  The case law is very clear that that kind of extensive

14  experience with even just one employer is sufficient to testify

15  as to market practices.  We cited those cases.  They have not

16  cited a single case, your Honor, for the contrary proposition

17  that employment at one major participant in the industry for

18  any period of time is insufficient.  The reality is one

19  employer is sufficient under the case law.

20         Second, Mr. Hiller has reviewed the deposition

21  transcripts that Chegg, Follett, and MBS have provided in this

22  case.

23         By the way, many of the questions about market

24  practices that those witnesses answer were actually asked by

25  the plaintiffs, not by the defendants.  So during the discovery

 1    phase of this case, they were extremely interested in learning

 2    about these participants' market practices.  So we were

 3    somewhat surprised at the end to learn that suddenly they

 4    didn't want market practice testimony.

 5            THE COURT:  What's the purpose of Hiller's testimony?

 6            MR. MANDEL:  Sure.  There's a threefold purpose of

 7    Mr. Hiller's testimony.

 8            The first is, very simply, it speaks to whether the

 9    books at issue in this case were sourced from defendants or

10    whether they were sourced from some third party.  As this Court

11    is aware, on the summary judgment motion we argued the

12    plaintiffs had insufficient evidence, circumstantial evidence,

13    to get past summary judgment.

14            Judge Gorenstein agreed with us with respect to 117 of

15    the 161 works at issue in this case.  Your Honor reversed Judge

16    Gorenstein.  Your Honor said circumstantial evidence is enough.

17            So what the jury is going to be asked to do in this

18    case is infer that a book that was found in one of our

19    customers' shelves came from us.  In order to do that, the jury

20    has to determine that our customers had a million sources, it

21    wasn't just us.  Is it more likely than not that that book was

22    sourced from defendants, or is it more likely than not that

23    this book was sourced from third parties.  That's the liability

24    portion of the case, of course.  If all the other major

25    distributors are following the same market practices, there is

1   no reason to infer that the book came from us.  So that's the

2   first reason it's relevant it goes to liability.

3          The second reason is it speaks to willfulness.  As far

4   as I know, only two cases in federal courts or any court have

5   considered the issue of whether market-practice testimony is

6   relevant in a copyright case.  Both cases which we cite

7   concluded it absolutely is relevant.  The plaintiffs point out

8   there's not a ton of reasoning in those cases, and they are

9   right about that.  I think there's not a ton of reasoning in

10  those cases because the answer is obvious.

11         Since Judge Hand for the Second Circuit 100 years ago

12  said that reasonable prudence is typically common prudence, in

13  virtually every kind of tort case, market practice testimony,

14  industry custom and usage evidence is relevant to determine the

15  defendant, the alleged tort feasor's state of mind.  So the

16  determination that is made in these cases is was there a

17  deviation from the standard of care in the industry.

18         So in making the willfulness determination, the jury

19  has to understand what is everyone else doing?  Was there a

20  departure from the standard of care; and because it's

21  recklessness, they're going to have to show a very substantial

22  departure.

23         THE COURT:  Isn't that inviting the jury to disregard

24  what Book Dog did because everyone infringes?

25         MR. MANDEL:  Absolutely not.

1    Their motion on this issue is directed to an argument

2  we are not going to make and they know we are not going to make

3  it, because Mr. Smyres, who is a defendant and the owner, the

4  CEO, testified, We hate counterfeit books.  We do everything we

5  can to stop counterfeit books.  We do not think it's right to

6  sell a counterfeit book.  We think all distributors, every

7  participant in the marketplace, has an obligation to take

8  reasonable steps to stop counterfeit books.  We hope our

9  suppliers and our customers do that, because it is a closed

10  system and we are all constantly selling each other books.

11    We are never going to argue at any point, either the

12  lawyers or the witnesses, no one is ever going to argue that it

13  is acceptable to sell a counterfeit book.  That argument, it's

14  not just something we personally disagree with, but it wouldn't

15  help us in front of the jury at all.  That would make us look

16  terrible and lead to a very punitive award.  I understand

17  that's what they want to pretend that we are arguing, but that

18  is not at all what we are arguing.

19    That brings me to the third reason all of this

20  testimony is relevant, which is they want to offer -- I

21  apologize if I'm a little loud.

22    THE COURT:  Just a teeny bit.

23    MR. MANDEL:  They would like to offer evidence that

24  they suffered actual injury.  This Court has ruled that they

25  are permitted to offer such evidence.  And that's fine.  They

1 can say, We are hurt, you know, in all these ways by

2 counterfeit books.

3   We are allowed, under the precedence that they cite,

4 to respond to that by simply saying, That may be true, you may

5 be hurt.  But most of that is not the result of the defendants'

6 behavior.

7   There's a causation requirement here.  They've got to

8 show that the harm came from us.  And if, in fact, we are doing

9 a far better job than everyone else, and the overwhelming

10 majority of counterfeit books that are out there were sold by

11 someone other than us, then, in fact, that injury should not be

12 attributed to us and they have not met their burden on

13 causation and damages.

14   THE COURT:  All right.  Mr. Zebrak.

15   MR. ZEBRAK:  Your Honor --

16   THE COURT:  If you want to stand, you can, but just

17 stay close to the mic.

18   MR. ZEBRAK:  The judge I clerked for in the Eastern

19 District of Virginia, if someone were seated down, he would

20 just say, I'm sorry, are you talking to me?  I can't hear you.

21   THE COURT:  Generally, proper practice in federal

22 court is to stand, and I enforce that rule uniformly except in

23 a rare situation like this where I have multiple lawyers who

24 are making arguments on different motions and we need to move

25 through with expedition.

1          MR. ZEBRAK:  Yes, your Honor.  And we certainly

2     appreciate that.

3          THE COURT:  All right.

4          MR. ZEBRAK:  I'm going to address both facets of our

5     motion, beginning though with the reliability piece, then

6     moving to the improper purpose; although many of the issues

7     sort of cross-pollinate.

8          There were a number of statements from defendants that

9     are just flat out not right.

10          Yes, as a general matter, you can work and have

11     substantial experience at one employer and be qualified to be

12     an expert.  But the cases don't say, of course, that you can

13     then offer testimony outside your expertise.  And that's just a

14     simple proposition that we offer.

15          And it's clear, if you look at his expertise, it's

16     internal at Nebraska Books.  It's very clear he doesn't know

17     what other distributors do in terms of how they buy books,

18     their detection practices, when they cut off -- stop buying

19     from suppliers, what they do with the books, what records they

20     keep.  Those are all just themes from defendants to try to have

21     a jury overlook the truly irresponsible behavior by their

22     client.

23          As a practical matter, he just can't testify where he

24     has no experience personally.  Or, alternatively, he could have

25     gone out and done the research, done the work.  That's what

 1    individuals do when they testify, having worked at one

 2    employer, they then read deposition testimony, transcripts,

 3    they call people, they do research.  He did none of that.

 4         Quite frankly, your Honor, what happened is he formed

 5    his opinions, wrote a report.  He then amended his report.  He

 6    amended the report not to change any opinions or to form new

 7    opinions, it was solely with an eye toward being at a hearing

 8    like this where defendants' counsel could say he considered

 9    deposition transcripts and he considered this Exhibit B that

10    defendants' counsel created that we'll get to.  He admits he

11    did not review those to inform his opinions.  At most, he says,

12    at a vague, general, metaphysical level, it corroborates my

13    beliefs.  He made no notes; he doesn't footnote his report.  He

14    really had no ability to link any of his statements to those

15    transcripts.

16         We actually reviewed those transcripts.  We submitted

17    a declaration from one of our counsel, which highlights part of

18    the problem we would have with an expert like this, is that

19    those third parties didn't testify to the things that he says

20    in his report that he admits were outside his personal

21    knowledge and are not in this third-party deposition testimony.

22         The case law is very clear.  You can't establish

23    reliability by, after the fact, giving him deposition

24    transcripts and giving him this document that defendants'

25    counsel created that, your Honor, purports to be the results of

1    an audit at one third-party distributor at a very summary

2    level.  It's been paraded into court by defendants' counsel on

3    several occasions.  It's clear defendants' counsel created it.

4    The witness admitted he didn't create the document.  In their

5    briefing they indicate that it is derived from data in the

6    documents he was given with the deposition transcripts after

7    the fact.  This is the so-called evidence of infringement by

8    others that defendants wish to introduce in order to

9    essentially avoid liability and avoid a finding of willfulness

10   under this rubric that everyone infringes and we're either in

11   good company because we adhere to the same practices as

12   everyone else, or we meet or exceed those standards.

13        Judge Gorenstein actually in the discovery hearing

14   recognized how convoluted their attempt to use this document

15   is.  It was more just *dicta* adhering.  But the idea is, your

16   Honor, there's two types of evidence we are relying on both,

17   direct and circumstantial.  As defendants point out, with

18   respect to the counterfeits in BDB1, a substantial amount of

19   those books we rely on circumstantial evidence for.  In BDB2

20   it's direct evidence where we obtained it from test purchases

21   or the books actually have the defendants' stickers on them or

22   other clear stamps and markings indicating where the third

23   party got it from.

24        What defendants wish to do is take this other

25   infringement evidence in the form of an audit report from an

audit done in 2016, for a wide swath of titles going far beyond the titles in this case and, again, the wrong time period.  And they want to take that data and somehow have it relate back to the titles in the case from which that specific distributor or some other distributor surrendered books to us that we determined are counterfeit.

