```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                           :
                                        Docket #16cv7123
 CENGAGE LEARNING, INC., et al.,  : 1:16-cv-07123-WHP-GWG

                  Plaintiffs,     :

  - against -                     :

 BOOK DOG BOOKS, LLC, et al.,     :
                                        New York, New York
                  Defendants.     : February 6, 2018

------------------------------------ :


                    PROCEEDINGS BEFORE
            THE HONORABLE GABRIEL W. GORENSTEIN,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:      OPPENHEIM ZEBRAK, LLP
                     BY:  MATTHEW OPPENHEIM, ESQ.
                          COREY MILLER, ESQ.
                     5225 Wisconsin Avenue N.W., Suite 503
                     Washington, D.C.  20015


For Defendants:      MANDEL BHANDARI, LLP
                     BY:  EVAN MANDEL, ESQ.
                     80 Pine Street, 33rd Floor
                     New York, New York 10005
```

```
Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> | <u>**Court**</u> |
|---|---|---|---|---|---|
| None | | | | | |

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|
| None | | | | |

1

```
 1                                                   3

 2              THE COURT:   Hello, this is Judge Gorenstein.

 3   Who's on the line, please?

 4              MR. MATTHEW OPPENHEIM:   Good evening, Your Honor.

 5   It's Matt Oppenheim and Corey Miller on behalf of

 6   plaintiffs.

 7              MR. EVAN MANDEL:   It's Evan Mandel on behalf of

 8   defendants.   Good evening.

 9              THE COURT:   Okay, we're being recorded.   We're

10   here based upon the letter filed today by Mr. Oppenheim,

11   docket 320, and I saw the response from Mr. Mandel, number

12   322.   So, Mr. Oppenheim, go ahead.

13              MR. OPPENHEIM:   Your Honor, yesterday evening,

14   after we did our hearing with the Court, defendants

15   produced 80 to 90 pages of financial documents.   This

16   production was unexpected and includes a variety of

17   different types of documents dating back from 2012 all the

18   way through 2016 and some 2017 information.

19              As the Court may be aware, the defendants and

20   their counsel have repeatedly indicated to this Court and

21   the plaintiffs that Mr. Smyres is the sole owner of the

22   companies at issue, and Mr. Smyres is the sole recipient of

23   any profits and that complete financial information was

24   provided within the annual financial statements.   All three

25   of those representations appear to be inaccurate.   These
```

4

1

2  are but a few of the issues raised by the documents which

3  plaintiffs have just had several hours to digest since they

4  were only produced last night.

5       The documents that were produced indicate that

6  there's a second owner of one of the key Smyres companies,

7  and that second owner was to receive distributions of 20

8  percent of the profits from the rental book business, as

9  well as substantial other payments.  Mr. Mandel in his

10 letter that was just filed and we've only briefly had an

11 opportunity to review has taken the position, well, that

12 that may be what the documents say with respect to the 2012

13 document, that that's not, in fact, what is in subsequent

14 documents.

15      Mr. Mandel's representation to the Court is

16 inaccurate.  In fact, the 2015 mutual termination agreement

17 specifically says that Mr. Glass's participation interest

18 is transferred to Mr. Glass's entity company called

19 Starfire Solutions, LLC, or from Starfire Solutions to

20 another entity, SSSCI Holdings, a Cayman Island

21 corporation.  And then subsequently in another 2015

22 agreement, there's yet, again, references to the fact that

23 he profit distribution was, indeed, to continue.  So Mr.

24 Mandel's position in his letter that the documents didn't

25 reflect the reality of how the company operated appear not

                                                                    5
to be accurate.

          These representations – the fact that there is a

second owner receiving distributions of profits now

undermines representations that counsel has made to the

Court, undermines sworn deposition testimony by multiple

witnesses in this case.  It's contrary to sworn affidavits

by Miss Cox, contrary to interrogatory responses, and I

believe, Your Honor, is substantially contrary to

information provided in BDB1, but we've not yet had time to

gather all of that.

          We've asked the defendants when they became aware

of these documents.  Based on the – the defendants have

refused to tell us.  Based on the time stamp of the

QuickBook printouts, these documents were gathered on

January 31.  They were not produced, Your Honor, until last

night, notably after our hearing.  There's no reason we

understand why these documents were held from January 31,

yet let alone not produced years and years ago.

          Some of the documents, Your Honor, are redacted,

and no privilege log has been produced.  During the meet

and confer, the defendants have claimed that some of the

redactions are a result of work product.  Work product, as

I understand it, Your Honor, is materials prepared in

anticipation of litigation.  I'm not sure how provisions of

```
1                                                          6
2   an agreement providing an equity participation could be
3   work product.  But in any event, there's no privilege log,
4   and that has not been set forth in any reliable way.

5           Your Honor is well aware I believe of the long
6   history of plaintiffs seeking financial documents in this
7   case.  Indeed, we have been seeking those documents since
8   March of 2017.  The discovery cutoff was in August of last
9   year, then extended to October 4.  We, Your Honor, filed,
10  plaintiffs filed a motion for an adverse inference based on
11  defendants' failure to produce financial documents.

12          Judge Pauley asked us to work collectively in an
13  effort to avoid that motion having to be ruled on and try
14  to resolve the failure of production.  He asked the parties
15  to go back, work on that issue, produce documents, take
16  depositions.  Since that time the defendants initially
17  refused to produce the documents we requested, and we had
18  to come to the court and get Your Honor to order them to
19  produce the documents, which Your Honor did.  Your Honor
20  set a deadline of January 16 for the production of those
21  documents.

