UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC., MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC, and PEARSON EDUCATION, INC., | Case No. 1:16-cv-07123 (WHP) (GWG) |
| Plaintiffs, | Judge William H. Pauley III |
| v. | |
| BOOK DOG BOOKS, LLC d/b/a TEXTBOOKRUSH and TEXTBOOKSRUS, APEX MEDIA, LLC, AND ROBERT WILLIAM MANAGEMENT, LLC, | |
| Defendants. | |

| | |
|---|---|
| JOHN WILEY & SONS, INC., CENGAGE LEARNING, INC., and PEARSON EDUCATION, INC., | Case No. 1:13-cv-00816 (WHP) (GWG) |
| Plaintiffs, | Judge William H. Pauley III |
| v. | |
| BOOK DOG BOOKS, LLC and PHILIP SMYRES, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

**TABLE OF CONTENTS**

Table of Authorities ..................................................................................................... ii

Table of Abbreviations .................................................................................................. v

Preliminary Statement .................................................................................................. 1

I. PLAINTIFFS ARE ENTITLED TO THEIR ATTORNEYS' FEES AS THE
PREVAILING PARTIES IN THESE CASES … ............................................... 3

   A. Plaintiffs are entitled to attorneys' fees and costs as damages for Defendants'
multiple breaches of the 2008 Settlement Agreement ........................................... 3

   B. Plaintiffs are entitled to attorneys' fees and costs in connection with Defendants'
willful copyright infringements ............................................................................ 3

      i. Deterrence and compensation favor an award of attorneys' fees given
Defendants' willful copyright infringements........ .................................. 4

      ii. Defendants forced Plaintiffs into this litigation and took objectively
unreasonable, and often frivolous, legal and factual positions that
increased the cost and complexity of the litigation... ............................... 5

         1. Defendants' pre-litigation conduct was outrageous.................. 6

         2. Defendants flagrantly disregarded the mandatory forum-
selection clause in the 2008 Settlement Agreement................. 8

         3. Defendants' objectively unreasonable conduct continued
unabated in litigation......... ................................................... 9

         4. Defendants were sanctioned for their unreasonable approach
to discovery on their corporate structure and finances............ 12

         5. Defendants' frivolous approach to affirmative defenses
exemplifies objective unreasonableness................................. 14

         6. Defendants' obsessively re-litigated the MBS and Chegg
summaries.............................................................................. 16

      iii. Awarding Plaintiffs fees would promote the enforcement of rights
by copyright holders........................................................................... 17

   C. Plaintiffs are entitled to attorneys' fees and costs in connection with Defendants'
willful trademark infringements.................... ........................................................ 18

II. THE ATTORNEYS' FEES PLAINTIFFS SEEK ARE REASONABLE ................... 19

   A. The Rates of Plaintiffs' Counsel Are Reasonable ............................................. 21

   B. The Number of Hours Counsel Expended Was Reasonable ................................ 23

III. PLAINTIFFS ARE ENTITLED TO REASONABLE COSTS ................................. 25

i

# TABLE OF AUTHORITIES

Cases

*Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31 (S.D.N.Y. 2015)................................18

*Berry v. Deutsche Bank Trust Co. Ams.*, 632 F. Supp. 2d 300 (S.D.N.Y. 2009) .........................24

*Bowen v. Massachusetts* 487 U.S. 879 (1988) .............................................................................9

*Brighton Collectibles, Inc. v. Renaissance Grp. Int'l*, No. 06-CV-01115-H (POR), 2008 WL 11339958 (S.D. Cal. Nov. 25, 2008) ..............................................................................................4

*Brown v. District of Columbia*, 80 F. Supp. 3d 90 (D.D.C. 2015) .............................................22

*Capitol Records, Inc. v. MP3tunes*, LLC, No. 07CV9931, 2015 WL 13684546 (S.D.N.Y. Apr. 3, 2015) .........................................................................................3, 4, 5, 21, 25

*City of Burlington v. Dague*, 505 U.S. 557 (1992) ....................................................................20

*Clarke v. Frank*, 960 F.2d 1146 (2d Cir. 1992).........................................................................23

*Design Tex Grp., Inc. v. U.S. Vinyl Mfg. Corp.*, No. 04 Civ. 5002, 2005 U.S. Dist. LEXIS 18276 (S.D.N.Y. Aug. 22, 2005) .........................................................................................................17

*Dropbox, Inc. v. Thru Inc.*, No. 17-15078, 2018 WL 1940122 (9th Cir. Apr. 25, 2018) .............19

*Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, No. 15-0563-CV, 2017 WL 5176230 (2d Cir. Nov. 8, 2017)..................................................................................................18

*Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303 (3d Cir. 2014).............................................18

*Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1994)......................................................................4, 17

*GAKM Res. LLC v. Jaylyn Sales Inc.*, No. 08 Civ. 6030, 2009 U.S. Dist. LEXIS 128595 (S.D.N.Y. May 21, 2009).........................................................................................................25

*Grant v. Martinez*, 973 F.2d 96 (2d Cir. 1992) .......................................................................23

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..............................................................................3

*Impression Prods. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523 (2017) .............................................15

*Kepner-Tregoe v. Vroom*, 186 F.3d 283 (2d Cir. 1999)..............................................................4

*Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016) ....................................................4

*Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U. S. 519 (2013) ......................................................15

*Lightbox Ventures, LLC v. 3rd Home Ltd.*, No. 16CV2379(DLC), 2018 WL 1779346 (S.D.N.Y. Apr. 13, 2018) ..........................................................................................................................18

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83 (2d Cir. 2012) ............................ 18, 19

*Matthew Bender & Co. v. W. Pub. Co.*, 240 F.3d 116 (2d Cir. 2001) ..........................................5

*Millea v. Metro-North R.R. Co.*, 658 F.3d 154 (2d Cir. 2011) ....................................................19

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 188 L.Ed.2d 816 (2014) 18

*Penshurst Trading Inc. v. Zodax L.P.*, 652 F. App'x 10 (2d Cir. 2016) ......................................18

*Perdue v. Kenny A.*, 559 U.S. 542 (2010) ...................................................................................20

*Regulatory Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC*, No. 13 Civ. 2493 (KBF), 2014 WL 4792082 (S.D.N.Y. Sept. 24, 2014) ............................................... 21, 22

*Richard Feiner & Co. v. Turner Entm't Co.*, No. 96 CV 1472, 2004 U.S. Dist. LEXIS 23869 (S.D.N.Y. Nov. 22, 2004) ..........................................................................................................4

*Ronnie Van Zant v. Pyle*, 270 F. Supp. 3d 656 (S.D.N.Y. 2017) ..............................................14

*Scantibodies Lab., Inc. v. Church & Dwight Co.*, No. 14-cv-2275 (JGK)(DF), 2016 U.S. Dist. LEXIS 154396 (S.D.N.Y. Nov. 4, 2016) ...................................................................................14

*Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12CV1416GBDRLE, 2016 WL 8458987 (S.D.N.Y. Aug. 12, 2016) ..........................................................................................19

