**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CENGAGE LEARNING, INC., MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC, and PEARSON EDUCATION, INC., | Case No. 1:16-cv-07123 (WHP) (GWG) |
| Plaintiffs, | Judge William H. Pauley III |
| v. | |
| BOOK DOG BOOKS, LLC d/b/a TEXTBOOKRUSH and TEXTBOOKSRUS, APEX MEDIA, LLC, AND ROBERT WILLIAM MANAGEMENT, LLC, | |
| Defendants. | |
| JOHN WILEY & SONS, INC., CENGAGE LEARNING, INC., and PEARSON EDUCATION, INC., | Case No. 1:13-cv-00816 (WHP) (GWG) |
| Plaintiffs, | Judge William H. Pauley III |
| v. | |
| BOOK DOG BOOKS, LLC and PHILIP SMYRES, | |
| Defendants. | |

**DECLARATION OF MATTHEW J. OPPENHEIM**

I, Matthew J. Oppenheim, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am counsel for Plaintiffs Cengage Learning, Inc. ("Cengage"), McGraw-Hill Global Education Holdings, LLC ("McGraw-Hill"), Pearson Education, Inc. ("Pearson"), and John Wiley & Sons, Inc. ("Wiley") (collectively, "Plaintiffs" or "Publishers").  I submit this declaration in support of Plaintiffs' Motion For Attorneys' Fees and Costs (the "Motion") in the above-referenced actions brought by Plaintiffs against Defendants, including Philip Smyres, Book Dog Books LLC ("BDB"), and other entities owned by Mr. Smyres, Case No. 1:13-cv-00816 (WHP)(GWG) ("*BDB I*"), and Case No. 1:16-cv-7123 (WHP)(GWG) ("*BDB II*"), as well as for the lawsuit brought by BDB in Ohio, subsequently transferred to this Court and then voluntarily dismissed by BDB, *Book Dog Books, LLC v. Cengage Learning,* Case No. 1:13-cv-06413 (WHP)(GWG) ("*Ohio Case*").

2.    I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently hereto.

3.    Attached hereto are true and correct copies of the following:

| Exhibit | Description | Admitted At |
|---------|-------------|-------------|
| Exhibit 1 | Excerpts of Trial Transcripts "TR") | n/a |
| Exhibit 2 | Oct. 2017 Email from Mandel to Gould | n/a |
| Exhibit 3 | Plaintiffs' Proposed Stipulations | n/a |
| Exhibit 4 | Aggregate of O+Z billings for *BDB I* and *BDB II* from Dec. 2012 through April 2018 | n/a |
| Exhibit 5 | Aggregate of O+Z billings for the *BDB Ohio Case* | n/a |
| Exhibit 6 | Aggregate of Ohio local counsel billings for *BDB Ohio Case* | n/a |
| Exhibit 7 | Summary of O+Z billings for *BDB I, BDB II* and *BDB* | n/a |

|  | *Ohio Case* |  |
|---|---|---|
| Exhibit 8 | USAO Attorney's Fees matrix, 2015-20118 for D.C. | n/a |
| Exhibit 9 | Aggregate of costs billed through April 2018 | n/a |
| Exhibit 10 | March 16, 2018 hearing excerpt | n/a |
| PX 124 | Nov. 27, 2007 Email from Smyres to Wood | TR 811 |
| PX 127 | 2008 Settlement Agreement (Redacted) | TR 191 |
| PX 199 | Aug. 5, 2011 Cease & Desist Letter (Redacted) | TR 267 |
| PX 201 | Aug. 2011 Email from Mooney to O+Z | TR 274 |
| PX 209 | Oct. 26, 2011 Email from Mooney to O+Z | TR 278 |
| PX 212 | Nov. 4, 2011 Letter from Mooney to O+Z | TR 280 |
| PX 213 | Nov. 22, 2011 Letter from Mooney to O+Z (Redacted) | TR 286-87 |

**A. Defendants' Objectively Unreasonable Litigation Conduct**

4.    *Defendants forced this litigation*:  After sending Defendants a cease and desist notice on Aug. 5, 2011, Plaintiffs attempted in good-faith to negotiate a consensual resolution of their claims, to no avail.  More than a year into those discussions, Defendants abruptly sued Plaintiffs in Ohio on December 18, 2012, notwithstanding their agreement that such claims would occur in New York.  Plaintiffs had no choice but to defend that action and, given Defendants' bad-faith and infringements, file suit in the Southern District of New York to vindicate their copyright, trademark and contract rights.