So the idea, just to illustrate, would be in 2012, for example, Distributor X surrenders a book to us; we determine it's counterfeit.  The defendants wish to use an audit report from 2016 to say that of the books examined at that distributor at that time, going far beyond the titles in this case, wrong temporal relation, that means it's less likely we supplied the books or that we're willful because others -- essentially, the we're-not-Napster defense; that others had a greater proportion of counterfeits in that one sample, which, of course, isn't even a statistically sound sample.  For all we know the distributor was already engaging in more careful practices with regards to the defendants, where they just sold the defendants books.  It's an isolated, misleading, incredibly prejudicial snapshot that both generically in the case, through their witnesses or third parties or with our witnesses they hope to use, as well as this is one of the two documents that, after Mr. Hiller did his work, which, again, goes beyond his expertise, it's one of the two sets of materials the defendants provided to them.

1          THE COURT:  I think I've got it.  You're starting to

2     repeat yourself now, all right?

3          MR. ZEBRAK:  Yes, your Honor.

4          THE COURT:  Let's turn to plaintiffs' motion to

5     preclude Quintero's rebuttal testimony.

6          With respect to this motion -- and this is directed at

7     plaintiffs' counsel -- your own expert reached conclusions

8     regarding Smyres' likely tax treatment.  Why doesn't that then

9     allow Quintero to describe Smyres' actual tax rate?

10         MR. OPPENHEIM:  Your Honor, I'm sorry.  To what

11    specifically are you referring when you say that Mr. Steinmetz

12    reached conclusions about Mr. Smyres' tax treatment?

13    Respectfully, I'm a little confused by that.

14         THE COURT:  Why isn't Quintero's explanation of

15    defendants' profitability, compared to other textbook sellers,

16    relevant to rebut Steinmetz's conclusions about defendants'

17    profitability?

18         MR. OPPENHEIM:  So there are two issues here and I

19    want to try to separate them out.  One is Quintero's testimony

20    about the Smyers businesses compared to the industry.  And the

21    other is Smyers' post-tax profitability.

22         With respect to the first, Mr. Quintero is providing

23    testimony that he claims -- or defendants claim is rebutting

24    Steinmetz.  I'd like to quote something directly from the

25    defendants' brief.  They say that it's rebutting Steinmetz's

1    report which says that the defendants' revenues have been

2    "artfully suppressed for purposes of litigation."

3           There is nothing within Mr. Steinmetz's report that

4    says that.

5           What Mr. Steinmetz opines on is what he views as the

6    profitability of the defendants' businesses based off of the

7    review of the financial records that he's seen and been

8    provided to.  He doesn't compare it to the industry; he simply

9    looks at their own financial records that were provided.

10          Now, there are issues that the defendants raise where

11   they disagree with Mr. Steinmetz.

12          THE COURT:  Doesn't Steinmetz say that Smyres may have

13   more profits than the records provide?

14          MR. OPPENHEIM:  He says that because records were not

15   provided.  That issue may be solved, your Honor, by your

16   request that we engage in some additional financial discovery.

17   So depending on what defendants choose to produce and what

18   happens, that issue may go away, I don't know.

19          But what he said is, Since I haven't seen these

20   records, there could be additional profits contained within

21   those records.  An entirely appropriate opinion given that the

22   records weren't produced.

23          But nowhere in Steinmetz's opinion does he speak to

24   Mr. Smyres' profitability compared to the industry.  So

25   Mr. Quintero's opinion on that can't possibly be rebuttal.

1    Steinmetz is simply saying, I'm looking at the books and

2    records; this is what I think the profits of the business are.

3           Quintero should come back and say, Based on my review

4    of the books and records, I disagree with Steinmetz on the

5    profits of the records for the following reasons, boom, boom,

6    boom, boom.  And the two experts can opine on their opinions of

7    what the profits are.  *Mano-a-mano*.

8           But once you start saying, Well, compared to the

9    industry what the defendants are trying to do is to suggest

10   that, Well, Mr. Smyers, even though he's making millions and

11   millions of dollars every year, which understates it, but even

12   though he's making that, actually his business is dwindling and

13   he's not doing so well.  What they want to do is put in front

14   of the jury that maybe he's not as profitable as he is because

15   the industry is on the decline.

16          There is no testimony from the plaintiffs on where the

17   industry is going; that is not rebuttal testimony; it is

18   improper.  So that's number one.

19          Two, Quintero has absolutely no basis to opine on

20   this.

21          THE COURT:  All right.  I think I've got it.

22          Just following on Mr. Oppenheim's last point, why is

23   such testimony relevant from Quintero?

24          MR. MANDEL:  Regarding the industry?

25          THE COURT:  Right.

1           MR. MANDEL:  Sure.

2           On page 6 of Mr. Steinmetz's report he states that the

3    profits of the defendants "appear to be understated."  It's

4    obviously rebutting what they are saying and what they want to

5    say.  What they've asked for an adverse inference on is

6    defendants are hiding their profits because of A and B and C;

7    they must really be making more money than they are claiming to

8    make.

9           Our response is, No, it's false with respect to all of

10   our own records and everything you're saying is wrong.  But our

11   other response is, By the way, the industry has declining

12   profits and revenues; it's in a very challenging position right

13   now.  So the fact that you might see dips in particular years,

14   particularly with respect to a certain business line doesn't

15   mean we are hiding profits; it means we are suffering an

16   adverse business climate that everyone in the industry is

17   suffering.

18          MR. OPPENHEIM:  Your Honor, may I respond to that?

19          THE COURT:  For just a moment.

20          MR. OPPENHEIM:  So Steinmetz does not say that profits

21   are being hit.  That's putting words in Steinmetz's mouth;

22   that's not what he says.

23          Where he takes issue is, for instance, where there are

24   certain profit shares -- and their own annual reports call them

25   profit distributions -- where profit distributions are made to

1     other entities.

2          The defendants have characterized them within their

3     annual reports, their financial reports, as expenses.

4          Mr. Steinmetz is a CPA, says, Based on my view of

5     these, they are not expenses, they are profit distributions.

6     That's what he means when he says they are understated.

7     Nothing about this has to do with industry trends.

8          If they are going to present a witness on the

9     industry, A, they should get a real witness who has a

10    background in industry trends; B, they should have done it

11    before the deadline; and C, we should have an opportunity to

12    put together rebuttal on that.  But none of that has happened.

13    Mr. Steinmetz would never be in a position to speak to industry

14    trends in the same way that Mr. Quintero is not.

15         Would you like to turn to the tax issue, your Honor?

16         THE COURT:  For a moment, yes.

17         MR. OPPENHEIM:  Your Honor, the fundamental problem

18    with the tax analysis by Quintero, apart from the fact that

19    it's not rebuttal, the fundamental problem is that the analysis

20    he did, it's hypothetical and so it's unreliable.  If he's

21    going to wear the cap of being an expert within this Court and

22    testify as an expert, his analysis has to be real.

23         What he did is he was told by somebody -- we have no

24    idea who -- here are the tax rates that Mr. Smyres paid in each

25    of these years.  We don't know how those were calculated; we

1    don't know where they came from.  They presumably came from tax

2    returns which were never produced.  They could have produced

3    them; we asked for financial records; they did not produce

4    them.  They gave Mr. Quintero some numbers, and he applied

5    those numbers to each of the entities.  Some of those entities

6    don't even pay as passed through to Mr. Smyres, so they pay

7    through other entities, so the application of those numbers to

8    those entities doesn't make any sense.

9            But the idea that you are going to take some

10   percentage number and apply it and say, That's what Mr. Smyres

11   paid in taxes is not accurate.

12           If they want to put forward what Mr. Smyres paid in

13   post-tax -- excuse me.  If they want to put forward what

14   Mr. Smyres' profits were post tax, then they should have

15   produced the tax returns and we could have taken depositions

16   and examinations on those after we had reviewed them.  This is

17   no way to do it as a rebuttal witness without the actual

18   documents in front of us.

19           THE COURT:  All right.

20           MR. MANDEL:  Can I just respond to the taxes point,

21   your Honor, very briefly?

22           THE COURT:  Go ahead.

23           MR. MANDEL:  In BDB1, the defendants and the

24   plaintiffs stipulated as to what Mr. Smyres' taxes were without

25   there being any production of tax returns whatsoever.  So the

stipulation is contained in Exhibit G to our declaration, which

is Document 256 on the docket.  It says right there what our

taxes were.  The taxes were never produced.  We were absolutely

relying upon that practice in the first case when we continued

it in the second case, assuming that that stipulation would

just be supplemented.

       But the taxes, I think there's no dispute about

relevance, but I just want to be crystal clear.  It's relevant

for three reasons:

       First, the parties have already stipulated to its

relevance in that stipulation in Exhibit G.  Although that

stipulation only goes through 2012, it went through 2012

because we were expecting to try the case shortly after that.

Certainly because they brought a second case and dragged this

whole process out for several years, we are entitled to

supplement that and have that tax information for subsequent

years.

       Two, it is undisputed that if taxes were paid at the

corporate level, taxes would be relevant.  It should come out

no differently simply because this is the pass-through entity.

       And third, it's undisputed and they have sought in a

very dogged way all of the profits.  During discovery they

sought as much information as they possibly could about the

profits that Mr. Smyres received from this business.  You can't

look at the profitability of any business without looking at

1    the taxes that are paid on that business.

2           THE COURT:  If there was a stipulation between the

3    parties relating to the years up to 2012, why isn't there a

4    stipulation for the same information up to 2016?

5           MR. MANDEL:  We offered that.  We begged them.  We

6    said, Let's just do another stipulation.  Let's not each have

7    experts on this issue; let's not have a whole folic and detour.