22          Then we asked to take a deposition based on those
23  documents.  The defendants refused.  We had to come to Your
24  Honor and ask for that deposition to go forward.  Then they
25  indicated that they wanted the deposition to be limited in
```

7

1
2  time, which we refused to agree to, so we had to come

3  forward.  Your Honor, we have repeatedly had to come

4  forward to move this issue forward.  We are already far

5  behind the schedule we want for this case and to resolve

6  these issues.  We took Judge Pauley seriously when he said

7  we should work to try to resolve this financial issue, but

8  we are now stuck in a very difficult place.

9        The defendants would like, because of their late

10  production last night, for us to adjourn the Cox deposition

11  which has been their goal all along.  They should not be

12  rewarded because of their discovery improprieties with

13  getting what they have sought all along.

14        So we have indicated to the defendants the

15  additional documents that are necessary for us to begin to

16  understand this information that's been provided, and we've

17  given them a list.  Those documents they should have

18  already gathered and they should have, and if they don't,

19  they should immediately.  And we need those documents by

20  tomorrow morning, Your Honor, in order to have any chance

21  of taking Mrs. Cox's deposition responsibly on Friday as it

22  is currently scheduled.  The defendants have indicated that

23  they will consider producing some of the documents we have

24  requested but not all of them and certainly will not agree

25  to produce them before tomorrow morning.

8

1

2          So, Your Honor, we call you in order to ask you

3    for an order requiring the defendants to produce the

4    requested documents by tomorrow morning.  This is not in

5    lieu of our seeking other sanctions by virtue of their

6    discovery misconduct, but rather in a serious effort by

7    plaintiffs to try to resolve this.  We do not understand

8    why these documents were produced now, years after they

9    should have been.

10          THE COURT:   All right, before I hear from Mr.

11   Mandel, I need you to think about this a little bit

12   practically, Mr. Oppenheim.  So, for example, if they had

13   not already collected items five and six on your list, it

14   would be absurd to, I think, suggest they could do it by 8

15   o'clock tomorrow.  So I think you need to ground your

16   requests in our current reality without prejudice to any

17   future applications you might make.  So if you want the

18   deposition to go forward on Friday, let's talk about what's

19   realistic, and if you tell me five and six is realistic,

20   you're going to lose some credibility with me.  But if you

21   want to go ahead and do that, go ahead.

22          MR. OPPENHEIM:   Well, Your Honor, here's the

23   issue.  There are a couple of issues here.  One is that I

24   don't want to push the entire schedule back because we're –

25   based on the schedule that's already been agreed upon with

9

1

2  the defendants, we're not going to finish the expert

3  depositions until basically a week before trial.  That

4  already prejudices the plaintiffs in putting their case

5  together.  We shouldn't – we shouldn't have to be dealing

6  with that, but we are because of this financial discovery

7  being pushed back so far.  So we shouldn't be further

8  prejudiced in terms of the schedule, that's one.

9          Two, I mean we've already paid for and bought

10 tickets to fly out --

11         THE COURT:  I don't think you heard what I said,

12 Mr. Oppenheim.  Let me try it again.  I'm assuming you are

13 going forward on Friday, and I'm not suggesting you should

14 not go forward on Friday.  What I said was we need to be

15 realistic about what it means to go forward on Friday, and

16 if being realistic means you have to get certain documents

17 tomorrow, I will accept that.  But what I can't accept as

18 realistic is a notion that they would conduct an email word

19 search and do a privilege review or whatever else they had

20 to do, responsiveness review, on your requests five and six

21 between now and 8 a.m.  That doesn't seem realistic to me.

22         MR. OPPENHEIM:  I'm sorry, Your Honor, I didn't

23 fully understand.  Your Honor, they should be ordered to

24 produce as much as they can humanly produce by 8 a.m.

25 tomorrow, and certainly every single agreement which should

1

2  be easily produced.  To the extent that there are

3  additional documents that they produce say 24 hours later,

4  Your Honor, depending on the volume and the nature of them,

5  plaintiffs may or may not be able to get through them for

6  purposes of the Friday deposition, and to the extent

7  necessary, Your Honor, they should, the defendants should

8  have to bring the witness to Washington in order to

9  complete the deposition on those additional documents, and

10  that should happen early the following week without the

11  schedule being adjusted for defendants.  It may be adjusted

12  for plaintiffs.

13          THE COURT:  Again, before I hear from Mr.

14  Mandel, it's hard to imagine, you know, a deposition on

15  Friday and one two days later.  That doesn't – two business

16  days later, I mean that doesn't make a lot of sense to me.

17  But, you know, and there may be other options, a telephonic

18  deposition or something, if you can point to a need based

19  upon a late production.  But let me hear from Mr. Mandel as

20  to what production if any, he's agreeing to and when it

21  would be done.  Or any other issue.  Go ahead, Mr. Mandel.

22          MR. MANDEL:  Sure.  I appreciate the Court

23  making itself available so quickly, you know, given all of

24  this.  And as a result of that, I'm going to take the time

25  to address all of his points.

1

2          I will say that plaintiffs know Mr. Smyres is not

3  the sole owner of all of these companies.  They asked

4  extensive questions in the deposition about the fact that

5  his son owns part of at least one of these companies.

6          THE COURT:   Glass is his son, I'm sorry?

7          MR. MANDEL:   And they never sought --

8          THE COURT:   Glass is his son?

9          MR. MANDEL:   I'm sorry, a totally separate

10  person.  No, Your Honor, Glass is just an employee and then

11  an independent contractor.  There's another person who is a

12  minor who is Mr. Smyres biological son.  He's referenced as

13  NS in the order reference --

14          THE COURT:   I think their point, Mr. Mandel --

15          (interposing)

16          THE COURT:   Mr. Mandel.  I think their point

17  was, I mean perhaps what you're assuming, but more to the

18  point that Glass was not being identified as someone

19  sharing profits.  I think that was really their point.

20  That had not previously been (indiscernible).

21          MR. MANDEL:   And I completely understand that.

22          THE COURT:   Okay.

23          MR. MANDEL:   And what I was leading up to was

24  the fact that they did not seek any email correspondence

25  concerning Mr. Smyres' son or what the nature of his

12