*Sub-Zero, Inc. v. Sub Zero N.Y. Refrigeration & Appliances Servs., Inc.*, No. 13-cv-2548, 2014 WL 1303434 (S.D.N.Y. Apr. 1, 2014) ......................................................................................22

*SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) ...........................18

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.,* No. 3:13-CV-831, 2018 WL 748871 (N.D.N.Y. Feb. 7, 2018) .............................................................................................................6

*Yukons Capital v. Feldman*, No. 15-cv-4964 (S.D.N.Y. Sept. 22, 2016) (LAK) (ECF Nos. 235 and 240) ......................................................................................................................................14

**TABLE OF AUTHORITIES (cont.)**

<u>Statutes</u>

15 U.S.C. § 1117.................................................................................................. 1, 18, 24

17 U.S.C. § 109....................................................................................................... 15, 16

17 U.S.C. § 505......................................................................................................... 1, 3, 24

28 U.S.C. § 1920............................................................................................................25

35 U.S.C. § 285............................................................................................................18

# TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| *BDB I* | *John Wiley & Sons, Inc., et al. v. Book Dog Books, LLC, et al.,* Case No. 1:13-cv-00816 (WHP)(GWG) (S.D.N.Y.) |
| *BDB II* | *Cengage Learning, Inc., et al. v. Book Dog Books, LLC, et al.,* Case No. 1:16-cv-7123 (WHP)(GWG) (S.D.N.Y.) |
| *BDB Ohio* | *Book Dog Books, LLC v. Cengage Learning,* Case No. 1:13-cv-06413 (WHP)(GWG) (S.D.N.Y.) |
| Dkt(I) | Docket entries in *BDB I* |
| Dkt(II) | Docket entries in *BDB II* |
| Dkt(Ohio) | Docket entries in *BDB Ohio* |
| Oppenheim Decl. | Declaration of Matthew J. Oppenheim |
| Ex. __ | Exhibit attached to the Oppenheim Declaration |
| PX __ | Plaintiffs' Trial Exhibits, attached to Oppenheim Declaration |
| TR | Trial Transcript, excerpts attached as Exhibit 1 to Oppenheim Declaration |

## PRELIMINARY STATEMENT

After a nearly seven-year dispute, the jury found Defendants liable for willfully infringing Plaintiffs' valuable copyrights and trademarks and for breaching a contract between the parties, and awarded Plaintiffs $34.2 million in damages. As the prevailing parties in these cases, Plaintiffs are entitled to attorneys' fees and costs on three separate bases: (1) as damages pursuant to a mandatory cost and fee-shifting provision in the parties' 2008 Settlement Agreement; (2) as the prevailing party under the Copyright Act, 17 U.S.C. § 505; and (3) as the prevailing party under the Lanham Act, 15 U.S.C. § 1117(a). Each category provides an independently justifiable basis for a full award and, whether independently or collectively, the Court should award the full amount requested.

Defendants and their counsel litigated these cases in an obstructionist, combative, and beyond-zealous manner that forced Plaintiffs to spend far more than they should have to enforce their rights. Defendants crossed the line by repeatedly lying and failing to abide by Court orders. They mocked the litigation and trial process by asserting factual and legal arguments for which they had no grounding and refusing to cooperate in the simplest of tasks, such as allowing Plaintiffs to complete a book inspection that was interrupted by a snowstorm, providing the current address of a former employee, or disclosing that they had no intention of calling numerous witnesses they repeatedly listed. Oppenheim Decl., ¶ 5. With Defendants, no task was simple. Every meet-and-confer was a hopelessly one-way discussion in which Defendants reflexively refused to compromise or narrow issues.

Before the ink dried on the parties' 2008 Settlement Agreement, Defendants lied to Plaintiffs about their sources and immediately resumed buying from their known counterfeit source in Thailand. When their wholesale customers discovered counterfeit books from Defendants, they shifted those sales to unsuspecting consumers online. When Plaintiffs served

1

notice of infringements in 2011, Defendants baldly and repeatedly lied about their involvement with counterfeits, then went on the offensive by filing an Ohio lawsuit in flagrant violation of the parties' New York forum-selection agreement.  In that suit, Defendants sought a declaratory judgment of non-infringement notwithstanding internal emails demonstrating Defendants that were aware at the time that they had, in fact, bought and sold counterfeit textbooks.  As the cases progressed, Defendants obstructed discovery, violated Court orders, refused to stipulate to uncontroverted facts, and lodged frivolous and overbroad objections at every turn.

Defendants vehemently refused for years to provide basic corporate structure and financial discovery.  Their unjustified refusals set in motion a parade of successful motions to compel spanning years, violations of those orders, follow-on orders, eve-of-trial disclosures that came to light through an anonymous tip, huge litigation costs, and ultimately sanctions. Defendants' obsessive re-litigation of frivolous affirmative defenses and inadmissible MBS and Chegg summaries was unjustified but standard practice for these Defendants.  Protecting the right to appeal is one thing, but compulsive re-litigation of meritless positions is wholly another.

The effect—if not the purpose—of these tactics was to extend the length, cost and complexity of the case.  Defendants pursued that strategy without regard to consequences and now must pay for the expenses incurred in responding to that failed strategy.  While courts often blame both parties when a case has been hotly litigated, Defendants' conduct in these cases was egregious and makes clear they are responsible for driving up the fees and expenses—not Plaintiffs.  Plaintiffs' fee request is reasonable and appropriate and should be granted in full.

**I. PLAINTIFFS ARE ENTITLED TO THEIR ATTORNEYS' FEES AS THE PREVAILING PARTIES IN THESE CASES.**

**A. Plaintiffs are entitled to attorneys' fees and costs as damages for Defendants' multiple breaches of the 2008 Settlement Agreement.**

Paragraph 17(a) of the 2008 Settlement Agreement provides that "upon the breach of any obligations hereunder . . . the breaching party shall be liable to pay the reasonable costs and attorney's fees incurred by the non-breaching party in pursuing such legal action[.]" PX 127 at ¶ 17(a). The jury concluded that Defendants breached the injunction provision of the Settlement Agreement, which prohibits Defendants from selling or importing (or assisting others in selling or importing) pirated editions of Plaintiffs' textbooks. Dkt(II) 414 at 16; PX 127 at ¶ 5. Years earlier, the Court likewise found that Defendants breached a separate provision of the Settlement Agreement—the forum-selection clause—by filing an action in Ohio related to the Settlement Agreement and later attempting to transfer *BDB I* to Ohio. Dkt(I) 281 ("R&R") at 14-17, adopted by Dkt(I) 351 (explaining that "[t]he Settlement Agreement explicitly provides that the parties may obtain attorneys' fees and costs in the event of a breach."). Plaintiffs are thus entitled to attorneys' fees and costs incurred to enforce their rights under the injunction and forum-selection clauses of the Settlement Agreement.