5.    *Discovery obstruction*:  Defendants repeatedly flouted their discovery obligations, stonewalling or providing incomplete information that required extra motions practice, depositions and Court intervention.  To cite some illustrative, but by no means exhaustive examples, Plaintiffs were forced to seek Court intervention and the Court

3

granted Plaintiffs' multiple requests for relief from Defendants' unjustified obstruction, including:

- Compelling the deposition of Thomas Cahill, Defendants' managing agent responsible for overseas purchasing. Dkt(I) 56 at 25-26;

- Compelling complete and accurate purchase and sales records after piecemeal and inconsistent productions. Dkt(I) 70 at 49-50;

- Compelling inspections of Defendants' quarantined books after Defendants repeatedly represented to the Court they would permit that but then refused; and requiring Court intervention to later complete the inspection and for permission to take notes of book inspections, *e.g.*, Dkt(I) 56 at 53-55; 70 at 59-66; 98 at 15-20;

- Refusing to allow Plaintiffs' experts to review suspect counterfeit books in Defendants' quarantine. Dkt (I) 85 at 29-38;

- Sanctioning Defendants for their unjustified refusal to appear for the properly-noticed deposition of Mr. Smyres. Dkt(I) 98 at 2-7;

- Failing to disclose insurance coverage as required by Rule 26 until two years into litigation;

- Refusing to meet-and-confer on a timely basis, resulting in two orders compelling discovery. Dkt(I) 217; 221;

- Hiding John Glass's ownership interests in *BDB I*, then disclosing it only after close of discovery in *BDB II*. Oppenheim Decl., ¶ 5;

- Pursuing baseless discovery in support of a first-sale defense involving *Plaintiffs'* alleged sale of counterfeits, for which Defendants never once showed a peppercorn of evidence, Dkt(II) 285;

- Defendants refused to cooperate in the simplest of tasks, such as allowing Plaintiffs to complete a book inspection that was interrupted by a snowstorm, providing the current address of a former employee, or disclosing that they had no intention of calling numerous witnesses they repeatedly listed.

6.      *Refusal to stipulate*: Defendants refused to stipulate to basic facts that would have narrowed issues for trial, including, for example, Plaintiffs' ownership and registration of their copyrights and trademarks. Plaintiffs asked Defendants many times for the basis for their refusal to so stipulate in the face of valid registrations. Defendants offered no explanation, hiding instead behind a vague claim of "trial strategy." At trial,

4

Defendants asked exactly zero questions about ownership or validity. Defendants refusal to stipulate to ownership and registration was objectively unreasonable, particularly given their prior admission in Requests for Admission that Plaintiffs owned approximately 60 of them. Defendants likewise refused to stipulate to basic background facts regarding the parties, the 2007-08 lawsuit and settlement, and authenticity of third-party documents. *See* Exs. 2-3.

7.    *Frivolous and overbroad objections*: Defendants objected to anything and everything at every stage of the case in an effort to delay and obscure. For example, Plaintiffs tried to resolve all Roadmap disputes well in advance of trial to make for an orderly and predictable trial. Defendants ignored that and failed to raise objections to documents underlying the Roadmap in five-hours of conferrals or in their December 2017 letter to the Court on Roadmap disputes.

8.    *Unreasonable witness list*: Defendants obscured their expected witnesses at trial by drowning Plaintiffs in a sea of alleged witnesses they never intended to call. For months they included as a witness Neil Mooney, whom the Court long ago precluded as a witness. Several weeks before trial, they had still listed former employee Britt Wood, who Plaintiffs learned that Defendants had not spoken to in years. And up to and through trial, they still listed Thomas Cahill, who lives in Australia, and for whom they had obviously had not bought plane tickets. Defendants also listed as witnesses and fought against exclusion of two experts (Wu and Hiller), then never called them. This tactic required Plaintiffs to both designate dozens of depositions *and* prepare to cross examine countless witnesses.