8    And they refused to do the stipulation.

9           THE COURT:  Why?

10          MR. MANDEL:  They can say why.

11          THE COURT:  Mr. Oppenheim.

12          MR. OPPENHEIM:  So Mr. Mandel has misstated the

13   record.  He wasn't counsel at the time and maybe that's why.

14          The defendants, prior to our entering into that

15   stipulation, produced detailed financial records.  I believe

16   they did produce actually the tax returns; but they produced

17   bank statements on a monthly basis.  They produced all the

18   financial records for all of the entities.  Everything they

19   produced in BDB1 they refused to produce in BDB2.  We couldn't

20   possibly enter into a stipulation; we had no idea what the

21   numbers were, your Honor.  We would have gladly have done it if

22   they had produced the same records, which they refused to do,

23   notwithstanding repeated orders by Judge Gorenstein.

24          THE COURT:  Was that issue regarding production of

25   those financial records litigated before Judge Gorenstein?

1    MR. OPPENHEIM:  Absolutely.  And he repeatedly ordered

2  their production, and they weren't produced, which was the

3  basis for our motion for an adverse inference, your Honor.

4    THE COURT:  I think a lot of that could be obviated by

5  conducting some discovery between now and the time of trial on

6  that issue.

7    MR. OPPENHEIM:  Your Honor, we would love to have a

8  stipulation on profitability.  Respectfully, we are going to

9  disagree about certain things.  The Garrison profit

10  distributions we're never going to reach agreement on.  But on

11  other issues we might reach agreement if they actually produce

12  complete records.

13    Your Honor, we've asked for additional records since

14  the conversation we had with your Honor last week.  Already I

15  believe Mr. Mandel has suggested that they may not be producing

16  any additional financial records.  So we may be back here, your

17  Honor.  We'll see.

18    THE COURT:  All right.

19    Let me turn to the plaintiffs' omnibus motion that has

20  a number of parts to it.

21    First, with respect to precluding defendants from

22  offering evidence of copyright infringement by other

23  distributors.

24    First, what's the relevance of this evidence?

25    MR. MANDEL:  It's the same three issues I mentioned

1    before in connection with custom and practice.  It's one, it

2    goes to liability --

3           THE COURT:  It's intertwined, right?

4           MR. MANDEL:  It is, your Honor.

5           THE COURT:  Are you going to be offering this kind of

6    evidence in your case-in-chief or cross-examining on it?

7           MR. MANDEL:  The short answer is both.  Primarily I

8    think in our case-in-chief.  I think where it will come in on

9    cross-examination is whichever witness they have to talk about

10   the evidence contained in their roadmap, whatever witness is

11   saying, You should draw an inference that we found a book in

12   your customer's shelf and we think it's counterfeit and here's

13   why we think it came from the defendants, we will probably have

14   to cross-examine that person on the issue of, Well, we are not

15   the only ones who provided that customer with counterfeits.

16   Isn't that the case?  Isn't it the case that you found -- we

17   only sold them ten copies; and you found 1,000 counterfeits on

18   their shelf.  So why is it you would think that that would come

19   from us as opposed to from all of the other customers?

20          THE COURT:  All right.  Go ahead.

21          MR. ZEBRAK:  May I respond to that?

22          Your Honor, at a high level we believe this case

23   should be -- the focus should be the defendants' conduct, not

24   the conduct of others.  They wish to use this evidence to rebut

25   arguments that we have not made and will not make at trial.

1          We do not contend and will not contend that they are

2     the only source of counterfeits in the market.  We have not

3     contended and will not contend that their practices are the

4     same, worse, or better than others.  We are not making

5     comparisons.

6          THE COURT:  But to determine if the defendants took

7     enough precautions, won't the jury need to compare what they

8     did against what others did?

9          MR. ZEBRAK:  A couple points in response to that, your

10    Honor.

11         At a high level, respectfully the answer is no.

12         First of all, just before we lose responding to

13    defendants' point, the issue here is that if there's a sliver

14    of potential relevance for this data, that they attempt to

15    drive a truck through it.

16         We are okay if they wish to say that, Well, with

17    respect to title X, well, we found infringing copies of those

18    titles; other suppliers had sold copies of those titles and the

19    record reflects that.  If it's focused on the titles, that's

20    one thing.  But what they want to do is use an audit report

21    that, again, out of time concerning other titles, in effect, to

22    establish this idea of who's better or worse than others and

23    make these metaphysical arguments about liability.  It's pure

24    speculation; it's not tied to any evidence.  So if they wish to

25    tie it to the titles in the case, that's one thing, for

1    example, in response to the roadmap.  But that's not what they

2    are doing, your Honor.  If they wish to do that, that would be

3    fine with us.

4            At a high level, there's two other points, your Honor.

5            One is Congress established strict liability and

6    established a damages regime, including with deterrence being

7    prominent among that.  Our focus is on the defendants' conduct,

8    what their strict liability -- what they did with their

9    detection processes and how that evolved over time relative to

10   our copyrights and what they knew or didn't know.  The jury

11   will look at that to make its determination on willfulness

12   rather than looking at some vague statements about what some

13   other distributor did process-wise at a point in time.

14           This gets back to the improper purpose, both for

15   Mr. Hiller and in this respect.  The fact that you may be

16   speeding on the highway, by analogy, and others are also

17   speeding at the same rate as you or speeding at a higher rate,

18   that doesn't allow you to avoid either paying a ticket or

19   paying the appropriate fine.  And make no mistake, that's what

20   they want to use it for.

21           How it compares to others, if others are similarly

22   using poor practices, that doesn't mean they are not willful.

23   We would greatly extend this trial out with very confusing

24   testimony that would have a jury really confused about what's

25   relevant or not.  And they don't, again, even have an

1  appropriate vehicle for this because Mr. Hiller is relying on

2  subjective beliefs, *ipse dixit*, so it's all intertwined.

3          THE COURT:  All right.  Look, this motion and the next

4  motion, seeking to preclude third-party counterfeit detection

5  policies and practices, they really raise precisely the same

6  issues, don't they?

7          MR. MANDEL:  They do, your Honor.

8          All I'll say in response is they have not pointed to a

9  single tort case in which the defendant's state of mind was at

10  issue, and custom-and-practice evidence was excluded.  They

11  have not pointed to a single case.  They have pointed to a

12  number of cases that say, You can't argue that it's lawful or

13  permissible to sell a counterfeit book.  That is a totally

14  different argument; we would never make that argument, as I

15  have already described.

16          To exclude custom-and-practice evidence in this case

17  would be extraordinary and unprecedented.

18          MR. ZEBRAK:  Your Honor, just very briefly, copyright

19  law has been around a long time, as has tort law.  And there

20  are tort concepts in copyright.  But, tellingly, they cite a

21  total of two cases for custom-and-practice evidence that has

22  come in for the purposes they wish to use it for.  Those two

23  cases, as they acknowledge, we point it out in our papers,

24  those two cases cite no precedent, have no reasoning provided,

25  and have not been relied on by any other cases for those

1    propositions.

2         Conversely, there's a long history of how juries deal

3    with willfulness, and it does not involve custom-and-practice

4    testimony.  Where custom-and-practice testimony comes in, your

5    Honor, may concern how an industry regards a licensing term and

6    what a word means.  But this idea of other people's practices

7    and whether you're in good company or not, there's just no

8    basis for it.

9         Several judges in this very district, your Honor, have

10   dealt with this.  They go on in their papers attempting to

11   distinguish these cases, but they can't, both on liability and

12   willfulness in the cases we cited.  One was Judge Duffy in

13   *Grand Upright Music v. Warner Brothers*; the other was Judge

14   Wood in the *LimeWire* case.

15        To the extent there's a thin read of potential

16   relevance -- and we dispute that there is -- it's so far

17   outweighed by the copyright concepts.  Mr. Mandel just

18   mentioned we're not arguing against tort law.  That's precisely

19   our point, your Honor.  Copyright law is strict liability, not

20   negligence; and copyright law has policy-driven reasons for

21   deterrence.

22        The fact that he's availing himself -- or defendants

23   are availing themselves of this law that just has no

24   application here, it's very similar, your Honor, to what the

25   Supreme Court has said about statutory damages actually; it

just came to me as we're sitting here now.  But they similarly

cite to the punitive damages cases concerning what's relevant

on statutory damages.  But Congress has already established

policy reasons in a statute.  And it's copyright law that

applies here your Honor, it's not tort law.

THE COURT:  All right.  Let's move on to the sixth

motion, precluding defendants' claim that plaintiffs themselves

distribute counterfeit books.

This is a question for defense counsel:  What is the

specific purpose for which you offer this evidence?

MR. BHANDARI:  It's for three purposes, your Honor.

First, as Mr. Mandel has already explained to the

Court, the precautions that are taken by others in the industry

are highly relevant to determining whether or not our clients

were reckless in that if they deviated from the normal

standards.

In this case we have extensive testimony that the

plaintiffs, every single one of the four publishers, receives

millions and millions of returned books from -- textbooks.  And

we also have testimony that they only have a handful of people

who expect those textbooks.  In many of the instances there's

been no training at all for many of the employees who do the

inspection; there are simply some written guidelines.

There will be some testimony that the counterfeits

have made their way in the inventory of the plaintiffs in this

1   case.  So looking at their own actions --

2          THE COURT:  Aren't you comparing apples to oranges?

3   Because aren't the plaintiffs very different from the

4   defendants in that the plaintiffs are book publishers and

5   you're a book distributor?

6          MR. BHANDARI:  The plaintiffs and the defendants have

7   the exact same goal, which is to prevent the distribution of

8   counterfeit textbooks from entering the market.