interest was or how it worked or anything.  Similarly, they did not seek any email correspondence with respect to Garrison or Stonehenge, and throughout discovery they were arguing that Garrison and Stonehenge were investors in the business and all the money they received or part of the money they received has to be considered the profits of the business.  The only issue here is the number of the profits of the business.  That's the only thing we're investigating, and that is a factor that the jury may consider.  In the unlikely event it finds liability and it awards some statutory damages, it can consider the defendants' profits.

The plaintiffs want to argue that some portion of what Garrison and Stonehenge received should be considered profits.  Similarly, the plaintiffs want to argue, I assume, that some of the money received by Mr. Glass should be treated as profits for purposes of that analysis.  The reality is we have already produced every single thing that the plaintiffs have sought with respect to all the other people and entities they want to argue the payments they received should be treated as profits.

With respect to Garrisons is all they requested was the number, the payments themselves, how the payments were calculated, and long after discovery closed they

13

 1
 2    requested the agreements.  And all of that was ultimately
 3    produced.  Similarly, we believe all of that has been
 4    produced with respect to Mr. Glass.  I'm double-checking
 5    with my client on all of that.
 6              THE COURT:   Wait, wait, wait, so if you – make
 7    my life easier, Mr. Mandel, since you're saying certain
 8    things have been produced.  Are you saying that you've
 9    already produced number one on his list?
10              MR. MANDEL:   So turning to his list, we have
11    produced number one with respect to the relevant period in
12    BDB2 which is 2013 through 2016.
13              THE COURT:   Okay, well, I gather there's a
14    desire now to have it earlier given that there was a
15    contention that he was getting profits before 2013, right?
16    So is there a problem with producing any previous
17    agreements?
18              MR. MANDEL:   Yeah, we don't feel discovery in
19    BDB1 should be opened, and that's the case for a variety of
20    reasons.  Most principally, the plaintiffs and the
21    defendants entered into a stipulation as to what the
22    profits of the defendants are in BDB1, and that stipulation
23    specifically says plaintiffs are entitled, the Court has
24    already determined that plaintiffs are entitled to a whole
25    host of additional documents, and plaintiffs have decided

14

1

2   that in lieu of receiving those documents, they're entering

3   into a stipulation.  They understood discovery was not

4   complete with respect to profits when they decided to enter

5   into that stipulation, and they should be held to it like

6   any party should be held to any stipulation they enter into

7   in federal court.  In addition, I believe it was yesterday

8   this Court issued an order saying that any requests for

9   supplemental discovery in BDB1 had to be made by 2015.

10          The reality is we're not, these are not

11  legitimate requests.  Plaintiffs are not seriously

12  interested in any of these documents.  They didn't seek

13  them with respect to any of the other individuals they want

14  to argue the profits are relevant.  All that plaintiffs are

15  trying to do here is muddy the water --

16          THE COURT:   Well, hold on, if I can --

17          (interposing)

18          MR. MANDEL:   -- failed to provide --

19          THE COURT:   Mr. Mandel, I'm not accepting the

20  parallelism.  My understanding is that this has been

21  generated by a late production by you, unlike what occurred

22  in the other situation, in which you are saying, you know

23  what, we just realized this guy was getting something

24  called profits.  We don't really think it's profits, so

25  just ignore what the label is.  But you're now giving that

1

2 to them for the first time.  And I don't see why they

3 shouldn't be entitled to test whether that is profits by

4 seeing whatever the agreement was.  So I'm not sure I buy

5 the parallel to what happened yesterday.

6 　　　　Now, as to what period this relates to, I guess I

7 would need to hear from Mr. Oppenheim whether there was,

8 whether people sort of wrapped up profits in Book Dog Book

9 1 and whether this request is spilling over into Book Dog

10 Book 1.  So let me just hear from Mr. Oppenheim on that.

11 　　　　MR. OPPENHEIM:   Yes, Your Honor, and I can

12 respond to several of the other points as well, Your Honor,

13 if you'd like.  But with respect to that specific issue, I

14 think it relates both to Book Dog Book 1 and to Book Dog

15 Book 2.  So with respect to Book Dog Book 2, if you just

16 look at these documents, they are referencing earlier

17 documents.  So in order to understand the documents that

18 were produced, you need the earlier documents.

19 　　　　So I'll give you, for example, Your Honor, the

20 employment and – the equity participation agreement, the

21 first page of which references that there is an, there are

22 equity contract rates that were previously agreed to.  And

23 this equity participation agreement is a follow-on to those

24 equity contract rights.  So we need to understand those in

25 order to understand this.  So that's number one, Your

1

2  Honor.

3          Two, the stipulation in BDB1 was entered into

4  after a significant amount of discovery was provided.  That

5  discovery was unequivocal that Mr. Smyres was the sole

6  owner of the company at issue.  Mr. Smyres testified to

7  that in the very first deposition.  And so it now appears,

8  and, again, Your Honor, we haven't had time to go through

9  everything that they said and did in BDB1 and how it now

10 appears to be inaccurate.  We'll do that in a subsequent

11 motion.  But it now appears that a large part of that could

12 be unwound based on this, and I don't know what the impact

13 of that is, Your Honor.  But at a minimum we should be able

14 to get that information.

15          To the extent that Mr. Mandel is saying we didn't

16 seek this kind of information with respect to Noah Smyres,

17 Noah Smyres was a toddler, so we didn't ask for his emails.

18 He was I think two years old at the time.  He's maybe five

19 now, I don't know.  But certainly we weren't going to seek

20 those emails between him and his son.  And his interest was

21 miniscule, and he was never paid a distribution we were

22 told.  This is a 20 percent equity participation, and

23 what's interesting about it is if you read the agreements,

24 in one agreement it seems to say he gets 20 percent of

25 Geckert, another agreement he seems to get 20 percent of

17

1

2  Robert William Management.  But the financial documents

3  that the defendants produced show that the payments were

4  coming out of Anaid Holdings, a company that we were told

5  was a holdings company.  So why there are payments coming

6  out of Anaid Holdings we don't understand, but we can't

7  understand the printout because they cut off certain

8  entries in the printouts.

9        So anyways, Your Honor, these documents raise

10  more questions than they answer, but the defendants can't

11  make a very late production --

12        THE COURT:  Okay, hold on, hold on, I really- I

13  interrupted Mr. Mandel because he made certain arguments

14  about number one, and I wanted to hear your response to

15  number one.  So I'm going to go back to Mr. Mandel, let him

16  finish out the other categories, and then I'm going to hear

17  from you.  All right, go ahead, Mr. Mandel, as to the other

18  categories.

19        MR. MANDEL:  Sure.