**B. Plaintiffs are entitled to attorneys' fees and costs in connection with Defendants' willful copyright infringement.**

The Copyright Act explicitly provides that reasonable attorneys' fees and full costs may be awarded to the prevailing party in a copyright infringement action. 17 U.S.C. § 505. A prevailing party is one who has "succeed[ed] on any significant issue in the litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (quotation marks omitted). By obtaining a complete and favorable jury verdict and $14.2 million in damages on their copyright claims, Plaintiffs are the prevailing parties by

3

any measure.  *See Capitol Records, Inc. v. MP3tunes*, LLC, No. 07CV9931, 2015 WL 13684546, at \*1 (S.D.N.Y. Apr. 3, 2015); *see also Brighton Collectibles, Inc. v. Renaissance Grp. Int'l*, No. 06-CV-01115-H (POR), 2008 WL 11339958, at \*3 (S.D. Cal. Nov. 25, 2008) ("Plaintiff is the prevailing party under the Copyright Act, as the jury found in favor of Plaintiff on its copyright infringement claims and awarded Plaintiff $281,000 in damages.").

Factors that "guide courts' discretion" in awarding attorneys' fees to a prevailing party under the Copyright Act include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534 n.19 (1994).  "[F]ee awards under § 505 should encourage the types of lawsuits that promote" the Copyright Act's "well settled" objectives of "enriching the general public through access to creative works," *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1986 (2016) (quoting *Fogerty*, 510 U.S. at 527), "discouraging infringement; securing a fair return for an author's creative labor; and stimulating artistic creativity for the general public good." *MP3tunes,* 2015 WL 13684546, at \*1 (quoting *Fogerty*, 510 U.S. at 526, n.19).

### i. Deterrence and compensation favor an award of attorneys' fees given Defendants' willful copyright infringements.

Defendants' willfulness in infringing Plaintiffs' copyrights is a compelling reason to award Plaintiffs their reasonable attorneys' fees.  Courts in this Circuit have repeatedly held an award of fees for willful infringement is vital to further the Copyright Act's statutory goals of deterrence and compensation.  *See, e.g., Kepner-Tregoe v. Vroom*, 186 F.3d 283, 289 (2d Cir. 1999) (affirming award of attorneys' fees as "justified based on court's finding of willfulness and . . . in line with the statutory goal of deterrence"); *MP3tunes,* 2015 WL 13684546, at \*2 (J. Pauley) (Defendant's "willfulness warrants an award" of attorneys' fees); *Richard Feiner & Co.*

*v. Turner Entm't Co.*, No. 96 CV 1472(RO), 2004 WL 2710054, at *1 (S.D.N.Y. Nov. 23, 2004) (granting fees and noting that "courts in this district routinely grant attorney's fees in cases of willful copyright infringement in order to deter such conduct").

The jury found Defendants' infringement willful for every copyright in the case and awarded statutory damages accordingly. Dkt(II) 414. Defendants are serial infringers whose decision to elevate profits over lawfulness compounds the need for deterrence. Based on the incomplete financial records provided, Defendants earned more than $53 million in profits from 2012 through 2016, TR at 1974:14-16, and Mr. Smyres personally pocketed $47 million in the eight-year period at issue in this case. TR at 1974:14-16, 1975:25-1976:2, 2596:24-2597:1. Awarding fees and costs will put Defendants and others on notice that, even with a substantial damages award on liability, they must pay a victim's legal fees and costs if they contest a valid claim of infringement. Like the serial infringer in *MP3tunes*, Defendants' "willfulness warrants an award" of attorneys' fees. 2015 WL 13684546, at *2.

> **ii. Defendants forced Plaintiffs into this litigation and took objectively unreasonable, and often frivolous, legal and factual positions that increased the cost and complexity of the litigation.**

An award of attorneys' fees is justified because Defendants forced Plaintiffs into this litigation by taking wholly indefensible positions at countless turns. Once litigation commenced, Defendants needlessly inflated the costs and complexity of prosecuting the action. Amongst the *Fogerty* factors, "objective unreasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted." *Matthew Bender & Co. v. W. Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001); *see also Kirtsaeng*, 136 S. Ct. at 1989 (holding that substantial weight should be given to the objective reasonableness factor). "[C]laims that are

clearly without merit or otherwise patently devoid of legal or factual basis ought to be deemed objectively unreasonable." *MP3tunes,* 2015 WL 13684546, at *2.

Defendants' strategy of advocating meritless and often frivolous positions started before Plaintiffs filed their complaint and continued through trial. This was no accident. Defendants cycled through five rounds of counsel and each exhibited the same tendency to press *all* possible angles, regardless of, and often in spite of, their total lack of merit. As a result, Plaintiffs suffered endless, costly detours. *See Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.,* No. 3:13-CV-831 (GLS/DEP), 2018 WL 748871, at *2 (N.D.N.Y. Feb. 7, 2018) (granting fees and costs in copyright case where non-prevailing party "litigated this case in an unreasonable manner that exacerbated the issues to be resolved and the expenses incurred by all parties").

### 1. Defendants' pre-litigation conduct was outrageous.

In resolving Plaintiffs' 2007 counterfeiting suit, Defendants agreed in the 2008 Settlement Agreement that they would not infringe again. PX 127 at ¶ 5. Defendants' then lied about their counterfeiting activities, violated the forum-selection clause of the settlement agreement and forced Plaintiffs to file suit.

Immediately after settling, Defendants continued doing business with known counterfeiter Best Books World. TR at 823:17-824:10. Though Defendants had the right to send books to Plaintiffs for counterfeit inspection, they did so only once in the ten years that followed. PX 127 at ¶ 12; TR at 822:25-823:9. When faced with counterfeiting allegations from Follett and Texas Books in February 2011, Defendants claimed to be "dismayed" by the allegations, TR at 898:20-899:8, notwithstanding known receipt of counterfeits from Best Books World and the Blackerbys and a customer having accused Defendants of selling counterfeits. TR at 899:9-19. Rather than remove counterfeits from the stream of commerce, they bought more inventory from

Best Books World and sold them online to unsuspecting customers. PX 124. Plaintiffs only learned of Defendants' post-settlement counterfeiting on July 18, 2011—*the very same day* Plaintiffs' right to inspect Defendants' inventory under the settlement agreement expired. TR at 563:1-564:2. This seems more than coincidental.

Plaintiffs sent a cease-and-desist letter on Aug. 5, 2011 and tried for over a year to consensually resolve their claims. PX 199; Oppenheim Decl., ¶ 4. Defendants lied repeatedly in those negotiations. Neil Mooney, their counsel at the time, sent four separate letters baldly disclaiming Defendants' knowledge of any misconduct. PX 201 ("My client is unaware of selling or otherwise distributing any pirated or otherwise unauthorized copies of any books whatsoever."); PX 209 ("None of these books were sourced from parties who supplied any book at issue in the 2008 dispute."); PX 212 ("No new copies or any believed to have been supplied by Life Everest or Best Books are on hand."); PX 213 ("TextbooksRus absolutely has no knowledge of distributing books that infringe upon your clients' copyrights."). Mr. Smyres confirmed these assertions were false, or provided incredible testimony purporting to excuse them. TR at 927:24-934:12.