9.    *Handling of the Ohio case*: Defendants' pursued the *Ohio Case* with their now-familiar tactics, only to voluntarily dismiss it after reneging on a near-final settlement and fighting to reinstate the case.  Plaintiffs attempted settlement negotiations throughout the cases, but Defendants repeatedly rebuffed and reneged.  They dismissed the *Ohio Case* after nearly two years of litigation, three amended complaints, multiple motions to dismiss or transfer venue, the transfer of the case to New York, four months of settlement discussions involving numerous lawyers and a court-supervised mediation with Judge Gorenstein, and with preparation under way for oral argument on Plaintiffs' motion to dismiss the following week.  Needless to say, the charade was costly to all parties and Defendants' abrupt exit from the settlement sparked another four years of litigation and substantial jury verdict.

10.    *Defendants' sanctioned financial discovery*:

a. In *BDB I*, Plaintiffs were forced to file four motions to compel financial records, each of which the Court granted.  Those production led to a stipulation in lieu of more financial discovery but that too was a ruse as Defendants tried to renege.  Defendants finally stipulated after Plaintiffs sought Court intervention, but eve-of-trial financial disclosures three years later would undermine the stipulation.

b. Defendants' continued obstruction of financial discovery and violations of court orders resulted in distracting and costly eve-of-trial expert reports and depositions.

c. After hiding Defendants' true ownership structure for five years, Defendants disclosed John Glass's ownership interest on the eve of trial, after the close of discovery in *BDB II*, and after Plaintiffs filed their first sanctions motion.

d. Plaintiffs learned Defendants' sham rental arm, Matasa Agila Holdings, LLC, after the close of discovery in *BDB II* through a tip from an anonymous informant.

e. Defendants' misconduct burdened Plaintiffs and the Court with an onslaught of ancillary litigation at great cost to Plaintiffs, for which Defendants must now be held to account.

11. *Frivolous approach to affirmative defenses*: Defendants asserted the proverbial kitchen sink of affirmative defenses and continued to do so in *BDB II* notwithstanding preclusive rulings dismissing them in *BDB I*. Defendants' first-sale defense in *BDB II* bears special mention. Ignoring the preclusive effect of summary judgment excluding it in *BDB I*, Defendants resurrected the defense in *BDB II* based on the unfounded theory that Plaintiffs sell counterfeit textbooks, and *if* Defendants sold those same textbooks thereafter, the first-sale doctrine would insulate them from liability. Defendants then used this and other defenses as a bludgeon to expand discovery exponentially.

12. *Obsessive re-litigation of MBS Summary*: Defendants' obsessive effort to infect the jury with misleading and unfounded evidence regarding MBS data is another prime example of Defendants' troubling litigation tactic. Years after waiving their right to serve a "counter-Roadmap" and failing to authenticate two spreadsheets produced by MBS in *BDB I*, Defendants extorted a Rule 902(11) certification on procedurally improper grounds and larded it with inadmissible hearsay. Defendants obtained the certification by promising to forego a narrow, post-discovery *BDB II* deposition that Judge Gorenstein reluctantly allowed, then used the certification as the foundation for an inaccurate and wholly argumentative Rule 1006 summary in hopes of misleading the jury. After the Court excluded the improper summary, Defendants served an improper trial subpoena on MBS to appear at a court in Missouri, forcing the parties, the Court and third-party MBS to drown in briefs and argument on MBS-related issues *ad nauseam*.

13.     *Obsessive re-litigation of Chegg Summary*: Defendants also obsessively litigated their inadmissible Chegg Summary and improperly injected it into trial several times.  After the Court rejected the summary, Defendants sought to use their financial expert as a human calculator to elicit precisely the same information contained within the excluded summary, then flagrantly ignored the Court's admonition not to argue the Chegg Summary percentages in closing, risking prejudicial infection of the jury both times.

**B.  Plaintiffs' Fees and Expenses Incurred**.

14.     I am the managing partner with the law firm Oppenheim + Zebrak, LLP ("O+Z").  O+Z is a boutique firm specializing in copyright and trademark enforcement matters and its attorneys are skilled litigators in the field with many years of relevant experience.