9          As the plaintiffs have argued multiple times, it hurts

10  their reputation, it hurts their brand, it obviously hurts

11  their profits for -- there would be counterfeit books that are

12  being distributed.  So they have a very strong incentive --

13  very similar incentives to what the defendants have.  They

14  conduct trainings telling everybody else what practices they

15  should -- textbook distributors should implement in order to

16  prevent the distribution of counterfeit books.

17         THE COURT:  Does this evidence tie into your first

18  sale defense?

19         MR. BHANDARI:  Yes, so that was the second point.

20  Like I said, there is three.

21         So the first is the practice of everybody who is

22  distributing textbooks, including the plaintiffs themselves.

23         The second is the first sale defense.  That's

24  obviously a critically important issue.

25         THE COURT:  Would you elaborate on that a little,

1   because I'm somewhat confused by the argument you're making

2   with respect to the first sale defense.

3            MR. BHANDARI:  Sure, your Honor.

4            The first sale doctrine says that when a copyright

5   owner sells a lawfully made copy of its work, it loses the

6   power to restrict the purchaser's right to sell or otherwise

7   dispose of that copy.  So if the plaintiffs in this case have

8   sold books that were not published by the plaintiffs' regular

9   printers, but were distributed, in fact, lawfully by the

10  plaintiffs, then the fact that used booksellers also distribute

11  that same book cannot possibly be a copyright infringement

12  because of the first sale doctrine.

13           What we have established through the testimony,

14  deposition testimony, is that there are almost certainly -- oh,

15  excuse me.  At least one of the publishers admit that there is

16  certainly at least one counterfeit copy of a publisher's

17  textbook in their inventory.  They have no mechanisms

18  whatsoever to cull them out of the inventory.  They sell them

19  as new books.  Therefore, the argument that the plaintiffs

20  themselves are selling books that have deviations from the way

21  in which the print specifications would have been done if the

22  printing had been done exactly according to the publisher

23  standards indicates that you can't simply say because a book

24  looks different than another book that the plaintiffs have in

25  their inventory, it's automatically counterfeit; because if the

1    plaintiffs themselves are the ones who are selling books that

2    have deviations and that are different and that were not

3    printed in accordance with their standards, the first sale

4    doctrine precludes them from being able to argue that it's

5    copyright infringement.

6         THE COURT:  How is this argument that you're making

7    now different from what you argued before Judge Gorenstein in

8    *Book Dog 1*?

9         MR. BHANDARI:  The facts that we have now are totally

10    different than what we had in *Book Dog 1*.  In *Book Dog 2* we

11    took deposition testimony of various plaintiffs' witnesses.

12    Those witnesses all testified that they received millions of

13    books in returns, every single one of the major textbook

14    distributors that return books, including Amazon, Follett, MBS.

15         This is kind of an amazing concept.  What the

16    plaintiffs testified is that Amazon, who buys new books from

17    the plaintiffs -- let's just take McGraw-Hill.  For example,

18    McGraw-Hill sells new textbooks to Amazon.  Amazon sells them

19    to customers who buy them on Amazon.  But then a certain

20    number, 20 to 40 percent of the total books that they sell to

21    Amazon, get returned by Amazon to McGraw-Hill.

22         In those supposedly new textbooks that McGraw-Hill

23    sold to Amazon there are counterfeit copies of the exact same

24    textbooks that are being returned by Amazon to McGraw-Hill.

25    Every single one of the plaintiffs testified that they received

counterfeit copies of the allegedly new books that they had

sold to these major textbook distributors back from those

textbook distributors.  That leads to a very obvious inference,

that in the first instance the plaintiffs themselves are

selling books that they believe to be counterfeit.

How is Amazon, in their inventory, getting books that

they believe are new books, and then when they return them to

the plaintiffs, the plaintiffs look at those books and they

say, Oh, we happen to find one of these copies is a

counterfeit.  The answer is the plaintiffs obviously have in

their inventory counterfeit copies, what they call counterfeit

copies, but, in fact, they are very good copies, because what's

really happened here is they were in the inventory of the

plaintiffs to begin with, the plaintiffs sold them to somebody

else; and because the first sale doctrine, the plaintiffs

cannot bring a copyright infringement action.  That testimony

was only established in *Book Dog 2*.

Second, we have testimony from one of the booksellers

saying, We definitely have at least one allegedly counterfeit

copy -- not allegedly.  He said, We have at least one

counterfeit copy in our inventory at this very time when he was

being deposed in September of 2017.  That's a big difference.

That's the reason why the first sale doctrine is very much

implicated here.

When Amazon, Follett, MBS, and every other major

1    textbook distributor is returning counterfeit copies to the

2    plaintiffs of books that were allegedly new books that are only

3    being returned, that indicates the plaintiffs are selling

4    counterfeit books to people.

5        MR. OPPENHEIM:  Your Honor, there's so much to respond

6    to.  May I?

7        THE COURT:  Yes.

8        MR. OPPENHEIM:  Let me first start with just the basic

9    proposition.

10        The reason we briefed these issues to your Honor is so

11    that when a party makes a claim, they put forward the evidence

12    to support the factual claim and it's before your Honor, we get

13    to see it, and we can respond to it.

14        Mr. Bhandari has put forward so many assertions to you

15    of certain facts that aren't in their briefs, frankly, I don't

16    believe the testimony is anything remotely close to what he

17    says.

18        It's a very dangerous game we're playing.  If you're

19    going to put forward facts to support an argument, you need to

20    put it in your briefs and you need to be able to cite to it,

21    and we then get an opportunity to respond to it.  These claims

22    that Mr. Bhandari is making are not supported and should not be

23    given any weight by the Court.  That's number one.

24        Two.  His arguments about this -- if you look at them,

25    he uses the words "if," "likely," "almost certainly."  What

he's talking about are possibilities that the plaintiffs have

sold counterfeit books.  The defendants, your Honor, cannot

point to the plaintiffs having distributed counterfeit books.

They can't.

Very late in the game, one week before discovery

closed, their corporate witness testified that the basis for

their assertion that the plaintiffs had distributed counterfeit

books was that they had received three books from the

plaintiffs that they believed were counterfeit.  This was a

week before discovery closed; this was the very first time the

plaintiffs heard of this.  I went back, I checked all the Rule

26 disclosures; nothing in there.  I can hand them up to you,

your Honor; they are not in there.

When your Honor ordered the defendants to put forward

the factual basis for their affirmative defenses and they

submitted in August of this year a detailed factual basis for

the first sale defense, not a single reference to an individual

buyer.

So the first time we learn about the claim is one week

before.  They've never produced the books; we've never had an

opportunity to inspect them.  And then when we finally, after

that deposition, go back and find the documents, your Honor,

that supposedly support this claim, these are sales that

apparently -- though it's hard to tell -- occurred in 2014 and

'15, so years and years ago, for titles not in the case, not to

1  them.

2         And I must, your Honor, just by way of example, if I

3  can hand up a copy of the documents, show you the types of

4  documents that they are relying on for this argument.  I don't

5  want to burden the Court with too many of them, but may I, your

6  Honor?

7         THE COURT:  Yes.

8         MR. OPPENHEIM:  For purposes of the record, your

9  Honor, I'll note that what I've handed up is a document which

10  is Bates labeled BDBCEN0004343 through 4346.

11         This is apparently one of the books they claim that

12  the plaintiffs distributed that was counterfeit, not a book in

13  the case, your Honor.  This is all we have.  We've never

14  actually seen the book; we've got these documents.  As you can

15  see by turning to the documents, the third page, the copyright

16  page, is cut off; can't really see the detail on it.

17         But the claim that this came from the plaintiffs is

18  based on the last page of the document, your Honor.  And this

19  is all we have.  This is the basis for this whole argument that

20  they have, that the plaintiffs distributed a counterfeit book.

21  If the document you have is cut off, your Honor, my apologies,

22  but that's what was produced to us.  It's apparently a purchase

23  order from Amazon in 2014; to whom, I don't know.  This is the

24  basis of their defense.

25         So, your Honor, first off, on this first sale -- so on

1    the first sale defense, they are relying on these books.  Now,

2    when you ask Mr. Dimm -- we asked Mr. Dimm, Well, are these

3    books counterfeit?

4           THE COURT:  Let me ask a more fundamental question for

5    a second.  Are any of these arguments specifically tied to any

6    of the books that are at issue in this case?

7           MR. OPPENHEIM:  Absolutely not, your Honor.

8    Absolutely not.

9           THE COURT:  Mr. Bhandari, are any of them tied to

10   books that are at issue in this case?

11          MR. BHANDARI:  Your Honor, we believe that --

12          THE COURT:  No, it's really -- it calls for a

13   yes-or-a-no answer.

14          MR. BHANDARI:  Yes, we intend to tie it to the books

15   in this case.

16          THE COURT:  Which one?  Which title?

17          MR. BHANDARI:  Every one of their titles.  We intend

18   to establish that they received returns from every single one

19   of the major textbook distributors.  In those returns there are

20   frequently counterfeit books.  And I can provide you, by the

21   way -- it was totally wrong what Mr. Oppenheim said that this

22   is not included in our briefing.  It's included on pages 13 and

23   14 of our opposition to plaintiffs' motion *in limine*.  I can go

24   through the details.  But everything I said is cited here.  I

25   can read you the deposition transcripts that were included.

1          These depositions were taken in September of 2017, so

2     that's the reason why the information that we obtained in

3     September of 2017 was obviously not included as a factual

4     predicate for our affirmative defenses in August of 2017.