20        THE COURT:  Two through six.

21        MR. MANDEL:  With respect to number two, we have

22  produced all responsive documents, again, from 2013 to

23  2016.

24        THE COURT:  So your objection is the year?

25        MR. MANDEL:  Yes.  With respect to number three,

18

we produced that in its entirety.  There they're only

seeking with respect to 2013 to 2016.  That is the thing

that I reference in my letter with double-checking to make

sure we haven't missed anything, but have no - the goal was

to produce all that by yesterday.

Number four, there's only - we can produce number

four, I don't think they're entitled to it, but there's

only one document and there's no burden in producing it.

So we can produce number four.  Numbers five and six are

the email communications, and we object to those.

THE COURT:  Have you gathered them already?

MR. MANDEL:  No.  I mean they were requested

from us I guess it was, I didn't see the email from this

morning, but it was late last night.

THE COURT:  Okay, and back to number --

MR. MANDEL:  Just to be clear --

THE COURT:  Go ahead.

MR. MANDEL:  Just to be clear, with respect

numbers five and six, they're just not seeking emails, you

know, their argument with respect to Mr. Smyres' son is Mr.

Smyres' son is too young to send emails, and I understand

that.  But they didn't ask for any emails about Garrison

and Stonehenge.  Garrison is a hedge fund that lent money

to the defendants, and there's a dispute there should that

19

money be treated as profits or should that money be treated

as interest and fees on a loan, and they didn't even ask

for the agreements with Garrison and Stonehenge during the

discovery period.  They have never, to this date they've

never asked for a single email on the subject.

THE COURT:  And --

MR. MANDEL:  The pur --

THE COURT:  Go ahead.

MR. MANDEL:  The purpose of requests five and

six is to somehow justify two days of depositions and to

support some sort of sanctions motion.

THE COURT:  Let's not assume motives --

(interposing)

MR. MANDEL:  -- produced --

THE COURT:  Let's not assume evil motives on our

adversaries.  Let's just address the merits of the dispute.

Well, turning to number two --

MR. MANDEL:  I have nothing further.

THE COURT:  All right, back to number two,

compensation - hold on.

MR. OPPENHEIM:  Can I address that, Your Honor?

THE COURT:  Hold on.

MR. OPPENHEIM:  Number two.

THE COURT:  Well, let me just understand from

1

2  Mr. Mandel.  So you have the same objection on the years

3  which is somehow that's pure Book Dog Book 1, and,

4  therefore, it's too long a period?

5           MR. MANDEL:   The objection is there's a

6  stipulation --

7           THE COURT:   And the same stipulation --

8           (interposing)

9           MR. MANDEL:   -- received in consideration --

10          THE COURT:   Right, and he's saying the

11  stipulation was based upon false representations, which is

12  going to be a little hard to unravel right now.  All right,

13  I'll hear from Mr. Oppenheim.

14          MR. OPPENHEIM:   Your Honor, with respect to

15  number two, we're not just seeking W2's, K1's, and 1099's,

16  which is I believe how Mr. Mandel is reading the request.

17  Whether or not they issued the proper tax documents is not

18  the question.  The question is what payments were made and

19  what documents are there regarding those payments?  So when

20  Mr. Mandel indicates that they've produced all of the

21  documents regarding the payments, what they've produced,

22  for instance, for 2013 there's a single line which has a

23  reference number and a cutoff, wire transfer, and then it

24  just has a number.  There's no information related to it at

25  all, and similarly we could go through for each of them,

21

what they've given us is not complete payment information.

We don't understand who it came from, who it went to.  We

want all of the documents associated with the payments, and

we don't want to end up in a situation where, just because

they didn't handle this properly from a tax perspective, we

don't get the information.

THE COURT:  Okay, so it's your belief that there

are other documents reflecting the payments than what you

got?  I'm not sure I follow.

MR. OPPENHEIM:  Well, there will be – so, for

instance, Your Honor, a ledger entry as described in number

three is more than just the cutoff line we have from the

QuickBooks.  There will be a complete entry in QuickBooks.

There will also likely be some documents showing an invoice

or a calculation about what was being paid and wire

transfer or a check or some kind of documentation

associated with the payment.

Now, based on what we're looking at, we're not

talking about a huge number of payments.  In 2013 it

appears that there was one.  There were two in 2014.  We're

talking about a handful here of payments, and we'd like the

documentation associated with all those payments, both the

complete ledger entries, not the cutoff entries we have,

but also the complete payment information, not just the tax

1   documents.

2          THE COURT:   Mr. Mandel, do you want --

3          MR. MANDEL:    I think I misspoke earlier, Your

4   Honor, when I said we had already produced that stuff.  I

5   think Mr. Oppenheim is right, he makes a fair point.  His

6   request number two seeks all documents not just the tax

7   reporting documents.  And I think there's two issues

8   embedded in here.  The first is what we produce shows the

9   date of the payment and the amount of the payment, and

10  because of the way in which it was produced, some of the

11  columns were truncated.  We will produce untruncated

12  columns.  I understand the plaintiff's concern.  There was

13  not a goal to truncate those columns.  I didn't even focus

14  on it.  That's fine.  We'll produce a copy where you could

15  see the whole column.

16          With respect to all documents, all documents is

17  very broad, and I think part of this problem originated

18  from my agreeing to a request from the plaintiff that was

19  incredibly vague and they're now arguing it's interpreted

20  in a way that I never imagined at the time it could be

21  interpreted.  And I don't know what all documents mean.

22  However, to the extent what he's referring to is to these

23  handful of payments, if it was a check or a wire transfer,

24  we can search for cancelled checks or wire transfer

confirmations, I don't know that we're going to have them,

but we can conduct a reasonable search for them.

THE COURT:   But what caused --

(interposing)

MR. MANDEL:   Then there's a lot of these --

THE COURT:   What caused someone to make the

payment to this guy?  Is it an agreement?  Is it an

invoice?  I mean what is it?

MR. MANDEL:   It's the agreement that we've

already --

THE COURT:   The agreement is going to say you

must pay X percent or whatever, X dollar value on certain

dates, and that'll match up to these payments?

MR. OPPENHEIM:   The agreements have a very

complicated formula of certain triggers causing certain

payments based on certain thresholds.  And for different

things occurring, Your Honor, and so there will necessarily

be, somebody will have done a calculation, likely a

spreadsheet, much like the Garrison monthly reporting

packages is my guess, but different because there are

different triggers and different issues.  But somebody had

to do some work to calculate these.  That's what we need.

We need --

THE COURT:   Okay, well, hold on, I was asking