Defendants then went on the offensive, dragging Plaintiffs into court in Ohio on December 18, 2012, despite an unequivocal New York forum-selection clause in the 2008 Settlement Agreement. Oppenheim Decl., ¶ 4; PX 127 at ¶ 19. Defendants misrepresented to the Court under oath that they had no counterfeit books despite their certain knowledge of them by this time. Dkt(Ohio) 18 at 71:9-22. And they falsely claimed—again under oath—that they would not do business with someone who had previously sent them counterfeits, Dkt(Ohio) 18 at 44:19-45:6, a claim belied at trial by Mr. Smyres' testimony that Defendants continued buying

7

from Best Books World and the Blackerbys after learning each had sold Defendants counterfeits. TR at 827:14-828:1; 891:23-892:3.

**2. Defendants flagrantly disregarded the mandatory forum-selection clause in the 2008 Settlement Agreement.**

In filing suit in Ohio in December 2012, Defendants' flagrantly disregarded the mandatory New York forum-selection clause in the 2008 Settlement Agreement, spawning a series of briefs in separate courts and expensive and unnecessary litigation in Ohio. Plaintiffs had no choice but to defend that action and, given Defendants' bad faith and infringements, sue in this Court to vindicate their copyright, trademark and contract rights. Oppenheim Decl., ¶ 4.

The Settlement Agreement enjoins Defendants from, among other things, infringing Plaintiffs' copyrights through the "sales and importation into the United States of any pirated editions of any of Plaintiffs' textbooks." PX 127 at ¶ 5. "[T]he parties further agree that *any related dispute* shall be heard in the federal or state courts located in the State of New York, and expressly waive any objection as to venue and any claim of inconvenient forum with respect to a related dispute being heard within the State of New York." *Id.* at ¶ 19 (emphasis added). Defendants ignored that their initial complaint alleged breach of the settlement agreement and took the baseless position that even their declaratory judgment claim "make[s] no allegations related to the 2008 agreement." Dkt(Ohio) 1 at 10-12; 23 at 1.

Defendants later moved to transfer *BDB I* to Ohio on even more frivolous grounds, arguing "[t]his lawsuit is not related to the 2008 Settlement Agreement," Dkt(I) 20 at 11, although the complaint expressly alleged a breach of the injunction and forum-selection provisions in the 2008 Settlement Agreement. Dkt(I) 16 at 19. Defendants even took the absurd position that "the breach of Injunctive Relief provision claim . . . is in fact unrelated to the 2008 Settlement Agreement." Dkt(I) 20 at 11.

8

Unsurprisingly, the Court held "the disputes are clearly related" to the settlement agreement and "defendants expressly waived the right to object to the Southern District of New York as a venue." Dkt(I), 27 at 21. The Court granted summary judgment on Defendants' breach of the forum-selection clause and the jury found Defendants breached the injunction provision. Dkt(I) 281, adopted by Dkt(I) 351; Dkt(II) 414 at 16.

As Justice Scalia so aptly observed in *Bowen v. Massachusetts*, "[n]othing is more wasteful than litigation about where to litigate," 487 U.S. 879, 930 (1988) (Scalia, J. dissenting). By any measure, Defendants' position on and vexatious litigation over the forum-selection clause was meritless and wasteful. Plaintiffs were forced to brief the issue many times, hire Ohio counsel, incur travel costs and suffer the distraction and hassle of ancillary litigation.

### 3. Defendants' objectively unreasonable conduct continued unabated in litigation.

*Discovery obstruction*: Defendants repeatedly flouted their discovery obligations, stonewalling or providing incomplete information that required extra motions practice, depositions and Court intervention. Oppenheim Decl., ¶ 5. Plaintiffs were forced to seek Court intervention and the Court granted Plaintiffs' multiple requests for relief from Defendants' obstruction, including but not limited to:

- Compelling the deposition of Thomas Cahill, Defendants' managing agent responsible for overseas purchasing. Dkt(I) 56 at 25-26);
- Compelling complete and accurate purchase and sales records after piecemeal and inconsistent productions. Dkt(I) 70 at 49-50;
- Compelling inspections of Defendants' quarantined books after Defendants repeatedly represented to the Court they would permit that but then refused; and requiring Court intervention to later complete the inspection and for permission to take notes of book inspections, *e.g.*, Dkt(I) 56 at 53-55; 70 at 59-66; 98 at 15-20;

9

- Refusing to allow Plaintiffs' experts to review suspect counterfeit books in Defendants' quarantine. Dkt (I) 85 at 29-38;

- Sanctioning Defendants for their unjustified refusal to appear for the properly-noticed deposition of Mr. Smyres. Dkt(I) 98 at 2-7;

- Failing to disclose insurance coverage as required by Rule 26 until two years into litigation. Oppenheim Decl., ¶ 5;

- Refusing to meet-and-confer on a timely basis, resulting in two orders compelling discovery. Dkt(I) 217; 221;

- Hiding John Glass's ownership interests in *BDB I*, then disclosing it only after close of discovery in *BDB II*. Oppenheim Decl., ¶ 5;

- Pursuing baseless discovery in support of a first-sale defense involving *Plaintiffs*' alleged sale of counterfeits, for which Defendants never once showed a peppercorn of evidence, Dkt(II) 285.

*Refusal to stipulate*: Defendants refused to stipulate to basic facts that would have narrowed issues for trial, such as Plaintiffs' ownership and registration of their copyrights and trademarks. Oppenheim Decl., ¶ 6. Defendants offered no explanation for their refusal to do so, hiding only behind a vague claim of "trial strategy." Ex. 2. But at trial, Defendants asked exactly zero questions about ownership or validity. This tactic was objectively unreasonable given their prior admission in Requests for Admission that Plaintiffs owned approximately 60 of the copyrights. Defendants likewise refused to stipulate to basic background facts regarding the parties, the 2007-08 lawsuit and settlement, and authenticity of third-party documents. Oppenheim Decl., ¶ 6 and Exs. 2-3.

*Frivolous and overbroad objections*: Defendants objected to anything and everything at every stage of the case. For example, Plaintiffs tried to resolve all Roadmap disputes well in advance of trial to make for an orderly and predictable trial. Oppenheim Decl., ¶ 7. Defendants tried to frustrate that by failing to raise objections to documents underlying the Roadmap in five hours of conferrals or in their December 2017 letter to the Court on Roadmap disputes. *Id.*; Dkt(II) 281. This extended the duration of disputes over the Roadmap until the eve of trial

10

when, following additional briefing and argument, the Court overruled all of Defendants' *772 objections* to documents underlying the Roadmap.  Dkt(II) 371; Ex. 10 at 14-17.

Overall, Defendants objected to *87 percent* of Plaintiffs' exhibits, compared to Plaintiffs' objections to *23 percent* of Defendants' exhibits.  *See* Dkt(II) 363-5, 363-6.  With few exceptions, Defendants' objections were frivolous.  Defendants simply buried Plaintiffs and the Court in process without regard to the (lack of) merit of their positions.