15.     I graduated from Cornell Law School in 1993.  I was admitted to practice in Maryland in 1993, in the District of Columbia in 1994, and thereafter in the State of New York.  I have been in good standing with these bars at all times, as well as with the numerous federal district courts, federal courts of appeal, and the U.S. Supreme Court, in which I am admitted to practice.

16.     Prior to forming O+Z, I was a partner in the national law firm of Jenner & Block LLP.  While at Jenner & Block, I co-chaired its Entertainment and New Media practice, and operated principally from its Washington, D.C. office.  Prior to joining Jenner & Block, I spent seven years at the Recording Industry Association of America, including as Senior Vice President for Business and Legal Affairs where, among other

things, I oversaw all industry-wide litigation for the recording industry.  I began my career as an associate with Proskauer Rose, LLP as a litigator.

17.    I have specialized in copyright litigation since approximately 1999.  Over the course of my career, I have served as counsel in many notable copyright cases, including the *A & M Records v. Napster, MGM v. Grokster, Capitol Records v. Thomas-Rasset, Sony Music v. Tenenbaum*, and *Kirtsaeng v. John Wiley & Sons, Inc.* (fee petitions) litigations.  Some of these are among the most preeminent copyright cases of our time.

18.    Plaintiffs are large, well-known educational publishers, all of which are based or have offices in the New York area.  They are sophisticated companies, which regularly must engage counsel to assist them to protect their copyrights and trademarks. Clients of this type require specialized counsel familiar with their companies and businesses, as well as the laws governing their intellectual property rights.  O+Z has represented Plaintiffs in this capacity as specialized counsel for over seven years.  Based in Washington, D.C., O+Z attorneys regularly litigate on behalf of Plaintiffs in New York, as well as in federal courts nationwide.

19.    Early in the retention, Plaintiffs and counsel agreed on a discounted rate and success fee for counsel.  Pursuant to that arrangement, Plaintiffs have already paid substantial fees and additionally will pay counsel a percentage of any recovery, which, based on the jury verdict will exceed the lodestar amount sought here.  Plaintiffs also are not seeking any type of multiplier on their lodestar calculation, as they might, but rather Plaintiffs seek a straight lodestar award at their ordinary rates.

20.     Plaintiffs seek an award of attorneys' fees in the amount of $5,910,116.72 (the "Fee Amount"), which consists of fees billed from December 2012 through April 2018 covering both cases and certain fees from the *Ohio Case*.

21.     The hourly rates for lawyers at O+Z, from when we first started working on this matter in 2011 through the present, are as follows:  for partners, $375 to $540; for senior counsel, $325 to $465; for associates, $175 to $430; and for paralegals and specialists, $100 to $245.  There is a range of hourly rates because, over the several years this litigation has been pending, O+Z has made modest annual rate increases and has had changes in personnel, both within the firm and the case team.  As a firm, and on behalf of Plaintiffs, we regularly practice in courts around the country, with a notable presence in the United States District Court for the Southern District of New York, where this case began.  Our firm's hourly rates are intentionally set at below-market levels in order to provide extra value to our clients.  All of our attorneys could easily charge higher hourly rates at any national firm if they so chose.

22.     I have served as lead counsel in this matter.  Because I and other O+Z attorneys working on these cases are members of the New York Bar, no local counsel was needed once the *BDB Ohio Case* was transferred to this Court.  While counsel regularly travelled to New York for hearings, depositions and meetings, counsel only billed time spent actually working in transit to New York (as opposed to all time in transit).  The other lawyers from my firm that have worked on this matter are each also qualified and experienced lawyers in good standing with their respective bars.  Indeed, the senior counsel that worked on this matter have been partners or senior counsel at prestigious national firms in their careers prior to joining O+Z.  The other trial counsel

10

who participated in the case all hail from well-regarded firms: Jeffrey Gould (Kirkland & Ellis), Michele Murphy (Akin Gump Strauss Hauer & Feld), Corey Miller (Cahill Gordon & Reindel).  All of the attorneys, paralegals and specialists at O+Z working on this matter are highly qualified professionals.  *See* Attorney and paralegal profiles, available at http://oandzlaw.com/attorneys-directory.html and http://oandzlaw.com/professionals-directory.html.