5          For every single one of the books we're going to

6     establish that there have been a very high volume of returns;

7     that in those returns they come from textbook distributors who

8     have returned counterfeit books to the plaintiffs.

9          THE COURT:  How are you going to establish this?

10          MR. BHANDARI:  We are going to ask the same witnesses

11     that I asked during the depositions, the witnesses for the

12     plaintiffs.  They are going to be under oath; they have to tell

13     the truth; they are going to have to admit every single one of

14     the titles that are at issue in this case.  They received

15     thousands and thousands of returns for every single one of

16     those titles.  And for every single one of those titles they

17     are going to say that they received returns from the textbook

18     distributors who have returned counterfeit books in the --

19          THE COURT:  Is that what they've said in deposition?

20          MR. BHANDARI:  Yes.  I will read to you the deposition

21     section that we cite in our papers.

22          THE COURT:  Spare me.

23          On this motion I'm going to require you to submit a

24     letter to me laying out what the evidence is of specific titles

25     that are at issue in this case.  And you can get me such a

1    letter by Monday the 18th.

2                MR. BHANDARI:  So to be clear, your Honor --

3                THE COURT:  I've got to move on.

4                MR. BHANDARI:  To be clear, your Honor, there is

5    nothing more than what I just described, which is -- we are

6    going to ask questions indicating that they received thousands

7    of returns; and that they received the returns from other

8    companies like Amazon who have included counterfeit books in

9    returns that they've sent to the plaintiffs.  That is not -- we

10   don't have anything more than that.

11               THE COURT:  That already sounds more opaque than what

12   you said to me two minutes ago about the evidence you're going

13   to offer in the case, that's why I want to see a letter.

14               MR. BHANDARI:  Okay.

15               THE COURT:  Okay?

16               The plaintiff can respond to that letter by December

17   21, all right?  I'll give you three business days to respond to

18   their --

19               MR. OPPENHEIM:  Close of business --

20               THE COURT:  -- letter of December 18.

21               Specifically, the proffer has to relate to books that

22   are at issue in this case; titles that are at issue in this

23   case.

24               Now, with respect to --

25               MR. BHANDARI:  Your Honor?  Sorry.

1          The other argument that we have is their general

2     practices of not inspecting the books that are coming in or

3     inspecting them to the standards by which they are inspecting

4     them should be --

5          THE COURT:  That's in your papers.  We can move on.

6          MR. OPPENHEIM:  Affirmative defenses, your Honor?

7          THE COURT:  Yes.

8          For plaintiffs' counsel, some of the affirmative

9     defenses that you're seeking to strike were not previously

10    stricken by Judge Gorenstein.  Is it really appropriate to

11    decide the merits of an affirmative defense through a motion *in*

12    *limine*?

13         MR. OPPENHEIM:  So can I back up, your Honor, just for

14    organizational purposes?

15         So there are certain defenses which I think it is,

16    your Honor.  I believe we're probably down to just only nine

17    affirmative defenses that are really left before the Court, if

18    I'm correct in my math.

19         So starting with 52, for 38 of them in their August

20    filing, the defendants acknowledge they are not seeking a jury

21    instruction; so it's not an affirmative defense, so I believe

22    it can be stricken.  I think that left us with 14.  And of

23    those 14, I believe five of them in defendants' papers, they've

24    indicated they just want to preserve for appeal.  So I believe

25    the Court can just rule based on collateral estoppel, and that

1    brings us down to just nine affirmative defenses to address.

2            One of those affirmative defenses, the for sale

3    doctrine, I believe we've just kind of handled, your Honor, in

4    the context of --

5            THE COURT:  Move on.

6            MR. OPPENHEIM:  Right.  Okay.

7            So then with respect to the remaining eight, some of

8    them, I think, are very easy to deal with, your Honor.  For

9    instance, affirmative defense No. 11, defendants' good faith

10   and commercial reasonableness bars plaintiffs' claims.  The

11   defendants lumped it in with affirmative defense 12, innocent

12   infringement.

13           I think we all know that your opinion on innocent

14   infringement in BDB1 will apply to BDB2.  So while the

15   plaintiffs may disagree with that, that's the law that's going

16   to apply to the case.  But certainly I think we can all agree

17   that there is no affirmative defense and copyright that good

18   faith and commercial reasonableness bars a claim.  There's no

19   legal basis for that; defendants haven't put one forward; that

20   can be stricken; defendants have nothing to support that.  I

21   think they almost acknowledge that in their filing by lumping

22   it in with innocent infringement.

23           The next one, affirmative defense 13, your Honor,

24   unconstitutionality of statutory damages, not an affirmative

25   defense, your Honor.  To the extent that they have a post-trial

1    issue on whether or not whatever damages are awarded are

2    constitutional, it's a post-trial issue; it's not for the jury,

3    it's not an affirmative defense.  I believe that can be

4    stricken.  For purposes of an affirmative defense, it

5    doesn't --

6              THE COURT:  Can't much of this be dealt with at the

7    trial?

8              MR. OPPENHEIM:  Your Honor, the only reason I don't

9    say yes is because I am concerned that in the absence of the

10   Court striking some of these, that the defendants are going to

11   put forward arguments on these defenses to the jury in their

12   opening and in their examination and in their closing as though

13   they are part of the case.

14             Let me give you an example, your Honor.

15             THE COURT:  They won't be making them in their closing

16   if I strike them after the evidence is in.  And if they make

17   them in their opening and they are on thin ice, they are doing

18   it at their peril.

19             MR. OPPENHEIM:  Your Honor, we all say that about

20   openings and arguments that are made at their peril, but we

21   would rather narrow this case.

22             Defendants can't point, for example, to a single fact

23   to support their statute of limitations argument.  They've

24   taken two dozen depositions across the cases; they've been

25   unable to cite to a single fact to suggest that any of the

claims are stale as a matter of the statute of limitations.  By

the way, laches we all know is out as a matter of law on the

copyright side.

So they've been given two opportunities now to put

forward facts on statute of limitations.  One in the August

filing before your Honor, and two in these briefs.  They can't

cite to a single piece of evidence that they can say the

plaintiffs should have known more than three years before the

case was filed.  They should not raise the issue in the case;

they should not examine witnesses on it.  Let's narrow it;

let's not confuse the jury.  If they've got something, put it

forward, but they don't.  Let's strike it; let's narrow this

case; let's try not to be here for three weeks; let's try not

to confuse the jury; let's try to have a targeted case.

So that's a very good example.

Your Honor, arguing on the constitutionality, they

really shouldn't say to the jury that there's some test for the

jury to be considering as to the connection between actual

damages and whatever copyright damages the jury might award.

That's not for the jury to be considering as a matter of

constitutionality and they shouldn't argue that.  I don't want

to have to retry the case after they bungle the opening on

these issues, your Honor; and then we have to decide whether it

was harmless error or not.

I could keep going through the remaining defenses,

1    your Honor.

2            THE COURT:  I'm sure you could, but life is short.

3            Let's move on to the defendants' motions.

4            MR. OPPENHEIM:  Can I make one quick last point, your

5    Honor, even though life is short?

6            We agreed not to file summary judgment motions in this

7    case; but one of the reasons was was we assumed that we would

8    be trying to narrow the case for trial.  That's what we are

9    trying to do now, your Honor.

10           THE COURT:  All right.

11           The defendants' omnibus motion to preclude plaintiffs'

12   roadmap.

13           First, for the defendants, there's nearly three months

14   remaining before trial.  Plaintiffs have said they are willing

15   to work in good faith to correct any problems that you have --

16   that the defendants had with the roadmap.  Why can't the

17   parties work together to create a document that they both agree

18   on?

19           MR. MANDEL:  In principle I totally agree with that,

20   your Honor.  When I started on this case two years ago, I took

21   a look at the docket and I said, This is absolutely insane.

22   How could a docket look like this?  There's way too much

23   fighting in this case.  I'm very embarrassed and sad to say

24   that since I took over, there hasn't been much less fighting.

25   I don't know why that is, but that is where we are.

1     All I can say on this issue is it's very difficult for

2   the parties to voluntarily get to an agreement on any issue, as

3   your Honor is aware.

4     THE COURT: Don't you think that the jury is going to

5   need something like a roadmap to help them understand the

6   evidence in the case?

7     MR. MANDEL: I think an accurate roadmap that fairly

8   summarized the evidence would be helpful to the jury. To cut

9   to the chase, if the plaintiffs are willing to commit to

10  working collaboratively to create a comprehensive roadmap, we

11  are totally open to doing that as well.

12    That means that the roadmap needs to say how many

13  allegedly counterfeit copies they found in our customers'

14  shelves. They can't tell the jury, Book Dog Books bought 100

15  copies from Best Books World, then not mention all of our other

16  suppliers, and then say that they found -- then we sold 100

17  copies to MBS and then say they found one sticker -- MBS. It's

18  got to say where all of our sources are comprehensively.

19  There's got to be a true summary. Here's where we got all of

20  our books from. Then it's got to say, Then we went to MBS.

21  Here's what we found. We found that MBS bought X number of

22  copies. MBS had Y number of copies on their shelf. That way

23  the jury can accurately say is it more likely than not that

24  defendants sold a copy of book to MBS.

25    THE COURT: Won't that make a roadmap so unwieldy that

1    it won't be useful to a jury?

2              MR. MANDEL:  I see it very differently, your Honor.

3              We believe that if the roadmap they have is the only

4    evidence of sales that's presented to the jury, one, we think

5    it's inadmissible for all the summary evidence requirements

6    that it doesn't satisfy; but we don't think they could get past

7    the judgment as a matter of law because it's insufficient

8    circumstantial evidence to permit an inference.