```
 1                                               24
 2  Mr. Mandel this question.
 3            MR. OPPENHEIM:   Oh, I apologize.  I thought you
 4  were asking me, Your Honor.
 5            THE COURT:   I was going to say to Mr. Mandel
 6  someone has to, something has to cause someone to write a
 7  check or make a wire transfer.  And unless the contract
 8  specifically lists amounts, which I didn't imagine it
 9  would, someone had to sit and do a calculation, and that
10  has to exist somewhere.
11            MR. MANDEL:   I think that's correct, and I think
12  that's exactly why we produced a spreadsheet.  Mr. Glass's
13  compensation was complicated.  There was certain fixed
14  compensation that he was receiving every month, and then
15  there was certain incentive compensation that was – then
16  there were basically different buckets of incentive
17  compensation.
18            THE COURT:   And for each payment is there a
19  document that does the calculation?
20            MR. MANDEL:   I have asked about that, and there
21  is – the answer is I don't think we maintain a
22  comprehensive set of those documents.  It may be for
23  certain payments we have a spreadsheet that calculates the
24  entire payment, or perhaps for certain years – there may be
25  something, a spreadsheet that calculates it for a year.
```

But from the earlier period of 2013 to 2014, if they exist, it's not something that can be quickly gathered.  I've looked into that.

I think what's key though is that there's only one of these buckets of compensation that is even arguably relevant to this case, and we produced to them a spreadsheet that showed for each year, from 2013 to 2016, how those amounts were calculated.  So I think they have what they need.  If they want to argue – I think they have what they need.

THE COURT:  What's a spreadsheet, I'm sorry, I don't even know what this is.

MR. OPPENHEIM:  I have no idea what spreadsheet they're referring to, Your Honor --

THE COURT:  I asked Mr. Mandel.

MR. OPPENHEIM:  I think they're referring --

THE COURT:  What's the spreadsheet?

MR. MANDEL:  I'm sorry, what was that?

THE COURT:  What're you talking about, what spreadsheet?

MR. MANDEL:  There is a spreadsheet, it's one page long, it's very simple, for each year.  Essentially the one bucket that's at issue here, and I won't say the number because the number's highly confidential, but Mr.

                                                                26

1
2   Glass was to receive X percent of certain distributions

3   that Mr. Smyres received.  And there's a calculation, we

4   produced a spreadsheet that shows what amount Mr. Smyres

5   received, and a 20 percent calculation, and then I believe

6   it totals up the amount that Mr. Smyres received over the

7   relevant period --

8             (interposing)

9             THE COURT:   It's for a lengthy period this

10  spreadsheet?

11            MR. MANDEL:   -- so each year --

12            THE COURT:   It's for some --

13            MR. MANDEL:   It's for all four years of the

14  relevant --

15            THE COURT:   So this is an after-the-fact thing

16  someone put together; it's not contemporaneous.

17            MR. MANDEL:   Obviously.

18            MR. OPPENHEIM:   Isn't there a Bates --

19            THE COURT:   Do you have a Bates stamp number?

20  Apparently no one knows what you're talking about.

21            MR. MANDEL:   I mean it should be in yesterday's

22  production.  I don't have the production in front of me.

23  If you're saying you didn't see it, if the plaintiffs are

24  saying they didn't see it in the production, I suppose it's

25  possible it was omitted, but we certainly wanted to include

27

1  it.

2          THE COURT:   Just email to them the spreadsheet

3  within 15 minutes of the end of the phone call, and I'm

4  sure that'll solve that problem.

5          Okay, again, we need to talk about what's

6  realistic, and it seems to what's realistic by tomorrow

7  certainly is getting all those agreements.  So I'm going to

8  order the production of the agreements from 2008 to the

9  present, and you should get that to them by noon tomorrow.

10  That's number one.

11          Number two, I don't know what to do.  It sounds

12  like you don't think those are gatherable.  Is that right,

13  Mr. Mandel?  They don't exist, no one put this in a form

14  that anyone can find or it's just not findable by tomorrow

15  or what?

16          MR. MANDEL:   Well, I'm not sure – I think this

17  encompasses many more categories of documents than I

18  previously understood.  But with respect to wire – with

19  respect to the period of 2013 through 2016 with respect to

20  wire transfers and checks, I think that probably can be

21  gathered.  With respect to payments that were made as wages

22  through a payroll service and reported on W2's, I have no

23  idea if we can get – I have no idea if the plaintiffs want

24  every paystub Mr. Glass received, but I have no idea if

1

2    those are gatherable.  And with respect to spreadsheets

3    showing calculations --

4            THE COURT:   Contemporaneous.

5            MR. MANDEL:   -- I don't think they're relevant.

6    I understand, contempor - that's what I meant,

7    contemporaneous spreadsheets.  I don't think they're

8    relevant.  It would probably be possible to gather some of

9    them, but we could not gather all of them.

10           THE COURT:   Okay, well, I mean you - at this

11   point, you know, I can't accept the defendants' narrative