*Unreasonable witness list*:  Defendants obscured their expected witnesses at trial by drowning Plaintiffs in a sea of alleged witnesses they never intended to call.  Their initial witness list included 49 live witnesses; Defendants called only 19.  Dkt(II) 187.  For months they included as a witness Neil Mooney, whom the Court long ago precluded as a witness.  Dkt(I) 298.  Several weeks before trial, they had still listed former employee Britt Wood, whom Plaintiffs learned Defendants had not spoken to in years.  And up to and through trial, they still listed Thomas Cahill, who lives in Australia, and for whom they obviously had not bought plane tickets.  Defendants also listed as witnesses and fought against exclusion of two experts (Wu and Hiller), then never called them.  This tactic required Plaintiffs to both designate dozens of depositions *and* prepare to cross-examine dozens of witnesses.  Oppenheim Decl., ¶ 8.  The Court admonished Defendants for this tactic: "when is the defendant going to seriously think about what witnesses they're actually calling as opposed to throwing a list in on this joint pretrial order that includes everybody you could possibly think of.  Is your mother-in-law on the list, because it really looks like it could be down to that[?]"  Dkt(II) 265 at 4.

*Handling of the Ohio Case*:  Defendants pursued the *Ohio Case* with their now-familiar tactics, only to voluntarily dismiss it after reneging on a near-final settlement and fighting to reinstate the case.  On the eve of that near-final settlement in the summer of 2014, the Court

provisionally discontinued both *BDB I* and the *Ohio Case* (which by then had been transferred to New York), with the right to reinstate the cases if needed. Dkt(I) 142; Dkt(Ohio) 76. When Defendants reneged on settlement, Plaintiffs reinstated *BDB I*. Dkt(I) 149.

Defendants did nothing, missed their deadline to restore the *Ohio Case*, then fought for reinstatement despite their neglect. Dkt(Ohio) 83. The Court reinstated the *Ohio Case* over Plaintiffs' objection, Dkt(Ohio) 86, then Defendants voluntarily dismissed the *Ohio Case* without explanation mere weeks later. Dkt(Ohio) 88. This was after nearly two years of litigation, three amended complaints, multiple motions to dismiss or transfer venue, the transfer of the case to New York, four months of settlement discussions involving numerous lawyers and a court-supervised mediation with Judge Gorenstein, and with preparation under way for oral argument on Plaintiffs' motion to dismiss the following week. Needless to say, the charade was costly to all parties, and Defendants' abrupt exit from the settlement sparked another four years of litigation and a substantial jury verdict. Oppenheim Decl., ¶ 9.

> **4. Defendants were sanctioned for their unreasonable approach to discovery on their corporate structure and finances.**

For more than five years, Defendants pursued an obstructionist and indefensible approach to discovery of their most basic corporate structure and finances, resulting in literally dozens of briefs, *13* orders compelling discovery, and ultimately sanctions. Defendants' corporate structure and finances are basic, core information Defendants had no reasonable basis to withhold and yet they guarded it like Fort Knox. The true nature of their business and finances are still unknown—which is troubling in the face of $34.2 million in damages. As the Court explained in granting sanctions, "[t]he ***staggering*** number of times that this Court and Magistrate Judge Gorenstein had to order defendants to produce further discovery leads this Court to conclude that defendants' omissions were ***not accidental***." TR at 2814:9-14 (emphasis added).

Defendants' well-documented history of discovery abuses, set forth in detail in multiple sanctions briefs, Dkt(II) 175, 241, 361, 372, captures the sheer unreasonableness of Defendants' conduct. Those abuses date to early in *BDB I*, when the Court compelled Defendants in September 2013 to disclose the most basic information about their businesses and related entities. Dkt(I) 37. Repeating history, Defendants refused to disclose all their businesses in *BDB II*, and the Court again compelled it. Dkt(II) 47 at 6-7, 64-65. Though Defendants agreed to "produce documents sufficient to show the defendants' beneficial owners," *id.* at 83, they withheld that information, only to produce it on the eve of trial nearly a year later. Oppenheim Decl., ¶ 10.

In *BDB I*, Plaintiffs were forced to file four motions to compel production of financial records, each of which the Court granted. Dkt(I) 37, 40, 70 at 20-27, 85 at 19-25. The parties then stipulated in lieu of more financial discovery, but that too was a ruse, as Defendants tried to renege. Oppenheim Decl., ¶ 10. The Court found that "Mr. Smyres was ***selfishly cavalier*** about the consequences his refusal would have for the progress of his lawsuit, and thus ***his conduct was without substantial justification***." Dkt(I) 180 (emphasis added). The Court explained "that Mr. Smyres has not justified his refusal to sign the stipulation given that he had agreed to do so and his counsel repeatedly raised this agreement, including in statements made to the Court, to avoid what would have been significant discovery obligations." *Id.* Eve-of-trial financial disclosures three years later would undermine the stipulation. Oppenheim Decl., ¶ 10.

Defendants stonewalled again in *BDB II*, requiring four more orders compelling production of documents, Dkt(II) 47 at 81, 91 at 103-06, 118 at 90-91, 127, and an order compelling a second deposition of Defendants' CFO. Dkt(II) 122. The still-inadequate discovery and looming prejudice at trial led to Plaintiffs' first sanctions motion on these issues.

Dkt(II) 175. When the trial date was continued shortly thereafter, the Court invited additional discovery in hopes of resolving the sanctions motion. Defendants misrepresented to the Court that they were "happy to do" additional discovery, Dkt(II) 289 at 70, but then refused to produce any documents or appear for a deposition. Defendants' frivolous obstructions resulted in three more successful motions to compel production of documents and a deposition. Dkt(II) 293 at 116, 128, 143 (ordering document productions); 309 (ordering deposition); 317 (rejecting request to unduly limit the deposition). It also caused distracting and costly eve-of-trial expert reports and depositions. Oppenheim Decl., ¶ 10.

Only then, despite five years of litigation and dozens of disputes over Defendants' corporate structure and finances, did Plaintiffs uncover two hidden bombshells: a secret owner, John Glass, and a sham rental arm, Matasa Agila Holdings, LLC—the latter of which only came to light through an anonymous informant. Oppenheim Decl., ¶ 10. This misconduct went far beyond objectively unreasonable—it was willful, in bad faith and appropriately sanctioned. Defendants' misconduct burdened Plaintiffs and the Court with an onslaught of ancillary litigation at great cost to Plaintiffs, for which Defendants must be held to account.[1]

### 5. Defendants' frivolous approach to affirmative defenses exemplifies objective unreasonableness.

---

[1] This egregious conduct followed on the heels of similar misconduct by Defendants' counsel. In at least *two* cases in the last 20 months, parties represented by Mandel Bhandari LLP (the same defense counsel in this case) were sanctioned for willfully violating their discovery obligations and defying court orders, and in a third case were admonished for their "appalling and unprofessional" conduct. *See Scantibodies Lab., Inc. v. Church & Dwight Co.*, No. 14-cv-2275 (JGK)(DF), 2016 U.S. Dist. LEXIS 154396, at *61 (S.D.N.Y. Nov. 4, 2016), *report and recommendation adopted by* 2017 U.S. Dist. LEXIS 21223 (S.D.N.Y. Feb. 15, 2017) (imposing sanctions for willfully withholding financial information bearing on damages, misrepresenting information, and failing to comply with discovery orders); *Ronnie Van Zant v. Pyle*, 270 F. Supp. 3d 656, 670-71 (S.D.N.Y. 2017) (ordering adverse inference instruction as sanction for failing to preserve evidence in the hands of a non-party individual under the defendants' control); *see also Yukons Capital v. Feldman*, No. 15-cv-4964 (S.D.N.Y. Sept. 22, 2016) (LAK) (ECF Nos. 235 and 240) (describing Mandel Bhandari LLP's behavior as "appalling and unprofessional").