23.    Attached hereto as **Exhibit 4** are detailed descriptions of and charges for the legal services provided by individuals at O+Z litigating *BDB I* and *BDB II* consolidated cases from December 2012 through April 2018.  These records include a description of the work performed, the attorney or paralegal performing the work and their respective hourly rates, and the length of time spent in connection therewith.

24.    Attached hereto as **Exhibit 5** are detailed descriptions of and charges for the legal services provided by individuals at O+Z to defend the *BDB Ohio Case*.   These records include a description of the work performed, the attorney or paralegal performing the work and their respective hourly rates, and the length of time spent in connection therewith.

25.    Exhibits 4 and 5 were prepared from the contemporaneous daily time records prepared in the normal course of my firm's business.  Since prior to the start of the billing records relevant in this case, O+Z has used a web-based software program called Time Tracker by eBillity® ("eBillity") to record time spent on matters billed to the firm's clients. All legal staff at O+Z are required to record their time entries for client matters on a daily basis.  For every day worked, each O+Z attorney, paralegal or specialist enters in eBillity, for each client matter, a description of the task(s) performed

11

and the amount of time spent on such task(s).  O+Z maintains and stores these time records in eBillity.  On a monthly basis, O+Z downloads the time records from eBillity into an offline accounting software program, QuickBooks®, which is then used to generate invoices for O+Z's clients, including Plaintiffs.  The invoices generated and sent to O+Z's clients attach the monthly time entries recorded in eBillity in a given month on a given client matter (though different clients receive the invoices in different formats depending on their billing systems).  Except as excluded in paragraphs 29-31 below, Exhibits 4 and 5 are an aggregate of the contemporaneous daily time records maintained by O+Z attorneys, paralegals and specialists in eBillity and provided to Plaintiffs on a monthly basis with O+Z's invoices.

26.     In order to exercise sound billing judgment, O+Z carefully reviewed its time entries to ensure that none of the fees sought are excessive, redundant, or otherwise unnecessary.   All work reflected in the time records was necessary and justified to obtain a finding of liability with respect to Defendants' willful infringement and contractual breaches, to address Defendants' meritless arguments and their obstinate and unreasonable conduct, and in light of the harm to Plaintiffs resulting from Defendants' infringing activities, which would have continued unabated but for this litigation.

27.     In addition, there are four Plaintiffs who have asserted claims against multiple Defendants in multiple cases.  Collectively, the cases spanned more than five years and resulted in a three-week jury trial.  Although Plaintiffs were able to take advantage of many efficiencies in jointly pursuing their claims in this case, there were a number of areas that required four times the effort had there been just one plaintiff, such as written discovery, document collection and review, and depositions.

28.     The hours also reflect the additional time and costs expended by Plaintiffs in having to deal with Defendants' changes of five sets of lead counsel.

29.     In an attempt to narrow the areas of potential dispute, Plaintiffs do not seek attorneys' fees for a variety of work done by O+Z in connection with these matters. Set forth below are descriptions of work that Plaintiffs have excluded.

a.     Fees relating to settlement.  Since Plaintiffs first began investigating Defendants in 2011, there have been numerous efforts to settle this case, including mediations and settlement conferences.  Plaintiffs are voluntarily excluding fees relating to settlement discussions and efforts, totaling $103,617.75.

b.     Fees relating to administrative tasks.  Plaintiffs have voluntarily excluded all fees performed by individuals relating to administrative tasks.  These fees total $90,181.65.

c.     Fees related to dismissed claims in BDB I.  In the initial complaint in February 2013, Plaintiffs included other claims relating to importation of international textbooks and conspiracy to commit fraud, which were dismissed earlier in the case. Plaintiffs have excluded fees in connection with these two causes of action, totaling $33,501.50.

d.     Fees for defending claims in BDB Ohio Case unrelated to Plaintiffs' infringement claims or the 2008 Settlement Agreement.  Certain of the Defendants sued Cengage and Pearson in the U.S. District Court for the Southern District of Ohio, styled Book Dog Books, et ano. v. Cengage Learning, Inc., at ano., Case No. 2:12-cv-01165 (JLG), in a case that was subsequently transferred to this Court and became the BDB Ohio Case. The Ohio Case complaint initially contained five counts: Count One- a

13

declaratory judgment that BDB and Smyres had not engaged in any copyright infringement; Count Two- breach of the 2008 Settlement Agreement; Count Three- Promissory Estoppel; Count Three- Antitrust; and Count Four- Defamation for accusing Defendants of copyright infringement.  Dkt(Ohio) 1.