9              You can't simply say, You sold 100 copies to MBS and

10   one copy we found there was counterfeit.  This is a problem of

11   probability.  It's not unlike dipping your hand into a jar of

12   marbles and pulling out one marble.  We are asking the jury to

13   say, Is it more likely than not that the marble that was pulled

14   out of that jar came from defendants, when the jury doesn't

15   know how many marbles were in the jar, how many counterfeit

16   marbles were in the jar, and where the marbles in the jar came

17   from.  That is simply, as a matter of probability, in our

18   opinion, insufficient statistical evidence.

19             It doesn't have to be complicated.  It can be provided

20   in a very simple layout where the jury sees there were X number

21   of books from other major distributors.

22             THE COURT:  Can't you bring all that out on

23   cross-examination without trying to filter everything into a

24   roadmap?

25             MR. MANDEL:  So you're saying we'd go through each of

1  the 161 titles; and for each title we would say to one of --

2  I'm not sure who we'd say it to because a lot of this testimony

3  comes from third parties that are not based in New York.  But

4  you're saying for each of the 161 titles we would say, Okay,

5  you found this roadmap here.  I'm also not sure who we'd ask

6  because the lawyers create the roadmap.

7       But let's assume they have some witness that suddenly

8  can testify competently to the roadmap.  We would say to that

9  person, How many copies did MBS buy in total?  And they would

10  say, I have no idea.  And then I guess we would show them the

11  MBS document, and they would say, I don't know if this document

12  is accurate or not.

13       If that's the direction we go, I think what will

14  happen is either the roadmap will be excluded or we will have a

15  counter roadmap that has all of the information.  Because I

16  don't think there's a witness we could go through all of this

17  information with to get it out.

18       THE COURT:  For plaintiffs' counsel, which witness or

19  witnesses of yours are going to have sufficient personal

20  knowledge of the roadmap to allow for its admission?

21       MR. OPPENHEIM:  Your Honor, in BDB1 there were

22  witnesses who were proffered as, for lack of a better term,

23  roadmap witnesses.  They were the witnesses who were involved

24  in directing the creation of the roadmap.  And they were

25  examined by defense counsel on the roadmap.  So they've taken

 1  depositions of those witnesses.

 2          Now, the defendants posit a world where, A, the

 3  roadmap should include all the evidence.  Well, then it's not

 4  really a summary, your Honor, as I think your Honor identified

 5  it; it wouldn't be a useful tool.  It's not a summary, it would

 6  be too lengthy.  B, they posit that each entity, each

 7  plaintiff, would have had to create their own summary and the

 8  individual would have had to do it.  Well, now we would have

 9  four roadmaps; they would all be overlapping.  It just doesn't

10  work.  This was done actually before the present defense

11  counsel were involved in the case in coordination with opposing

12  counsel.

13          So defense counsel has raised some issues with certain

14  aspects of the roadmap.  They didn't like certain nomenclature.

15  We've attempted to change that, your Honor.  But fundamentally,

16  at the end of the day, we believe that the vehicle is the right

17  vehicle; it's the way to put it forward.  Because otherwise

18  this trial will be more than three weeks if we have to put on

19  every single piece of evidence and go through it.  It's just

20  totally unmanageable.

21          THE COURT:  It is entirely appropriate in this case to

22  have summary evidence submitted for all of the voluminous

23  records.  It's very simple.

24          I'm directing the parties to meet and confer, to come

25  to an agreement with respect to the roadmap.  I'm going to

1   require you to do that in the next 30 days.  If there's a

2   dispute about it, I'm going to send it to Magistrate Judge

3   Gorenstein so that it can be resolved before trial.

4           Let's move on to the defendants' motion seeking to

5   preclude testimony from employees of -- I think four or five

6   employees of the plaintiffs.

7           MR. BHANDARI:  Thank you, your Honor.

8           THE COURT:  Mr. Bhandari, why do you take issue with

9   these experts being employees of the plaintiffs?

10          MR. BHANDARI:  Your Honor, it goes to the bias that

11  they have.

12          THE COURT:  But can't you examine on that?  Is there

13  any precedent that you can point me to that disqualifies them

14  from testifying?

15          MR. BHANDARI:  No, your Honor, not simply for being

16  the employees.

17          But just to quickly address that point, which is not

18  the most fundamental problem with their testimony, but to

19  quickly address that point, in this instance their testimony

20  was directed by counsel.  The reports were written by counsel;

21  the books that were given were marked as counterfeit when

22  they --

23          THE COURT:  That happens all the time in every case,

24  okay.  Do you think in an antitrust case that the expert sits

25  and just writes his report and gives it to counsel?  Trust me,

1    that's not the way it happened when I practiced law, and it's

2    not the way it's happened for the last 20 years that I've been

3    a judge.

4            MR. BHANDARI:  Understood, your Honor.

5            THE COURT:  Okay?

6            MR. BHANDARI:  Yes.

7            That is not a reason to disqualify them in and of

8    itself.

9            THE COURT:  They have opinions that they've gained by

10   virtue of their experience through their employment.

11           MR. BHANDARI:  That is where we disagree, your Honor.

12           They are basically just simply offering eyewitness

13   testimony.  The testimony they are offering is literally no

14   different than what would be in a courtroom if a person who

15   worked for Cosco, who saw a shoplifter, said, I am offering my

16   expert testimony that the person who is sitting at the

17   defendant's table is the exact same as the person in this

18   picture.

19           THE COURT:  Right.  But I will tell you that during

20   the course of the jury trial, I'm not going to -- don't ask me

21   to qualify someone as an expert; simply ask me whether their

22   testimony can be heard by the jury under Rule 702.  I'll offer

23   to the jury that by virtue of their specialized knowledge or

24   experience, I'm going to permit them to testify and offer some

25   opinions.  I don't give product endorsements.  That's really

1    what happens when a lawyer asks a judge to qualify an expert

2    for the jury.

3            MR. BHANDARI:  So in this instance, your Honor --

4            THE COURT:  So don't worry about that.  They'll be

5    testifying based on their experience.  Whether it is as a fact

6    witness or they're offering some views based upon their

7    experience, that will be lost on the jury, all right.  It will

8    be just fine.

9            MR. BHANDARI:  Well, your Honor, what I'm saying is

10   this is a *Daubert* challenge.  What we are saying is they cannot

11   testify as experts, they can be produced as experts, for two

12   reasons.  One is they are literally offering just eyewitness

13   testimony.  And there's nothing that allows eyewitness

14   testimony to be considered expert testimony.  That's lay

15   testimony.

16           Second --

17           THE COURT:  This happened -- no.  We're going to move

18   on, okay.

19           MR. BHANDARI:  Your Honor, may I make one more

20   argument?

21           THE COURT:  This happens all the time in the context

22   of art cases and forgeries, all right.  It's just like that.

23   We have so-called experts in forgery all the time.  It's

24   eyewitness testimony.  But it's also expert testimony.

25           MR. BHANDARI:  Your Honor, if I may make one last

1    argument here.

2        The methodology that was employed here is not a

3    reliable methodology.  This is a critical point.  In the

4    forgery cases that you're talking about, there are frequently

5    laboratory tests on paper.  In the art cases that you're

6    talking about, there's spectrum analysis that's done to show

7    that the inks in the page could not have been done at a certain

8    time.  In this case we have testimony from the plaintiffs'

9    witnesses that there's laboratory analysis that can be done to

10   determine whether or not the paper is the same as the paper in

11   the book that's being examined, and that would be expert

12   testimony that should be employed.

13       Here, simply having someone say, I know it when I see

14   it, there's slight differences in the variation, that is not a

15   reliable methodology, your Honor.  That's what *Kumho* and

16   *Daubert* seek to preclude.  If these witnesses had used the

17   laboratory analysis, if they'd used spectrum ink analysis, if

18   they had examined the paper, if they had used any sort of

19   reliable methodology that has been tested and can be endorsed

20   by this Court, that would be fine.

21       We don't allow people to come into court and to simply

22   opine on their opinions.  They have to explain the methodology.

23   For handwriting analysis, for example, there would be studies

24   saying that this particular type of loop can only be done by a

25   person who has made that type of loop many other times; the

1    analysis has a scientific methodology behind it.

2            Here you will read these reports, we've highlighted

3    them for you in our motion to exclude these as expert

4    witnesses, and there is no evidence whatsoever that they've

5    employed any methodology that's been tested in any way.  So

6    that's why these particular witnesses are very different than

7    the witnesses you see in the cases cited by the plaintiffs.

8            For example, they cite an employee of Gucci who served

9    as an expert in a trial, because he said this component part of

10   a particular purse is manufactured by Gucci and we supply it to

11   the ultimate manufacturer of this item.  This particular

12   component does not fit the components that we send from here to

13   there.  There is an established methodology for saying a

14   component has these parts to it and no layperson would be able

15   to tell that without having an expert.

16           This is totally different.  All these witnesses do

17   literally is offer eyewitness testimony.  And that's why I

18   started with that.  Their methodology doesn't exist.  There's

19   no reliability.  They don't fulfill any of the factors of *Kumho*

20   or *Daubert*.  That's why we've made a motion to exclude here.

21           THE COURT:  Mr. Zebrak.

22           MR. ZEBRAK:  Your Honor, I can go into this at any

23   level of detail your Honor wishes, but at a high level -- and I

24   don't say this lightly, because I don't put accusations like

25   this into -- or statements like this into briefs or open court.

1    This is just a gross misrepresentation of both the

2  law, what these experts did by way of their work here.  The

3  facts of the case, the law and, at best, at very best, these

4  bogus criticisms go to weight and can be brought out on

5  cross-examination.  I can go through and explain what the

6  methodology was.  It was not an *ipse dixit*, close my eyes, a

7  counterfeit.