12   which is, oh, it says profits, it's not really profits, and

13   somehow this should be a problem.  So I think the

14   defendants have failed by not producing these documents

15   earlier, and I don't know if this will solve it, but I am

16   going to order the production of this material.  And the

17   more they get it before this deposition, the less likely it

18   is you might have to have a second deposition, which I

19   can't say won't happen and I can't say you won't have to

20   bring the person to Washington and it may not be at a time

21   you want to do it.

22           So I'm not going to cut it fine as to the years

23   because at this point I can't figure out if there was a

24   misrepresentation in Book Dog Book 1, just as there was a

25   failure to produce here that's just happened.  So I'm going

1

2 to require for all those years to have contemporaneous

3 backup for whatever these distributions were.  The more you

4 can get them by tomorrow, the better it's going to be for

5 you.  Ledger entries, I guess you feel you've already

6 produced – this is number three we're talking about.

7       MR. MANDEL:  Yes, that we fully satisfied –

8 their objection, I think, is that it's --

9       (interposing)

10       THE COURT:  All right, you're going to solve

11 that by tomorrow.

12       MR. MANDEL:  -- truncated version.

13       THE COURT:  So that'll hopefully be solved by

14 tomorrow.  The operating agreement, I assume you can – I'm

15 going to order that production.  You're claiming that's

16 happened already?

17       MR. MANDEL:  No, that we can do by tomorrow.

18       THE COURT:  Okay, now, as to the emails, you

19 know, I mean if you're insisting that this guy's not

20 getting profits, then this seems highly – you know, you're

21 the ones who are saying the thing that this thing says is

22 not true.  And regardless of whether there were previous

23 email requests, this new production and your contentions

24 regarding it are now raising big issues.

25       If you guys want to just say, you know what,

30

fine, it's profits, then that's going to solve the problem,

but you're not willing to say that.  So you need to produce

the communications that discuss what this material is

between your people and Glass.  Now, I doubt you can do it

by tomorrow, I don't know what you can do in the next few

days, but if you're going to persist in that contention,

then those communications need to be produced.  If you want

to give me a realistic deadline, I'll do it.  If it goes

too far out, you're opening yourself up to that you're not

being able to cure this problem.

       The simple sanction to me is to just treat this

all as profits, but if you don't want to do that, then

you're going to have to act very quickly.

       MR. MANDEL:  Okay, just so I understand.  What

is it we'd have to agree is profit?

       THE COURT:  I think – I mean I assume what this

is all about, and Mr. Oppenheim can correct me, is that you

– Mr. Oppenheim believes these payments to Mr. Glass are

profits and need to be included in that gross number that's

he going to argue to a jury should be a basis for, or

whoever, is going to be a basis for statutory damages.

That's what this is all about, right, Mr. Oppenheim?

       MR. OPPENHEIM:  Your Honor, that is the most

obvious and glaring thing it's about.  But it is not all

                                                                31

it's about.

            THE COURT:  Well, what else is the relevance of

this?

            MR. OPPENHEIM:  So, Your Honor, since literally

the very first deposition of Mr. Smyres in, I can't

remember whether it was late 2013 or early 2014.  He had

said to us that he was the sole owner of every one of the

companies that he owned other than one, Academico Centro

Americano.  We're now learning that that fundamental

understanding about who was involved in the company and who

had an ownership interest is unsettled.  And it raises

questions that we would be asking all along to try to

understand how that changes the calculus.  So I don't --

            THE COURT:  To what though?

            MR. OPPENHEIM:  So --

            THE COURT:  Maybe it's a credibility issue,

okay, I understand that, but what else are we talking

about?

            MR. OPPENHEIM:  So we never asked Mr. Glass at

all about any ownership interest when we took his

deposition in BDB1 or how it might affect we he was doing.

We never took his deposition in BDB2 because we were told

by the defendants, and this is amazing to me – do you

remember we had that long discussion about who was a

32

1

2   properly disclosed Rule 26 witness, and they had listed

3   everybody including witnesses from the fraud claim which

4   was out.  And Your Honor said to them you need to indicate

5   who has knowledge for purposes of BDB2 so the plaintiffs

6   know who to take depositions of.  They did not include Mr.

7   Glass.  Now Mr. Glass, it turns out, had an equity

8   participation interest and was intimately involved in the

9   Amazon buyback program.  The Amazon buyback program

10  apparently was the source for some of the books at issue in

11  the case.

12          So, Your Honor, I can't tell you on the phone

13  today, other than the profits issue, how what they've

14  disclosed today changes the fundamental underpinnings of

15  our case because we had these documents for 24 hours and

16  that's it.

17          THE COURT:  Okay --

18          MR. OPPENHEIM:  But I don't want to be limited

19  to just that at this point.