Defendants' repeated attempts to raise frivolous affirmative defenses illustrates Defendants' objectively unreasonable positions taken throughout these cases. After the close of discovery in *BDB I*, Defendants amended their Answer to add approximately two dozen new affirmative defenses, claiming none would require new discovery. Dkt(I) 279 at 1. The Court ordered Defendants to submit proposed jury instructions and factual contentions and further ordered that Defendants "<u>shall be precluded</u> from seeking any jury instruction for which Defendants did not provide a proposed jury instruction." Dkt(I) 293 (emphasis in original).

Defendants' submissions demonstrated they lacked a shred of evidence on every defense. Dkt(I) 283. Defendants did not bother defending several affirmative defenses in the briefing that followed and the Court granted summary judgment on all but one affirmative defense for which Defendants sought a jury instruction. Dkt(I) 361, *adopted in part by* Dkt(I) 367.

*BDB II* was déjà vu all over again. This time, Defendants pled ***fifty-two*** affirmative defenses, notwithstanding the preclusive effect of prior rulings and the Court's instruction that *BDB II* should be cabined. Dkt(II) 33. Many defenses were frivolous on their face. Defendants pled a lack of subject-matter jurisdiction in this federal case under the Copyright and Lanham Acts and alleged that Plaintiffs' claims were precluded by the First Amendment. In this case about physical counterfeits, Defendants even pled a defense under the ***Digital*** Millennium Copyright Act. Through repeated briefing and charge conferences on Defendants' frivolous defenses, the Court struck all but one for which they sought jury instructions. Dkt(II) 285 at 4-6; TR at 3097-3132 (final jury instructions as delivered).

Defendants' first-sale defense in *BDB II* bears special mention. Ignoring the preclusive effect of summary judgment excluding it in *BDB I*, Defendants resurrected the defense in *BDB II*. This legal position is objectively unreasonable because the first-sale defense does not apply

15

to counterfeits, but only to "lawfully made" goods. 17 U.S.C. § 109(a); *Impression Prods. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1527 (2017); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 535 (2013) (explaining that the phrase "lawfully made under this title" in 17 U.S.C. § 109(a) means that first-sale protection applies only to works that are "not pirated"). Defendants nevertheless used this as a bludgeon to expand discovery exponentially. Oppenheim Decl., ¶ 11.

Defendants' factual position on this defense was equally tenuous. After the close of discovery, and skeptical of Defendants' representation that they had evidence to support the defense, the Court ordered Defendants to "lay[] out what the evidence is of specific titles that are at issue in this case." Dkt(II) 289 at 42:23-25, 43:23. In response, "Defendants failed to do so," Dkt(II) 285 at 5, offering only a speculative daisy-chain of "what ifs," *see* Dkt(II) 273, confirming they had no supporting evidence and that their representation to the Court that *Plaintiffs* ever sold counterfeits was false. The defense, like so many others, was stricken.

### 6. Defendants' obsessively re-litigated the MBS and Chegg summaries.

Defendants' obsessive effort to infect the jury with misleading and unfounded evidence regarding MBS's data exemplifies Defendants' litigation tactics. Years after waiving their right to serve a "counter-Roadmap" and failing to authenticate two spreadsheets produced by MBS in *BDB I*, Defendants extorted a Rule 902(11) certification larded with inadmissible hearsay on procedurally improper grounds. Defendants obtained the certification by foregoing a narrow, post-discovery *BDB II* deposition that Judge Gorenstein reluctantly allowed, then used the certification as the foundation for an inaccurate and argumentative Rule 1006 summary. Oppenheim Decl., ¶ 12. The Court appropriately rejected the summary as both based on inadmissible hearsay and as "grossly misleading," but gave a more neutral MBS Summary a lifeline if Defendants could lay a proper foundation. Dkt(II) 370 at 4-7.

Like a dog with a bone, Defendants would not relent.  They served an improper trial subpoena on MBS to appear at a court in Missouri, forcing the parties, the Court and third-party MBS to drown in briefs and argument on MBS-related issues *ad nauseam*.  Oppenheim Decl., ¶ 12.  Defendants' counsel even questioned the truth and accuracy of MBS's affiant in signing the Rule 902(11) certification that Defendants requested.  TR at 703.   The Court finally had enough, explaining that "for the third or fourth, but certainly the final time, defendants' application to admit the MBS summary is denied."  TR 2071:8-20.

Defendants also obsessively litigated their inadmissible Chegg Summary and improperly injected it into trial several times.  After the Court rejected the summary, Dkt(II) 370 at 4, Defendants sought to use their financial expert as a human calculator to elicit precisely the same information contained within the excluded summary, TR at 2570-2594, then flagrantly disregarded the Court's admonition not to argue the Chegg Summary percentages in closing, TR at 3096:5-10, risking prejudicial infection of the jury both times.  Oppenheim Decl., ¶ 13.

### iii. Awarding Plaintiffs' fees would promote the enforcement of rights by copyright holders.

Plaintiffs' enforcement efforts served a further purpose of § 505—namely, to encourage copyright owners to enforce their rights.  *See Design Tex Grp., Inc. v. U.S. Vinyl Mfg. Corp.*, No. 04 Civ. 5002 (JSR), 2005 WL 2063819, at *3 (S.D.N.Y. Aug. 24, 2005) ("[I]t is essential to encourage copyright owners to bring such suits and make clear that willful infringers cannot act with impunity.").  Encouraging enforcement is vital to "[t]he primary objective of the Copyright Act[, which] is to encourage the production of original literary, artistic, and musical expression for the good of the public." *Fogerty*, 510 U.S. at 524.  That incentive is whittled away when parties infringe, as Defendants did here.

**C.**     **Plaintiffs are entitled to attorneys' fees and costs in connection with Defendants' willful trademark infringements**

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Historically, the Second Circuit has held that a case may be "exceptional" where it involves "fraud or bad faith or willful infringement." *Penshurst Trading Inc. v. Zodax L.P.*, 652 F. App'x 10, 11–12 (2d Cir. 2016) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012)). More recently, courts have applied a less stringent standard to find a case "exceptional" under the Supreme Court's ruling in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749 (2014). Under *Octane Fitness*, given the "totality of the circumstances," an exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* at 1756; *see also Penshurst Trading*, 652 F. App'x at 11–12. The *Octane Fitness* standard applies the familiar *Fogerty* analysis from the copyright context. 134 S.Ct. at 1756.[2]

---

[2] In *Octane Fitness*, the Supreme Court interpreted parallel language in the Patent Act, 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). The Court rejected a "bad faith" or "willfulness" standard and held that a case may be exceptional even without proof of such culpable intent. *Octane Fitness,* 134 S.Ct. at 1756. Most courts that have addressed the issue since *Octane Fitness*, including courts in this District, have held that the Supreme Court's decision applies to fee applications under the Lanham Act as well. *See, e.g.*, *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (en banc) (per curiam); *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314-15 (3d Cir. 2014); *Lightbox Ventures, LLC v. 3rd Home Ltd.*, No. 16CV2379(DLC), 2018 WL 1779346, at *16 (S.D.N.Y. Apr. 13, 2018); *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 46 (S.D.N.Y. 2015). The Second Circuit has not yet resolved the question, opting twice to defer it. *See Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 16 (2d Cir. Nov. 8, 2017); *Penshurst* Trading, 652 F. App'x. at 12.