Defendants also moved for a temporary restraining order under a theory of promissory estoppel to compel Pearson and Cengage to continue to sell textbooks to them.  At the TRO hearing on December 28, 2012, Judge Graham denied BDB's request and later issued with a written opinion.  Dkt(Ohio) 15.  Notwithstanding the fact that Pearson and Cengage stopped selling to Defendants *because* of their infringing activities, as Judge Graham so concluded, Plaintiffs have nevertheless excluded their fees related to defending the TRO.  This amount totals $33,323.75.

On January 3, 2013, BDB amended the complaint, dropping the breach of contract and promissory estoppel counts and continuing with only claims for Declaratory Judgment, Antitrust and Defamation.  Dkt(Ohio) 14.  After the *Ohio Case* was transferred to this Court and in response to the Publishers' proposed motions to dismiss, BDB filed a Second Amended and then a Third Amended Complaint.  In those complaints, BDB asserted two additional counts: one for breach of the 2008 Settlement Agreement and one for Fraudulent Inducement in connection with the 2008 Settlement Agreement. Dkt(Ohio) 57, 64.

There is no question that BDB's Declaratory Judgment, Breach of Contract and Fraudulent Inducement counts were related to the 2008 Settlement Agreement and its anti-infringement prohibition.  However, BDB's claims for defamation and antitrust were also related to the 2008 Settlement Agreement, given (1) BDB's claim that the

14

publishers' accusations of infringement constituted defamation, and (2) the antitrust claim was based the publisher's communications in connection with their counterfeiting investigations.  Plaintiffs have nevertheless excluded any billing entries that directly relate to the antitrust and defamation counts, totaling $11,312.50.  In addition, Plaintiffs have reduced the remaining fees billed to the *BDB Ohio Case* by an additional 40% ($33,669.80) to account for the presence of these two causes of action.  In short, although Plaintiffs incurred $134,005.50 in fees to defend the *BDB Ohio Case*, they are seeking to recover only $50,504.70 of those fees.

e.  <u>All fees incurred prior to start of *BDB Ohio Case*</u>.  In addition to excluding fees associated with Plaintiffs' attempts to resolve and settle their dispute with Defendants before and during the litigations, Plaintiffs are voluntarily excluding all fees incurred in connection with their investigations of Defendants before they were sued by Defendants in the *BDB Ohio Case*.

f.  <u>Fees billed by supporting attorneys and staff.</u>  Throughout the five-year history of the litigations, the core team of attorneys working on these cases have been assisted from time to time by other attorneys and paralegals, as circumstances required. Although critical and necessary to the prosecution of these cases, Plaintiffs are voluntarily excluding their time spent working on these cases, totaling $24,746.00.

g.  <u>Weekly update calls.</u>  Counsel also conducted weekly update calls with clients on the status of the cases; fees associated with those calls were also excluded.

30.    As a further result of Defendants' breach of the 2008 Settlement Agreement by bringing the *BDB Ohio Case* in Ohio, Plaintiffs were required to retain local counsel, Brian J. O'Connell.  Attached hereto as **Exhibit 6** is a spreadsheet totaling

the amount of fees and costs incurred by Plaintiffs ($20,648.78) for local counsel, along with copies of the underlying billing records. For the bulk of time Mr. O'Connell was engaged on this case, he worked at Strauss Troy, where his billing rate was $290-$295 per hour. Mr. O'Connell briefly practiced at the beginning of his engagement at Dinsmore & Shohl, during which time he billed at $400 per hour and his associate billed at $300 per hour. As with O+Z's bills, Plaintiffs have excluded amounts billed and costs incurred in connection with the TRO hearing in Ohio, settlement, the fraud count and administrative tasks. After exclusion of these items, and like O+Z bills, Plaintiffs then reduced these fees by a further 40 percent. The total excluded from local counsel billings and costs is $14,233.41, resulting in fees sought in the amount of $6,415.37.