8    This sort of testimony where you compare a known

9  legitimate authentic product from your employer that you know

10  well against a book under review, it happens all the time.

11  That they pitch it as novel and unprecedented is just flatly

12  inaccurate.

13    MR. BHANDARI:  They don't use that methodology, your

14  Honor.  For example, they said they don't even know where some

15  of the books came from that they are using as examples.

16    THE COURT:  Gentlemen, it's enough.  We're moving on

17  to the next motion, the defendants' motion to preclude Harry

18  Steinmetz's testimony.

19    Don't the defendants' concerns here all go to the

20  conclusions that Steinmetz reached?  Isn't that what the

21  objection really is?  You don't seem to challenge his expertise

22  or methodologies; you challenge his conclusions.  Am I right

23  about that?

24    MS. VICKERS:  No, your Honor, with all due respect.

25    There are a number of issues with Mr. Steinmetz's

report that relate to not specifically his conclusions, but,
rather, to him reaching issues that are irrelevant and that are
highly prejudicial.

So the first of those is his conclusions and
statements about the reasons for the defendants' corporate
structure. For example, Mr. Steinmetz says he doesn't
understand the economic reasons for it; he questions the need
for multiple layers; he believes that multiple layers may be
used to disguise ownership. Those statements have nothing to
do with the relevance information, to the extent that
Mr. Steinmetz's report is relevant at all, his testimony is
relevant at all, it's relevant to any profits that --

THE COURT: That's a conclusion, right?

MS. VICKERS: Well, but it is --

THE COURT: It's a conclusion.

MS. VICKERS: It isn't a conclusion that has anything
to do with the actual relevant legal standard in this case.

THE COURT: Haven't the parties agreed that Steinmetz
is not going to speculate on the possible motivations of
defendants' corporate structure?

MS. VICKERS: Well, the plaintiffs say that in their
papers; and yet in his report he does just that. He says that
he's --

THE COURT: Isn't it a judicial admission when
plaintiffs say that they are not going to offer testimony from

1  Steinmetz speculating about the reasons for defendants'

2  corporate structure?

3          MS. VICKERS:  If that's your Honor's finding, then we

4  would agree with that.  If the plaintiffs will agree that the

5  only -- if the plaintiffs' papers are interpreted to mean --

6          THE COURT:  Am I right about this, Mr. Oppenheim?

7          MR. OPPENHEIM:  Your Honor, what Mr. Steinmetz says in

8  his report and what we said in our filing, your Honor, was we

9  don't intend to affirmatively have him testify as to the intent

10 behind the corporate structure, whatever that may be.

11         Everything that defendant is raising right now is what

12 Mr. Steinmetz says in response to the testimony by Ms. Cox, the

13 chief financial officer.  So Ms. Cox posited that the reason

14 for the complex structure, corporate structure, is for tax

15 planning and compliance purposes.

16         So Mr. Steinmetz then responds to Ms. Cox's assertion.

17         So if defendants don't intend to put forward any

18 witnesses who says, The reason we have this crazy structure is

19 for tax planning and compliance reasons, then there will be no

20 issue.  If, however, they intend to defend this structure, then

21 of course Mr. Steinmetz may be called to respond to that and

22 say, I don't see that.  There's no tax planning purposes for

23 it.  So that's what we've said in the brief, your Honor, and

24 that was what Mr. Steinmetz says in his report.

25         MS. VICKERS:  Your Honor, Ms. Cox's testimony was in

1    response to questions by plaintiffs' counsel, where they were

2    trying to establish the predicate for this assertion by their

3    expert and that there's something shady or improper about this

4    corporate structure.

5           The fact of the corporate structure is not the issue.

6    The issue are the allegations that there is something that

7    Mr. Steinmetz doesn't understand about it or there's some other

8    reason for it.  There's something unstated, and that implies to

9    the jury that there's some nefarious purpose.

10          THE COURT:  That's all speculative.  I'm not going to

11   permit that.

12          Let me ask plaintiffs' counsel on another aspect of

13   his testimony, why does the jury need to hear about the

14   defendants' cash flow?  What does that have to do with the

15   issues in this case?

16          MR. OPPENHEIM:  Your Honor, the cash flow analysis

17   demonstrates -- it gives the jury an understanding of the size

18   and profitability of defendants' enterprise.  The profit

19   figures, your Honor --

20          THE COURT:  If they are looking at a cash flow

21   analysis, isn't that likely to cause confusion with the jury

22   about defendants' profits?

23          MR. OPPENHEIM:  Your Honor, I have no doubt that the

24   defendants will ably -- to the extent that plaintiffs leave any

25   confusion as the distinction between profits and cash flow,

1    that defendants will raise that and explain that to the jury

2    through their cross-examination and their own witnesses.

3            To the extent that the plaintiffs put forward a cash

4    flow analysis, the point is to take out of the analysis those

5    types of treatments in a profitability analysis that don't come

6    through in a cash flow analysis.  So Mr. Steinmetz would

7    explain the distinction between the two, and the jury would

8    have both.  Frankly, I'm sure that the jury will understand.

9    There's a huge difference between the money they put in their

10   pocket and what their tax return says sometimes.  So I believe

11   the jury is capable of understanding this and won't be

12   confused.

13           MS. VICKERS:  Your Honor, may I respond?

14           THE COURT:  Go ahead, Ms. Vickers.

15           MS. VICKERS:  So there is no reason -- as your Honor

16   noted, the cash flow analysis is not relevant; it's not part of

17   the elements that the jury is to consider.  It's clearly set

18   forth by Second Circuit law that it's the profits they can

19   consider.  The cash flow analysis is -- this is plaintiffs'

20   attempt to put a large number in front of the jury.  There's no

21   reason for it other than to confuse them.

22           Quite frankly, your Honor, we've ended up in this

23   place with all these competing motions concerning the financial

24   analysis and discovery because the plaintiffs really are

25   attempting to put on a mini trial here about defendants'

1    financials.

2          The *Book Dog Books 2* is an add-on case; it's a case

3    involving approximately 55 books.  There's been extensive

4    financial discovery, including the production of audited

5    financials for the defendants in this case.

6          What we are trying to do here is to simplify issues

7    for the jury and allow the jury to focus on what the key issues

8    are in this case, which obviously is liability.  To the extent

9    damages become an issue --

10          THE COURT:  But profits are a relevant consideration

11    for statutory damages, aren't they?

12          MS. VICKERS:  They absolutely are, your Honor.  We've

13    produced audited financials that set forth the profits.

14          THE COURT:  All right.

15          The last motion relates to the adverse inference

16    instruction.

17          For the plaintiffs, you say that it's too burdensome

18    to do more discovery at this point and only an adverse

19    inference motion is appropriate; but you've still got three

20    months till trial.  What else would you need other than to

21    depose Ms. Cox on her conclusions?

22          MR. OPPENHEIM:  Two responses to your question, your

23    Honor.

24          First is --

25          THE COURT:  Get a little closer to the microphone.

1          MR. OPPENHEIM:  I'm sorry.  My voice is fading.

2          At the time that we filed the motion, your Honor, the

3     trial date was not March 19.  So there certainly is more time

4     now undoubtedly.

5          THE COURT:  Right.

6          MR. OPPENHEIM:  And if the parties work together, I

7     suppose with additional litigation we may get through their

8     failure to produce.

9          THE COURT:  I'm thinking that this motion can melt

10    away, just like the snow outside this morning, with a little

11    more discovery.

12         MR. OPPENHEIM:  Your Honor, I believe we've been back

13    to Judge Gorenstein six times on this issue of the financial

14    records, five or six.  It really has been banging our head

15    against the wall, your Honor.

16         THE COURT:  It's just that an adverse inference

17    instruction is just an extreme measure.  There's certainly

18    adequate time for further discovery.

19         MR. OPPENHEIM:  Your Honor, we could have gone to

20    Judge Gorenstein after the first noncompliance and asked for

21    sanctions.  We didn't.  To say that we have been diligent and

22    patient is an understatement, because we asked for these

23    records in the very first document requests.  It has been

24    painful, the number of meet-and-confers which have been

25    useless, the defendants' representations to the Court, which

1    have been useless.  And even now, your Honor, we're still

2    there.

3            Let me give you an example.

4            What the defendants' opposition says is, We've

5    produced these records.  But what they really say, if you look

6    at it in detail, is, It's all contained within the audited

7    financial statements.

8            It's not.  It's not in the audited financial

9    statements.  If it were in there, we wouldn't be filing the

10   motion.  We've asked for the records behind it.  In fact,

11   Ms. Cox, during her deposition, was asked certain questions.

12   She said, I can't answer them.  Some she could, based on the

13   audited financial statements, but others she couldn't.  She

14   said, I need to look at the underlying documents that were

15   provided to my accounting firm to prepare the financial

16   statements.

17           We don't have those.

18           THE COURT:  The defendants say that what you're

19   seeking simply does not exist.

20           MR. OPPENHEIM:  Your Honor, it does.  I mean there are

21   many, many entities involved here; and they have documents

22   associated with P&Ls balance sheets, tax returns, distribution

23   statements.  They have the documents because these are

24   companies that are reporting profits.

25           I'll give you an example.

So Mr. Smyres purchased personally the real estate on which his companies operate.  He then leases personally that back to the companies for them to use the space.

Ms. Cox testified, Well -- we asked her how the rent was determined.  She said, I don't know.

We said, Well, is it fair market value?