20          THE COURT:  My larger point is the current

21  requests are critical to your deposition of the 30(b)(6) -

22  Cox is that her name?

23          MR. OPPENHEIM:  Yes, Miss Cox.  Yes, Your Honor

24  --

25          THE COURT:   -- critical --

1

2          (interposing)

3          THE COURT:   -- and if they are willing to say

4   now that we'll accept that these things are to

5   characterized as profits, then I think that solves the Cox

6   deposition problem at a minimum.  I mean, right, Mr.

7   Oppenheim?

8          MR. OPPENHEIM:   I'm following your reasoning,

9   but here's where I'm getting hung up, Your Honor, is I

10  don't know – we can't calculate the quantum of them because

11  the spread – at least the QuickBooks printouts that we've

12  been given, the numbers don't match in the slightest.  Let

13  me put some flesh on that so it makes sense.

14          So apparently, according to these printouts, Mr.

15  Glass's company was paid in 2016 and 2017 by Anaid Holdings

16  LLC a fairly substantial amount of money, though it's hard

17  to really understand what's what in this printout.  Anaid

18  Holdings, Your Honor, we have P&L's and balance sheets that

19  you had previously ordered be produced, and the numbers in

20  those P&L's and balance sheets don't reflect any of the

21  payments that are in what we were given last night.  I mean

22  they're not even remotely close.

23          And, by the way, none of the equity participation

24  agreements that we received last night reference Anaid

25  Holdings.  They reference other entities.  So we don't know

1

2  why Anaid Holdings is --

3          (interposing)

4          THE COURT:   Okay, so the bottom line, to cut

5  through this, is --

6          MR. OPPENHEIM:   I'm sorry.

7          THE COURT:   -- is that you still need at least,

8  for example, the backup documents to verify that the, as to

9  the actual amount that was paid to Glass.

10         MR. OPPENHEIM:   Yes, Your Honor, and from what

11 entities and how it interrelates with the other financial

12 documents we've received, if that makes sense.

13         THE COURT:   All right, so we're not going down,

14 at this point --

15         (interposing)

16         THE COURT:   Go ahead.  Mr. Mandel, you want to

17 say something?

18         MR. MANDEL:   It's amazing – yeah, I mean it's

19 amazing that they just said that because they were told

20 when they requested the trial balances, excuse me, the

21 balance sheets and the profit and loss statements that they

22 were not accurate.  We said that they're not going to be

23 accurate, you know, it's crazy to produce things that are

24 not accurate, this is not a good use of time.  And Your

25 Honor said that's fine if they're not accurate but just

1

2   produce them anyway, and we did.  Now they're saying we

3   need to do discovery and the fact that they're not accurate

4   when they knew from day one they weren't going to be

5   accurate.

6          (interposing)

7          MR. OPPENHEIM:   I'm sorry, that was a reference

8   to the most recent hearing, and Leah, Miss Vicker, excuse

9   me, made that representation, but not with respect to the

10  Anaid P&L and balance sheet that were produced last year.

11  There was never a representation before those documents

12  were submitted that they were inaccurate.  And at the

13  hearing that Miss Vickers said that to you, Your Honor, you

14  said to her that they, if they're producing documents that

15  they think are inaccurate, they should provide a letter to

16  plaintiffs explaining why they believe they're inaccurate.

17  We never received any such letter.

18          THE COURT:   Okay, this is a little bit of a

19  sidetrack from what I, a road I was going down that I'm no

20  longer going to go down which is whether they could be

21  relieved of the obligation to produce these documents

22  through some stipulation that the matters were profits.  If

23  you two can't agree on that, that's fine.

24          So we're now back to the road of the production,

25  we're back to what I said before, which was I went through

36

1

2  it and saying basically it all had to be produced, and the

3  question is timing, and the more that's produced in advance

4  of Friday, and we talked about the things that absolutely

5  could be produced in advance of Friday, the better.  And to

6  the extent things dribble out or fail to come out at all,

7  there may be consequences from that.  So I don't know what

8  more I can do than that.  I think we talked about each

9  category and what could be done by tomorrow at noon, and we

10  heard that.

11        And we're now left with the emails which I still

12  say are relevant given defendants' contentions that the

13  characterization of this material's profit is incorrect,

14  that has to be tested through statements, communications

15  between Glass and the defendants regarding what his role is

16  and what this money is.  And they need to start down the

17  road of finding those, and if they get to them very

18  quickly, there may be an opportunity to have some kind of

19  second deposition.  And if they don't, then there may be

20  other consequences from the failure to produce.

21        So I think that's all I can do right now.  Mr.

22  Oppenheim, anything else you think we should be doing?

23        MR. OPPENHEIM:   Not at this point, Your Honor.

24  Obviously, the plaintiffs reserve their rights as we go

25  forward to continue to seek an adverse inference.