This case is exceptional under either standard. The *Fogerty* factors are the same here as in the copyright context and, as there, heavily favor an award of fees and costs under *Octane Fitness*. But even under the older standard, the case is no doubt exceptional given the jury's unanimous finding of willful infringement and Defendants' lengthy history of vexatious litigation conduct described above. And by awarding Plaintiffs the maximum statutory damages on all trademarks, the jury signaled loud and clear that the question of Defendants' willfulness was not even close.

Courts faced with willful trademark infringement (and case records that pale in comparison) routinely dub them exceptional and award attorneys' fees and costs. *See, e.g.*, *Louis Vuitton,* 676 F.3d at 111 (affirming fee award for willful trademark infringement and noting that "[s]ome of the allegedly unnecessary work in fact resulted from the defendants' own dilatory treatment of Louis Vuitton's discovery requests"); *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12CV1416 (GBD) (RLE), 2016 WL 8458987, at *7 (S.D.N.Y. Aug. 12, 2016), *R&R adopted*, 2016 WL 5409482 (S.D.N.Y. Sept. 28, 2016) ("infringement was willful, and an award of attorneys' fees is warranted"); *see also Dropbox, Inc. v. Thru Inc.*, No. 17-15078, 2018 WL 1940122, at *2 (9th Cir. Apr. 25, 2018) (affirming finding that trademark case was exceptional and awarding more than $2.3 million in attorneys' fees and costs where defendant filed frivolous motion to dismiss, gave inaccurate discovery responses and asserted counterclaims wholly lacking in merit).

## II. THE ATTORNEYS' FEES PLAINTIFFS SEEK ARE REASONABLE.

The proper starting point for determining the presumptive reasonable fee is the 'lodestar' amount, which is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011). Where

the party seeking fees establishes that both the hours and rates are reasonable, there is a "'strong presumption' that the lodestar represents the reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). The presumption may be overcome only in "exceptional" and "rare circumstances" based on "specific evidence." *Perdue v. Kenny A.*, 559 U.S. 542, 554 (2010).

Plaintiffs' requested lodestar amount is reasonable by any standard. Early in the retention, Plaintiffs and counsel agreed on a discounted rate and success fee for counsel. Oppenheim Decl., ¶ 19. Pursuant to that arrangement, Plaintiffs have already paid substantial fees and additionally will pay counsel a percentage of any recovery, which, based on the jury verdict, will exceed the lodestar amount sought here. Plaintiffs also are not seeking any type of multiplier on their lodestar calculation, as they might, but rather seek a straight lodestar award at their ordinary rates. And, as explained below, the fee request and billing records reflect deductions of more than $300,000 in fees that Plaintiffs excluded to ensure their reasonableness.

In sum, Plaintiffs seek an award of attorneys' fees based on their lodestar in the amount of $5,910,116.72 (the "Fee Amount"), which consists of fees billed from December 2012 through April 2018 covering both *BDB I* and *BDB II* and certain fees from the *Ohio Case*. Oppenheim Decl., ¶ 20. Given the duration of these cases and manner in which Defendants litigated them, the accompanying Oppenheim Declaration and exhibits thereto demonstrate that the Fee Amount is entirely reasonable.[3]

---

[3] Plaintiffs seek a cumulative award of fees based on three separate bases: contract damages and as the prevailing party on their copyright and trademark claims. The fees expended on those respective claims cannot be disaggregated or assigned to the different causes of action because all efforts combined to prove all claims. To the extent the Court must assign a specific amount for contract damages for Defendants' contract breaches, the full Fee Amount should be awarded, but such order should also confirm that the fees are warranted on all three bases.

### A. The Rates of Plaintiffs' Counsel Are Reasonable.

Rates are deemed reasonable when they are in line with the rates prevailing in the district for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Regulatory Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC*, No. 13 Civ. 2493 (KBF), 2014 WL 4792082, at *1 (S.D.N.Y. Sept. 24, 2014). Plaintiffs' counsel, Oppenheim + Zebrak, LLP ("O+Z"), is a boutique firm specializing in copyright and trademark enforcement matters and its attorneys are skilled litigators in the field with many years of relevant experience. Oppenheim Decl., ¶ 14. The qualifications and billing rates for each member of the litigation team are referenced in the Oppenheim Declaration and accompanying exhibits. *Id.*, ¶¶ 21-22. O+Z knows Plaintiffs' businesses well, and has represented Plaintiffs to protect their copyrights and trademarks for over seven years, and regularly represent copyright owners in protecting their rights. *Id.*, ¶ 18. Based in Washington, D.C., O+Z attorneys regularly litigate on behalf of Plaintiffs in New York, as well as in federal courts nationwide. *Id.* ¶ 18.

The Fee Amount was calculated using O+Z's hourly rates as follows: $375 to $540 for partners; $325 to $465 for senior counsel; $175 to $430 for associates; and $100 to $245 for paralegals and specialists.[4] O+Z's hourly rates are intentionally set at below-market levels in order to provide extra value to clients. *Id.* ¶ 21. These rates are more than reasonable when compared to hourly rates awarded by New York or D.C. courts (and elsewhere) in copyright cases. For example, in 2015, this Court awarded $2,740,516 in fees (on a $12 million judgment) to prevailing copyright plaintiffs in *Capitol Records, Inc. v. MP3tunes, LLC*. No. 07cv9931, 2015 WL 7271565, at *3-4, 6 (S.D.N.Y. Nov. 12, 2015). In doing so, this Court found hourly rates up to $720 per hour for partners, $562 per hour for of-counsel, and $397 for associates to be

---

[4] Between 2012 and 2018, O+Z's rates increased modestly each year.

"within the range of what is considered reasonable." *Id.* at \*17. Notably, the fee award in the

single *MP3tunes* case for a single plaintiff group is proportionally less than Plaintiffs seek here

for four different publishing houses and two separate cases.