31. In sum, the total amount that Plaintiffs voluntarily excluded from their application is at least $347,039.11 ($332,805.70 from O+Z fees and $14,233.41 from local counsel fees). After such deductions, the total amount of fees, for both O+Z and local counsel, that Plaintiffs seek is $5,910,116.72

32. Redactions have been made to Exhibits 4, 5 and 6 to protect Plaintiffs' attorney-client privilege. The inadvertent disclosure of any confidential or privileged information should not be considered a waiver of any applicable privileges. In addition to redacting for privilege, Plaintiffs have redacted from Exhibit 6 billing entries in their entirety for the excluded tasks described above.

33. As illustrated in the time records, O+Z has rendered services in this action on everything from drafting pleadings, to propounding and responding to written discovery, to preparing for and participating in depositions, to significant document

review, to motions practice, to analysis of case issues, to court conferences to settlement negotiations, to trial and trial preparation and much more.

34.     For ease of reference, I have provided a summary analysis in **Exhibit 7** of the fees itemized in Exhibits 4 and 5.  The summary analysis in Exhibit 7 breaks down the total amount of fees requested by the number of hours spent by each attorney and paralegal and his or her respective hourly rate(s) at O+Z.

35.     I am generally familiar with the prevailing hourly rate in both New York and Washington, D.C. for lawyers with comparable experience and in this area of practice.  I believe that my firm's hourly rates are below the prevailing rates of other lawyers with similar background and expertise.  In *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07cv9931, 2015 U.S. Dist. LEXIS 156069, at *16-19, 24-25 (S.D.N.Y. Nov. 12, 2015), the court recognized that the billable rate of $720/hour for my former colleague, and current Co-Chair of Jenner & Block's Content, Media, and Entertainment Practice, was reasonable for an experienced copyright attorney in the New York area.

36.     Attached as **Exhibit 8** is a true and correct copy of a matrix prepared by the United States Attorney's Office for the District of Columbia that is designed to evaluate requests for attorney's fees in civil cases within the District of Columbia, available online at https://www.justice.gov/usao-dc/file/796471/download.  The hourly rates cited therein provide that reasonable hourly rates for experienced attorneys practicing in the District of Columbia well exceed $500/hour.

37.     During the five-year litigation and three-week trial, Plaintiffs also incurred reasonable out-of-pocket expenses that were necessary to the litigation of this case. These expenses include costs that are taxable under 28 U.S.C. 1920, such as for court

transcripts, depositions, witness fees, and exemplification and copies of papers.  They also include costs that are non-taxable under 28 U.S.C. 1920, including, *inter alia,* courtroom equipment rental, trial support and "hot seat" staff, storage of electronic evidence and deposition videos, travel for court hearings and out-of-town depositions and inspections, electronic research, and expert witness fees.

38.     These taxable and non-taxable costs are enumerated by category in **Exhibit 9** and total $852,493.43.  Exhibit 9 was created by attorneys and staff under my direction and is comprised of information pulled from O+Z's accounting software, which tracks and bills Plaintiffs for such costs.  The costs are reviewed to ensure that they are necessary and reasonable and are then forwarded to Plaintiffs for payment.  Plaintiffs' costs are billed as incurred with no administrative or other markup.

39.     As with the attorneys' fees, Plaintiffs are not seeking to recover costs incurred in connection with settlement discussions, including travel and mediation fees, and court costs associated with *pro hac vice* filings.  Plaintiffs also deducted from their costs the amount of $4542.30, representing payment made by Defendants in 2014 as sanctions for failing to produce Mr. Smyres at his deposition.  In addition, Plaintiffs are not seeking to recover costs associated with overhead and administrative costs, such as internal phone, copying and printing charges, and in-town working meals and travel.

40.     The fees and expenses identified herein and in the Exhibits are as billed to the Plaintiffs through April 2018.  Plaintiffs continue to incur additional fees and expenses as this case continues and reserve the right to submit a supplemental request for fees and costs incurred after April 2018.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 18, 2018, in Washington, D.C.