She said, I have no reason to believe that.  I don't know.  And she said, I think it's just based on the value of the mortgage, in which case you would see a balance sheet that shows -- or, excuse me, a P&L that shows zero profit, right.  It's not.  Those companies annually have profits, but we don't have the details of them, right.

So they say, Well, it's in the statements.

It's not in the statements.

So we've sent the defendants a letter -- and unfortunately I didn't bring it with me, your Honor -- earlier this week, after your Honor suggested that we should try to solve this issue, requesting certain financial documents to try to move this issue forward.

Frankly, I don't think we should have to.  I think after going back to the Court six times, I think it's fair to say, You know what?  We've spent enough time and money on this. They should be hoisted on their own petard.  They brought this on themselves; it wasn't us doing it.  They could have done what they did in BDB1 and produced complete financial records.

1   This firm chose not to.  And they apparently have done that

2   before.  So we are where we are.

3        Now, if your Honor wants us to try to solve it, even

4   though I respectfully disagree and say, We went back to the

5   Court enough and they should be subject to sanction at this

6   point, if your Honor wants us to try to solve it, we will.

7        But here's what I think they are going to do:  They

8   are going to tell us, We are not going to give you the

9   documents you've asked for.  You can figure out what you need

10  to figure out based on the annual financial statements, which

11  obviously we can't, because our expert has said they are

12  insufficient.  So we'll take the deposition of Ms. Cox.  She

13  will or won't be able to testify as to certain things, and

14  we'll be back here.

15       So I'm not telling you, your Honor, that you have to

16  rule in our favor on the adverse inference motion as a matter

17  of law.  I think you should.  I think we've demonstrated in

18  that motion that we've done more than enough to try to get

19  these records.  And then at some point we shouldn't have to

20  spend more money chasing down these financial records.  I think

21  at some point you say, Five motions to compel is enough.

22       But if your Honor wants us to solve it, the defendants

23  should be instructed, without hesitation they should produce

24  every financial record we asked for expeditiously and then

25  we'll taking the depositions.  But it has to be one or the

1    other; we shouldn't go through more gamesmanship and then end

2    up briefing an entirely new motion to your Honor and have to

3    set another argument where we are back here doing this again.

4              MS. VICKERS:  Your Honor, may I respond to that?

5              THE COURT:  Yes, Ms. Vickers.

6              MS. VICKERS:  There are many, many statements

7    Mr. Oppenheim made that are just inaccurate.

8              Starting with --

9              THE COURT:  Just cut to the top two statements, all

10   right?

11             MS. VICKERS:  Absolutely.

12             Primarily the allegation that we have not complied

13   with Judge Gorenstein's orders is entirely incorrect.

14             We went before Judge Gorenstein on the scope of

15   financial discovery.  The plaintiffs asked for certain

16   documents; we produced them.  They asked for different

17   documents; we produced them.

18             With respect to the last set of documents that were

19   produced, the plaintiffs asked for those two days before the

20   close of discovery.  We agreed to produce them without an order

21   because we wanted to put this behind us; we wanted to provide

22   as much financial discovery as they needed in this case and

23   move on because we had a trial at that point within just weeks.

24             They did not come back to us before the second

25   deposition of Ms. Cox and say, Look, you know what?  The

1    documents you produced don't have enough detail on X, Y, or Z.

2    They deposed Ms. Cox and then we were hit with this motion.

3           The reality is that the documents that they requested

4    have been produced.  To the extent that they are asking for

5    additional information, we are willing to have a conversation

6    with them.  They did send us a letter Tuesday night.  We have

7    not had a chance to fully review it, but we are certainly

8    willing to discuss with them whether there's anything they

9    think we've overlooked.

10          Plaintiffs continue to assert -- this is the other

11   thing that I need to be very clear about.  They continue to

12   assert that there's missing information, when they are simply

13   misinterpreting what they received.

14          So, for example, for the two real estate companies

15   that Mr. Oppenheim described, the defendants, although they are

16   not companies that sell books and buy books, we agreed --

17   again, without any order from Judge Gorenstein, we agreed to

18   produce the financial records for those entities.  We did do

19   that.  Even though they are small companies and they, in fact,

20   don't produce -- generally create paper records every year, our

21   client went ahead, prepared these documents.  This is all set

22   forth in our briefing and in the letter that we sent to Judge

23   Gorenstein at the time.  We created these documents; we

24   produced it to them.  Those documents established that there

25   are profits, and those profits stayed with the companies.

1    There isn't some other there there. We've produced what's

2    exist there.

3         Having said all of that, we are willing to look at

4    their letter and see if there's anything else that we can

5    resolve here. But I don't think that -- the insinuation that

6    the defendants have not been complying and not provided

7    adequate financial discovery in this case is improper.

8         THE COURT: All right. But I think at this point you

9    should be working together to do some more -- do the discovery.

10   I haven't seen this letter that plaintiffs' counsel sent on

11   Tuesday to you. Work together on this.

12        MS. VICKERS: We're happy to do that, Judge.

13        Just one question. That letter covers a number of

14   categories of documents that the plaintiffs have never

15   requested before. We'll look at that; we'll consider whether

16   we think any of that's appropriate. To the extent that we

17   don't agree with that, would you prefer that we come back to

18   you or to Magistrate Judge Gorenstein?

19        THE COURT: No. Magistrate Judge Gorenstein will

20   welcome you. I don't have enough hours in the day --

21        MS. VICKERS: Thank you, your Honor.

22        THE COURT: -- to deal with it.

23        All right. At this point other than what's been noted

24   on the record, I'm reserving on all of the motions *in limine*.

25        It is my intention to get an opinion and order out to

1  you on almost all, if not all, of these motions, and to do so

2  before the end of the year.

3       Now, we're currently set to have you submit your joint

4  pretrial order on January 10.  That, in my view, no longer

5  makes sense.  I want to pick a new date for that so that you

6  have an opportunity, one, to complete some of these discovery

7  issues before Magistrate Judge Gorenstein, work together on the

8  roadmap, and have the benefit of my rulings on *in limine* so

9  that you know how the trial is going to shape up.

10      Keeping all of that in mind, is February 28th a good

11  date to shoot for for a joint pretrial order?

12           MR. MANDEL:  Yes, your Honor.

13           MR. OPPENHEIM:  Fine with plaintiffs, your Honor.

14           THE COURT:  All right.

15      I'd like to get a joint request to charge from you by

16  March 9.  "Joint" means joint, not 100 competing charges.  I'm

17  only interested in the substantive charges.  Don't propose a

18  charge to me on circumstantial evidence; I'm enamored of my

19  own.  All right?

20      If there's any voir dire then that's unique to this

21  case, you can submit that individually also by March 9.

22      Is there anything else at this point that the parties

23  believe needs to be discussed?

24           Mr. Oppenheim.

25           MR. OPPENHEIM:  Your Honor, if I may just return to

1    your request with respect to our meeting and conferring on the

2    roadmap and offer maybe a suggestion to move the process

3    forward.

4              We very much want to resolve any disputes on the

5    roadmap in advance of trial because --

6              THE COURT:  Of course.

7              MR. OPPENHEIM:  -- we don't want to be in a position

8    where at trial suddenly we're changing gears and putting on a

9    different case.  So it would be very useful if there were a

10   process whereby defendants identified all of their issues and

11   concerns with respect to the roadmap to us, and we could try to

12   address or not address, and then brief that to Judge

13   Gorenstein, and to require that they tell us everything, let us

14   try to fix it, as opposed to just telling us to meet and

15   confer.

16             So if they give us a laundry list, I don't care if

17   it's 100 items, your Honor, tell us everything that you have

18   concerns with so that we can try to address it.  That would be

19   a process that I believe will get us ultimately to the place

20   that your Honor wants us.

21             THE COURT:  When can you do that, Mr. Mandel?

22             MR. MANDEL:  I think a more sensible process would be

23   for us to take one or two titles, send them over -- create a

24   roadmap page that we think is appropriate, and send that over.

25   If that's agreeable to them, fantastic; if it's not agreeable

1    to them, then we'll meet and confer on the two versions and see

2    if we can get to the middle.  I think that's the best approach.

3            THE COURT:  What about that?

4            MR. OPPENHEIM:  To deal with some of their issues, I

5    think that works.  One of the issues that they raised at the

6    very kind of tail-end of their briefing was concern about some

7    of the underlying evidence supporting the roadmap.  And to the

8    extent that they've got any concerns with that evidence, I'd

9    like to have that laid out which --

10           THE COURT:  All right.  First, I think that you should

11   sit down in the next week and meet and confer about this.  To

12   the extent that you cannot agree on the format for the roadmap

13   and the content of the roadmap, you can set it forth in a

14   letter that ultimately will go to Judge Gorenstein.  I'd like

15   to be copied on that letter so that I've got a gift from you

16   during the holidays that I can read and reread.

17           So submit any such letter by -- we'll miss Christmas,

18   but I'll save it for the new year -- December 29.  That way you

19   can tee the matter up with Judge Gorenstein.

20           Anything else?

21           MR. OPPENHEIM:  Not from plaintiffs, your Honor.

22           THE COURT:  Anything further from the defendants?

23           MR. MANDEL:  Just with respect to voir dire, how does

24   your Honor conduct it?

25           THE COURT:  We'll talk about all -- I've got other

HCEVCENC

1  matters on.  We'll talk about that at a final pretrial

2  conference that I'm going to fix right now for March 16, 11:30.

3          Anything else?

4          MR. MANDEL:  Thank you, your Honor.

5          MR. OPPENHEIM:  No, your Honor.

6          THE COURT:  Have a great holiday.

7                          *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25