```
 1                                                     37
 2              THE COURT:   All right, Mr. Mandel, anything else
 3   we should be doing now?
 4              MR. MANDEL:   From the defendants – yeah, I mean
 5   the – we do not want to adjourn this deposition.  We want
 6   this to be over much more than the plaintiffs want this to
 7   be over, I can assure you.  But we can produce whatever
 8   needs to be produced by the end of this week, that can be
 9   done.  We're not talking about a massive amount of stuff.
10   So it seems silly to me to prolong a discovery fight into
11   the weeks leading up to trial when instead we can adjourn a
12   deposition by two or three days and just have this all sewn
13   up.  I'm absolutely extremely surprised that we're being
14   required to produce emails when there were no email
15   productions on any of these topics with respect to any of
16   the disputed so-called profit receivers.
17              THE COURT:   Did you previously produce documents
18   claiming things were profits and then simultaneously say
19   they're absolutely wrong to characterize themselves as
20   profits?  Has that happened before?
21              MR. MANDEL:   Yes, that's exactly what happened
22   with respect to Garrison and Stonehenge.  Miss Cox
23   testified that certain things were profits.  She later
24   changed her testimony, but they seized upon that to say we
25   want all the Garrison discovery.  And Your Honor ordered us
```

38

1
2   to produce the reports to Garrison showing the numbers, and
3   Your Honor – and they didn't even seek, by the way, Your
4   Honor, the contracts with Garrison until longer after
5   discovery.  They sought that in December, and to this day
6   they haven't sought a single email.  But it's exactly the
7   same dispute.
8           So, you know, they're getting much more now –
9   they're seeking much more now.  Forget about what they're
10  getting.  They're seeking much more now than they ever
11  sought during discovery, and no one wants to adjourn this
12  deposition, but if they're actually going to get more than
13  they got during discovery, which I respectfully disagree
14  with, but if they're going to get that, rather than appeal
15  that to Judge Pauley or rather than have two or three more
16  motions about subsequent depositions and where they're
17  going to be, it makes much more sense for us to just
18  produce it this week, even if we disagree with the
19  production, and have the deposition next week.
20          THE COURT:   You're willing to bring the person
21  to Washington?
22          MR. MANDEL:   I mean I don't know what the
23  witness' schedule is, but I can try and do that.
24          THE COURT:   Well, I'm not ordering it, but if
25  the plaintiffs want to – anyway, I don't have a reason to

1

2  believe that what I'm ordering is unreasonable here given

3  the late production here and the bizarre claim from the

4  defendants that what it says is not really what it is.  So

5  I don't – I'm not second-guessing at all my ruling.  But if

6  the plaintiffs voluntarily believe there would be an

7  efficiency in putting this off and if there's some

8  agreement as to the location that makes them satisfied that

9  it's worth doing, that's up to the parties, but otherwise

10 I'm not going to order a postponement of the deposition.

11 Anything else, Mr. Mandel?

12         MR. MANDEL:   So just to be clear, I just want to

13 make sure.  So we're – I think Your Honor has ruled, but I

14 want to make sure the record is clear.  We're seeking a

15 protective order requiring the deposition to happen

16 sometime next week, and am I correct in understanding that

17 the Court is denying that application?

18         THE COURT:   That's correct.

19         MR. MANDEL:   Okay.  Nothing further from the

20 defendants, Your Honor.

21         THE COURT:   Anything else, Mr. Oppenheim?

22         MR. OPPENHEIM:   No, thank you, Your Honor.

23         THE COURT:   All right, thank you, everyone.

24         MR. OPPENHEIM:   Good evening.

25         (Whereupon the matter is adjourned.)

40

# C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Cengage Learning,

Inc., et al., versus Book Dog Books, LLC, et al., Docket

#16cv7123, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.

Signature_____*Carole Ludwig*_____

Date:  February 8, 2018