Plaintiffs in *MP3tunes* were represented by Jenner & Block, LLP, where Matthew

Oppenheim, Plaintiffs' lead counsel in this case, was formerly a partner and co-chaired its

Entertainment and New Media practice. Oppenheim Decl. ¶ 16. Other cases in this District have

followed suit. *See, e.g. Regulatory Fundamentals Grp.*, 2014 WL 4792082, at \*2 ("In recent

years, New York district courts have approved rates for experienced law firm partners in the

range of $500 to $800 per hour . . . [and] for law firm associates in the range of $200 to $450 per

hour.") (collecting cases); *Beastie Boys*, 112 F. Supp. 3d at 55-56 (approving rate of $675 for

three "experienced partners in copyright cases," and $461 and $505 for second- and fourth-year

associates); *Sub-Zero, Inc. v. Sub Zero N.Y. Refrigeration & Appliances Servs., Inc.*, No. 13-cv-

2548 (KMW) (JLC), 2014 WL 1303434, at \*8-9 (S.D.N.Y. Apr. 1, 2014) (collecting cases and

accepting rates of $785 and $485 for experienced attorneys in trademark case).

O+Z's hourly rates are also reasonable compared to established attorney rates in the

District of Columbia. Ex. 8 (USAO Attorney's Fees ("*Laffey*") Matrix – 2015-2018, providing

for purposes of recovering reasonable attorney's fees under a fee-shifting statute, that a

reasonable rate in D.C. for attorneys with 2 years or less experience is $302/hour, and reasonable

rates for more senior attorneys range from $536/hour to $602/hour); *see also Brown v. District of

Columbia*, 80 F. Supp. 3d 90, 96 (D.D.C. 2015) ("The purpose of the *Laffey* Matrix is to

determine the reasonableness of the fees sought.").[5]

---

[5] The Fee Amount also incorporates fees incurred by Ohio local counsel, whom Plaintiffs
retained to defend against the *Ohio Case*. Local counsel's hourly rate ranged from
approximately $290 to $400 per hour. Oppenheim Decl., ¶ 30 and Ex. 6.

**B.     The Number of Hours Counsel Expended Was Reasonable.**

In determining the reasonableness of hours expended by counsel, the question is whether, "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). A district court should look to "its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992).

Plaintiffs' reviewed their billing entries prior to submitting them to the Court to ensure they were reasonable and not excessive, redundant, or otherwise unnecessary. All work reflected in the time records was necessary and justified to obtain a finding of liability with respect to Defendants' willful infringement and contractual breaches, to address Defendants' meritless arguments and obstinate and unreasonable conduct, and in light of the harm to Plaintiffs resulting from Defendants' infringing activities, which would have continued unabated but for this litigation. Oppenheim Decl. ¶ 26.

The Oppenheim Declaration sets forth numerous categories of work for which Plaintiffs do not seek attorneys' fees, including fees relating to settlement efforts, administrative tasks, claims dismissed in *BDB I*, and claims in the *Ohio Case* arguably unrelated to Plaintiffs' infringement claims or the 2008 Settlement Agreement. In sum, Plaintiffs voluntarily excluded approximately $347,039.11 in fees. Oppenheim Decl. ¶¶ 29-31.

The Oppenheim Declaration also attaches as Exhibits 4 and 5 itemized billing records identifying the date worked, time billed, individual or "timekeeper" performing the work, hourly rate, a description of the work performed, and the length of time spent in connection therewith. Ex. 4 (*BDB I* and *BDB II*); Ex. 5 (*Ohio Case*). These billing records are an aggregate of the

contemporaneous daily time records maintained by attorneys, paralegals and specialists and provided to Plaintiffs on a monthly basis with invoices. Oppenheim Decl., ¶¶ 23-25. Plaintiffs have also provided a summary analysis at Exhibit 7 that breaks down the Fee Amount by total hours spent by each person and his/her respective hourly rates. Ex. 7.

The hours reflected in Plaintiffs' requested Fee Amount were reasonably expended in pursuing Plaintiffs' claims against Defendant in this case. As an initial matter, there are four Plaintiffs who have asserted claims against multiple Defendants in multiple cases. Collectively, the cases spanned more than five years and resulted in a three-week jury trial. Although Plaintiffs were able to take advantage of many efficiencies in jointly pursuing their claims in this case, some areas required four times the effort than had there been just one plaintiff, such as written discovery, document collection and review and depositions of Plaintiffs' representatives. Oppenheim Decl., ¶¶ 26-27.

The Fee Amount also reflects that, though O+Z is located in in Washington, D.C., several of its attorneys are members of the New York and S.D.N.Y bars and thus no local counsel was needed. And while counsel regularly travelled to New York for hearings, depositions and meetings, counsel only billed time spent actually working in transit to New York (as opposed to all time in transit). *Id.* ¶ 22. The hours also reflect the additional time and costs expended by Plaintiffs in having to deal with Defendants' revolving door of five sets of lead counsel. *Id.* ¶ 28.

Moreover, as detailed at length above, Defendants' abusive litigation conduct required Plaintiffs to expend far more time and effort than otherwise necessary. Counsel's efforts were productive and valuable, as the sizable jury verdict Plaintiffs obtained demonstrates.

24

### III. PLAINTIFFS ARE ENTITLED TO REASONABLE COSTS.

As prevailing parties on their copyright and trademark claims, Plaintiffs are entitled to recover their full costs, 17 U.S.C. § 505; 15 U.S.C. 1117(a), including "reasonable out-of-pocket" expenses incurred during litigation as part of their attorneys' fee award. *See Berry v. Deutsche Bank Trust Co. Ams.*, 632 F. Supp. 2d 300, 304-06 (S.D.N.Y. 2009) (Pauley, J.) (noting that courts have discretion to allow full cost recovery in an action brought under the Copyright Act); *GAKM Res. LLC v. Jaylyn Sales Inc.*, No. 08 Civ. 6030 (GEL), 2009 WL 2150891, at *10 (S.D.N.Y. May 21, 2009) (R&R noting that filing fees, service fees, and transportation expenses are the types of routine costs awarded to prevailing parties in trademark and copyright infringement actions). Under 28 U.S.C. § 1920, Plaintiffs are entitled to their "taxable costs," a subset of full costs.

Plaintiffs are seeking a total of $852,493.43 in costs incurred through April 2018 that were necessary for the litigation of these cases. Oppenheim Decl., ¶ 38 and Ex. 9. These costs include deposition transcripts, filing and service fees, court transcripts, e-discovery, experts, trial costs, investigatory work, legal research (Lexis), printing and shipping, travel and miscellaneous itemized costs. *See MP3tunes, LLC*, 2015 WL 7271565, at *6 (awarding "reasonable out-of-pocket" costs, including e-discovery, photocopying, legal and database research, outside duplication and printing services, and travel).

As with attorneys' fees, Plaintiffs are not seeking costs related to settlement efforts or internal administrative items. Plaintiffs' requested costs are itemized and substantiated in Exhibit 9 to the Oppenheim Declaration. Plaintiffs continue to incur additional attorneys' fees and expenses as this case continues and reserve the right to submit a supplemental request for fees and costs incurred after April 2018.

Dated: May 18, 2018 By:  */s/*    *Matthew J. Oppenheim*

Matthew J. Oppenheim
Jeffrey M. Gould
Julie C. Chen
Corey Miller
OPPENHEIM + ZEBRAK, LLP
5225 Wisconsin Avenue NW, Suite 503
Washington, DC 20015
Tel: 202.480.2999
Fax: 866.766.1678

*Attorneys for Plaintiffs*